Jonathan A. Shapiro
Maura T. Healey
Louis W. Tompros
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6000
617-526-5000 (Fax)

Stuart F. Delery
Josh Goldfoot
WILMER CUTLER PICKERING HALE AND DORR LLP
2445 M Street, NW
Washington, D.C. 20037
202-663-6000
202-663-6363 (Fax)

Sharra E. Greer
Kathi S. Westcott
Sharon E. Debbage Alexander
SERVICEMEMBERS LEGAL DEFENSE NETWORK
P.O. Box 65301
Washington, DC 20035
202-328-3244
202-797-1635 (Fax)

04 — 12546 GAO

MAGISTRATE JUDGE Alexander

RECEIPT # 60546
AMOUNT $ 50
SUMMONS ISSUED yes 3
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE 12/6/04

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Thomas Cook; Megan Dresch; Laura Galaburda; Jack Glover; David Hall; Monica Hill; Jenny Lynn Kopfstein; Jennifer McGinn; Justin Peacock; James E. Pietrangelo II; Derek Sparks; Stacy Vasquez,<br><br>       Plaintiffs,<br><br>       v.<br><br>Donald H. Rumsfeld, Secretary of Defense; Tom Ridge, Secretary of Homeland Security; United States of America,<br>       Defendants. | No. _____<br><br>Civil Action<br><br>**COMPLAINT** |

## NATURE OF THE ACTION

1.    Plaintiffs are twelve citizens who served our country honorably in the United States Army, Navy, Air Force, or Coast Guard. All served at some point during the global war on terrorism; many served much longer, devoting their adult lives to the service of our nation. Several were decorated, awarded medals or ribbons, or received commendations for outstanding service to our country. Each plaintiff also is either gay or lesbian. Each was forced to leave the military prematurely, and despite valuable contributions, solely because of his or her sexual orientation. Those discharges violated plaintiffs' constitutional rights.

2.    The United States trains members of its Armed Forces to live by values of honor, loyalty, and trustworthiness. Yet, the United States requires gay, lesbian, and bisexual service members to deceive their colleagues, friends, and family by actively concealing their sexual orientation.

3.    Federal law currently requires the discharge of any service member who says he or she is gay, lesbian, or bisexual. It also requires discharge whenever a service member commits any broadly defined "homosexual act" or marries or attempts to marry someone of the same sex. *See* 10 U.S.C. § 654. That law, together with regulations promulgated under it, is popularly called "Don't Ask, Don't Tell."

4.    The so-called "Don't Ask, Don't Tell" statute declares that gay, lesbian, and bisexual service members would pose an unacceptable risk to military morale, good order, discipline, and unit cohesion. But nearly eleven years of experience under "Don't Ask, Don't Tell"—and nearly twelve years of experience under the prior, almost identical, military regulation excluding gay, lesbian, and bisexual service members—belie any suggestion that gay, lesbian, or bisexual service members pose any such risks. There is no credible evidence that the presence of plaintiffs and other gay, lesbian, and bisexual service members in the military has

2

hurt military effectiveness. "Don't Ask, Don't Tell" lacks any rational, important, or compelling basis, and serves no legitimate government or military interest.

5.      Gay, lesbian, and bisexual service members serve—and have always served—at every level of the military. An estimated 65,000 gay, lesbian, or bisexual service members currently serve in the Armed Forces, and an estimated one million veterans are gay, lesbian, or bisexual. No credible authority establishes that those service members are less capable, less honorable, or less deserving of respect than their heterosexual colleagues.

6.      "Don't Ask, Don't Tell" has harmed and continues to harm plaintiffs and other service members, their families, and our country. "Don't Ask, Don't Tell" has shattered careers, deprived the United States of the service of dedicated and skilled professionals, and belittled all service members' capacity for tolerance and professionalism. Approximately 10,000 service members—including plaintiffs—have been discharged under "Don't Ask, Don't Tell." Many more citizens have decided not to join the military because of "Don't Ask, Don't Tell."

7.      "Don't Ask Don't Tell" punishes gay, lesbian, and bisexual service members such as plaintiffs for their sexual orientation and for their private, constitutionally protected conduct. As a result, it has denied and continues to deny them several constitutional rights, including the fundamental right of privacy, the right to equal protection of the law, and rights guaranteed by the First Amendment.

8.      Plaintiffs seek the opportunity to return to military service so that they may resume serving our country with honor. Because plaintiffs cannot rejoin the Armed Forces so long as defendants enforce the military's unconstitutional policy of excluding gay, lesbian, and bisexual service members, plaintiffs seek a declaratory judgment that "Don't Ask, Don't Tell"—

3

10 U.S.C. § 654 and the regulations issued under it—are unconstitutional both on their face and as applied to plaintiffs.

9.      Shortly after 10 U.S.C. § 654 became law, several service members challenged the statute's constitutionality in federal court on substantive due process, equal protection, and First Amendment grounds. Responding to the service members' arguments, the government argued that the so-called "Don't Ask, Don't Tell" statute regulated conduct and required discharge of service members for acts, but did not discriminate based on sexual orientation.

10.      Several United States Courts of Appeals accepted the government's argument, and upheld its constitutionality on the grounds that "Don't Ask, Don't Tell" regulated homosexual conduct. In general, those circuits relied in part on the United States Supreme Court's decision in *Bowers v. Hardwick,* 478 U.S. 186 (1986), or on other decisions that had done so. In *Bowers,* the Supreme Court held that a statute criminalizing sodomy was constitutional.

11.      In *Lawrence v. Texas,* 539 U.S. 558 (2003), the United States Supreme Court recognized that the constitutional right of privacy encompasses a liberty interest in private adult consensual intimacy and relationships. The Court held that this is a "full right" that can be exercised "without the intervention of government." The Court explicitly overruled *Bowers,* stating *"Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers* v. *Hardwick* should be and now is overruled."

12.      No federal court has yet addressed whether "Don't Ask, Don't Tell" is constitutional in light of, and after, *Lawrence.*

4

## PARTIES

13.    Plaintiff Thomas Cook served in the United States Army until "Don't Ask, Don't Tell" caused him to leave military service against his will. He resides in Amarillo, Texas.

14.    Plaintiff Megan Dresch served in the United States Army until "Don't Ask, Don't Tell" caused her to leave military service against her will. She resides in Scottsdale, Arizona.

15.    Plaintiff Laura Galaburda served in the United States Air Force until "Don't Ask, Don't Tell" caused her to leave military service against her will. She resides in Jamaica Plain, Massachusetts.

16.    Plaintiff Jack Glover served in the United States Air Force until "Don't Ask, Don't Tell" caused him to leave military service against his will. He resides in Anchorage, Alaska.

17.    Plaintiff David Hall served in the United States Air Force until "Don't Ask, Don't Tell" caused him to leave military service against his will. He resides in Anchorage, Alaska.

18.    Plaintiff Monica Hill served in the United States Air Force until "Don't Ask, Don't Tell" caused her to leave military service against her will. She resides in Fayetteville, North Carolina.

19.    Plaintiff Jenny Lynn Kopfstein served in the United States Navy until "Don't Ask, Don't Tell" caused her to leave military service against her will. She resides in San Diego, California.

20.    Plaintiff Jennifer McGinn served in the United States Army until "Don't Ask, Don't Tell" caused her to leave military service against her will. She resides in Bremerton, Washington.

5

21.    Plaintiff Justin Peacock served in the United States Coast Guard until "Don't Ask, Don't Tell" caused him to leave military service against his will. He resides in Knoxville, Tennessee.

22.    Plaintiff James E. Pietrangelo II served in the United States Army and the Vermont Army National Guard until "Don't Ask, Don't Tell" caused him to leave military service against his will. He currently has no permanent residence.

23.    Plaintiff Derek Sparks served in the United States Navy until "Don't Ask, Don't Tell" caused him to leave military service against his will. He resides in Seattle, Washington.

24.    Plaintiff Stacy Vasquez served in the United States Army until "Don't Ask, Don't Tell" caused her to leave military service against her will. She resides in Houston, Texas.

25.    Defendant Donald H. Rumsfeld is the duly appointed, confirmed, and acting Secretary of Defense. He is responsible for the enforcement and administration of 10 U.S.C. § 654 in the United States Army, Navy, Marine Corps, and Air Force. He is named in his official capacity only.

26.    Defendant Tom Ridge is the duly appointed, confirmed, and acting Secretary of Homeland Security. He is responsible for the enforcement and administration of 10 U.S.C. § 654 in the United States Coast Guard. He is named in his official capacity only. Defendant Ridge has stated his intention to resign as Secretary of Homeland Security in February 2005.

27.    The United States of America is named as a defendant because this action challenges the constitutionality of an Act of Congress. *See* 28 U.S.C. § 2403(a).

6

## JURISDICTION

28.    The Court has subject matter jurisdiction over this action under 28 U.S.C.

§§ 1331, 1346(a)(2), and 2201, because it arises under the Constitution and laws of the United

States.

29.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because

Plaintiff Galaburda resides in this judicial district, because the United States maintains military

bases in this judicial district (including the Hanscom Air Force Base and the Coast Guard

Support Center in Boston), and because no real property is involved in this action.

## THE MILITARY'S BAN ON GAY, LESBIAN, AND BISEXUAL SERVICE MEMBERS

30.    The United States has formally barred gay, lesbian, and bisexual persons from

serving in the military since at least World War II.

31.    The version of Department of Defense Directive 1332.14 that was effective on

October 1, 1982 (published at 47 Fed. Reg. 10,162) declared, "[h]omosexuality is incompatible

with military service." That Directive made a "basis for separation" any of three things: a

statement that a service member is gay, lesbian, or bisexual; a "homosexual act"; or marriage or

attempted marriage to someone of the same sex.

32.    Between 1982 and 1993, the United States Armed Forces discharged over 15,000

service members because they were gay, lesbian, or bisexual, or because they were suspected or

presumed to be gay, lesbian, or bisexual.

33.    In November 1993, the National Defense Authorization Act became law. That

Act included a provision, later codified at 10 U.S.C. § 654, that wrote the pre-existing

Department of Defense Directive into the United States Code. Other than stating that

"homosexual acts," rather than "homosexuality," were incompatible with military service, the

7

bases for discharge under the statute were identical to those in the 1982 Directive. In fact, 10 U.S.C. § 654 duplicated much of the 1982 Directive word for word.

34.     Thus, a statute titled "Policy Concerning Homosexuality in the Armed Forces," codified at 10 U.S.C. § 654, currently sets out the United States policy of discharging gay, lesbian, and bisexual service members from the military. Over time, the name "Don't Ask, Don't Tell" came to be applied to this statute and the regulations issued under it. That name is inaccurate, because it falsely suggests to the public that the statute strikes a compromise that might allow gay, lesbian, and bisexual service members to remain in the military.

35.     The statute has no "Don't Ask" guarantee: nothing in 10 U.S.C. § 654 prohibits the military from asking service members about their sexual orientation. Defense Department regulations purport to restrict commanders' discretion to initiate investigations, but in practice there are few restraints on commanders' ability to ask service members whether they are gay, lesbian, or bisexual—and no restrictions on discharging gay, lesbian, and bisexual service members who answer those questions truthfully. Indeed, Plaintiffs Glover, Hall, McGinn, Peacock and Sparks were all discharged after commanders or investigators asked them whether they were gay or lesbian.

36.     Although the so-called "Don't Ask, Don't Tell" statute has no "Don't Ask" protection, it does have an unforgiving "Don't Tell" provision. The statute requires the discharge of any service member who states to anyone "that he or she is a homosexual or bisexual, or words to that effect." 10 U.S.C. § 654(b)(2). Any honest admission by a service member that he or she is gay, lesbian, or bisexual requires discharge—even if that admission is made to a family member or to a health care provider, and even if that admission is involuntary, or made as part of a court proceeding or a police report.

8

37.    The statute also requires the discharge of service members who marry, or attempt to marry, someone "known to be of the same biological sex."  10 U.S.C. § 654(b)(3).

38.    The statute also requires the discharge of service members who engage in, attempt to engage in, or solicit another to engage in a "homosexual act."  10 U.S.C. § 654(b)(1).  Those acts include not only sex, but also any other "bodily contact" that could be interpreted as demonstrating a "propensity" or intent to satisfy sexual desire.  For example, as described in paragraph 128 below, Plaintiff Justin Peacock was found to have committed a "homosexual act" when he allegedly held hands with another man for a few seconds.  The statute requires discharge for these "homosexual acts" even when they occur in private between consenting adults, and even when they are engaged in with an adult civilian.

39.    The statute contains a rare exception to the requirement that service members be discharged for "homosexual acts."  If a service member who commits a "homosexual act" can prove several factors, including that "such conduct is a departure from the member's usual and customary behavior" and that "the member does not have a propensity or intent to engage in homosexual acts," the service member will not be discharged.  10 U.S.C. § 654(b)(1)(A), (E).  The statute also contains a rare exception that allows service members to be retained if a determination is made that "the member engaged in conduct or made statements for the purpose of avoiding or terminating military service," and "separation of the member would not be in the best interest of the armed forces."  10 U.S.C. § 654(e).

40.    "Don't Ask, Don't Tell" is applied harshly, but unevenly.  Women account for approximately 30% of discharges under "Don't Ask, Don't Tell," even though they comprise only approximately 14% of the Armed Forces.  Similarly, service members under the age of 25 are disproportionately likely to be discharged under the law.

41.    The Defense Department has issued regulations purporting to implement 10 U.S.C. § 654. The currently operative regulations include Department of Defense Instructions 1332.30 and 1332.40, which cover separation of officers, Department of Defense Directive 1332.14, which covers separation of enlisted members, and Department of Defense Directive 1304.26, which covers standards for accession into the military.

42.    Individual military services have issued their own regulations purporting to implement 10 U.S.C. § 654. Those regulations include, but are not limited to, the following: Army Regulations 600-8-24 and 135-175, covering separation of Army officers; Army Regulation 635-200, covering separation of enlisted Army personnel; Navy MILPERSMAN 1900, covering separation of Navy officers and enlisted personnel; Air Force Instructions 36-3206 and 36-3207, covering separation of Air Force officers; Air Force Instruction 36-3208, covering separation of Air Force enlisted personnel; Marine Corps Separation and Retirement Manual, Chapter 4, covering separation of Marine Corps officers; Marine Corps Separation and Retirement Manual, Chapter 6, covering separation of Marine Corps enlisted personnel; and Coast Guard Personnel Manual, Chapter 12, covering separation of Coast Guard officers and enlisted personnel.

## DISPUTED STATUTORY FINDINGS IN
## 10 U.S.C. § 654

43.    Section 654(a) purports to list "findings" made by Congress. Many of those "findings" are not findings of fact but assertions about constitutional law. Those assertions include declarations of what powers and discretion the Constitution grants the Congress, and assertions about what "rights" the Constitution does not protect. The remaining "findings" are merely opinions unsupported by the evidence before Congress. As a result, the "findings" are not entitled to any special deference by this Court.

10

44.    Congress stated in 10 U.S.C. § 654(a)(15) that the "presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." The evidence Congress had before it did not support this conclusion; to the contrary, that evidence directly contradicted this "finding." The presence of gay, lesbian, and bisexual service members in the military has not hurt military operations, impaired discipline, or posed a risk to unit cohesion.

45.    Two Department of Defense reports, available to Congress at the time, reached conclusions contrary to the findings of 10 U.S.C. § 654(a)(15). One report recommended an elimination of the ban on military service by gay, lesbian, and bisexual citizens on grounds of a lack of evidence that the presence of such citizens in the military would create serious morale or security problems. That report was: Theodore R. Sarbin, Ph.D. & Kenneth E. Karols, M.D., Ph.D., *Defense Personnel Security Research and Education Center, Nonconforming Sexual Orientation and Military Suitability* (Dec. 1988). Another report concluded, "homosexuals show preservice suitability-related adjustment that is as good [as] or better than the average heterosexual." That report was: M. McDaniel, *Defense Personnel Security Research and Education Center, Preservice Adjustment of Homosexual and Heterosexual Military Accessions: Implications for Security Clearance Suitability* (1989). A General Accounting Office published in 1992 reported that gay persons had been successfully integrated into other nations' militaries, and had been successfully integrated into domestic paramilitary organizations. A RAND report, *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment*, National Defense Research Institute (1993), after conducting a comprehensive review of the available studies, found that "[t]here is no direct scientific evidence regarding the effects of the presence of

acknowledged homosexuals on unit cohesion or unit performance" and that "there is ample reason to believe that heterosexual and homosexual military personnel can work together effectively."

46.    The experience of the Armed Forces in the eleven years since Congress enacted 10 U.S.C. § 654 has undercut the statutory "findings" even further.  Service members known to be gay, lesbian, or bisexual have served our country with distinction in recent conflicts in Kosovo, Afghanistan, Iraq, and elsewhere.  There is no evidence that their presence harmed unit cohesion or military discipline.

47.    The militaries of the United Kingdom, Israel, Canada, Australia, and many other allies of the United States allow gay, lesbian, and bisexual persons to serve in the armed forces and allow those service members to be open about their orientation.  There is no credible evidence to suggest that these policies have undermined unit cohesion, good order, or discipline, or have brought discredit on those militaries.

48.    United States service members served alongside service members from the United Kingdom and Australia during several armed conflicts, including Operation Enduring Freedom and Operation Iraqi Freedom.  There is no evidence that the morale, good order, discipline, or unit cohesion of the United States Armed Forces were harmed when United States service members served with openly gay, lesbian, and bisexual military personnel from our allies.

49.    During times of conflict, when unit cohesion is most important, the military has relaxed or ignored its ban on gay, lesbian, and bisexual service members in the military.  During the 1991 Gulf War, the Department of Defense announced that the discharge of known gay personnel could be "deferred" until those personnel were no longer needed.  More recently, discharges under 10 U.S.C. § 654 fell in 2002 and 2003, at a time when the United States Armed

12

Forces were stationed near and fighting in Afghanistan and Iraq. This selective enforcement or relaxation of the policy of discharging gay, lesbian, and bisexual service members at times when unit cohesion is most crucial refutes the contention that such discharges are necessary to serve unit cohesion.

50.     The Armed Forces include a diverse array of service members from many racial, religious, and ethnic backgrounds. Although some service members (as with the population in general) harbor animus toward other racial, ethnic, and religious groups, that animus does not pose unacceptable risks to morale, good order, and unit cohesion because the Armed Forces has implemented programs designed to prevent and remedy harassment and bias based on that animus. Similarly, although some service members harbor animus against gay, lesbian, and bisexual people, the Armed Forces could keep animus against gay, lesbian, and bisexual service members from posing unacceptable risks to morale, good order, and unit cohesion through similar programs. The so-called "Don't Ask, Don't Tell" statute and regulations exacerbate the harm to unit cohesion caused by animus against gay, lesbian, and bisexual service members because, among other things, it effectively forces harassed service members to choose between either silently enduring the harassment, or risking the end of their military careers.

51.     In 10 U.S.C. § 654(a)(13), Congress stated that "[t]he prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service." This conclusion was not supported by substantial evidence.

52.     "Homosexual conduct," as the term is used in 10 U.S.C. § 654(a), is generally private, consensual behavior that does not implicate concerns about morale, good order, discipline, or unit cohesion because it does not occur in shared military spaces or involve

separately delineated offenses of fraternization, adultery, abuse of trust, public indecency, or coercion. Each branch of the military has regulations, made criminally enforceable under Article 92 of the Uniform Code of Military Justice, prohibiting romantic relationships of any kind that might harm good order and discipline.

## INFRINGEMENT OF PLAINTIFFS' CONSTITUTIONAL RIGHTS

53.    Each plaintiff is either gay or lesbian, meaning that each plaintiff is "homosexual" within the meaning of 10 U.S.C. § 654(f)(1) and regulations issued under that statute.

54.    10 U.S.C. § 654 and regulations issued under that statute caused each plaintiff's discharge and prevents each plaintiff's return to service.

55.    Each plaintiff's discharge from military service violated his or her rights under the Constitution of the United States, and constitutes a judicially redressable injury-in-fact.

56.    Each plaintiff desires the opportunity to apply to re-join military service at the rank, pay grade, and specialty that plaintiff held at the time he or she left military service.

57.    Each plaintiff is barred from applying to re-join military service because of defendants' enforcement of 10 U.S.C. § 654 and regulations issued under that statute. Unless enjoined from enforcing 10 U.S.C. § 654 and regulations issued under that statute, defendants will reject any application from any plaintiff to re-join military service because of plaintiffs' sexual orientations and prior discharges under 10 U.S.C. § 654. This ongoing exclusion from military service violates each plaintiff's constitutional rights and constitutes a judicially redressable injury-in-fact.

58.    Each plaintiff is a United States citizen over the age of eighteen. Each plaintiff would be eligible to re-join the Armed Forces but for 10 U.S.C. § 654 and regulations issued under that statute.

59.     Plaintiffs' injuries are redressable by this Court through an order declaring 10 U.S.C. § 654, and any regulations issued under that statute, unconstitutional; and through an order that, upon application by a plaintiff and provided that the plaintiff meets all applicable eligibility requirements other than 10 U.S.C. § 654, the plaintiff be re-accessed at the same rank, pay grade, and specialty he or she held at the time 10 U.S.C. § 654 unconstitutionally caused his or her separation from the Armed Forces.

60.     An actual, current justiciable controversy exists between plaintiffs and defendants over (1) whether each plaintiff's discharge from military service was unconstitutional; (2) whether each plaintiff's continuing exclusion from military service is unconstitutional; and (3) whether 10 U.S.C. § 654 and regulations issued under it are unconstitutional on their face. Declaratory judgment is proper under 28 U.S.C. § 2201.

61.     Equitable relief is proper because plaintiffs have no adequate remedy at law.

62.     Each plaintiff's injuries continue to this day, because 10 U.S.C. § 654 and regulations issued under that statute prevent each plaintiff's return to military service.

## PLAINTIFFS' DISCHARGES UNDER
## 10 U.S.C. § 654

### *Thomas Cook*

63.     Plaintiff Thomas Cook joined the United States Army on April 11, 2001.  He joined the military to change his life and better himself.  Cook excelled in the Army and was quickly promoted.  He attained the rank of Specialist (E-4) with an Intelligence specialty, and eventually earned the Army Achievement Medal.

64.     Cook deployed to Kuwait in support of military operations in the Middle East from April through September of 2002.

65.    In late 2003, Cook's company received orders to deploy to Iraq. Preparing for
that deployment, Cook participated in a field training exercise with two other enlisted soldiers in
his company. One of them—Cook's team leader—was a sergeant. On one occasion, the three
men saw a man whom they knew to be gay walk by. The sergeant said to Cook that "[i]f I ever
found out someone in my crew was gay, I would kill him."

66.    This threat worried Cook, because Cook is gay. Cook knew that he was about to
be deployed to Iraq with this sergeant, and was worried about what would happen if the sergeant
found out Cook is gay. But Cook did not know of any mechanisms through which he could
confidentially and without risk of retaliation report the sergeant's threat.

67.    Cook decided that the best way to protect his own safety was to inform his
commander about the sergeant's threat and to explain that he is gay. Thus, in December 2003,
Cook told his battalion commander he is gay.

68.    Cook's battalion commander thought Cook made that statement solely to avoid
deployment to Iraq. He recommended that Cook receive a general discharge rather than an
honorable discharge—something that would have hurt Cook's ability to get a job in civilian life.
With the help of an attorney, Cook fought the battalion commander's recommendation and the
Army issued him an honorable discharge, reflective of his honorable service record.

69.    Cook was discharged from the Army on January 22, 2004, because of 10 U.S.C.
§ 654 and the applicable regulations issued under it. At the time of his discharge, Cook had
served in the Army for nearly three years.

16

*Megan Dresch*

70.    Plaintiff Megan Dresch joined the United States Army on August 22, 2001. After basic training and an eight-week military police training course, Dresch was stationed in Kaiserslautern, Germany and served in the Military Police.

71.    Dresch found the burden of lying about her relationship with her girlfriend back home stressful. In an effort to relieve this stress, Dresch sought permission to speak with the Chaplain at her base from her command.

72.    When told she would need to reveal her reasons for requesting to see the Chaplain, Dresch sought the intervention of a friend and fellow private who had a personal relationship with a non-commissioned officer in their chain of command.

73.    Without Dresch's permission, this friend told the non-commissioned officer that Dresch is a lesbian. The non-commissioned officer then asked Dresch if she is a lesbian. In response to this direct question, Dresch responded that she is.

74.    Dresch was honorably discharged from the Army on September 6, 2002, because of 10 U.S.C. § 654 and the applicable regulations issued under it. At the time of her discharge, Dresch had served in the Army for just over one year. During her service, she earned the National Defense Service Medal, the Army Service Ribbon, and had attained the rank of Private Second Class (E-2) with a Military Police specialty.

*Laura Galaburda*

75.    Plaintiff Laura Galaburda joined the United States Air Force on December 10, 1998.

76.     Dr. Galaburda participated in the Air Force's Health Profession Scholarship Program as an Air Force Reserve officer, which provided her a scholarship to attend medical school at Boston University.

77.     During her active duty rotations as a physician at Andrews Air Force Base, Dr. Galaburda realized that she was continually forced to lie or only partially answer questions from her colleagues and patients because of her sexual orientation. "Don't Ask, Don't Tell" made it impossible for Galaburda to conceal her sexual orientation and also remain true to her personal sense of honesty and her obligations to her patients. Consequently, Dr. Galaburda decided to tell her commander that she is a lesbian. She submitted a letter to her commander on February 14, 2002, informing her commander that she is gay.

78.     Dr. Galaburda was discharged on August 15, 2002, from both the Air Force and the Health Professional Scholarship Program because of 10 U.S.C. § 654 and the applicable regulations issued under it.

79.     Following her discharge, the Air Force began recoupment proceedings against Dr. Galaburda, seeking to recover the cost of her medical education. That recoupment proceeding is ongoing.

80.     At the time of her honorable discharge, Dr. Galaburda had served in the Air Force Reserves for almost four years. She had attained the rank of Second Lieutenant (O-1) and was a resident physician, with training specializing in family medicine.

*Jack Glover*

81.     Jack Glover entered the University of Alaska-Anchorage's Air Force Reserve Officer Training Corps (ROTC) program in August 2000. Glover was also offered the Commander's Leadership Scholarship, a full scholarship to the University with tax-free stipend.

18

82.    Glover's dedication and skill were quickly noticed, and he received honors and leadership positions typically reserved for the most promising cadets. He was offered his first leadership position—Flight Adjutant—shortly after joining the ROTC program. In the spring of 2001, Glover accepted the position of General Military Corps Advisor. In that position, Glover served as the chief lower classman—a position similar to the Chief Master Sergeant role in the Air Force. In the fall of 2001, Glover served exceptionally well as the Operations Group Commander with the rank of Cadet Lieutenant Colonel, in which he was charged with the overall training of the cadets. In the spring of 2002, Glover was asked to remain in the operations group to help prepare the cadets for Field Training. In the fall of 2002, Glover again was to serve as a Cadet Lieutenant Colonel as a Group Commander.

83.    Glover's talent and dedication also earned him several prestigious training opportunities  In the summer of 2001, Glover attended the Air Force ROTC's five-week Field Training program. In May of 2002, Glover was selected to go to Vandenberg Air Force Base for three weeks of space program orientation.

84.    Glover began dating another University of Alaska student, David Hall, in December 2000. Hall was serving in the Air Force on active duty at the time, but he joined the University of Alaska-Anchorage's Air Force ROTC program in May 2001.

85.    In the fall of 2001, Glover, with Hall, helped create a local Arnold Air Society chapter. The Arnold Air Society is an Honor Society in ROTC devoted to community service.

86.    In March 2002, someone told Glover's command that Glover and David Hall were gay. An investigation began into whether Glover is gay. During this investigation, Glover maintained his silence in the face of questioning about his personal relationships and sexual orientation.

19

87.    During the course of the investigation, Glover was again made a Group Commander.

88.    On August 22, 2002, Glover was disenrolled from ROTC and honorably discharged because of 10 U.S.C. § 654 and the applicable regulations issued under it. Glover had served two years in the ROTC.

89.    At the time of his disenrollment and discharge, Glover ranked third in his ROTC class. The awards and ribbons he was authorized to wear included the Society of the War of 1812 Award, Honors Award, Distinctive GMC Cadet Award, College Scholarship Recipient, Outstanding Flight Award, Warrior Flight Award, Recruiting Award, Arnold Air Society Membership, CAP Membership, and the Governor of the State of Alaska ROTC Award.


*David Hall*

90.    Plaintiff David Hall joined the Air Force on March 6, 1996, following the example of his father and stepfather, who each had served over twenty years in the Air Force. After basic training, Hall graduated from tech school with the second-highest score in his class and was assigned to the 27th Fighter Squadron at Langley Air Force Base in Hampton, Virginia.

91.    At Langley, Hall was one of the top airmen in his flight. He worked as a weapons loader, winning several loading competitions and the Airman of the Quarter award. While based at Langley, Hall did a three-month assignment in Saudi Arabia and was handpicked to go to Kuwait to help fix aircraft.

92.    In the summer of 1998, Hall was assigned to Elmendorf Air Force Base outside of Anchorage, Alaska, where he was selected to work at the Weapons Standardization Section, which employs highly qualified airmen to train and evaluate the load crew on the base. While at

the Weapons Standardization Section, Hall won several medals and Airman of the Quarter awards.

93.    In his spare time, Hall began taking classes at the University of Alaska-Anchorage, where he met and began dating fellow student Jack Glover. Glover encouraged Hall to join the Air Force ROTC.

94.    After receiving a strong recommendation from his active duty commander, Hall was accepted into the Air Force ROTC in May 2001. Hall was honorably discharged as an enlisted member from the Air Force in August 2001 following that acceptance. At that time, Hall had served in the Air Force for five years and attained the rank of Staff Sergeant (E-5) with an Aircraft Armament Systems specialty. During his active duty service, Hall received numerous awards, including the Air Force Achievement Medal, Air Force Commendation Medal, Air Force Longevity Service Award, Air Force Training Ribbon, NCO Professional Military Education Ribbon, Armed Forces Expeditionary Medal, Air Force Outstanding Unit Ward (2), and Air Force Good Conduct Medal.

95.    With Glover, Hall helped create a local Arnold Air Society chapter. Hall was named the chapter's Vice-Commander.

96.    In March 2002, Hall received a coveted slot to train to be a pilot—an honor given to approximately 500 cadets nationwide each year. At the time Hall received this honor, he had the highest ranking of all the Air Force ROTC juniors in his detachment. In recognition of his talent and dedication, Hall was named a Cadet Captain and flight commander. He soon advanced to another leadership position: Operations Officer, Cadet Major.

97.    In June 2002, after returning from Field Training, Hall was called in to speak to a Judge Advocate General and a Staff Sergeant. They told him that they knew of his relationship with Glover.

98.    Hall refused to comment about his relationship with Glover, and an investigation ensued. He was disenrolled and honorably discharged from the Air Force ROTC on August 21, 2002, because of 10 U.S.C. § 654 and the applicable regulations issued under it.

99.    At the time of his disenrollment and discharge, Hall was ranked first in a class of over one hundred cadets. He had served one year in the Air Force ROTC in addition to his five years of previous active duty service.

*Monica Hill*

100.    Plaintiff Monica Hill joined the United States Air Force on December 21, 1994, having won an Air Force scholarship to medical school.

101.    For her residency, Dr. Hill worked at a civilian hospital in Columbus, Ohio. While in Columbus, she lived in the community with her partner of fourteen years, Terri Cason, who was a nurse at the hospital.

102.    In the summer of 2001, Dr. Hill was scheduled to report to Andrews Air Force Base for her permanent active duty assignment. Dr. Hill arranged for an apartment in Northern Virginia, not far from the base, and arranged to have her possessions moved on July 18, 2001.

103.    Cason's health deteriorated dramatically in July 2001. In two weeks, Cason went from working at the hospital to being unable even to do household chores. Cason's doctors first thought she had an infectious disease, and treated her with antibiotics. On July 14, 2001, Cason's doctors changed their diagnosis. Cason had lung cancer, with additional metastatic brain lesions. That diagnosis meant that Cason had between two months and two years to live.

22

104.    Desperate to remain with her dying partner, and feeling it was irresponsible to move her partner from her treating physician, Dr. Hill decided to seek permission to delay reporting to Andrews Air Force Base. In explaining the situation, she revealed the nature of her relationship with Cason. Dr. Hill requested a two-year deferment on July 22, 2001. In response, the Air Force canceled Dr. Hill's orders to report to Andrews Air Force Base.

105.    Cason died in September 2001.

106.    Several months after her orders were cancelled, the Air Force informed Dr. Hill that discharge proceedings were pending against her based on her statement in her request for deferment that she is a lesbian. The Air Force began an investigation into Dr. Hill's sexual orientation. During the investigation, the investigating officer suggested in hostile and accusatory tones that Dr. Hill had invented the story of Cason's illness, and that Dr. Hill had revealed her sexual orientation solely to escape going on active duty. Dr. Hill was required to provide Cason's death certificate as proof that she had not invented the story. Additionally, the investigating officer repeatedly asked Dr. Hill about her sexual orientation and for details of her sexual history.

107.    The investigation concluded that Dr. Hill had made a "homosexual admission" requiring discharge under "Don't Ask, Don't Tell," and that she had made the statement for the purpose of being separated from the military. The Air Force began discharge proceedings. Dr. Hill was honorably discharged on October 2, 2002, because of 10 U.S.C. § 654 and the applicable regulations issued under it.

108.    Following her discharge, the Air Force began recoupment proceedings against Dr. Hill, seeking to recover the cost of her medical education.

23

109.    At the time of her discharge, Dr. Hill had served in the Air Force Reserves for nearly eight years. She had attained the rank of Captain (O-3) and was a physician specializing in internal medicine.

*Jenny Lynn Kopfstein*

110.    After spending two years in a civilian college, Plaintiff Jenny Kopfstein joined the United States Navy when she entered the United States Naval Academy in 1995. Kopfstein graduated from the Naval Academy with a Bachelors Degree in Physics on May 26, 1999, and was selected as a Surface Warfare Officer. She immediately attended the prestigious Surface Warfare Officer's School in Rhode Island—a school dedicated to teaching shipboard systems and operations, similar to the flight training pilots receive at flight school.

111.    After graduating from the Surface Warfare Officer's School, Kopfstein was given her first duty station on the *U.S.S. SHILOH*. The *SHILOH's* homeport is in San Diego. Serving on board a ship for the first time, Kopfstein realized that concealing her sexual orientation from others was inconsistent with her strong values of honesty and honor. Kopfstein found it difficult to answer casual questions about her personal life without lying or concealing the whole truth. After a few months on board, Kopfstein gave her Commanding Officer a letter saying that she is a lesbian, and saying that she wished to continue service.

112.    Despite having made this admission, the Navy did not immediately seek to discharge Kopfstein. Instead, Kopfstein went on a six-month deployment to the Western Pacific in support of Operation Enduring Freedom. She completed that deployment, and still no discharge proceedings began. Although Kopfstein had originally been scheduled for an 18-month tour of duty on the *SHILOH,* she was retained on the ship for 22 months.

24

113.    Revealing her sexual orientation to others did not harm Kopfstein's job performance, or the unit cohesion or morale of others. To the contrary, during her deployment and in the months following that deployment, Kopfstein continued to display a high degree of professionalism and excellence. The Navy recognized this, and gave Kopfstein several awards and honors, including qualifying Kopfstein as Officer of the Deck Underway, which allowed her to take command of the entire ship in certain situations. Kopfstein was promoted to the rank of Lieutenant Junior Grade (O-2) with a Surface Warfare Officer specialty after returning from her deployment.

114.    Nineteen months after Kopfstein revealed her sexual orientation, a Board of Inquiry convened to investigate whether grounds existed for discharging Kopfstein under "Don't Ask, Don't Tell." Although it is highly unusual for a Navy Captain to speak on a subordinate officer's behalf in a Board of Inquiry hearing, both of Kopfstein's Captains (command of the *U.S.S. SHILOH* changed during her tour of duty) volunteered to testify on her behalf. Both Captains testified that they understood that Kopfstein is a lesbian, but that Kopfstein was an excellent officer and that she should ideally remain in the Navy.

115.    The Board of Inquiry disregarded the recommendations of Kopfstein's Captains. Concluding that Kopfstein's statement that she is a lesbian constituted grounds for discharge under "Don't Ask, Don't Tell," the board voted in February 2002 to discharge Kopfstein from the Navy.

116.    Kopfstein was honorably discharged from the Navy on October 31, 2002, because of 10 U.S.C. § 654 and the applicable regulations issued under it. At the time of her discharge, Kopfstein had served in the Navy for nearly three years, not counting her four years as a midshipman at the Academy. During her service, Kopfstein received numerous awards,

including the Navy Achievement Medal, Meritorious Unit Commendation (2), Battle "E" Ribbon, National Defense Service Medal (2), Armed Forces Expeditionary Medal, Sea Service Deployment Ribbon, Navy Expert Rifle Medal, Navy Expert Pistol Shot Medal, and Surface Warfare Qualification Breast Insignia.

## Jennifer McGinn

117.    Plaintiff Jennifer McGinn enlisted in the Army on November 13, 2001. She was motivated to do so by the terrorist attacks on America on September 11, 2001.

118.    The Army assigned McGinn to Fort Leonard Wood in Missouri for basic training, followed by Advanced Individual Training as a Military Police officer.

119.    During boot camp, McGinn became friends with another female enlisted member. One night in February, as McGinn's friend was leaving her barracks, McGinn's drill sergeant suddenly ordered a line-up, and falsely alleged that McGinn and her friend had been kissing. McGinn is a lesbian, but the drill sergeant was incorrect: McGinn and her friend had not kissed.

120.    An investigation ensued. McGinn's drill sergeant sought witnesses and accused the other recruits of lying when they refused to come forward to support his allegations. McGinn's drill sergeant searched her wall locker, and read personal letters from her friends and family.

121.    McGinn's drill sergeant told McGinn that homosexuality is "just wrong," adding, "Men and women are made to be together, Private. It says that in the Bible. Do you read the Bible, Private?" McGinn's drill sergeant declared "You can't go to heaven if you're gay," and remarked "I see that shit on TV and, I'm not saying it's wrong, but I'm a Christian and it makes me sick." Other Sergeants made harassing statements and repeatedly asked McGinn about her sexual orientation and sexual history.

122.    Due to her drill sergeant's allegations, the Army began an investigation into McGinn's sexual orientation. During the investigation, McGinn was asked to fill out a questionnaire that asked several questions about her sexual history. Questions on the form included, "Have you experienced difficulties being around other members of your own sex?;" "Did you tell your recruiter about your Homosexual/Bisexual conduct prior to entering the Army?;" and, "Did you engage in Homosexual/Bisexual acts as an experiment?" Posing these questions to McGinn violated Defense Department and Army regulations.

123.    McGinn was honorably discharged from the Army on April 1, 2002, because of 10 U.S.C. § 654 and the applicable regulations issued under it. At the time of her discharge, McGinn had served in the Army for five months.

### Justin Peacock

124.    Justin Peacock entered the Coast Guard on September 17, 2001. Following basic training, Peacock reported for duty to Cape Disappointment, Washington. Although Peacock kept the fact that he is gay secret, rumors circulated about his sexual orientation. Peacock endured repeated jokes and taunts about his perceived sexual orientation.

125.    The jokes and teasing became progressively worse in the spring of 2002. During one night of watch duty, several other Coast Guardsmen repeatedly teased Peacock about what they perceived to be his sexual orientation. In response, Peacock asked, "So what if I am gay?," or words to that effect. Many of the Coast Guardsmen present when this incident occurred later testified that they did not believe that Peacock was making a statement about his sexual orientation. Rather, they interpreted his remark as an attempt to sarcastically rebuff the harassment he was enduring.

126.    Later that spring, Peacock's civilian roommate, a man, visited the local military exchange with Peacock. The two were not romantically involved. However, another Coast Guardsman falsely alleged that Peacock was seen holding hands at the exchange with his roommate for approximately two seconds.

127.    During this time, a fellow seaman began harassing Peacock repeatedly, calling him "a stupid faggot" among other things. Peacock reported this harassment to his Executive Officer. Peacock's executive officer admonished the seaman who made that remark, but also inappropriately began an investigation into whether Peacock is gay. The Executive Officer asked the seaman who had harassed Peacock if he had any evidence that Peacock is gay. Peacock's Executive Officer then expanded his investigation, asking other seamen if they had evidence that Peacock is gay.

128.    On August 26, 2002, someone reported the alleged handholding incident at the military exchange to Peacock's command. Based on this report, an officially sanctioned investigation of Peacock began on September 4, 2002. The Coast Guard then moved to discharge Peacock for homosexual acts, including the allegation he held hands with another man. Peacock requested to defend himself before an administrative discharge board. Peacock presented evidence to the Board that he had been investigated in violation of Defense Department, Department of Homeland Security, and United States Coast Guard regulations that, among other things, forbade investigations based on rumors.

129.    Despite testimony contradicting much of the alleged conduct, Peacock lost his case. Peacock was honorably discharged from the Coast Guard on July 31, 2003, because of 10 U.S.C. § 654 and the applicable regulations issued under it.

28

130.    At the time of his discharge, Peacock had served in the Coast Guard for almost two years.  He was promoted from E-3 to E-4 during the investigation into his alleged homosexual conduct, and earned a Boatswain's Mate specialty and several awards and commendations, including the Coast Guard Unit Commendation Award, Coast Guard Meritorious Unit Commendation, and National Defense Service Medal.

*James E. Pietrangelo II*

131.    Plaintiff James E. Pietrangelo II joined the United States Army in 1989.  During Operation Desert Storm in 1991, Pietrangelo led an infantry team in combat as a Specialist in the 1st Armored Division.  In recognition of that work, Pietrangelo was awarded the Combat Infantryman's Badge and received an Army Commendation Medal.  Pietrangelo finished his infantry tour in 1993.

132.    Pietrangelo entered law school in 1993 and practiced law for several years as a civilian.  He then took a commission as a Judge Advocate General officer with the Army.  Pietrangelo served as Chief of Operational Law with the 10th Mountain Division.

133.    In February 2003, Pietrangelo volunteered to deploy with Operation Iraqi Freedom before it began.  He served as an operational law attorney, and then as Chief of Operational Law, in Kuwait and Iraq from February 2003 to August 2003.  Pietrangelo's duties included advising commanders on issues of military and international law.  Pietrangelo also deployed forward and served in Iraq, where he helped restart the Baghdad court system.  For his service in Operation Iraqi Freedom, Pietrangelo was awarded a Meritorious Service Medal and a Joint Service Commendation Medal.

134.    Pietrangelo came off active duty in February 2004 and returned to Vermont. He began a clerkship with the Vermont State's Attorney's Office as part of a process of becoming a member of the Vermont bar.

135.    Before his clerkship was complete, Pietrangelo decided to return to Iraq. He felt that the Army needed his expertise and experience as well as more Americans to volunteer for the Operation at a critical time. Pietrangelo volunteered with the Vermont National Guard as Chief of Operational Law with the 42nd Infantry Division—the first National Guard division to be mobilized for Operation Iraqi Freedom. The Army ordered Pietrangelo to mobilize on May 24, 2004.

136.    In the meantime, Pietrangelo met and fell in love with another man.

137.    Pietrangelo gave up his lodging in Vermont and reported to Fort Drum as ordered to begin his next deployment. Two weeks into training at Fort Drum, Pietrangelo decided that he could not keep his relationship with his boyfriend secret, because Pietrangelo might be injured or killed in Iraq.

138.    Pietrangelo wrote a memo to his commander on June 14, 2004, declaring that he is gay and in love with another man. The memo stated that Pietrangelo desired to return to serve in Iraq (as he had volunteered to do), and stated that if the Army would decline to enforce the "Don't Ask, Don't Tell" policy in his case, he would go to Iraq.

139.    The Army cancelled Pietrangelo's scheduled deployment to Iraq and began discharge proceedings. Pietrangelo nonetheless continued to provide his expertise and experience to our country. After discharge proceedings began, Pietrangelo created an operational law office from scratch for the 42nd Infantry Division, and prepared the Judge Advocate's Office for deployment.

140.    Pietrangelo was honorably discharged from the United States Army and the Vermont Army National Guard on October 8, 2004, because of 10 U.S.C. § 654 and the applicable regulations issued under it.

141.    At the time of his discharge, Pietrangelo had served in the Army for more than seven years and in the Army National Guard/Reserves for six years, attaining the rank of Captain (O-3). He had earned the Combat Infantryman Badge, Meritorious Service Medal, Army Commendation Medal (3), Army Achievement Medal (2), Joint Service Commendation Medal, Army Good Conduct Medal, National Defense Service Medal (2), Global War on Terrorism Expeditionary Medal, Global War on Terrorism Medal, Southwest Asia Service Medal with 3 Bronze Service Stars, Armed Forces Reserve Medal with "M" Device, Liberation of Kuwait Medal, Kuwait Liberation Medal, Overseas Service Ribbon, NCO Professional Development Ribbon, Army Service Ribbon, and Expert Infantryman Badge.

### Derek Sparks

142.    Derek Sparks enlisted in the United States Navy on October 26, 1987, as a Signalman. During his continuous fourteen-and-a-half-year military career, Sparks served on several deployments in several capacities, repeatedly demonstrating his professionalism and skill.

143.    Sparks's first command was the *U.S.S. SACRAMENTO.* In his four years on the *SACRAMENTO,* Sparks made two deployments, one of them in support of Operation Desert Storm. In recognition of his service, the Navy awarded Sparks a Sailor of the Quarter award. After serving on the *SACRAMENTO,* Sparks worked for a year and a half in the Navy Absentee Collection Unit, and then transferred to the *U.S.S. COWPENS,* and then the *U.S.S. HURRICANE,* where in addition to serving as the ship's only Signalman, Sparks became qualified as Combat

Information Center Watch Officer and served as the Assistant Supply Officer and Information Systems Security Manager. Sparks then worked as a corrections officer at the Naval Consolidated Brig Miramar, and from there transferred to the *U.S.S. BRIDGE* after completing Command Career Counselor School.

144.    During his long career, Sparks received four Sea Service Ribbons, the COMCARGRU with one letter of commendation, the National Defense Service Medal, the SW Asia Service Medal, a Navy Unit Commendation, the Navy Expert Pistol Medal, the Navy Battle "E" Ribbon, Kuwait Liberation Medal, Liberation of Kuwait Medal, three Navy and Marine Corps Achievement Medals, four Navy Good Conduct Awards, a Meritorious Unit Commendation Ribbon, and various letters of commendation and appreciation from different commands.

145.    Sparks' final deployment was on the *U.S.S. BRIDGE*, near Afghanistan, in support of Operation Enduring Freedom. Sparks served as the *BRIDGE's* Command Career Counselor. By that time, Sparks had attained the rank of Petty Officer First Class (E-6).

146.    One evening during that deployment, Sparks was watching an action movie on the television in his office. Two other service members, both male, were also watching the movie in the office with him. Unknown to Sparks, his Master Chief observed the three men through a hole in the wall. The Master Chief later alleged he saw Sparks and the other two sailors engaging in homosexual activity. Though Sparks is gay, that accusation was false. Nonetheless, an investigation began based on those allegations.

147.    Throughout the investigation into these allegations, all three sailors involved denied committing homosexual acts. The Master Chief's initial report to the ship's Master-At-Arms made no mention of Sparks engaging in the alleged misconduct, but a second report filed

six hours later implicated him. Following repeated questioning by investigators, Sparks decided not to fight the Navy any longer. Sparks denied his Master Chief's allegation of engaging in homosexual conduct aboard ship, but stated to his command that he is gay.

148.    Because of that admission, the Navy discharged Sparks on April 9, 2002, because of 10 U.S.C. § 654 and the applicable regulations issued under it. Even though Sparks' command recommended he receive an honorable discharge, Sparks was given a general discharge.

*Stacy Vasquez*

149.    Plaintiff Stacy Vasquez joined the United States Army in 1991, immediately after high school. She trained as a paralegal, and worked in that capacity for about ten years.

150.    In 2002, Vasquez was ordered to attend recruiting school. She was selected as the Distinguished Honor Graduate from both recruiting school and advanced non-commissioned officer paralegal studies courses. During Vasquez' annual evaluation in 2002, while under investigation, she was cited as the top recruiter in the Army and told she should be promoted ahead of her peers.

151.    In January 2003, Vasquez's commander told her that a co-worker's wife had seen Vasquez kissing a woman at a club in Dallas. Vasquez's commander told her that he liked Vasquez's work as a recruiter, and that he would not tell anyone about the allegation if Vasquez would write a statement saying that she is a lesbian. Several of Vasquez's co-workers tried to convince her not to write such a statement, but Vasquez wrote it anyway.

152.    Contrary to her commander's promise, Vasquez was removed from her recruiting job and the Army began an investigation into her sexual orientation based on her letter. Vasquez was forced to sit idle each day for several months in her first sergeant's office. Finally, Vasquez

was discharged from the military in August 2003 because of 10 U.S.C. § 654 and the applicable regulations issued under it.

153.    At the time of her honorable discharge, Vasquez had served in the Army for nearly twelve years. Vasquez earned many awards and commendations during her long Army career, including the Army Commendation Medal (6), Army Achievement Medal (5), Army Good Conduct Medal (3), National Defense Service Medal (2), Armed Forces Reserve Medal with "M" device, Army Service Ribbon, Overseas Service Ribbon (3), NCO Professional Development (3), Sergeant Audie Murphy Member, Physical Fitness Excellence Award, Expert Marksmanship Qualification Badge with Grenade Bar, Marksman Marksmanship Qualification Badge with Rifle Bar, Driver and Mechanic Badge with Driver Bar, U.S. Army Gold Recruiter Badge with 3 Sapphire Achievement Stars, and the U.S. Army Basic Recruiter Badge with 3 Gold Achievement Stars. She had attained the rank of Sergeant First Class (E-7) with recruiter and paralegal specialties.

## CLAIMS

### CLAIM 1:

### VIOLATION OF DUE PROCESS

154.    Plaintiffs incorporate by reference all prior paragraphs in this Complaint as if they were completely restated here.

155.    The Fourth, Fifth, and Ninth Amendments to the Constitution of the United States guarantee and protect vital interests in liberty and privacy, and forbid the United States, and its agencies and officers, from depriving citizens of those rights without due process of law.

34

156.    Those vital interests in liberty and privacy include a fundamental liberty interest in private adult consensual intimacy and relationships, including consensual intimacy and relationships between adults of the same sex.

157.    The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, prohibits adult service members from enjoying fundamental liberty interests, including but not limited to the fundamental liberty interests described above. This deprives plaintiffs of liberty, privacy, and due process of law.

158.    The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, and regulations issued under it, are enforced arbitrarily and capriciously, in violation of the Fifth Amendment's Due Process Clause.

159.    The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, and regulations issued under it, deprive service members of their vital interests in liberty and privacy in violation of the Fourth, Fifth, and Ninth Amendments to the Constitution of the United States.

160.    There is no compelling interest, important interest, or even legitimate governmental interest motivating those deprivations of vital interests in liberty and privacy. Nor are the restrictions on plaintiffs' liberty and privacy necessary, narrowly tailored, or even rationally related to such a governmental interest.

161.    The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, is unconstitutional on its face, and was unconstitutional as applied to each plaintiff.

162.    Congress lacked constitutional authority to delegate to the Secretary of Defense (or the Secretary of Homeland Security) authority to issue unconstitutional regulations under 10 U.S.C § 654.

163.    All regulations issued under 10 U.S.C. § 654, including but not limited to those listed in paragraphs 41-42 above, are unconstitutional on their face, and were unconstitutional as applied to each plaintiff.

164.    Plaintiffs have no adequate remedy at law and face the continuing and irreparable loss of their rights. By reason of these violations of their constitutional rights, plaintiffs are entitled to declaratory judgment and injunctive relief against the enforcement of 10 U.S.C. § 654 and regulations issued under that statute.

165.    All plaintiffs join this claim.

## CLAIM 2:

## VIOLATION OF THE FIRST AMENDMENT

166.    Plaintiffs incorporate by reference all prior paragraphs in this Complaint as if they were completely restated here.

167.    The First Amendment to the Constitution of the United States guarantees the freedom of speech, the right to peaceably assemble, the right to expressive association, the right to petition the Government for a redress of grievances, and freedom from compelled speech.

168.    The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, and all regulations issued under it, abridge service members' First Amendment rights.

169.    There is no compelling interest, important interest, or even legitimate governmental interest, for those restrictions of First Amendment rights. Nor are the restrictions on plaintiffs' First Amendment rights necessary, narrowly tailored, or even rationally related to such a governmental interest.

170.    Among other things, service members are prohibited by 10 U.S.C. § 654 and the regulations issued under it from stating that they are gay, lesbian, or bisexual, or from making

any other statement—whether to other service members or civilians—suggesting a propensity to engage in homosexual acts. They are also prevented from seeking redress for some problems (such as family needs, or harassment for being gay, lesbian, or bisexual) because doing so could lead to their discharge. Their ability to associate with persons of their choice is severely restricted.

171.    The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, is unconstitutional on its face, and was unconstitutional as applied to each plaintiff.

172.    Congress lacked constitutional authority to delegate to the Secretary of Defense (or the Secretary of Homeland Security) authority to issue unconstitutional regulations under 10 U.S.C § 654.

173.    All regulations issued under 10 U.S.C. § 654, including but not limited to those listed in paragraphs 41-42 above, are unconstitutional on their face, and were unconstitutional as applied to each plaintiff.

174.    Plaintiffs have no adequate remedy at law and face the continuing and irreparable loss of their rights. By reason of these violations of their constitutional rights, plaintiffs are entitled to declaratory judgment and injunctive relief against the enforcement of 10 U.S.C. § 654 and regulations issued under that statute.

175.    All plaintiffs join this claim.

### CLAIM 3:

### DENIAL OF EQUAL PROTECTION BASED ON SEXUAL ORIENTATION

176.    Plaintiffs incorporate by reference all prior paragraphs in this Complaint as if they were completely restated here.

177. The Fifth Amendment to the Constitution of the United States guarantees the equal protection of law.

178. The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, denies the equal protection of law to gay, lesbian, and bisexual service members. It discharges gay, lesbian, and bisexual service members because of their sexual orientation, but does not discharge heterosexual service members because of their sexual orientation. It also restricts the speech and conduct of gay, lesbian, and bisexual service members without imposing equivalent restrictions on the speech and conduct of heterosexual service members. The "Don't Ask, Don't Tell" statute therefore reflects an improper animus based on sexual orientation.

179. All regulations issued under 10 U.S.C. § 654 deny the equal protection of law to gay, lesbian, and bisexual service members.

180. There is no compelling interest, important interest, or even legitimate governmental interest for those denials of equal protection of law. Nor are those denials necessary, narrowly tailored, or even rationally related to such a governmental interest.

181. The so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, is unconstitutional on its face, and was unconstitutional as applied to each plaintiff.

182. Congress lacked constitutional authority to delegate to the Secretary of Defense (or the Secretary of Homeland Security) authority to issue unconstitutional regulations under 10 U.S.C § 654.

183. All regulations issued under 10 U.S.C. § 654, including but not limited to those listed in paragraphs 41-42 above, are unconstitutional on their face, and were unconstitutional as applied to each plaintiff.

184.    Plaintiffs have no adequate remedy at law and face the continuing and irreparable loss of their rights.  By reason of these violations of their constitutional rights, plaintiffs are entitled to declaratory judgment and injunctive relief against the enforcement of 10 U.S.C. § 654 and regulations issued under that statute.

185.    All plaintiffs join this claim.

WHEREFORE, plaintiffs request that the Court:

A.    Enter an order declaring that the so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, is unconstitutional on its face;

B.    Enter an order declaring that the so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, as it was applied to each plaintiff, is unconstitutional;

C.    Enter an order declaring that regulations issued under the so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, are unconstitutional on their face;

D.    Enter an order declaring that regulations issued under the so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, as they were applied to each plaintiff, are unconstitutional;

E.    Enjoin defendants from enforcing the so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, and regulations issued under that statute;

F.    Enter an Order that, upon application by a plaintiff in this case, that plaintiff be re-accessed at the same rank, pay grade, and specialty he or she held at the at the time defendants unconstitutionally caused his or her separation from the Armed Forces, if the plaintiff meets all applicable eligibility requirements other than those set by the so-called "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654, and regulations issued under that statute;

G.    Grant costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412;

39

H.     Grant plaintiffs such other further equitable relief that the Court considers proper.

Dated: December 6, 2004

Jonathan A. Shapiro (BBO No. 567838)
Maura T. Healey (BBO No. 640856)
Louis W. Tompros (MA. admission pending)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6000
617-526-5000 (Fax)

Stuart F. Delery (*pro hac vice* pending)
Josh Goldfoot (*pro hac vice* pending)
WILMER CUTLER PICKERING HALE AND DORR LLP
2445 M Street, NW
Washington, D.C. 20037
202-663-6000
202-663-6363 (Fax)

Sharra E. Greer (*pro hac vice* pending)
Kathi S. Westcott (*pro hac vice* pending)
Sharon E. Debbage Alexander (*pro hac vice*
pending)
SERVICEMEMBERS LEGAL DEFENSE NETWORK
P.O. Box 65301
Washington, DC 20035
202-328-3244
202-797-1635 (Fax)

Attorneys for Plaintiffs