# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| THOMAS COOK; MEGAN DRESCH; LAURA GALABURDA; JACK GLOVER; DAVID HALL; MONICA HILL; JENNY LYNN KOPFSTEIN; JENNIFER McGINN; JUSTIN PEACOCK; JAMES E. PIETRANGELO II; DEREK SPARKS; STACY VASQUEZ,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; TOM RIDGE, Secretary of Homeland Security; UNITED STATES OF AMERICA,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-12546 GAO |

_____

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS


MICHAEL J. SULLIVAN
United States Attorney

MARK T. QUINLIVAN
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3606


Dated:  February 7, 2005

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.     The Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.     The DoD Directives and Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.     Plaintiffs' Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.     SUBSTANTIAL DEFERENCE MUST BE ACCORDED TO THE
       CONSIDERED JUDGMENT OF CONGRESS, THE EXECUTIVE,
       AND THE MILITARY IN DETERMINING ELIGIBILITY
       REQUIREMENTS FOR MILITARY SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.    THE DISCHARGE OF SERVICE MEMBERS WHO ENGAGE
       IN HOMOSEXUAL CONDUCT DOES NOT VIOLATE DUE PROCESS
       OR EQUAL PROTECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.     Congress Rationally Determined that the Prohibition
             Against Homosexual Conduct Continues To Be Necessary
             In The Unique Circumstances Of Military Service . . . . . . . . . . . . . . . . . . . . . . . 22

        C.     The Statute Does Not Violate Equal Protection . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.   THE STATUTE DOES NOT VIOLATE THE FIRST AMENDMENT . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES**</u>                                                                           <u>**PAGE(S)**</u>

<u>Able</u> v. <u>United States</u>,
    155 F.3d 628 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

<u>Able</u> v. <u>United States</u>,
    88 F.3d 1280 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 29, 33

<u>Beller</u> v. <u>Middendorf</u>,
    632 F.2d 788 (9th Cir. 1980), *cert. denied*,
    452 U.S. 905, 454 U.S. 855 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n1, 19, 21

<u>Ben-Shalom</u> v. <u>Marsh</u>,
    881 F.2d 454 (7th Cir. 1989), *cert. denied*, 494 U.S. 1004 (1990) . . . . . . . . . . . . . . 2 n.1

<u>Blodgett</u> v. <u>Holden</u>,
    275 U.S. 142 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Bowers</u> v. <u>Hardwick</u>,
    478 U.S. 186 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Bristol Energy Corp.</u> v. <u>State of New Hampshire Public Util. Comm'n</u>,
    13 F.3d 471 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Brown</u> v. <u>Glines</u>,
    444 U.S. 348 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Chappell</u> v. <u>Wallace</u>,
    462 U.S. 296 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Collins</u> v. <u>City of Harker Heights</u>,
    503 U.S. 115 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Conley</u> v. <u>Gibson</u>,
    355 U.S. 41 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Dawson</u> v. <u>Delaware</u>,
    503 U.S. 159 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Dept. of the Navy v. Egan,
      484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Detenber v. Turnage,
      701 F.2d 233 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Dronenburg v. Zech,
      741 F.2d 1388 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n.l

Giboney v. Empire Storage & Ice Co.,
      336 U.S. 490 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Gilligan v. Morgan,
      413 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Goldman v. Weinberger,
      475 U.S. 503 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 18

Greer v. Spock,
      424 U.S. 828 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Heller v. Doe,
      509 U.S. 312 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 29

Hensala v. Dept. of Air Force,
      343 F.3d 951 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 19 n.5

Hoffman v. United States,
      1997 WL 136418 (E.D. Pa. March 24, 1997), *aff'd*,
      124 F.3d 187 (3d Cir. 1997) (Mem.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Holmes v. California Army National Guard,
      124 F.3d 1126 (9th Cir. 1997), *cert. denied*, 525 U.S. 1067 (1999) . . . . . . . . . . . . *passim*

In re Kandu,
      315 B.R. 123 (W.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Johnson v. Johnson,
      385 F.3d 503 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21 n.6

Lawrence v. Texas,
      539 U.S. 558 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Lofton v. Secretary of the Dept. of Children and Family Serv.,
    358 F.3d 804 (11th Cir. 2004), *cert. denied*,
    73 USLW 3247 (U.S. Jan 10, 2005) (No. 04-478) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Matthews v. Marsh,
    755 F.2d 182 (1st Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Moore v. City of East Cleveland,
    431 U.S. 494, (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Orloff v. Willoughby,
    345 U.S. 83 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Palko v. Connecticut,
    302 U.S. 319 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Parker v. Levy,
    417 U.S. 733 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 17

Philips v. Perry,
    106 F.3d 1420 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Philips v. Perry,
    883 F. Supp. 539, 547 (W.D. Wash. 1995), *aff'd*, 106 F.3d 1420 (9th Cir. 1997) . . . . . 34

Rich v. Secretary of Army,
    735 F.2d 1220 (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n.1

Richenberg v. Perry,
    97 F.3d 256 (8th Cir. 1996), *cert. denied*, 522 U.S. 807 (1997) . . . . . . . . . . . . . . *passim*

Romer v. Evans,
    517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Rostker v. Goldberg,
    453 U.S. 57 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 13

Schlesinger v. Ballard,
    419 U.S. 498 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Schroeder v. Hamilton School Dist.,
    282 F.3d 946 (7th Cir.), *cert. denied*, 537 U.S. 974 (2002) . . . . . . . . . . . . . . . . . . . . 21 n.6

Solorio v. United States,
    483 U.S. 435 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Steffan v. Perry,
    41 F.3d 677 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n.1, 21 n.6, 25, 26, 29

Thomasson v. Perry,
    80 F.3d 915 (4th Cir. 1996), *cert. denied*, 519 U.S. 948 (1996) . . . . . . . . . . . . . . *passim*

Thorne v. U.S. Dept. of Defense,
    945 F. Supp. 924, 927-30 (E.D. Va. 1996), *aff'd*,
    139 F.3d 893 (4th Cir.), *cert. denied*, 525 U.S. 947 (1998) . . . . . . . . . . . . . . . . 30 n.7, 35

Turner Broadcasting System, Inc. v. FCC,
    520 U.S. 180, 199 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Turner Broadcasting v. FCC,
    512 U.S. 622, 66 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Extreme Associates, Inc.,
    --- F. Supp.2d ---, 2005 WL 121749 (W.D. Pa. Jan. 20, 2005) . . . . . . . . . . . . . . . . . . . . 20

United States v. Marcum,
    60 M.J. 198 (C.A.A.F. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

United States v. O'Brien,
    391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Walmer v. United States,
    52 F.3d 851 (10th Cir.), *cert. denied*, 516 U.S. 974 (1995) . . . . . . . . . . . . . . 2 n.1, 21 n.6

Walters v. National Ass'n of Radiation Survivors,
    473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Washington v. Glucksberg,
    521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Wayte v. United States,
    470 U.S. 598, 609 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Wilson v. Ake,
    No. 8:04-CV-1680-T-30TBM, 2004 WL 3142528 (M.D. Fla. July 20, 2004) . . . . . . . . 20

Wisconsin v. Mitchell,
        508 U.S. 476 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Woodward v. United States,
        871 F.2d 1068 (Fed. Cir. 1989), *cert. denied*, 494 U.S. 1003 (1990) . . . . . . . 2 n.1, 21 n.6

## CONSTITUTIONAL PROVISIONS

U.S. CONST. art. I, § 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES

National Defense Authorization Act for Fiscal Year 1994,
        Pub. L. No. 103-160, § 571, 107 Stat. 1670-73, *codified* at 10 U.S.C. § 654 . . . . . . . . . . 5

10 U.S.C. § 654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
10 U.S.C. § 654(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
10 U.S.C. § 654(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10 U.S.C. § 654(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10 U.S.C. § 654(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
10 U.S.C. § 654(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
10 U.S.C. § 654(a)(8)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17
10 U.S.C. § 654(a)(8)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17
10 U.S.C. § 654(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10 U.S.C. § 654(a)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10 U.S.C. § 654(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10 U.S.C. § 654(a)(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 15
10 U.S.C. § 654(a)(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
10 U.S.C. § 654(a)(15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15, 22
10 U.S.C. § 654(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 15
10 U.S.C. § 654(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29
10 U.S.C. § 654(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
10 U.S.C. § 654(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## LEGISLATIVE MATERIAL

S. Rep. No. 112, 103rd Cong., 1st Sess. 265-70 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Policy Concerning Homosexuality in the Armed Forces:  Hearings Before the Senate Comm. on Armed Services*, 103d Cong., 2d Sess. (1993) . . . . . . . . . . . . . . . . . . 4 n.2

*Policy Implications of Lifting the Ban on Homosexuals in the Military: Hearings Before the House Comm. on Armed Services*, 103d Cong., 1st Sess. (1993) . . . . . . . . . . . . 4 n.3

*Assessment of the Plan to Lift the Ban on Homosexuals in the Military: Hearings Before the Military Forces and Personnel Subcomm. of the House Comm. on Armed Services*, 103d Cong., 1st Sess. (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4 n.3

## PRESIDENTIAL PRONOUNCEMENTS

29 Weekly Comp. Pres. Doc. 112 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 Weekly Comp. Pres. Doc. 1369 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## DEPARTMENT OF DEFENSE DIRECTIVES AND INSTRUCTIONS

Department of Defense Directive 1332.14, Enlisted Administrative Separations . . . . . . . . *passim*

Department of Defense Instruction 1332.40, Separation Procedures for Regular and Commissioned Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## MISCELLANEOUS

Chief Justice Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## PRELIMINARY STATEMENT

This case involves a challenge to the constitutionality of the carefully-crafted policy decision, reached jointly by Congress and the Executive Branch after months of study, hearings, and debate, and embodied in an Act of Congress, 10 U.S.C. § 654, regarding homosexual conduct in the Armed Forces of the United States. Plaintiffs, twelve gay or lesbian former members of the Army, Navy, Air Force, and Coast Guard, contend that the statute and the implementing Department of Defense ("DoD") regulations, which are oftentimes collectively referred to as the "Don't Ask, Don't Tell" policy, are unconstitutional on their face and as applied to them. Plaintiffs contend that § 654 and the implementing DoD regulations are unlawful because they (1) infringe upon what plaintiffs describe as their "fundamental liberty interests," in violation of the Fourth, Fifth and Ninth Amendments; (2) abridge their rights to freedom of speech and freedom of association, in violation of the First Amendment; and (3) deny them equal protection of the laws, in violation of the Fifth Amendment's Due Process Clause.

None of these claims has merit. Every court of appeals to have considered the very same claims as those raised by plaintiffs has held that § 654 and the implementing DoD regulations do not infringe upon constitutional rights to privacy, equal protection, or free speech. See Able v. United States, 155 F.3d 628 (2d Cir. 1998) ("Able II"); Holmes v. California Army Nat'l Guard, 124 F.3d 1126 (9th Cir. 1997), cert. denied, 525 U.S. 1067 (1999); Philips v. Perry, 106 F.3d 1420 (9th Cir. 1997); Richenberg v. Perry, 97 F.3d 256 (8th Cir. 1996), cert. denied, 522 U.S. 807 (1997); Able v. United States, 88 F.3d 1280 (2d Cir. 1996) ("Able I"); Thomasson v. Perry, 80 F.3d 915 (4th Cir.) (en banc), cert. denied, 519 U.S. 948 (1996). See also Hoffman v. United States, 1997 WL 136418 (E.D. Pa. March 24, 1997) (upholding constitutionality of § 654 against constitutional challenge),

-1-

*aff'd*, 124 F.3d 187 (3d Cir. 1997) (Mem.).[1] These courts have recognized the special deference that is accorded the judgment of Congress and the Executive in matters of military affairs, particularly those that regulate the composition of the Armed Forces, and have found that the Act is a conduct-based policy that rationally furthers the government's interest in maintaining unit cohesion, reducing sexual tension, and promoting personal privacy. As the Second Circuit explained in Able II, "[t]hese concerns distinguish the military from civilian life and go directly to the military's need to foster instinctive obedience, unity, commitment, and esprit de corps," and "[a]fter this extensive legislative examination, embodied in numerous findings, we cannot say that the reliance by Congress on the professional judgment and testimony of military experts and personnel that those who engage in homosexual acts would compromise the effectiveness of the military was irrational." 155 F.3d at 634, 635 (internal quotation and citation omitted). Indeed, as the en banc Fourth Circuit ruled in Thomasson, to accept the claims of those who seek to invalidate the statute "would not only overturn the efforts of the elected branches of government to resolve a significant question of national military policy," but "[i]t would also violate much plain and settled Supreme Court precedent." 80 F.3d at 934.

Nor does the Supreme Court's decision in Lawrence v. Texas, 539 U.S. 558 (2003), alter this conclusion. That decision, in which the Court held that a state statute criminalizing homosexual

---

[1] These decisions are in accord with other courts of appeals decisions upholding the earlier military policy regarding homosexual conduct in the Armed Forces. Walmer v. United States, 52 F.3d 851 (10th Cir.), *cert. denied*, 516 U.S. 974 (1995); Steffan v Perry, 41 F.3d 677 (D.C. Cir. 1994) (en banc); Ben-Shalom v. Marsh, 881 F.2d 454 (7th Cir. 1989), *cert. denied*, 494 U.S. 1004 (1990); Woodward v. United States, 871 F.2d 1068 (Fed. Cir. 1989), *cert. denied*, 494 U.S. 1003 (1990); Dronenburg v. Zech, 741 F.2d 1388 (D.C. Cir. 1984); Rich v. Secretary of Army, 735 F.2d 1220 (10th Cir. 1984); Beller v. Middendorf, 632 F.2d 788 (9th Cir. 1980) (Kennedy, J.), *cert. denied*, 452 U.S. 905, 454 U.S. 855 (1981).

sodomy did not survive rational basis review, has no bearing on § 654, which does not impose criminal penalties, and in which "the military's justifications are based on factors which are unique to military life." Able II, 155 F.3d at 634. Indeed, when it enacted § 654, Congress expressly found that "[t]he prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary *in the unique circumstances of military service*," 10 U.S.C. § 654(a)(13) (emphasis added), and plaintiffs' challenge to the constitutionality of the Act therefore "cannot be viewed apart from the special legal status of military life." Thomasson, 80 F.3d at 924. Moreover, every Article III court to have considered the question has held that the Supreme Court's decision in Lawrence does not establish a fundamental right that would trigger heightened scrutiny.

For these reasons, this Court should follow the unanimous view of the courts of appeals and hold that § 654 and the implementing DoD regulations do not run afoul of the Constitution, and dismiss this action with prejudice for failure to state a claim upon which relief can be granted.

## STATEMENT OF THE CASE

A. **The Statute.** The challenged statute represents the culmination of a joint effort by the Executive and Legislative Branches to reach consensus on a controversial issue, which has profound effects on the military's ability to fulfill its mission. On January 29, 1993, President Clinton directed the Secretary of Defense to review the miliary policy then in force. See 29 Weekly Comp. Pres. Doc. 112 (1993). The Defense Department studied the issue and met with groups and individuals holding a wide spectrum of views.

At the same time, Congress undertook its own extensive review of the issue of homosexual conduct in the Armed Forces, holding lengthy hearings on the issue and receiving testimony from military commanders, gay rights activists, experts in military personnel policy, and many interested

-3-

civilians and members of the Armed Forces.  The Senate held hearings on March 29, 31, April 29,

May 7, 10, 11 and July 20-22, 1993.[2]  The House held hearings on May 4 and 5, and July 21-23,

1993.[3]  As part of its review, Congress examined the historical background of the military's policy

on homosexual conduct, the role of unit cohesion in developing combat readiness, and the

experience of foreign militaries with the issue.  See Senate Report No. 112, 103d Cong., 1st Sess.

269-70 (1993) (hereinafter "S. Rep. 112") (attached in Appendix).

General Colin Powell, who was then Chairman of the Joint Chiefs of Staff, testified before

Congress that the Joint Chiefs had "spent an enormous amount of time considering this issue,"

"challen[ing their] own assumptions," considering "the history of the issue," and "argu[ing] with

each other."  S. Rep. 112, at 279.  General Powell testified that the Joint Chiefs consulted with a

variety of persons, including commanders at every level, enlisted troops, and family members of

service members.  Id.  They also examined the arguments of gay/lesbian rights proponents.  Id.

General Powell emphasized that the concern of the Joint Chiefs was "the unique perspective of the

military and what is best for military effectiveness."  Id.  They concluded that the presence of persons

in the military who engage in, or are likely to engage in, homosexual acts "would have an

unacceptable detrimental and disruptive impact on the cohesion, morale, and esprit of the armed

forces."  Id. at 278.

---

[2]  See Policy Concerning Homosexuality in the Armed Forces:  Hearings Before the Senate Comm. on Armed Services, 103d Cong., 2d Sess. (1993).

[3]  See Policy Implications of Lifting the Ban on Homosexuals in the Military:  Hearings Before the House Comm. on Armed Services, 103d Cong., 1st Sess. (1993); Assessment of the Plan to Lift the Ban on Homosexuals in the Military:  Hearings Before the Military Forces and Personnel Subcomm. of the House Comm. on Armed Services, 103d Cong., 1st Sess. (1993).

Following extensive debate, President Clinton announced (29 Weekly Comp. Pres. Doc. 1369 (1993)), and Congress enacted a new statute governing homosexual conduct in the Armed Forces. See National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 571, 107 Stat. 1670-73, *codified* at 10 U.S.C. § 654. Thereafter, DoD issued Directives and Instructions implementing the statute.

The statutory policy is grounded in fifteen legislative findings. 10 U.S.C. § 654(a). Congress recognized that "[m]ilitary life is fundamentally different from civilian life" because of "the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion." § 654(a)(8)(A). Accordingly, "military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society." § 654(a)(8)(B). Congress' policy culminates with its findings that:

> (13) The prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service.

> (14) The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

> (15) The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

§§ 654(a)(13)-(15).

The statute provides for separation from service if a member has: (1) "engaged in, attempted to engage in, or solicited another to engage in a homosexual act," § 654(b)(1); (2) "stated that he or

she is a homosexual or bisexual * * * unless * * * [the member] demonstrate[s] that he or she is not

a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage

in homosexual acts," § 654(b)(2); or (3) "married or attempted to marry a person known to be of the

same biological sex," § 654(b)(3).  The statute defines "[h]omosexual act" as "(A) any bodily

contact, actively undertaken or passively permitted, between members of the same sex for the

purpose of satisfying sexual desires; and (B) any bodily contact which a reasonable person would

understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A)."

§ 654(f)(3).

Separation for engaging in a homosexual act or acts is not required if the member has

demonstrated that "(A) such conduct is a departure from the member's usual and customary behavior;

(B) such conduct, under all the circumstances, is unlikely to recur; (C) such conduct was not

accomplished by use of force, coercion, or intimidation; (D) under the particular circumstances of

the case, the member's continued presence in the armed forces is consistent with the interests of the

armed forces in proper discipline, good order, and morale; and (E) the member does not have a

propensity or intent to engage in homosexual acts."  § 654(b)(1).  In addition, as § 654(b)(2)

indicates and the legislative history confirms, a member's statement that he or she is a homosexual

gives rise to a rebuttable presumption that the member engages in, or is likely to engage in,

homosexual acts.  S. Rep. 112, at 293-94.

**B.  The DoD Directives and Instructions.**  The DoD regulations, which are set forth in

Directives and Instructions, provide that "[h]omosexual conduct is grounds for separation from the

Military Services."  Department of Defense Directive ("DoDD") 1332.14, Enlisted Administrative

Separations, ¶ E3.A1.1.8.1, at 26 (attached in Appendix); Department of Defense Instruction

("DoDI") 1332.40, <u>Separation Procedures for Regular and Commissioned Officers</u>, ¶ E2.3, at 9 (attached in Appendix). "Homosexual conduct" means "homosexual acts, a statement by a member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage." DoDD 1332.14 ¶ E3.A4.2.3, at 68; DoDI 1332.40 ¶ E1.1.12, at 6.

First, a member shall be separated if he or she "has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts," DoDD 1332.14 ¶ E3.A1.1.8.1.2.1, at 27; DoDI 1332.40 ¶ E2.3.1.1, at 9, unless there are further approved findings that "Such acts are a departure from the member's usual and customary behavior"; "Such acts under all circumstances are unlikely to recur"; "Such acts were not accomplished by use of force, coercion, or intimidation"; "Under the particular circumstances of the case, the member's continued presence in the Armed Forces is consistent with the interest of the Armed Forces in proper discipline, good order, and morale"; and "The member does not have a propensity or intent to engage in homosexual acts." DoDD 1332.14 ¶¶ E3.A1.1.8.1.2.1.1-.5, at 27; DoDI 1332.40 ¶¶ E2.3.1.1.1-.5, at 9-10.

Second, a member may be discharged if he or she "has made a statement that he or she is a homosexual or bisexual, or words to that effect." DoDD 1332.14 ¶ E3.A1.1.8.1.2.2, at 27; DoDI 1332.40 ¶ E2.3.1.2, at 10. Such a statement "creates a rebuttable presumption that the [member] engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts"; however, the member is given the opportunity "to rebut the presumption by presenting evidence demonstrating that he or she does not engage in, attempt to engage in, have a propensity to engage in, or intend to engage in homosexual acts." DoDD 1332.14 ¶ E3.A1.1.8.1.2.2, at 27;

DoDI 1332.40 ¶ E2.3.1.2, at 10.[4]  The regulations give guidance to administrative boards on how to assess whether a member has demonstrated that he or she should be retained, setting forth both the types of evidence a service member may offer to rebut the presumption as well as providing illustrative examples.  DoDD 1332.14 ¶¶ E3.A1.1.8.1.2.2.1-.5, at 28; DoDI 1332.40 ¶¶ E2.3.1.2.1-.5, at 10.  Third, a member will be discharged if he or she "has married or attempted to marry a person known to be of the same biological sex."  DoDD 1332.14 ¶ E3.A1.1.8.1.2.3, at 28; DoDI 1332.40 ¶ E2.3.1.3, at 10-11.

In setting forth the bases for separation, the DoD regulations focus on homosexual acts and the likelihood of such acts, *not* on sexual orientation.  The regulations expressly state, for example, that "[a] member's sexual orientation is considered a personal and private matter, and is not a bar to continued service" unless it is manifested by homosexual conduct, which, as noted, is defined as homosexual acts, statements that demonstrate a propensity or intent to engage in homosexual acts, and homosexual marriages and attempted marriages.  DoDD 1332.14 ¶ E3.A1.1.8.1.1, at 26; DoDI 1332.40 ¶ E2.3, at 9.  Likewise, the regulations provide that a statement by a service member that he or she is a homosexual "is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts."  DoDD 1332.14 ¶ E3.A1.1.8.1.1, at 26; DoDI 1332.40 ¶ E2.3, at 9.

**C.  Plaintiff's Suit**:  Plaintiffs, twelve gay or lesbian former members of the Army, Navy, Air Force, and Coast Guard, filed this action on December 6, 2004, contending that § 654 and the

---

[4]  Under the regulations, "[p]ropensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a *likelihood* that a person engages in or will engage in homosexual acts."  DoDD 1332.14 ¶¶ E3.A1.1.8.1.2.2, at 27,  E3.A4.2.4.4, at 68; DoDI 1332.40 ¶¶ E1.1.17, at 6, E2.3.1.2, at 10 (emphasis added).

implementing DoD regulations are unconstitutional on their face and as applied to them, and seeking declaratory and injunctive relief. Plaintiffs allege that they were discharged for making statements that they are gay or lesbian, see Complaint ¶¶ 67-69 (Cook); ¶¶ 73-74 (Dresch); ¶¶ 77-78 (Galaburda); ¶¶ 104, 107 (Hill); ¶¶ 111, 114-16 (Kopfstein); ¶¶ 138, 140 (Pietrangelo); ¶¶ 147-48 (Sparks); ¶¶ 151-52 (Vasquez); or as a result of allegations that they had engaged in homosexual acts, id. ¶¶ 119, 123 (McGinn); ¶¶ 126, 129 (Peacock). In addition, plaintiffs Glover and Hall, who acknowledge that they were engaged in a romantic relationship while serving on active duty and, thereafter, in the Air Force ROTC (id. ¶ 84 (Glover); ¶ 93 (Hill), allege that they were discharged following allegations that they were engaged in a relationship. Id. ¶¶ 86, 88 (Glover); ¶¶ 97-98 (Hill).

**STANDARD OF REVIEW**

A motion to dismiss for failure to state a claim should be granted where the complaint fails to "state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). The Court may grant a 12(b)(6) motion when it appears that there is no set of facts under which the plaintiff would be entitled to relief. See, e.g., Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In other words, a claim should be dismissed for failure to state a claim where there is a "dispositive issue of law." Bristol Energy Corp. v. State of New Hampshire Public Util. Comm'n, 13 F.3d 471, 478 n.8 (1st Cir. 1994).

**ARGUMENT**

**I.     SUBSTANTIAL DEFERENCE MUST BE ACCORDED TO THE CONSIDERED JUDGMENT OF CONGRESS, THE EXECUTIVE, AND THE MILITARY IN DETERMINING ELIGIBILITY REQUIREMENTS FOR MILITARY SERVICE**

Before turning to the merits, we begin with first principles. In their Complaint, plaintiffs assert (Complaint ¶ 43-52) that the Congressional findings in § 654 "are not entitled to any special

deference by this Court," and offer a variety of reasons why, in their view, those findings should be disregarded. That proposition is manifestly incorrect. Because of the importance of this issue, and because the questions raised by this case "implicate[] in the most fundamental way the role of courts in our democratic system," Thomasson, 80 F.3d at 921, we explore in some detail the deference that is owed Congress and the Executive Branch when making judgments concerning military matters, including most particularly decisions regarding the composition of the Armed Forces.

**1.** The adjudication of an Act of Congress is "the gravest and most delicate duty that [a] Court is called upon to perform." Blodgett v. Holden, 275 U.S. 142, 148 (1927) (Holmes, J.). This principle applies with even more force in the context of military affairs. "The Constitution assigns the conduct of military affairs to the Legislative and Executive branches," and "[t]here is nothing timid or half-hearted about this constitutional allocation of authority." Thomasson, 80 F.3d at 924. The Founding Fathers vested Congress with "plenary control" to promulgate rules relating to the composition and regulation of the Armed Forces. Article I gives Congress the authority "[t]o raise and support Armies," "[t]o provide and maintain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval Forces." U.S. CONST. art. I, § 8, cls. 12-14. The Supreme Court therefore has recognized that "[t]he constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping," United States v. O'Brien, 391 U.S. 367, 377 (1968), and that "judicial deference * * * is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." Rostker v. Goldberg, 453 U.S. 57, 70 (1981). "This is especially the case where, as here, the challenged restriction was the result of exhaustive inquiry

-10-

by Congress in hearings, committee and floor debate." Able II, 155 F.3d at 632 (citing Rostker, 453 U.S. at 64, 72).

The Constitution also "in a special way rests responsibility for the military services in the President, naming him explicitly in Article II, section 2, as the 'Commander in Chief of the Army and Navy of the United States.'" Philips, 106 F.3d at 1430 (quoting U.S. CONST. art II, § 2, cl. 1). Therefore, because the Constitution "states fully and directly that the governance of military affairs is a shared responsibility of Congress and the President," Thomasson, 80 F.3d at 924, "[d]eference by the courts to military-related judgments by Congress and the Executive is deeply recurrent in Supreme Court caselaw and repeatedly has been the basis for rejections to a variety of challenges to Congressional and Executive decisions in the military domain." Able II, 155 F.3d at 633 (citing examples).

Moreover, "[n]ot only is the scope of Congress's constitutional power in this area broad, but the lack of competence on the part of the courts is marked." Rostker, 453 U.S. at 65. As the Supreme Court has adumbrated:

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.

Gilligan v. Morgan, 413 U.S. 1, 10 (1973). Because the "'courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have,'" Chappell v. Wallace, 462 U.S. 296, 305 (1983) (quoting Chief Justice Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181, 187 (1962)), they must be "particularly careful not to substitute [their] judgment" for that of the Political Branches in military matters. Rostker, 453 U.S. at 68. See

-11-

Detenber v. Turnage, 701 F.2d 233, 234 (1st Cir. 1983) (Breyer, J.) (holding that draft registration program was not unconstitutional deprivation of liberty or privacy, and stating that "[w]hatever the strength of their claims from a moral or political point of view, from a legal perspective the arguments are without merit.").

Moreover, deference is due not only to the Political Branches in regards to military matters, but deference also must be accorded to the "considered professional judgment" of military officials, Goldman v. Weinberger, 475 U.S. 503, 509 (1986), concerning "complex * * * decisions as to the composition * * * of a military force." Rostker, 453 U.S. at 65. The military's "special constitutional function * * * to fight or be ready to fight wars should the occasion arise," Greer v. Spock, 424 U.S. 828, 837-38 (1976), renders it "by necessity, a specialized society separate from civilian society [that has,] by necessity, developed laws and traditions of its own during its long history." Parker v. Levy, 417 U.S. 733, 744 (1974).

Indeed, because "the military must insist upon a respect for duty and a discipline without counterpart in civilian life," restrictions on individual liberty and autonomy are required to achieve "the subordination of personal preferences and identities in favor of the overall group mission." Goldman, 475 U.S. at 507-08. Therefore, "Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which [military society] shall be governed," Parker, 417 U.S. at 743, 756, and "courts have traditionally shown the utmost deference to the [p]redictive judgment" of Congress and military authorities on such issues. Dept. of the Navy v. Egan, 484 U.S. 518, 529-30 (1988).

**2.** These principles are fully applicable in cases involving constitutional challenges. "Congress has the primary responsibility for balancing the rights of servicemen against the needs of

the military * * * [even where] the constitutional rights of servicemen [are] implicated." <u>Solorio</u> v.

<u>United States</u>, 483 U.S. 435, 447-48 (1987).  This is not to say that the Court has no role in deciding

constitutional questions in the military context; but in deciding such questions, "the Constitution

itself requires [great] deference to congressional choice." <u>Rostker</u>, 453 U.S. at 67.  In the equal

protection context, for example, the Supreme Court has given great deference to the decisions of

Congress and the Executive Branch because "[t]he responsibility for determining how best our

Armed Forces shall attend to [its] business rests with Congress," <u>Schlesinger</u> v. <u>Ballard</u>, 419 U.S.

498, 510 (1975), and, in balancing competing individual and military interests, "Congress [is]

certainly entitled, in the exercise of its constitutional powers to raise and regulate armies and navies,

to focus on the question of military need rather than 'equity.'" <u>Rostker</u>, 453 U.S. at 80.

Thus, in <u>Rostker</u>, in rejecting a constitutional challenge to the male-only draft registration

under heightened equal protection scrutiny, the Court deferentially reviewed a Congressional finding

that any future draft "would be characterized by a need for combat" from which women had been

permissibly excluded.  <u>Id</u>. at 76.  In assessing the evidence before Congress, the Supreme Court

stressed that "[t]he District Court was quite wrong in undertaking an independent evaluation of this

evidence, rather than adopting an appropriately deferential examination of *Congress'* evaluation of

that evidence." <u>Id</u>. at 82-83.  <u>See</u> <u>also</u> <u>Walters</u> v. <u>National Ass'n of Radiation Survivors</u>, 473 U.S.

305, 330 n.12 (1985) ("When Congress makes findings on essentially factual issues * * * those

findings are of course entitled to a great deal of deference").  The Court also emphasized that a

reviewing court "must have 'due regard to the fact that this Court is not exercising a primary

judgment but is sitting in judgment upon those who also have taken the oath to observe the

Constitution and who have the responsibility for carrying on government.'" <u>Rostker</u>, 453 U.S. at 64 (citation omitted).

The Supreme Court likewise has characterized its "review of military regulations challenged on First Amendment grounds" as being "far more deferential than constitutional review of similar laws or regulations designed for civilian society." <u>Goldman</u>, 475 U.S. at 507. Thus, "[w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." <u>Parker</u>, 417 U.S. at 758. As the Court has described, "[t]he military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." <u>Goldman</u>, 475 U.S. at 507. Consequently, "[s]peech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected." <u>Parker</u>, 417 U.S. at 759.

These principles of deference "have found concrete expression in the Supreme Court's treatment of free speech challenges in the military context." <u>Able I</u>, 88 F.3d at 1294. Thus, the Court has upheld a military restriction which banned anything but regulation head coverings outdoors, notwithstanding an Air Force Officer's desire to wear a yarmulke in accordance with the religious practices dictated by his Orthodox Judaism, <u>Goldman</u>, 475 U.S. at 509; upheld the removal from active duty of an Air Force Reserve officer who, without the permission of his base commander and in violation of Air Force regulations, circulated a petition criticizing Air Force grooming standards, <u>Brown</u> v. <u>Glines</u>, 444 U.S. 348, 355 (1980); and upheld a prohibition on speeches and

political demonstrations by civilians on military bases because of the "special constitutional function of the military in our national life," <u>Greer</u>, 424 U.S. at 837.  The Court also has emphasized that, "when evaluating whether military needs justify a particular restriction * * * courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."  <u>Goldman</u>, 475 U.S. at 507-08 (citations omitted).

With these principles in mind, we turn now to the merits of plaintiffs' constitutional challenges to § 654 and the implementing DoD regulations.

## II.     THE DISCHARGE OF SERVICE MEMBERS WHO ENGAGE IN HOMOSEXUAL CONDUCT DOES NOT VIOLATE DUE PROCESS OR EQUAL PROTECTION

Congress determined that "[t]he prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service," and that "[t]he presence in the armed forces of persons who demonstrate [whether by word or deed] a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability."  10 U.S.C.  §§ 654(a)(13), (15).

Plaintiffs challenge this statutory prohibition, averring (Complaint ¶¶ 155-59) that they have "a fundamental liberty interest in private adult consensual intimacy and relationships, including consensual intimacy and relationships between adults of the same sex," and complain that § 654 and the implementing DoD regulations "prohibit[] adult members from enjoying [these] fundamental liberty interests."  Plaintiffs also aver (Complaint ¶¶ 177-79) that § 654 and the implementing DoD regulations deny them the equal protection of the laws because "[i]t discharges gay, lesbian, and bisexual service members because of their sexual orientation, but does not discharge heterosexual service members because of their sexual orientation."  With respect to both contentions, plaintiffs

-15-

assert (Complaint ¶¶ 160, 180) that "[t]here is no compelling interest, important interest, or even legitimate governmental interest" that would justify the challenged statute and implementing DoD Directives, and that those restrictions are not "necessary, narrowly tailored, or even rationally related to such a governmental interest."

As we now demonstrate, none of those assertions has merit. We turn first to the question of the appropriate standard of review, and show that § 654 and the implementing DoD regulations are subject only to rational basis review. We then show that § 654 is a well-supported, rational conclusion, informed by the experience and considered judgment of military leaders, and does not run afoul of the Constitution.

### A.    Standard of Review

**1.**  Plaintiffs assert (Complaint ¶ 156) that they have a  "a fundamental liberty interest in private adult consensual intimacy and relationships," which would trigger heightened scrutiny. That contention is in error.

The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 720, (1997). The Supreme Court has identified the nature of rights that qualify for heightened judicial protection, which include those fundamental liberties that are "'implicit in the concept of ordered liberty,'" such that "'neither liberty nor justice would exist if they were sacrificed.'" Id. at 721 (quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)). The Court has also characterized those liberties as ones that are "objectively, 'deeply rooted in this Nation's history and tradition.'" Id. at 720-21 (quoting Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977) (plurality opinion)). The Court has cautioned courts, however, to "'exercise the utmost care'" in conferring fundamental-

-16-

right status on a newly asserted interest. Id. at 720 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)).

   None of the features that the Supreme Court has identified as qualifying for heightened judicial scrutiny apply in this case. Plaintiffs' constitutional challenge to § 654 "cannot be viewed apart from the special legal status of military life," Thomasson, 80 F.3d at 924, and, as we have shown above, both Congress and the courts have repeatedly recognized that military life is fundamentally different from civilian. See, e.g., Able II, 155 F.3d at 633 ("Justice is afforded on different terms than is found in civilian life because the military is a '"specialized community governed by a separate discipline."'") (quoting Parker, 417 U.S. at 744, in turn quoting Orloff v. Willoughby, 345 U.S. 83, 94 (1953)). Because "[t]he primary purpose of the armed forces is to prepare for and to prevail in combat should the need arise," 10 U.S.C. § 654(a)(4), Congress found that military society is properly characterized by "its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society." § 654(a)(8)(A)-(B). As the Senate Armed Services Committee recognized, "[w]hile civilians remain secure in their homes, with broad freedom to live where and with whom they choose, members of the armed forces may be assigned, involuntarily, to any place in the world, often on short notice, often to places of grave danger, often in the most spartan and primitive conditions." S. Rep. 112, at 272-73.

   Accordingly, because "[r]esponsibility for the awesome machinery of war requires a degree of training, discipline, and unit cohesion that has no parallel in civilian society," id. at 272, Congress found that military personnel must be subject to standards of conduct that regulate a service member's life "for 24 hours each day beginning at the moment the member enters the military status

-17-

and not ending until that person is discharged or otherwise separated from the armed forces." 10

U.S.C. § 654(a)(9). Congress found that these standards of conduct apply "at all times the member

has a military status, whether the member is on base or off base, and whether the member is on duty

or off duty." § 654(a)(10); S. Rep. 112, at 272, 278. Congress further found that "[t]he pervasive

application of the standards of conduct is necessary because members of the armed forces must be

ready at all times for worldwide deployment to a combat environment." 10 U.S.C. § 654(a)(11).

As the Supreme Court has recognized, "[t]he essence of military service 'is the subordination of the

desires and interests of the individual to the needs of the service.'" <u>Goldman</u>, 475 U.S. at 507

(quoting <u>Orloff</u>, 345 U.S. at 92).

 Given these unique characteristics of military life, every court of appeals to have considered

the question has held that "there is no fundamental constitutional right on the part of a service

member to engage in homosexual acts and there is a legitimate military interest in preventing the

same." <u>Thomasson</u>, 80 F.3d at 928. <u>See</u> <u>Philips</u>, 106 F.3d at 1426-27 (reaffirming circuit precedent

holding that "regulations directed to homosexual acts rather than merely to status or orientation, are

constitutional"); <u>Richenberg</u>, 97 F.3d at 261 ("We join six other circuits in concluding that the

military may exclude those who engage in homosexual acts as defined in § 654(f)(3)(A)."). <u>See also</u>

<u>Matthews</u> v. <u>Marsh</u>, 755 F.2d 182, 183 (1st Cir.1985) (remanding district order reinstating plaintiff

in ROTC in light of new evidence as to plaintiff's homosexual conduct because evidence of such

conduct would be "highly relevant" to whether a plaintiff is entitled to relief such as reinstatement).

 Contrary to plaintiffs' suggestion (Complaint ¶ 12), these decisions are unaffected by the

Supreme Court's decision in <u>Lawrence</u>, in which the Court held that substantive due process does

not permit criminalizing private consensual homosexual conduct. To begin with, <u>Lawrence</u> did not

-18-

address a policy, as here, implicating the "'special circumstances and needs of the armed forces.'"

Philips, 106 F.3d at 1426 (quoting Beller, 632 F.2d at 810).  In enacting the challenged statute, the

Senate Armed Services Committee expressly stated that its policy regarding homosexual conduct

was based on the unique needs and circumstances of military life and military service:

> The committee's review and its recommendation have focused on the impact of
> homosexual conduct in the unique setting of military service.  Therefore, if the
> Supreme Court should reverse its ruling in [Bowers v. Hardwick, 478 U.S. 186
> (1986)] and hold that private consensual homosexual acts between adults may not be
> prosecuted in civilian society, *this would not alter the committee's judgment as to the
> effect of homosexual conduct in the armed forces.*  The committee finds that there are
> no significant developments in civilian society that would require a change in
> military policy.

S. Rep. 112, at 287 (emphasis added).  Thus, as Judge Tashima of the Ninth Circuit has persuasively

analyzed, "Lawrence does not impliedly overrule [the Ninth Circuit's decision in] Holmes.  Holmes

was based on the special needs of the military, a subject that Lawrence does not address.  Thus, the

two cases are not 'closely on point,' and Holmes remains the law of the circuit."  Hensala v. Dept.

of Air Force, 343 F.3d 951, 959 n.1 (9th Cir. 2003) (Tashima, J., concurring in part and dissenting

in part) (internal quotations and citations omitted).[5]  See also United States v. Marcum, 60 M.J. 198,

207 (C.A.A.F. 2004) (in considering as-applied challenge to criminal prohibition on sodomy under

the Uniform Code of Military Justice, court inquires, *inter alia*, whether there are "additional factors

relevant solely in the military environment that affect the nature and reach of the Lawrence liberty

interest.").

---

[5]   The panel majority in Hensala did not take issue with Judge Tashima's analysis, but instead
chose not to address the question of whether Lawrence called into question prior circuit precedent
because it had not been addressed by the district court.  See id. at 956 ("Because the claim has not
been presented to the district court, we decline to address it on appeal."); id. at 959 ("We need not,
and do not, reach the question of whether [Lawrence] has effectively overruled Holmes.").

Second, the Supreme Court did not characterize the right at issue in <u>Lawrence</u> as being "fundamental," nor did the Court apply strict scrutiny, the proper standard when fundamental rights are implicated. To the contrary, the Court invalidated the Texas statute on rational-basis grounds, holding that it "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." 539 U.S. at 578. Thus, while <u>Lawrence</u> clearly established the unconstitutionality of *criminal* prohibitions on consensual adult sodomy, courts have rightly declined to find that <u>Lawrence</u> impliedly announced a new fundamental right that would trigger strict scrutiny. <u>See</u>, <u>e.g.</u>, <u>Lofton</u> v. <u>Secretary of the Dept. of Children and Family Servs.</u>, 358 F.3d 804, 816 (11th Cir. 2004) (stating that "language and reasoning [of <u>Lawrence</u>] are inconsistent with standard fundamental-rights analysis."), *cert. denied*, 73 USLW 3247 (U.S. Jan 10, 2005) (No. 04-478); <u>United States</u> v. <u>Extreme Associates, Inc.</u>, --- F. Supp.2d ---, 2005 WL 121749, * 12 (W.D. Pa. Jan. 20, 2005) ("Despite defendants' urging, we do not find that <u>Lawrence</u> created a 'new' and/or 'broad' fundamental right to engage in private sexual conduct. Although the <u>Lawrence</u> opinion is mixed, certain language suggests that the Court engaged in a rational basis review of the challenged statute. In that light, it is reasonable to find that the court itself did not consider it was addressing a fundamental right."); <u>Wilson</u> v. <u>Ake</u>, No. 8:04-CV-1680-T-30TBM, 2004 WL 3142528, * 5 (M.D. Fla. July 20, 2004) ("The Court in <u>Lawrence</u> did not find private sexual conduct between consenting adults to be a fundamental right. Rather, the Court determined that the Texas statute failed under the rational basis analysis.") (internal citation omitted); <u>In re Kandu</u>, 315 B.R. 123, 139-40 (W.D. Wash. 2004) (rejecting contention that <u>Lawrence</u> requires application of heightened scrutiny to constitutional challenge to the Defense of Marriage Act, noting that the Court in <u>Lawrence</u> "applied without explanation a rational basis test, rather than strict scrutiny review required when fundamental

-20-

rights are at issue."); <u>Marcum</u>, 60 M.J. at 205 ("[W]e will not presume the existence of such a fundamental right in the military environment when the Supreme Court declined in the civilian context to expressly identify such a fundamental right.").

Finally, the decision in <u>Lawrence</u> addressed the type of constitutional challenge that then-Judge Kennedy noted was not at issue in <u>Beller</u> – "ones in which the state seeks to use its *criminal* processes to coerce persons to comply with a moral precept even if they are consenting adults acting in private without injury to each other."  632 F.2d at 810 (emphasis added).  <u>See Lawrence</u>, 539 U.S. at 578 (holding that "[t]he State cannot demean their existence or control their destiny by making their private sexual conduct a crime.").  That the challenged statute and implementing regulations do not impose criminal penalties further distinguishes this case from <u>Lawrence</u>, and refutes plaintiffs' assertion that § 654 must be subjected to heightened scrutiny.

**2.**  Legislative classifications that do not infringe upon fundamental rights and do not target a suspect class[1] are subject to rational basis review.  <u>Romer</u> v. <u>Evans</u>, 517 U.S. 620, 632 (1996).  Such classifications are accorded "a strong presumption of validity" and must be sustained "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>Heller</u> v. <u>Doe</u>, 509 U.S. 312, 320 (1993).  The courts cannot "simply set aside these lengthy labors of the legislative process and supplant with [their] own judicial judgment the product of a serious

---

[1]  Although the First Circuit has not had occasion to address this issue, every other court of appeals to have considered the question has held that homosexuals do not constitute a suspect class. <u>See</u> <u>Johnson</u> v. <u>Johnson</u>, 385 F.3d 503, 532 (5th Cir. 2004); <u>Lofton</u>, 358 F.3d at 818 & n.16; <u>Holmes</u>, 124 F.3d at 1132; <u>Richenberg</u>, 97 F.3d at 260-61; <u>Thomasson</u>, 80 F.3d at 928; <u>Walmer</u>, 52 F.3d at 854-55; <u>Steffan</u>, 41 F.3d at 288-89; <u>Ben-Shalom</u>, 881 F.2d at 464; <u>Woodward</u>, 871 F.2d at 1076. <u>See</u> <u>generally</u> <u>Schroeder</u> v. <u>Hamilton School Dist.</u>, 282 F.3d 946, 957 (7th Cir.) (Posner, J., concurring) ("Homosexuals have not been accorded the constitutional status of blacks or women."), *cert. denied*, 537 U.S. 974 (2002).

-21-

and prolonged debate on a subject of paramount national importance." <u>Thomasson</u>, 80 F.3d at 923.

The Government "has no obligation to produce evidence to sustain the rationality" of the Act; to the

contrary, "a legislative choice is not subject to courtroom factfinding and may be based on rational

speculation unsupported by evidence or empirical data." <u>Heller</u>, 509 U.S. at 320.  "The Constitution

gives to Congress the role of weighing conflicting evidence in the legislative process," and the courts

"are not to 're-weigh the evidence *de novo*, or to replace Congress' factual predictions with [their]

own.'" <u>Turner Broadcasting System, Inc.</u> v. <u>FCC</u>, 520 U.S. 180, 199, 211 (1997) (quoting <u>Turner</u>

<u>Broadcasting</u> v. <u>FCC</u>, 512 U.S. 622, 66 (1994)).

> **B.    Congress Rationally Determined that the Prohibition Against Homosexual Conduct Continues To Be Necessary In The Unique Circumstances Of Military Service**

Congress found that the service "in the armed forces of persons who demonstrate a

propensity or intent to engage in homosexual acts would create an unacceptable risk to the high

standards of morale, good order and discipline, and unit cohesion that are the essence of military

capability." 10 U.S.C. § 654(a)(15).  As is demonstrated below, Congress had ample grounds for

reaching this informed, rational judgment.  Among other things, Congress sought to promote unit

cohesion, reduce sexual tension, and protect personal privacy.

**1.**  Congress found that members of the military may be required "to make extraordinary

sacrifices, including the ultimate sacrifice, to provide for the common defense." § 654(a)(5).   In

order to achieve success in combat, Congress found it was necessary that military units be

characterized by "high morale, good order and discipline, and unit cohesion." § 654(a)(6).  As the

Senate Armed Services Committee recognized, members of the Armed Forces "are not recruited for

a single job at a single location.  They must be capable of serving not as an individual, but as a

-22-

member of a team, in a variety of assignments and locations, often under dangerous and life-threatening conditions." S. Rep. 112, at 273. Congress therefore found that "[o]ne of the most critical elements in combat capability is unit cohesion, that is, the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members." 10 U.S.C. § 654(a)(7).

This fundamental principle cannot be over-emphasized. In his testimony before the Senate Committee, General H. Norman Schwarzkopf, U.S. Army (Ret.), stated that unit cohesion "is the single most important factor in a unit's ability to succeed on the battlefield." S. Rep. 112, at 275. As he explained:

> What keeps soldiers in their foxholes rather than running away in the face of mass waves of attacking enemy, what keeps the marines attacking up the hill under withering machinegun fire, what keeps the pilots flying through heavy surface-to-air missile fire to deliver bombs on target is the simple fact that they do not want to let down their buddies on the left or on the right.
>
> They do not want to betray their unit and their comrades with whom they have established a special bond through shared hardship and sacrifice not only in the war but also in training and the preparation for the war.

Id. at 274-75. General Powell likewise testified that, "[t]o win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies." Id. at 275. See also id. at 275-76 (quoting testimony of Dr. William Daryl Henderson, former Commander of the Army Research Institute and author of *Cohesion: The Human Element in Combat*).

Congress also heard testimony that unit cohesion must be developed long before a unit is sent to the battlefield. Dr. David Marlowe, Chief of the Department of Military Psychology at the Walter

-23-

Reed Army Institute of Research, testified that "[c]ohesion is not something magical. It does not suddenly happen the moment the bullets come. If it was not there to begin with, it is going to take a long time and some dead and mangled bodies before you get it." Id. at 276. Likewise, General Powell testified that:

> Bonding begins on the first day of boot camp. Bonding takes place everytime a GI joins a new unit. A unit must bond as a fighting force before it is sent to the battlefield. Unit members work together, train together, and deploy together sharing experiences that contribute to the development of cohesion. Mutual trust, common core values, self confidence, and realization of shared goals help to form the cohesive military team. Cohesion requires the sacrifice of personal needs for the needs of the unit, subjugating individual rights to the benefit of the team.
>
> While individual initiative is rewarded, the contribution of the team--the cohesive unit--is what guarantees military success.

Id. at 275.

Based on this uniform testimony, the Senate Armed Services Committee concurred with General Powell's assessment that "[w]e cannot allow anything to happen which would destroy that feeling of cohesion within the force." Id. at 275.

**2.** A significant element of unit cohesion is reducing or eliminating sexual tension from distracting the members of the unit, and protecting the personal privacy of service members. As the Senate Armed Services Committee recognized, among both heterosexuals and homosexuals, "[s]exual behavior is one of the most intimate and powerful forces in society," and, "[w]hen dealing with issues involving persons of different genders * * * the armed forces do not presume that servicemembers will remain celibate or that they will not be attracted to members of the opposite sex. Rather, the military specifically provides men and women with separate quarters in order to ensure privacy because experience demonstrates that few remain celibate and many are attracted to

-24-

members of the opposite sex." Id. at 284.  Indeed, the Senate Armed Services Committee expressly noted that "[t]he separation of men and women is based upon the military necessity to minimize conditions that would disrupt unit cohesion, such as the potential for increased sexual tension that could result from mixed living quarters." Id. at 277-78 .  As General Powell testified, "[c]ohesion is strengthened or weakened in the intimate living arrangements we force upon our people. * * *  In our society gender differences are not considered conducive to bonding and cohesion within barracks living spaces."  Id. at 278.  Thus, because "[s]exual behavior is one of the most intimate and powerful forces in society," id. at 281, the Senate Armed Services Committee found that it was reasonable for the military to take these factors into account in establishing gender-based assignment policies.  Id. at 278.

Just as "[i]t is reasonable for the armed forces to take these factors into consideration in establishing gender-based assignment policies," it also "is reasonable for the armed forces to take [them] into consideration when addressing issues concerning persons who engage in or have the propensity or intent to engage in sexual activity with persons of the same sex." Id. at 278.  See Richenberg, 97 F.3d at 262 ("[I]t is rational to assume that both homosexuals and heterosexuals 'are likely to act in accordance with their sexual drives.'") (quoting Steffan, 41 F.3d at 692).  As the Senate Armed Services Committee recognized, it would be "irrational * * * to develop military personnel policies on the basis that all gays and lesbians will remain celibate or that they will not be sexually attracted to others." S. Rep. 112, at 278.  As noted, the military seeks to reduce sexual tension and protect personal privacy among heterosexuals by providing men and women with separate berthing and bathing facilities.  In addition to accommodating privacy concerns, the separation by gender serves to reduce the sexual "temptations facing heterosexuals" who, "like

homosexuals, are likely to act in accordance with their sexual drives" despite rules that bar such sexual encounters. Steffan, 41 F.3d at 692.

But, while the military is able to promote unit cohesion, reduce sexual tension, and protect personal privacy in the case of heterosexual servicemembers by providing separate quarters for men and women, such an accommodation is not available for those individuals who engage in homosexual conduct, "[t]he military could not eliminate the difficulties of quartering homosexuals with persons of the same sex by totally segregating homosexuals." Id. at 692. Thus, as the en banc D.C. Circuit recognized in Steffan, far from stemming from irrational bias or stereotypes, "heterosexuals and homosexuals are treated differently because the means at the military's disposal for dealing with the natural phenomenon of sexual attraction differ for the two." Id. Rather, § 654 "accommodates the reasonable privacy concerns of heterosexual service members and reduces the sexual problems that may arise when some members of the unit have a propensity or intent to engage in homosexual acts and others do not. These same concerns for privacy and sexual tension explain the military's policy of providing service men and women with separate living quarters." Thomasson, 80 F.3d at 929-30.

This is not to say, and indeed Congress rejected, the "stereotypical" notion that homosexuals are sexual "predators" who "find every person of the same sex to be sexually attractive." S. Rep. 112, at 284. As General Powell testified: "Our concern has not been about homosexuals seducing heterosexuals or heterosexuals attacking homosexuals. The first of these so-called problems is manageable and the second so-called problem is punishable. For us, the issue is also not what is acceptable in civilian life, and it is not our place as the uniformed leaders of the armed forces to use our official position to make moral or religious judgments on this issue." Id. at 279. Rather,

Congress merely acknowledged the fact that homosexuals, like heterosexuals, are likely to act in accordance with their sexual desires. In the words of the Senate Armed Services Committee:

> The issue * * * is not whether military personnel can be trained to accept gays and lesbians as co-workers. * * * [M]ilitary personnel may be required to work with gays and lesbians who are DoD civilian employees or contractor employees. No servicemember has the right to refuse to work with a gay or lesbian or to abuse or harass such a person. This is not the same, however, as requiring military personnel to share their personal living spaces with individuals who, by their acts or statements, demonstrate a propensity or intent to engage in sexual conduct with persons of the same sex.

Id. at 281.

Thus, in enacting the challenged Act, Congress emphasized that it was attempting to devise a policy that respects the fact that, in the military setting, homosexuals, unlike heterosexuals, will be called upon to share intimate living arrangements with individuals to whom they may be sexually attracted. As General Powell explained:

> [O]pen homosexuality in units is not just the acceptance of benign characteristics such as color or gender or background. It involves matters of privacy and human sexuality that, in our judgment, if allowed to exist openly in the military, would affect the cohesion and well-being of the force. It asks us to deal with fundamental issues that the society at large has not yet been able to deal with.

Id. General Powell therefore testified that "it would be prejudicial to good order and discipline" if the military required heterosexuals and persons who demonstrate that they do or are likely to engage in homosexual acts "to share the most private facilities together, the bedroom, the barracks, latrines, and showers." Id. The Senate Armed Services Committee quoted these comments of General Powell and noted that they "do not reflect an irrational prejudice against gays and lesbians. His comments, which the Committee endorses, represent a prudent evaluation of the impact of such

-27-

behavior on the armed forces, and underscore the fact that the policy is based upon prudence, not prejudice." Id.

**3.** These considerations amply justify the statutory policy enacted by Congress. As the en banc Fourth Circuit reasoned: "It was legitimate * * * for Congress to conclude that sexual tensions and attractions could play havoc with a military unit's discipline and solidarity. It was appropriate for Congress to believe that a military force should be as free as possible of sexual attachments and pressures as it prepared to do battle. Any argument that Congress was misguided in this view is one of legislative policy, not constitutional law." Thomasson, 80 F.3d at 929. The Second, Eighth, and Ninth Circuit likewise have determined that the challenged statute satisfies rational basis review. See Able II, 155 F.3d at 636 (holding that "[t]he testimony of numerous military leaders, the extensive review and deliberation by Congress, and the detailed findings set forth in the Act itself provide a 'reasonably conceivable state of facts,' to uphold the Act."); Philips, 106 F.3d at 1429 (noting that "the Navy has explained that in its judgment separating members who engage in homosexual acts is necessary to further military effectiveness by maintaining unit cohesion, accommodating personal privacy and reducing sexual tension," and holding that "we cannot say that the Navy's concerns are based on 'mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable' by the military. Nor can we say that avoiding sexual tensions lacks any 'footing in the realities' of the Naval environment in which Philips served.:"); Richenberg, 97 F.3d at 262 ("Military leaders have determined that excluding those with a propensity to engage in homosexual acts, like providing separate housing for men and women, reduces sexual tensions that would jeopardize unit cohesion, the cornerstone of an effective military. * * * Given these rational

concerns, Congress and the President may rationally exclude those with a propensity or intent to engage in homosexual acts.").

4. Because it is legitimate for Congress to proscribe homosexual acts in the Armed Forces, it follows that it is legitimate for the government to seek to forestall these same dangers by trying to *prevent* the commission of such acts.  See Thomasson, 80 F.3d at 929-30 (citing cases).  The statute therefore reasonably provides that a member's statement that he or she is a gay or lesbian establishes a rebuttable presumption that the member has a propensity to engage in homosexual acts, unless the member demonstrates that he or she does not engage in, and is not likely to engage in, homosexual acts.  See 10 U.S.C. § 654(b)(2); DoDD 1332.14 ¶ E3.A1.1.8.1.2.2, at 27; DoDI 1332.40 ¶ E2.3.1.2, at 10.   In other words, such a statement may lead to discharge, "not because it reflects the member's sexual orientation," but because "the statement indicates a likelihood that the member engages in or will engage in homosexual acts."  DoDD 1332.14 ¶ E3.A1.1.8.1.1, at 26; DoDI 1332.40 ¶ E2.3, at 9.  As the Senate Armed Services Committee found, it is reasonable for the military to presume that, when a service member makes a statement that he or she is a gay or lesbian, that member engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.  See S. Rep. 112,  at 294.

Nor was it unreasonable for Congress to conclude that a service member's statement that he or she is a homosexual raises a rebuttable presumption that the member may engage in homosexual acts, as all four courts of appeals to have considered the question have found.  See Holmes, 124 F.3d at 1135 ("We agree with the Second, Fourth, and Eighth Circuits on this issue. Although the legislature's assumption that declared homosexuals will engage in homosexual conduct is imperfect, it is sufficiently rational to survive scrutiny under Heller."); Richenberg, 97

F.3d at 262 ("[I]t is rational to assume that both homosexuals and heterosexuals 'are likely to act in accordance with their sexual drives.'") (quoting Steffan, 41 F.3d at 692); Able I, 88 F.3d at 1296-97 ("Section 654(b)(2) creates an evidentiary presumption that a person who identifies himself as a homosexual will engage in or is likely to engage in homosexual acts.    This evidentiary use substantially furthers the government's interest because it is plain to us that there is a correlation between those who state that they are homosexual and those who engage in homosexual acts."); Thomasson, 80 F.3d at 930 ("The presumption that declared homosexuals have a propensity or intent to engage in homosexual acts certainly has a rational factual basis.").

Moreover, as the Ninth Circuit made clear in Holmes, a discharge of a service member is not based solely on a statement that the member is gay or lesbian, it is based on that statement *plus* the member's failure to rebut the presumption that he or she is likely to engage in homosexual acts. See 124 F.3d at 1135. See also Thomasson, 80 F.3d at 934 (Murnaghan, J., concurring) ("The case concerns a rebuttable presumption which Thomasson did not rebut.    Whether the employer was a military or nonmilitary body, it is enough that the presumption used is rational and thus constitutional.").[2]    The DoD regulations provide that a member is entitled, with assistance of counsel, to attempt to rebut the presumption by presenting any relevant evidence and witnesses to the administrative board.    See DoDD 1332.14 ¶¶ E3.A1.1.8.1.2.2.1-.5, at 28; DoDI 1332.40 ¶¶ E2.3.1.2.1-.5, at 10.    Thus, a service member who states that he or she is a homosexual is not required to disprove his sexual orientation; rather, the member must show that he or she does not

_____

[2]    We note that those courts that have reviewed the question have determined, based on a review of the military records, that service members are afforded a meaningful opportunity to rebut the presumption. See Holmes, 124 F.3d at 1135-36 (rejecting contention that presumption is effectively irrebuttable based on review of military records); Thorne v. U.S. Dept. of Defense, 945 F. Supp. 924, 927-30 (E.D. Va. 1996) (same), aff'd, 139 F.3d 893 (4th Cir.), cert. denied, 525 U.S. 947 (1998).

engage in, and is not likely to engage in, homosexual acts. See Holmes, 124 F.3d at 1135 ("Thus, under the statements prong of the 'don't ask/don't tell' policy, service members are not discharged for having a homosexual 'status.'  The discharges result because of actual conduct or a propensity for conduct that is prohibited.").

*    *    *

In sum, because "the means chosen by Congress in the Act are rationally related to legitimate legislative ends," Thomasson, 80 F.3d at 930, plaintiffs' claim that the § 654 and the implementing DoD regulations violate their fundamental right to liberty and privacy should be dismissed with prejudice for failure to state a claim upon which relief can be granted.

### C.    The Statute Does Not Violate Equal Protection

As noted above, plaintiffs also claim (Complaint ¶¶ 177-79) that § 654 and the implementing DoD regulations deny them the equal protection of the laws because "[i]t discharges gay, lesbian, and bisexual service members because of their sexual orientation, but does not discharge heterosexual service members because of their sexual orientation."

That claim, too, should be dismissed with prejudice for failure to state a claim upon which relief can be granted.  As we have shown above, and as the courts of appeals have unanimously determined, the challenged statute and implementing DoD regulations satisfy rational basis review, and do not discriminate against homosexuals based on their orientation, but on the likelihood or propensity to engage in homosexual acts.  Indeed, the courts of appeals have unanimously held that § 654 and the implementing DoD regulations do not violate equal protection.  See Able II, 155 F.3d at 636 ("We conclude that under rational basis review § 654 does not violate the Equal Protection Clause of the Constitution."); Philips, 106 F.3d at 1429 ("[B]ound by our precedent that the

-31-

relationship between the Navy's mission and its policy on homosexual acts is not so attenuated as to render the distinction arbitrary and irrational, we hold that [§ 654] does not violate Philips's right to equal protection."); Richenberg, 97 F.3d at 262 ("Given these rational concerns, Congress and the President may rationally exclude those with a propensity or intent to engage in homosexual acts."); Thomasson, 80 F.3d at 931 ("In sum, we conclude that the Act represents a legitimate legislative match of ends and means that withstands appellant's equal protection challenge.").

## III.    THE STATUTE DOES NOT VIOLATE THE FIRST AMENDMENT

As we showed *supra* pp. 6, 7, 29-30, a member's statement that he or she is a homosexual creates a rebuttable presumption that the member engages in, or likely will engage in, homosexual acts.  We now show, consistent with the unanimous views of the courts of appeals to have considered the issue, that the military may, consistent with the First Amendment, use a service member's statement that he or she is gay or a lesbian as evidence of the member's likelihood of engaging in validly prohibited homosexual acts.

The Supreme Court repeatedly has affirmed the validity under the First Amendment of "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993).  "[I]t has never been deemed an abridgment of freedom of speech * * * to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken [or] written." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949).  To the contrary, the "Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations * * * simply because those beliefs and associations are protected by the First Amendment." Dawson v. Delaware, 503 U.S. 159, 165 (1992).

The Supreme Court's decision in <u>Wayte</u> v. <u>United States</u>, 470 U.S. 598, 609 (1985), is particularly illuminating. Wayte had written to Government officials that he had not registered for the draft and did not intend to do so. The Government, relying heavily on those letters, prosecuted him pursuant to its "passive policy" of prosecuting only those persons who reported themselves as having violated the law, or who were reported by others. <u>Id</u>. at 600-01. The Supreme Court rejected Wayte's argument that the use of his letter violated free speech because it created a "content-based regulatory system with a concomitantly disparate, content-based impact on nonregistrants." <u>Id</u>. at 611. Instead, the Court noted that Wayte's letters were simply an example of "self-reporting" of a violation of the law, <u>id</u>. at 614, and held that the First Amendment does not prohibit the use of the letters as "strong, perhaps conclusive evidence of the nonregistrant's intent not to comply [with the draft registration law] -- one of the elements of the offense." <u>Id</u>. at 612-13.

<u>Wayte</u> disposes of the plaintiffs' First Amendment claim. As the en banc Fourth Circuit has recognized, "the statute's essential concern is not with speech declaring homosexuality, as Thomasson alleges, but is instead with the propensity or intent to engage in acts which Congress has deemed detrimental to the military's mission," <u>Thomasson</u>, 80 F.3d at 932, and, if the First Amendment permits the evidentiary use of speech in criminal proceedings to show improper acts, it *a fortiori* permits the evidentiary use of speech in administrative proceedings to determine a member's suitability for continued military service. <u>See</u> <u>Able I</u>, 88 F.3d at 1296-97 ("This evidentiary use substantially furthers the government's interest because * * * there is a correlation between those who state that they are homosexual and those who engage in homosexual acts."). Moreover, "[t]he military policy here is justified on a content-neutral, nonspeech basis: preventing

the disruptions that homosexual activity among service members might have on military readiness."

Thomasson, 80 F.3d at 933.

Thus, "[w]hile the government may not rely on information that would impinge on First Amendment rights if there is no connection between the information sought and the state's interest, where such a connection does exist, the information may be used even though communicated by speech or expressive activity." Philips v. Perry, 883 F. Supp. 539, 547 (W.D. Wash. 1995) (internal citation omitted), aff'd, 106 F.3d 1420 (9th Cir. 1997).  As en banc Fourth Circuit has held:

> There is no constitutional impediment, therefore, to the use of speech as relevant evidence of facts that may furnish a permissible basis for separation from military service.   No First Amendment concern would arise, for instance, from the discharge of service members for declaring that they would refuse to follow orders, or that they were addicted to controlled substances.  Such remarks provide evidence of activity that the military may validly proscribe.  And, as we discussed above, the military may take measures to prevent the commission of sexual activity that it deems detrimental to its mission.   Based upon this rationale, courts have consistently rejected First Amendment challenges to the use of a service member's declaration of homosexuality as a basis for separation.

Thomasson, 80 F.3d at 931 (citing cases).

Lastly, and contrary to plaintiffs' assertion (Complaint ¶ 36) that "[a]ny honest admission by a service member that he or she is gay, lesbian, or bisexual *requires* discharge," the challenged statute creates only a rebuttable presumption that such a member will engage in, or is likely to engage in, homosexual acts, and "[s]ervice members who state that they are homosexual can avoid separation by rebutting the presumption that they have a propensity or intent to engage in homosexual acts."  Thomasson, 80 F.3d at 932.  See also Holmes, 124 F.3d at 1135 (discharge under § 654 is based on a member's statement "***plus*** their failure to present any evidence at their discharge hearings to rebut the presumption that a declaration of homosexuality evidences a

-34-

propensity to engage in prohibited homosexual conduct.") (emphasis in original).    The retention of service members who rebut the presumption that they engage in, or are likely to engage in, homosexual acts is dispositive evidence that the policy does not target speech or the response of service members to speech.   See Holmes, 124 F.3d at 1135-36 (holding, after review of military records, that presumption is not irrebuttable); Thorne, 945 F. Supp. at 927-30 (same).

Accordingly, because the plaintiffs were discharged for their conduct, not for their speech, the First Amendment "is not implicated," Holmes, 124 F.3d at 1136, and plaintiffs' First Amendment claim should be dismissed with prejudice for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of defendants, uphold the constitutionality of § 654 and the implementing DoD regulations, and dismiss this action with prejudice.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  _/s/ Mark T. Quinlivan_____
MARK T. QUINLIVAN
Assistant U.S. Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3606

Dated: February 7, 2005

Calendar No. 164

| 103D CONGRESS<br>*1st Session* | SENATE | REPORT<br>103–112 |
|---|---|---|

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1994

## REPORT

[TO ACCOMPANY S. 1298]

ON

AUTHORIZING APPROPRIATIONS FOR FISCAL YEAR 1994 FOR MILITARY ACTIVITIES OF THE DEPARTMENT OF DEFENSE, FOR MILITARY CONSTRUCTION, AND FOR DEFENSE ACTIVITIES OF THE DEPARTMENT OF ENERGY, TO PRESCRIBE PERSONNEL STRENGTHS FOR SUCH FISCAL YEAR FOR THE ARMED FORCES, AND FOR OTHER PURPOSES

TOGETHER WITH

### ADDITIONAL VIEWS

## COMMITTEE ON ARMED SERVICES UNITED STATES SENATE



JULY 27 (legislative day, JUNE 30), 1993.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1993

70–703

# POLICY CONCERNING HOMOSEXUALITY IN THE ARMED FORCES

Current Department of Defense policy provides that "the presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission." The armed forces discharge servicemembers when there is an approved finding that: (1) the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act; (2) the member has stated that he or she is a homosexual or a bisexual; or (3) the member has married or attempted to marry a person of the same biological sex.

On January 29, 1993, the President directed the Secretary of Defense to review the Department's policy and to provide him with recommendations by July 15, 1993. On February 4, 1993, the Senate adopted an amendment, which was enacted into law, calling for a comprehensive review of the policy, and directing the Committee on Armed Service to conduct hearings. On July 19, 1993, the Secretary of Defense submitted his recommendations, which were approved by the President, to the Congress.

The Committee on Armed Services, after detailed hearings and careful review of the recommendations of the Secretary of Defense, agreed that a specific legislative framework for the policy should be set forth in law. Part I of this Report summarizes the committee's findings and recommendations. Part II sets forth the background to the committee's action. Part III describes the basis for the committee's action. Part IV contains a sectional analysis of the committee's legislative proposal.

## I. SUMMARY

Based upon the committee's review and deliberations, the committee recommends legislation that sets forth legislative findings and a framework to guide the Department of Defense in its implementation of the policy concerning homosexuality in the armed forces. The committee recommends the following findings:

(1) Section 8 of article I of the Constitution of the United States commits exclusively to the Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for the government and regulation of the land and naval forces.

(2) There is no constitutional right to serve in the armed forces.

(3) Pursuant to the powers conferred by section 8 of article I of the Constitution of the United States, it lies within the discretion of the Congress to establish qualifications for and conditions of service in the armed forces.

(263)

264

(4) The primary purpose of the armed forces is to prepare for and to prevail in combat should the need arise.

(5) The conduct of military operations requires members of the armed forces to make extraordinary sacrifices, including the ultimate sacrifice, in order to provide for the common defense.

(6) Success in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion.

(7) One of the most critical elements in combat capability is unit cohesion, that is, the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members.

(8) Military life is fundamentally different from civilian life in that—

    (A) the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion, require that the military community, while subject to civilian control, exist as a specialized society; and

    (B) the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.

(9) The standards of conduct for members of the armed forces regulate a member's life for 24 hours each day beginning at the moment the member enters military status and not ending until that person is discharged or otherwise separated from the armed forces.

(10) Those standards of conduct, including the Uniform Code of Military Justice, apply to a member of the armed forces at all times that the member has a military status, whether the member is on base or off base, and whether the member is on duty or off duty.

(11) The pervasive application of the standards of conduct is necessary because members of the armed forces must be ready at all times for worldwide deployment to a combat environment.

(12) The worldwide deployment of United States military forces, the international responsibilities of the United States, and the potential for involvement of the armed forces in actual combat routinely make it necessary for members of the armed forces involuntarily to accept living conditions and working conditions that are often spartan, primitive, and characterized by forced intimacy with little or no privacy.

(13) The prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service.

(14) The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

(15) The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

The committee recommends that the policy concerning homosexuality in the armed forces continue the current conduct-based standards for discharge, as reiterated by the Secretary of Defense on July 19, 1993, which require separation on the basis of homosexual acts, statements, and marriages. The committee also recommends that these standards be set forth in the enlistment contract and in similar documents used for the appointment of officers. In addition, the committee recommends that the decision as to whether questions about homosexuality should be asked during the accession policy should be left to the discretion of the Department of Defense.

The standards and procedures set forth in the committee's recommendations are consistent with the policy of the Department of Defense, as set forth in DoD Directive 1332.14 (Enlisted Administrative Separations) and the policy memorandum issued by the Secretary of Defense on July 19, 1993 ("Policy on Homosexual Conduct in the Armed Forces"), as clarified in hearings before the committee.

## II. BACKGROUND

### RESTRICTIONS BASED UPON HOMOSEXUALITY ARE A LONGSTANDING FEATURE OF MILITARY PERSONNEL POLICY

Until the post-World War II period, military regulations on administrative separation were drafted in a manner that gave commanders broad discretion to discharge members of the armed forces. The Army, for example, authorized separation for reasons such as "inaptness or undesirable habits" (section VIII of Army Regulation 615–200). This regulation did not list any specific traits.

With respect to courts-martial, homosexual conduct traditionally was prosecuted in the armed forces under the general article (currently Article 134 of the UCMJ, 10 U.S.C. 934), which authorizes trial by court-martial for conduct that is service-discrediting or that is prejudicial to good order and discipline. The Articles of War of 1916 established a specific article proscribing assault with intent to commit sodomy. In the aftermath of World War I, Congress established the offense of sodomy, including consensual sodomy, as Article 93 of the Articles of War. See Manual for Courts-Martial, 1921, para. 443, sec. XI.

During World War II, the Army developed a medical approach to homosexuality, involving efforts at identification and treatment. An undetermined number of gay men and lesbians served during the war as a result of a combination of factors: concealment of homosexuality because of social taboos; the relative flexibility of personnel regulations; wartime personnel needs; and the inability of psychiatrists to determine who was homosexual. When there was an identification of an individual as a homosexual, however, an effort at treatment was made. Failure to respond to treatment provided a basis for a "section VIII" discharge. The massive manpower in-

flux of civilians into the armed forces during World War II, combined with the medical approach to homosexuality, led to the discharge during the war of a significant number of persons for reasons related to homosexuality.

In 1944, the Army in Circular No. 3 endeavored to distinguish between homosexuals who were discharged because they were "not deemed reclaimable" and those who were retained because their conduct was not aggravated by independent offenses. In 1945, a greater emphasis was placed on "reclamation" of homosexual soldiers. If a homosexual soldier was deemed "rehabilitated", the soldier was returned to service.

In 1947, the policy was revised to discharge individuals who had "homosexual tendencies" even if they had not committed homosexual acts. Those who committed homosexual acts were subject to court-martial or administrative discharge, with the character of discharge depending on the nature of the act.

The Uniform Code of Military Justice, enacted in 1950, contained a prohibition on sodomy, including consensual sodomy, in Article 125 reflecting the previously enacted prohibitions in the Articles of War and the Articles for the Government of the Navy.

In 1950 the Army adopted a mandatory administrative separation policy, which stated: "True, confirmed, or habitual homosexual personnel, irrespective of sex, will not be permitted to serve in the Army in any capacity and prompt separation of known homosexuals from the Army is mandatory." This policy was somewhat relaxed in 1955, permitting soldiers to be deemed "reclaimable" when they "inadvertently" participated in homosexual acts. This policy was reversed in 1958, when the mandatory separation policy was reinstated.

In 1970, a Department of Defense-wide policy was issued, authorizing separation on the basis of homosexual acts and "homosexual tendencies." There was no definition of the term "homosexual tendencies." Under the Directive, the final decision on separation of an individual soldier was a matter of command discretion rather than mandatory.

In the 1970s, there was increasing litigation concerning the procedures and basis for the DoD policies on the separation of homosexuals. In several court cases, the Department was asked to provide detailed reasons for not exercising the discretion to retain an individual when there was a finding of homosexual acts or tendencies. There is no data on the specific number of cases in which the discretion to retain an individual was exercised, but it does not appear to have been frequently used. The litigation, however, was considered during a detailed review of the DoD administrative discharge policy in the late 1970s during President Carter's administration. This review involved all aspects of administrative discharge proceedings and all reasons for administrative discharge, not just discharges for homosexuality.

As a result of that review, the Department of Defense made two significant changes in policy which were set forth in a memorandum issued by then-Deputy Secretary of Defense Graham Claytor on January 16, 1981. First, the Department of Defense issued a conduct-based policy, which authorized separation of persons who, by their acts or statements, demonstrate a propensity or intent to

engage in homosexual conduct, and eliminated "homosexual tendencies" as a reason for separation. Second, the mandatory separation policy, which had been used in the 1950s, was reinstated. This policy was incorporated without substantive change in the 1982 revision of DoD Directive 1332.14, which provides the current authority for enlisted administrative separations. Similar standards are set forth in DoD Directive 1332.30, which governs officer administrative separations. The policy memorandum issued by the Secretary of Defense on July 19, 1993 continues the conduct-based focus of Department of Defense policy.

In summary, the authority to administratively separate homosexuals has been in effect over a lengthy period of time, although the manner in which this policy has been implemented has varied. This authority has been consistently supported over the years by Congress and by every Administration, both Republican and Democratic.

### EVENTS LEADING UP TO THE COMMITTEE'S HEARINGS

In September 1992, during the Senate's debate on the National Defense Authorization Act for Fiscal Year 1993, Senator Howard Metzenbaum offered an amendment that would have established a "prohibition on discrimination in the military on the basis of sexual orientation." Senator Sam Nunn, Chairman of the Senate Armed Services Committee observed that "this subject deserves the greatest care and sensitivity" and stated: "We will have hearings on the subject next year. We will hear from all viewpoints, and we will take into consideration the viewpoints of our military commanders, the viewpoints of those in the homosexual community, the viewpoints of those who are in uniform who may be homosexual, gay, and we will also consider the men and women in uniform who are not in that category and the effect it would have on military morale." Based upon the assurance that hearings would be held in 1993, Senator Metzenbaum withdrew his amendment.

During the 1992 election campaign, Presidential candidate Bill Clinton said that, if elected, he would take action to change the current policy restricting the service of gay men and lesbians serving in the armed forces. He also spoke of the need to consult carefully with the military leadership on this issue. After the election, he reiterated his views on changing the policy and the need to consult with the military leadership.

Secretary of Defense Aspin, during his confirmation proceedings in January 1993, indicated that there would be extensive consultations with Congress on this subject.

Shortly after the Inauguration, a series of media reports suggested that a significant change in the Department's policy was imminent. A number of Senators indicated that they would offer an amendment early in the Congressional session that would prohibit any change in policy. Senator Nunn, among others, expressed the view that neither the Executive Branch nor Congress should institute a significant change in the current policy, by Presidential order or by Congressional action, prior to undertaking a comprehensive review, including hearings, on this subject.

On January 29, 1993, the President directed issuance of an interim policy that would be in effect until July 15, 1993. This in-

terim policy retained all then-existing rules restricting the service of gay men and lesbians in the armed forces. The policy also set forth two modifications that would apply during the interim period. First, reflecting a recommendation made by the Joint Chiefs of Staff, new recruits would not be questioned about homosexuality during the enlistment process. Second, gay and lesbian cases that did not involve homosexual acts would be processed through separation from active duty, and the individual would be placed in a nonpay status in the Standby Reserve during this interim period.

In addition, the President directed the Secretary of Defense to conduct a review of the current policy and to provide him with a draft Executive Order by July 15, 1993.

On February 4, 1993, during Senate consideration of the Family and Medical Leave Act, the Senate debated two amendments related to the service of gay men and lesbians in the armed forces.

The first amendment would have frozen in law "all Executive Orders, Department of Defense Directives, and regulations of the military departments concerning the appointment, enlistment, and induction, and the retention, of homosexuals in the Armed Forces, as in effect on January 1, 1993." The amendment was tabled by a vote of 62–37.

The Senate then unanimously adopted an amendment expressing the Sense of Congress that the Secretary of Defense should conduct "a comprehensive review of the current Department of Defense policy with respect to the service of homosexuals in the Armed Forces." The amendment further expressed the Sense of Congress that the results of the review should be reported to the President and Congress not later than July 15, 1993. In addition, the amendment expressed the Sense of Congress that the Senate Committee on Armed Services should conduct "comprehensive hearings on the current military policy" and should conduct "oversight hearings on the Secretary's recommendations as such are reported."

The amendment, as adopted, was enacted as section 601 of the Family and Medical Leave Act of 1993, Public Law No. 103–3. The Senate also agreed to an order that effectively precluded consideration of any further amendments in the Senate relating to the service of gay men and lesbians in the armed forces until July 15, 1993. This procedure permitted the Department of Defense and the Committee on Armed Services to conduct their reviews prior to legislative action on specific amendments.

### COMMITTEE PROCEEDINGS

The question of whether changes should be made in the restrictions on the service of gay men and lesbians in the armed forces has generated intense feelings in the Congress, in towns and communities across the country, and particularly throughout the ranks of the military services. Some individuals view the question as a moral issue, touching upon deeply held religious and philosophical beliefs. Others view it as a civil rights issue involving the fair and equitable treatment of individuals with a particular sexual orientation who want to serve their country in uniform.

While the committee has received testimony reflecting these broad, strongly held views, the Committee's primary focus and concern has been the implications of any change in the current policy

on the effectiveness of our armed forces to carry out their mission to defend our nation.

Article I, section 8 of the Constitution commits exclusively to the Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for the government and regulation of the land and naval forces. Pursuant to these powers, it lies within the discretion of Congress to establish the qualifications for military service, the terms and conditions of military service, and the standards necessary to ensure good order and discipline within the armed forces.

The committee began its hearings on March 29, 1993, with an overview of the historical and legal background of the current Defense Department policy. Dr. David Burrelli, a sociologist from the Foreign Affairs and National Defense Division of the Congressional Research Service, summarized the historical development of the Defense Department's current policy. Professor David A. Schlueter of St. Mary's Law School described how the military legal system addresses the issue of homosexuality, and outlined legal issues raised by the current policy and proposals for change. Professor Steven A. Saltzburg of George Washington University National Law Center described the state of litigation concerning the service of gay men and lesbians in the armed forces, and outlined legal issues raised by this litigation. Mr. Charles Dale, a legislative attorney from the American Law Division of the Congressional Research Service, summarized the general state of the law with respect to issues concerning gay men and lesbians in the United States.

On March 31, 1993, the committee conducted a hearing on the role of unit cohesion in developing combat effectiveness, receiving testimony from three experts on military personnel policy: Dr. William D. Henderson, former commander of the Army Research Institute; Dr. Lawrence Korb, former Assistant Secretary of Defense for Manpower, Reserve Affairs, and Logistics; and Dr. David Marlowe, chief of the Department of Military Psychiatry at Walter Reed Army Institute of Research.

The committee held a hearing on April 29, 1993, on the experiences of foreign military services. Testimony was presented by Dr. Charles Moskos, Professor of Sociology at Northwestern University; Dr. David Segal, Professor of Sociology at the University of Maryland; Dr. Judith Stiehm, Pressor of Political Science at Florida International University; and Lt. Gen. Calvin Waller, U.S. Army (retired).

On May 7, 1993, the committee received testimony from Members of the Senate, including Senator Howard Metzenbaum, Senator Frank H. Murkowski, Senator John F. Kerry, Senator Barbara Boxer, Senator Conrad Burns, Senator Dianne Feinstein, Senator John H. Chafee, and Senator James M. Jeffords.

The committee conducted a field visit to the Norfolk Naval Complex on May 10, 1993. During the morning, members of the committee visited four classes of ships: the aircraft carrier John F. Kennedy; the amphibious assault ships Austin and Gunston Hall; the attack submarines Montpelier, Flying Fish, and Baton Rouge; and the submarine tender, Emory S. Lamb. During these visits, members of the committee conducted informal discussions with sailors and marines of all ranks, visiting with them in their work-

ing and living spaces, including a visit to a submarine tender with a mixed gender crew. During the afternoon, the committee conducted a formal hearing at which testimony was presented by seventeen members of the Navy and Marine Corps selected by the committee, including both enlisted personnel and officers.

On May 11, 1993, the committee received testimony in Washington, D.C., from current and former members of the armed forces, including: General H. Norman Schwarzkopf, U.S. Army (Ret.); Colonel Frederick C. Peck, U.S. Marine Corps; Major Kathleen Bergeron, U.S. Marine Corps; Command Master Chief David Borne, U.S. Navy; Dr. Margarethe Cammermeyer, former Colonel and Chief Nurse, Washington Army National Guard; Chief Petty Officer Stevens R. Amidon, U.S. Navy; Thomas Paniccia, former Staff Sergeant, U.S. Air Force; and Sergeant Justin Elzie, U.S. Marine Corps.

Secretary of Defense Les Aspin submitted the administration's recommendations to Congress on July 19, 1993. On July 20, 1993, the committee received testimony on the recommendations from Secretary Aspin and the Joint Chiefs of Staff: General Colin L. Powell, U.S. Army, Chairman of the Joint Chiefs of Staff; Admiral David E. Jeremiah, U.S. Navy, Vice Chairman; General Gordon R. Sullivan, Chief of Staff, U.S. Army; General Carl E. Mundy, Jr., Commandant of the Marine Corps; Admiral Frank B. Kelso, II, Chief of Naval Operations; and General Merrill A. McPeak, Chief of Staff, U.S. Air Force.

On July 21 and July 22, 1993, the committee heard from the Honorable Jamie S. Gorelick, General Counsel of the Department of Defense, and Major General John P. Otjen, U.S. Army, Senior Member of the Military Working Group established by Secretary Aspin to review this issue.

In addition, the committee received testimony for the record from numerous private citizens and organizations.

The testimony presented to the committee represented a wide range of experiences, including those of current and former servicemembers who have publicly identified themselves as gay or lesbian. The committee received a broad variety of views, ranging from recommendations to reinstate the policy in effect prior to the January 29, 1993 interim modifications to recommendations for elimination of restrictions on homosexual acts. The committee carefully considered all points of view in developing its recommendations.

### III. Basis for Committee's Action

*Article I, section 8 of the Constitution commits exclusively to the Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for the government and regulation of the land and naval forces. Pursuant to these powers, it lies within the discretion of the Congress to determine qualifications for and conditions of service in the armed forces*

The Framers of the Constitution, in Article I, section 8, expressly vested the powers to raise and regulate military forces in the Congress. Detailed statutory mandates on the qualifications for and conditions of military service are found primarily in title 10 of the

United States Code. The President may supplement, but not supersede, the rules established by Congress for the government and regulation of the armed forces.

The role of the courts in reviewing military personnel matters is even more circumscribed. Although the constitutional guarantees of the Bill of Rights are generally available to servicemembers, the application of those guarantees in the military setting differs considerably from the manner in which they apply in civilian society.

The limited role of the judiciary in reviewing military personnel policies, the differing application of constitutional rights in the military, and the special role of the armed forces have been consistent themes in the Supreme Court's review of military matters:

> [J]udges are not given the task of running the Army. . . . The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. *Orloff* v. *Willoughby*, 345 U.S. 83, 93–94 (1953).

> [I]t is the primary business of armies and navies to fight and to be ready to fight should the occasion arise. *Ex rel. Toth* v. *Quarles*, 350 U.S. 11, 17 (1955).

> The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping. *United States* v. *O'Brien*, 391 U.S. 377 (1968).

> None of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs. In that area, as any other, Congress remains subject to the limitations of the Due Process Clause . . . but the tests and limitations to be applied may differ because of the military context. . . . [W]e must be particularly careful not to substitute our judgment of what is desirable for that of Congress, or our own evaluation of evidence for a reasonable evaluation by the Legislative Branch. *Rostker* v. *Goldberg*, 453 U.S. 67–68 (1981).

> [J]udicial deference to . . . congressional exercise of authority is at its apogee when legislative action [is] under the congressional authority to raise and support armies and make rules and regulations for their governance . . . *Id.* at 70.

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. *Gilligan* v. *Morgan*, 413 U.S. 1, 10 (1973).

> [T]he military is, by necessity, a specialized society separate from civilian society. *Parker* v. *Levy*, 417 U.S. 733, 743 (1974).

> Congress is permitted to legislate both with greater breadth and with greater flexibility when regulating military personnel. *Id.* at 756.

where and with whom they choose, members of the armed forces may be assigned, involuntarily, to any place in the world, often on short notice, often to places of grave danger, often in the most spartan and primitive conditions.

For the sailors in the Persian Gulf, their ship is home. For the soldiers on the DMZ in Korea, their barracks is home. For the Marines serving in Somalia in Operation Restore Hope, their tent is home. Military men and women do not have the right to choose with whom they will share this home. They do not have the right to choose with whom they will share these burdens. They do not have the right to choose whether they will be placed in harm's way or under what conditions. Most important, they do not have the right to choose when and where they may be asked to make the ultimate sacrifice for their country.

General Gordon Sullivan, Chief of Staff of the Army, eloquently summarized the differences between military and civilian life in testimony before the committee on July 20, 1993:

> What separates us from civilian society is ultimate sacrifice, the sacrifice of our lives for our country. We have to sublimate everything that we do to selfless service to our Nation. Duty, honor, country . . . [I]t is, in fact, that mission, the protection of the Nation, which must govern everything that we do.

Although the individual decision to join the armed forces, in the absence of actual draft calls, is a matter of voluntary choice, there is no constitutional right to serve in the military. See, e.g., *Nieszner* v. *Mark*, 684 F.2d 562 (8th Cir.), *cert. denied* 460 U.S. 1022 (1982); *West* v. *Brown*, 558 F.2d 757 (5th Cir.), *cert. denied* 435 U.S. 926 (1977). The armed forces routinely restrict the opportunities for service on the basis of circumstances such as physical condition, age, sex, parental status, educational background, medical history, and mental aptitude. These restrictions primarily reflect professional military judgment as to what categories of personnel contribute to overall combat effectiveness rather than narrow performance criteria related to the performance of a specific task. They are based on the fact that members of the armed forces are not recruited for a single job at a single location. They must be capable of serving not as an individual, but as a member of a team, in a variety of assignments and locations, often under dangerous and life-threatening conditions.

Once military status is acquired, military service is not voluntary. Once an individual has changed his or her status from civilian to military, that person's duties, assignments, living conditions, privacy, and grooming standards, are all governed by military necessity, not personal choice. In a nation that places great value on freedom of expression, freedom of association, freedom of travel, and freedom of employment, the armed forces stand as a stark exception. Military commanders have the authority, as they have throughout our nation's history, to tell servicemembers where to live, where to work, and even when they must put their lives at risk—and to use the criminal law, the Uniform Code of Military Justice, to punish those who disobey any such orders.

The unique conditions of military service have existed from the days of the Revolutionary War, through the formation of the Constitution, to the present. Throughout our history, members of the armed forces have been subjected to controls and regulations that would not have been tolerated in civilian society.

This does not mean that Congress expects military commanders to exercise their authority in an arbitrary and capricious manner. There are numerous laws and regulations governing military service which provide servicemembers with protections against abuse and which establish means of redress. These have been carefully crafted to maintain the delicate balance between the individual concerns and the needs of the armed forces. While the nature of military service has changed over time, the fundamental precept—that the rights of the individual servicemember must be subordinated to the needs of national defense—remains unchanged.

The committee is mindful of the admonition of the Supreme Court that Congress is not free to disregard the Constitution when dealing with military affairs. As the Court noted in *Rostker* v. *Goldberg,* the "Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States." 453 U.S. at 64.

Congress has played a leading role in enhancing the rights of members of the armed forces, including enactment of the Uniform Code of Military Justice; establishment of an independent civilian tribunal, the U.S. Court of Military Appeals, to review court-martial cases; authorization to appeal military justice cases directly to the Supreme Court; enhanced procedural rights in the promotion process; expanded opportunity for wearing religious apparel while in uniform; and protections for military whistleblowers. Whenever the committee considers a military practice or proposal in which military personnel would not be provided with the same rights as their civilian counterparts, the committee carefully assesses the military necessity for any difference in treatment.

The committee has carefully considered the needs of the armed forces and the rights of all persons, including those who are gay or lesbian, in addressing the issue of restrictions on the service of gay men and lesbians in the armed forces.

*The foundation of combat capability is unit cohesion*

General H. Norman Schwarzkopf, U.S. Army (Ret.), who commanded U.S. forces in Operations Desert Shield and Desert Storm, testified that unit cohesion "is the single most important factor in a unit's ability to succeed on the battlefield." General Schwarzkopf, whose distinguished career included combat in Vietnam and senior military personnel management responsibilities, told the committee:

> What keeps soldiers in their foxholes rather than running away in the face of mass waves of attacking enemy, what keeps the marines attacking up the hill under withering machinegun fire, what keeps the pilots flying through heavy surface-to-air missile fire to deliver bombs on targets is the simple fact that they do not want to let down their buddies on the left or on the right.

They do not want to betray their unit and their comrades with whom they have established a special bond through shared hardship and sacrifice not only in the war but also in the training and the preparation for the war. It is called unit cohesion, and in my 40 years of Army service in three different wars, I have become convinced that it is the single most important factor in a unit's ability to succeed on the battlefield.

General Gordon Sullivan, Chief of Staff of the Army, in testimony before the committee on July 20, 1993, emphasized the importance of the bonds of trust between soldiers. Quoting from a letter in which one soldier wrote to another, "I always knew if I were in trouble and you were still alive that you would come to my assistance," General Sullivan added:

Every officer in the United States Army, . . . every soldier [and] noncommissioned officer, . . . everyone in the services must know that . . . I will give up my life for them; and they, in turn will give up their life for me. I have to have trust in them, and them in me.

General Colin Powell, Chairman of the Joint Chiefs of Staff, testified on July 20, 1993, that—

To win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies. We cannot allow anything to happen which would disrupt that feeling of cohesion within the force.

General Powell noted in response to a question from the committee that the armed forces give constant attention to the development and maintenance of unit cohesion:

Bonding begins on the first day of boot camp. Bonding takes place everytime a GI joins a new unit. A unit must bond as a fighting force before it is sent to the battlefield. Unit members work together, train together, and deploy together sharing experiences that contribute to the development of cohesion. Mutual trust, common core values, self confidence, and realization of shared goals help to form the cohesive military team. Cohesion requires the sacrifice of personal needs for the needs of the unit, subjugating individual rights to the benefit of the team.

While individual initiative is rewarded, the contribution of the team—the cohesive unit—is what guarantees military success.

In his testimony before the committee, Dr. William Darryl Henderson, a decorated combat veteran, former commander of the Army Research Institute, and author of the book, *Cohesion: The Human Element in Combat*, illustrated the role of unit cohesion in transforming a collection of disparate individuals into a motivated, combat capable group willing to endure and prevail amidst the horrors of war:

276

> [T]he nature of the relationship among soldiers in combat is a critical factor in combat motivation. . . .
>
> The real question is: why soldiers fight? What causes soldiers to repeatedly expose themselves to the most lethal environment known, instead of taking cover or leaving the area as quickly as possible.
>
> Combat motivation is not a mythical force that emerges on the battlefield. It must be developed and maintained well in advance of any war. . . .
>
> A central finding of cohesion research is that the nature of modern war dictates that small-unit cohesion is the only force capable of causing soldiers to expose themselves repeatedly to enemy fire in the pursuit of unit objectives.
>
> The confusion, danger, hardship, dispersion, and isolation of modern war requires that soldiers, sailors, and airmen in combat be controlled and led through an internalization of soldier values and personal operating rules that are congruent with the objective, goals, and values of the organization. . . .

To summarize the findings on the importance of unit cohesion, Dr. Henderson cited the distinguished military author, S.L.A. Marshall, who wrote: "I find it to be one of the simplest truths of war that the thing which enables an infantry soldier to keep going with his weapon is the near presence or presumed presence of a comrade."

Dr. David Marlowe, Chief of the Department of Military Psychiatry at the Walter Reed Army Institute of Research, emphasized that unit cohesion must be developed long before a unit is on the battlefield:

> Cohesion is not something magical. It does not suddenly happen the moment the bullets come. If it was not there to begin with, it is going to take a long time and some dead and mangled bodies before you get it.

Dr. Marlowe noted that while it is difficult to project current trend into the future, he anticipated that the unit cohesion would continue to be a paramount concern:

> [T]echnological advances, smaller forces, battlefield dispersal, and the shift to a force projection modality have made the continuing maintenance of highly cohesive units more important to the future than they have ever been in the past and the immediate present.
>
> In the past, in time of danger we have usually been . . . afforded the luxury of time in which to create highly cohesive units to counterpunch or strike the enemy. When we have not had that luxury, the results, as in the initial results of the Korean conflict, were disastrous for our soldiers.
>
> The speed with which events and their consequences now overtake us make it imperative that our forces be able to make an immediate transition from peace to war. High continuing levels of cohesion are critical to making that transition with maximum unit effectiveness and minimal

short- or long-term negative effects on the mental health, physical health, and performance of the soldier.

The committee notes that the end of the Cold War has not diminished the need for military forces composed of readily available, highly cohesive units. Events in Somalia and the former Yugoslavia, as well as continuing tensions in areas ranging from the Korean border to the Persian Gulf, have demonstrated that units-in-being must be prepared to deploy to hostile, inhospitable conditions, with little advance warning or preparation.

*Military personnel policy must facilitate the assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy*

One of the defining characteristics of military life is deployment to the field or on board vessels, for training or operations. Although many servicemembers, in garrison, have the opportunity to live off-post or in on-post quarters providing substantial privacy, the armed forces do not train or deploy in a garrison environment. General Colin Powell, Chairman of the Joint Chiefs of Staff, advised the Committee that—

> While some military specialties may gravitate to office type settings no Servicemember is guaranteed a particular assignment in a particular location. We are provided assignments anywhere in the world, often at very short notice, based on the needs of the Army, Navy, Air Force, or Marine Corps. Every military man and woman must be prepared to serve wherever and in whatever capacity the Armed Forces require their skills. Even forward deployed units need cooks and typists.

Military personnel policy must reflect the conditions under which servicemembers live while deployed for training or operations. General Powell noted that—

> [T]he majority of our young men and women are required to live in communal settings that force intimacy and provide little privacy. It may be hard to contemplate spending 60 continuous days in the close confines of a submarine; sleeping in a foxhole with half a dozen other people; 125 people all living and sleeping in the same 40 by 50 foot, open berthing area, but this is exactly what we ask our young people to do.

During training and deployment, a servicemember's home frequently is a cramped tent, a crowded berth on a vessel, or an open-bay barracks. The little privacy that a servicemember can find in such circumstances is highly valued.

During field training exercises and deployments, every effort is made to ensure that men and women are provided with separate living arrangements. One of the factors in dictating the pace of increasing the opportunities for women in the armed forces has been the need to accommodate sexual privacy with respect to living, rest room, and bathing facilities for deployed troops.

The separation of men and women is based upon the military necessity to minimize conditions that would disrupt unit cohesion,

such as the potential for increased sexual tension that could result from mixed living quarters. General Powell stated that—

> Cohesion is strengthened or weakened in the intimate living arrangements we force upon our people. Youngsters from different backgrounds must get along together despite their individual preferences. Behavior too far away from the norm undercuts the cohesion of the group. In our society gender differences are not considered conducive to bonding and cohesion within barracks living spaces.

It is reasonable for the armed forces to take these factors into consideration in establishing gender-based assignment policies and it is reasonable for the armed forces to take this into consideration when addressing issues concerning persons who engage in or have the propensity or intent to engage in sexual activity with persons of the same sex.

*The presence in military units of persons who, by their acts or statements, demonstrate a propensity to engage in homosexual acts, would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are essential to effective combat capability*

Military life is fundamentally different from civilian life. The extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion require that the military community, while subject to civilian control, exist as a specialized society. The military society is characterized by laws, rules, customs, and traditions, including numerous restrictions on personal behavior that would not be acceptable in civilian society.

The standards of conduct for members of the armed forces completely regulate a service member's life, twenty-four hours a day, from the day a person acquires military status until the day that person is discharged. Military personnel must be available, at all times, for worldwide deployment to a combat environment. Their conduct is subject to the Uniform Code of Military Justice at all times—on base and off base, on duty and off duty.

The world-wide deployment of U.S. military forces, the international responsibilities of the United States, and the potential for involvement in actual combat frequently require the involuntary assignment of military personnel in circumstances in which their living conditions are spartan and primitive, characterized by forced intimacy and little or no privacy.

In view of the unique conditions that characterize military life, there is broad agreement that lifting the restrictions on the service of gay men and lesbians would be detrimental to the best interests of the armed forces.

General Colin Powell, Chairman of the Joint Chiefs of Staff, testified before the committee on July 20, 1993 that—

> [T]he presence of open homosexuality would have an unacceptable detrimental and disruptive impact on the cohesion, morale, and esprit of the armed forces.

When asked about his position in light of the fact that military personnel can be asked to work with DoD civilians who may be gay or lesbian, General Powell responded by describing the unique nature of military service:

> Active military service is not an everyday job in an ordinary workplace. It requires a unique blend of skills, ethics, culture, and bonding to ensure an effective warfighting force. There is often no escape from the military environment for days, weeks, and often months on end. We place unique demands and constraints upon our young men and women not the least of which are bathing and sleeping in close quarters. The fact that as military members we serve 24-hours a day under often severely constrained conditions is more than rhetoric, it is a way of life.

General Powell emphasized that the views of the Joint Chiefs were based upon careful, thorough, and open-minded review of the issue:

> The Joint Chiefs and I have spent an enormous amount of time considering this issue. We had the President's guidance from January and we owed him and the Secretary of Defense our . . . very best advice on this issue. We challenged our own assumptions. We have challenged the history of this issue. We have argued with each other.
>
> We have consulted with our commanders at every level, from lieutenant [and] ensign all the way up to the commander in chief[s] of the various theaters. We have talked to our enlisted troops. We have talked to the family members who are part of the armed services team. We examined the arguments carefully of those who are on the other side of the issue from us.

He also made it clear that the recommendations of the chiefs were based solely upon considerations of military effectiveness:

> Our concern has not been about homosexuals seducing heterosexuals or heterosexuals attacking homosexuals. The first of these so-called problems is manageable and the second so-called problem is punishable. For us, the issue is also not what is acceptable in civilian life, and it is not our place as the uniformed leaders of the armed forces to use our official position to make moral or religious judgments on this issue.
>
> Our perspective is a unique one, and it is the unique perspective of the military and what is best for military effectiveness. The military exists to fight the Nation's wars, to accomplish our war-fighting mission. Hopefully, we are always strong enough to deter wars, but always ready to fight and win . . . if necessary.

General H. Norman Schwarzkopf, U.S. Army (Ret.), who commanded U.S. and Coalition forces in Operations Desert Shield and Desert Storm, testified before the Committee on May 11, 1993:

> I am opposed to . . . lifting the ban on homosexuals in the military service, and my opposition grows out of honest

concern for the impact that such a measure would have on the men and women of the armed forces and the resultant reduction in our Nation's ability to protect our vital interests.

[I]n my years of military service, I have experienced the fact that the introduction of an open homosexual into a small unit immediately polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war . . .

[I]n every case I am familiar with, and there are many, whenever it became known in a unit that someone was openly homosexual, polarization occurred, violence sometimes followed, morale broke down, and unit effectiveness suffered.

Lieutenant General Calvin Waller, U.S. Army (Ret.), who served as the Deputy Commander in Operations Desert Shield and Desert Storm, testified before the Committee on April 29, 1993:

Cohesion and discipline are the soul of a military organization, [and] it is my opinion that [allowing] homosexuals . . . total openness in our Armed forces would cause less ready units or units that would not nearly be as effective as the units we currently have. . . .

There is a big difference between the normal workplace of 8 hour days and a military unit, where units are routinely required to live in close and cramped quarters under the most adverse conditions. Having a casual encounter with an individual who is openly homosexual is one thing. . . . [O]n the other hand, having to be exposed to the same individual on a 24 hour basis, day in and day out, is "a horse of another color."

Command Master Chief David Borne, U.S. Navy, testified on May 11, 1993, that—

One the most compelling arguments against allowing openly gay men and women to serve in the military is privacy. However, there are others. Life aboard ship is not an eight-hour-a-day job. It is 24 hours a day, seven days a week, for as long as six months at a time. And that is if you are lucky. Some of us have done more. We sleep in extremely close quarters together. We use the same head or bathroom facilities, and you have nowhere you can go to just get away from your coworkers. In other words, you live together.

The committee carefully considered the testimony of other witnesses, including current and former members of the armed forces and former Assistant Secretary of Defense Lawrence Korb, who testified on March 31, 1993 that these problems could be overcome through training and education.

The committee is well-aware of the large and effective training establishment maintained by the armed forces. The Committee also notes that training troops to change social attitudes is a formidable task.

281

The issue, however, is not whether military personnel can be trained to accept gays and lesbians as co-workers. As the committee has noted elsewhere in this report, military personnel may be required to work with gays and lesbians who are DoD civilian employees or contractor employees. No servicemember has the right to refuse to work with a gay or lesbian or to abuse or harass such a person. This is not the same, however, as requiring military personnel to share their personal living spaces with individuals who, by their acts or statements, demonstrate a propensity or intent to engage in sexual conduct with persons of the same sex.

General Colin Powell, Chairman of the Joint Chiefs of Staff, emphasized the differences in the armed forces between the issue of homosexuality and the issues of race and gender:

> Unlike race or gender, sexuality is not a benign trait. It is manifested by behavior. While it would be decidedly biased to assume certain behaviors based on gender or membership in a particular racial group, the same is not true for sexuality. We have successfully mixed rich and poor, black and white, male and female, but open homosexuality in units is not just the acceptance of benign characteristics such as color or gender or background. It involves matters of privacy and human sexuality that, in our judgment, if allowed to exist openly in the military, would affect the cohesion and well-being of the force. It asks us to deal with fundamental issues that the society at large has not yet been able to deal with.

Major Kathleen Bergeron, U.S. Marine Corps, offered the following observations at the May 11, 1993, hearing:

> I do not believe that any amount of sensitivity training or reeducating will change the way Marines think or feel about homosexual behavior because there is nothing more basic to an individual than his or her sexuality. Homosexuals are tolerated in the civilian community because individuals can separate their jobs from the other aspects of their lives. Civilians go home at night and distance themselves from the workplace. If homosexuals were allowed to serve in the military, the rules would have to change. Marines would have to be afforded the same considerations their civilian counterparts now have.

It is one thing to use military training and education to ensure that military personnel treat all persons, including DoD civilians and contractors who happened to be gay or lesbian, with dignity and respect. It would be something very different, however, to direct that military training and education be used to require military personnel to accept shared living arrangements with persons who, by their acts or statements, demonstrate a propensity or intent to engage in sexual conduct with persons of the same sex.

Sexual behavior is one of the most intimate and powerful forces in society. In civilian life people are not compelled to live with individuals who are sexually attracted to persons of the same sex, and the committee finds no military necessity to compel persons to do so in the military.

The reason it would be inappropriate to permit persons who engage in or have a propensity or intent to engage in homosexual acts to serve in the unique conditions that characterize military service was underscored by the General Counsel of the Department of Defense on July 21, 1993. In response to the question of why the armed forces would discharge an individual for stating: "I have a propensity to homosexuality, but I have resisted that propensity and have not engaged in any homosexual acts," she said:

> The definition of homosexual conduct, which is the basis for discharge, includes a statement by a servicemember that demonstrates a propensity. Now, if you say that you have a propensity, I would say that demonstrates that you have a propensity, and that is all that is required. The military is not required to take the risk that you will not engage in the act.

The committee agrees that the armed forces should not be required to take that risk in the unique conditions of forced intimacy and minimal privacy that characterize military life.

### There are important differences between the issue of racial integration and the issues related to the service of gays and lesbians in the armed forces

One of the arguments advanced in favor of lifting the restrictions against the service of gays and lesbians in the armed forces is that the current ban is simply the product of prejudice, similar to the prejudice involved in opposition to racial integration of the armed forces after World War II.

This issue was eloquently addressed by General Colin Powell, Chairman of the Joint Chiefs of Staff, in a letter dated May 8, 1992 to Representative Patricia Schroeder:

> I am well aware of the attempts to draw parallels [to] the positions used years ago to deny opportunities to African-Americans. . . . I need no reminders concerning the history of African-Americans in the defense of their Nation and the tribulations they faced. I am a part of that history.
>
> Skin color is a benign, non-behavioral characteristic. Sexual orientation is perhaps the most profound of human characteristics. Comparison of the two is a convenient but invalid argument. I believe the privacy rights of all Americans in uniform have to be considered, especially since those rights are often infringed upon by the conditions of military service.

The committee notes that opposition to racial integration in the post-World War II period included stereotypes attributing behavior deficiencies to African-Americans. The committee also notes that there is prejudice based upon stereotypes against gays and lesbians in American society. The committee emphasizes, however, that its position on the service of gays and lesbians is not based upon stereotypes, but upon the the impact in the military setting of the conduct that is an integral element of homosexuality.

Homosexuality is not merely an abstract sense of identity. It is intimately connected with conduct. The Random House Dictionary

defines "homosexuality" to mean "sexual desire or behavior directed towards a person or persons of one's own sex." This is consistent with Department of Defense policy, as set forth in DoD Directive 1332.14, the July 19, 1993 policy memorandum of the Secretary of Defense, and the committee's proposed legislation, which are based on conduct. The proposed legislation, for example, defines "homosexual" to mean "a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts."

While some individuals may view themselves as homosexual, gay, or lesbian based upon thoughts that never ripen into a propensity or intent to engage in homosexual acts, advocates of gay rights have expressly linked sexual orientation to conduct. For example, in a brief challenging the the constitutionality of sodomy laws, which were ultimately sustained by the Supreme Court, *Bowers* v. *Hardwick*, 478 U.S. 186, the Lambda Legal Defense and Education fund took the position that—

> For gay people, sexuality and their sexual orientation play an especially central role in the definition of self. . . . [Sodomy laws] impose an added burden on gay people, blocking their sense of self as well as their sexual fulfillment. . . .
>
> [S]tate regulation of same sex behavior constitutes the total prohibition of an entire way of life. . . .

It is reasonable for the armed forces to take into account the potential behavior of persons who define themselves as homosexual, gay, or lesbian. As General Powell noted in testimony before the House Budget Committee in 1992:

> [I]t is very difficult in a military setting, where you don't get a choice of association, where you don't get a choice of where you live, to introduce a group of individuals who are proud, brave, loyal, good Americans, but who favor a homosexual life style, and put them in with heterosexuals who would prefer not to have somebody of the same sex find them sexually attractive, put them in close proximity, [and] ask them to share the most private facilities together, the bedroom, the barracks, latrines, and showers.
>
> I think that is a very difficult problem to give the military. I think it would be prejudicial to good order and discipline to try to integrate that in the current military structure.

General Powell's comments do not reflect an irrational prejudice against gays and lesbians. His comments, which the Committee endorses, represent a prudent evaluation of the impact of such behavior on the armed forces, and underscore the fact that the policy is based upon prudence, not prejudice.

*The restrictions on the service of gays and lesbians are based upon reasonable military personnel policy considerations*

As noted in the preceding sections of this report, the restrictions on the service of gays and lesbians in the armed forces are based

upon reasonable considerations related to military morale, discipline, and unit cohesion.

Some have suggested that the policy is based upon irrational stereotypes, such as the view that homosexuals are predators or that all homosexuals inevitably are attracted to all persons of the same sex.

The committee, in recommending codification of restrictions related to homosexuality, does not rely upon such stereotypical views. The committee notes that some individuals may view themselves as "homosexual", "gay," or "lesbian" based upon intentions that are never acted upon, just as there are persons who view themselves as heterosexual who remain celibate. Likewise, the committee notes that not every gay or lesbian person will find every person of the same sex to be sexually attractive, just as not every heterosexual person finds every person of the opposite sex to be sexually attractive.

It would be irrational, however, to develop military personnel policies on the basis that all gays and lesbians will remain celibate or that they will not be sexually attracted to others. When dealing with issues involving persons of different genders, for example, the armed forces do not presume that servicemembers will remain celibate or that they will not be attracted to members of the opposite sex. On the contrary, the military specifically provides men and women with separate quarters in order to ensure privacy because experience demonstrates that few remain celibate and many are attracted to members of the opposite sex.

Similar considerations apply to the development of policies with respect to homosexuality. The committee agrees with the view of the Department of Defense that it is appropriate to take into consideration that when a person indicates that he or she has a propensity or intent to engage in homosexual act, the armed forces are not required to wait until the person engages in that act before taking personnel action. As noted elsewhere in this report, the courts have sustained the Department's position and the committee agrees.

The committee notes that the under current DoD Directives and the July 19, 1993 Memorandum of the Secretary of Defense, separation is required when there is a finding that the individual has the propensity or intent. The government is not required to prove in each individual case that a service member will not remain celibate or to otherwise prove adverse impact on a specific unit. The committee agrees with this approach. No service member is guaranteed that he or she will remain in any particular unit, and the armed forces must be able to manage their personnel by establishing qualification standards that facilitate worldwide assignment and timely deployment.

### Restrictions on the service of gay men and lesbians do not violate the constitutional rights of military personnel

As noted above, the responsibility for establishing the regulations for the government of the land and naval forces is vested in the Congress. The rights of military personnel are established by the Congress and by the Executive Branch, acting under authority granted by the Congress. The Supreme Court repeatedly has em-

phasized that the application of constitutional rights to members of the armed forces may take into account the unique requirements of military service and may differ in substantial degree from the application of such rights in civilian life. The committee has carefully considered the constitutional rights of military personnel and prospective members of the armed forces, including those who are gay and lesbian, in drafting its recommendations.

Under current DoD policy, a servicemember's admission that he or she is homosexual provides a basis for discharge because the admission establishes a rebuttable presumption that the individual is a person who engages in, desires to engage in, or intends to engage in homosexual acts. The admission is not a statement protected by the free speech guarantees of the First Amendment because it "can rationally and reasonably be viewed as reliable evidence of a desire and propensity to engage in homosexual conduct." *ben Shalom* v. *Marsh,* 881 F.2d 454, 464 (7th Cir. 1989), cert. denied 110 S. Ct. 1296 (1990). See also *Pruitt* v. *Cheney,* 963 F.2d 1160 (9th Cir. 1991), cert. denied, 113 S. Ct. 655 (1992); *Rich* v. *Secretary of the Army,* 735 F.2d 1220 (10th Cir. 1984). As the court noted in ben Shalom, "the Army does not have to take the risk that an admitted homosexual will not commit homosexual acts that will be detrimental to its assigned mission." 881 F.2d at 460–61. The committee agrees with these views and has incorporated these concepts into its recommendations.

The discharge policy, as set forth in current DoD policy and as recommended by the committee, does not violate the due process or equal protection requirements of the Constitution. In response to a question about the differing treatment of homosexual and heterosexual behavior in the armed forces, the General Counsel of the Department of Defense testified on July 21, 1993 that—

> The courts have specifically addressed the issue of the distinction that is made within the Uniform Code, within the Manual for Courts-Martial, and within our regulations between homosexual conduct and heterosexual conduct, and have repeatedly deferred to the military judgment that such distinctions are appropriate. [I]t is my view that if those precedents hold, that the courts in the future will reach the same result with respect to [Secretary Aspin's] July 19th policy.

Military personnel do not have a constitutionally protected property interest in continued military service, and there is no protected liberty interest arising from a discharge based on homosexuality. Homosexual conduct is not a fundamental right and a classification based upon the choice of one's sexual partners is not a suspect classification. Moreover, there is no constitutionally protected privacy right to engage in homosexual conduct. *See Woodward* v. *United States,* 871 F.2d 1068 (Fed. Cir. 1989); *Dronenberg* v. *Zech,* 741 F.2d 1388 (D.C. Cir. 1984); *Rich* v. *Secretary of the Army,* 735 F.2d 1220 (10th Cir. 1984). *Beller* v. *Middendorf,* 7632 F.2d 788 (9th Cir. 1980), cert. denied, 452 U.S. 905 (1981). *Cf. Bowers* v. *Hardwick,* 478 U.S. 186 (1986).

The committee has taken note of a district court opinion, *Meinhold* v. *Department of Defense,* 808 F. Supp. 1455 (C.D.Cal.

1993) (holding that there is no rational basis for DoD's restrictions on the recruitment and retention of gays and lesbians). This opinion, which is not consistent with the decisions of other federal courts that have considered the DoD policy, was issued prior to the President's January 29, 1993 announcement of an interim policy, this committee's hearings, and the President's announcement of a revised policy on July 19, 1993. The review undertaken by the Executive Branch and this committee's hearings have established that the presence in the armed forces of persons who, by their acts or statements, have demonstrated a desire or propensity to engage in homosexual acts, would be contrary to the vital interest in ensuring morale, good order, discipline, and unit cohesion in the armed forces.

*Legal issues in civilian society*

The committee has taken note of legal issues involving gay men and lesbians in civilian society.

The Supreme Court, in *Bowers* v. *Hardwick*, has ruled that there is no constitutional right to engage in private homosexual acts, and that such acts may be proscribed by the criminal law. Sodomy is a crime in at least 24 states. Although proposals for decriminalization were adopted in two dozen states beginning in 1961, no state has decriminalized sodomy since 1983. Since 1973, a countertrend has resulted in the enactment of criminal laws prohibiting same-sex sodomy in eight states.

Federal law does not prohibit discrimination on the basis of homosexuality. The anti-discrimination provisions of Title VII of the 1964 Civil Rights Act and related statutes do not apply to discrimination based upon sexual orientation. There is no express statutory prohibition against discrimination in the federal civil service on the basis of sexual orientation. The Civil Service Reform Act of 1978, which does not expressly mention sexual orientation, prohibits "discrimination for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others." 5 U.S.C. 2302(b)(10). As a result, federal agencies may not establish a blanket exclusion of gays and lesbians, but there are circumstances in which an agency may consider homosexuality to be a factor in an employment decision for a specific position. *See, e.g., Padula* v. *Webster*, 822 F.2d 98 (D.C. Cir. 1987).

Testimony before the committee indicated that a minority of the states provide protections on the basis of sexual orientation with respect to one or more of the following: public employment, private employment, public accommodations, education, housing, credit, banking, and insurance. Eight states have enacted statutes, fourteen have provided such protections through executive orders, and several state constitutions have been interpreted to provide protections to gay and lesbian employees. Various municipalities have adopted protections for municipal employees, and approximately 25 municipalities have adopted "domestic partnership" laws. Registration under these laws is largely symbolic, but in some jurisdictions the partnership law extends certain employment benefits to the partners of municipal employees. Various employers in the public

and private sectors, including police and fire departments, have eliminated restrictions based on sexual orientation.

The committee does not find these developments to be persuasive with respect to proposed elimination of the restrictions on homosexuality in the armed forces, due to the unique conditions of service in the United States military; the combat mission of the armed forces; world-wide deployments; the potential for extreme lack of privacy over extended periods of time while deployed on military operations or on field training exercises; the potential for involuntary assignments; the extraordinary physical, mental, and emotional demands of military combat; and the critical role of unit cohesion in achieving success during military combat.

The committee notes that while some jurisdictions and employers have reduced or eliminated certain restrictions based on sexual orientation, they have done so as a matter of local choice, not as a result of federal statutory or constitutional legal requirements. The courts have sustained a variety of state actions which were challenged as discriminating against gays and lesbians, including—

Police department dismissal of gays and lesbians. *E.g., Childers* v. *Dallas Police Department*, 513 F. Supp. 134 (N.D. Tex. 1981), *aff'd* 669 F.2d 732 (5th Cir. 1982) *Endsley* v. *Naes*, 673 F. Supp. 1032 (D. Kan 1987), *Todd* v. *Navarro*, 698 F. Supp. 81 (S.D. Fla. 1988), *Dawson* v. *State Law Enforcement Division*, (D.S.C. 1992). *See also Walls* v. *Petersburg*, 895 F.2d 188 (4th Cir. 1990) (sustaining a law enforcement agency's inquiry into an officer's off-duty same-sex relationship.)

Dismissal or sanctions against teachers based upon matters related to sexual orientation. *E.g., Ross* v. *Springfield School Dist. No. 19*, 56 Or. App. 197, 641 P.2d 600 (1982); *Rowland* v. *Mad River Local School Dist.*, 730 F.2d 444 (6th Cir.), *cert. denied*, 470 U.S. 1009 (1984); *Gaylord* v. *Tacoma School District.*

Presumptions against gays and lesbians prevailing in a child custody dispute. *E.g., G.A.* v. *D.A.*, 745 S.W.2d 726 (Mo. Ct. App. 1987).

Limiting marital status to unions of persons of the opposite sex. *E.g., Baker* v. *Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971).

While the committee takes note of the fact that there is no constitutional protection for homosexual acts, and there are no federal statutes which prohibit discrimination on the basis of homosexual orientation in civilian society, the committee emphasizes that these considerations are not essential to its recommendations. The committee makes no judgment as to whether the protection of the civil rights laws should be extended to sexual orientation. The committee's review and its recommendations have focused on the impact of homosexual conduct in the unique setting of military service. Therefore, if the Supreme Court should reverse its ruling in *Bowers* and hold that private consensual homosexual acts between adults may not be prosecuted in civilian society, this would not alter the committee's judgment as to the effect of homosexual conduct in the armed forces. The committee finds that there are no significant developments in civilian society that would require a change in military policy.

*The experience of foreign nations*

The committee considered testimony on the experience of foreign nations with respect to the service of gay men and lesbians in the armed forces. The committee found that although some nations permit gays and lesbians to serve in their armed forces, such service frequently is accompanied by discrimination which has the result of disadvantaging gays and lesbians with respect to assignments, tenure, or promotions. Even the Scandinavian nations and the Netherlands, which have the most liberal policies, apply a conscription policy that results in dissimilar treatment of homosexuals and heterosexuals. A declared homosexual in those countries has the option of avoiding military service, an option which is not available to heterosexuals.

There is little actual experience in foreign nations with open homosexuality in military service. As Dr. David Segal testified on April 29, 1963:

> Even where policy and law allow them to serve, very few soldiers openly declare themselves to be homosexual, perhaps because there is a risk of gay bashing and of career costs to going public. Thus, the number of military personnel in Western nations who publicly identify themselves as homosexual appears to be very small. Even in those countries with non-exclusionary policies, open homosexuals may find themselves referred for psychiatric counseling, and excluded from certain units and certain assignments.

No other nation in the world requires the members of its armed forces to serve under the conditions that face the armed forces of the United States. There is no other nation which has the international responsibilities, overseas deployments, degree of field exercises, daily operating tempo, and frequency of circumstances in which servicemembers must live in conditions of little or no privacy. The committee concludes that while the foreign experience is worth monitoring, it does not provide a relevant basis for permitting gays and lesbians to serve openly in the armed forces of the United States.

*The restrictions on the service of gays and lesbians do not provide a basis for harassment or mistreatment of persons who are gay or lesbian*

Department of Defense civilian personnel policies do not, as a general rule, preclude the service of gays and lesbians as civilian employees of the Department of Defense. Similarly, civilian contractors who provide equipment and services to the armed forces may employ gays and lesbians. As a result, military personnel who are assigned to work with DoD civilian or contractor employees may be required to work with persons who are gay or lesbian. They are obligated to conduct themselves in such circumstances as military professionals without regard to the sexual orientation of their civilian co-workers.

Similarly, military personnel must conduct themselves off-duty and off-post in a manner that reflects credit on the armed forces. Harassment of civilians based upon their sexuality is inappropriate.

The same considerations apply when a member of the armed forces is subject to administrative or disciplinary processing based on allegations related to homosexuality. The proper means of addressing such allegations is through administrative discharge boards or courts-martial, not through harassment or mistreatment of individual servicemembers. Every member of the armed forces, regardless of alleged misconduct, is entitled to be treated with dignity and respect during the course of any military proceedings.

As General Colin Powell said in testimony before the committee on July 20, 1993: "No soldier, sailor, airman or Marine should be subjected to harassment or violence. . . ." The committee agrees that members of the armed forces who harass or mistreat their colleagues bring discredit upon themselves and their military service.

The committee notes that there have been instances of abuse of gay and lesbian servicemembers, including a recent court-martial which resulted in a conviction for murder of a servicemember who was facing discharge for homosexuality. The committee condemns any harassment or mistreatment of gay men and lesbians by members of the armed forces. The Uniform Code of Military Justice provides ample authority to discipline individuals who harass or mistreat civilian employees, members of the civilian community, or fellow servicemembers based upon sexual orientation. The committee expects the Secretary of Defense to monitor this issue and, if necessary, to issue appropriate regulatory guidance.

### The July 19, 1993 Secretary of Defense Policy Memorandum

On July 19, 1993, Secretary Aspin submitted to Congress a memorandum which he had issued to the Secretaries of the Military Departments and the Chairman of the Joint Chiefs of Staff entitled "Policy on Homosexual Conduct in the Armed Forces" (hereafter referred to as the "July 19 Memorandum"). Under the July 19 Memorandum, current policies remain in effect until October 1, 1993. The committee reviewed the memorandum during three hearings on July 20, 21, and 22, receiving testimony from the Secretary of Defense, the Joint Chiefs of Staff, the General Counsel of the Department of Defense, and the Military Working Group. The committee carefully considered the July 19 Memorandum and the related hearings in the development of its legislative recommendations.

Based upon the testimony received at the hearing, the committee finds that the Department of Defense has retained the central features of its policy concerning homosexuality in the armed forces. The July 19 Memorandum carries forward longstanding Department of Defense policy, as reflected in the current version of DoD Directive 1332.14, which focuses on conduct that is incompatible with military service—homosexual acts, marriages, and statements that demonstrate a propensity to engage in homosexual acts. The July 19 Memorandum makes it clear that the mandatory discharge policy is necessary because such matters interfere "with the factors critical to combat effectiveness, including unit morale, unit cohesion, and individual privacy."

In the July 19 Memorandum, the description of the basic reasons for separation on the basis of homosexual acts, statements, and marriages remains unchanged, except for minor drafting clarifica-

tions. The July 19 Memorandum, for example, refers to statements which indicate a "propensity or intent" rather than "desire or intent" as under the current version of DoD Directive 1332.14. The committee views this as a useful clarification that will not affect the practical effect of the policy. The General Counsel confirmed that acts and statements that in the past provided a basis for discharge continue to provide a basis for discharge under the July 19 Memorandum.

The basic procedures for processing such cases also remain the same. The government must prove by a preponderance of the evidence that an individual engaged in the proscribed conduct or made the requisite statement. If the case involves a homosexual act, the burden then shifts to the individual to show that he or she meets the traditional criteria for retention in a homosexual acts case (including a showing that the conduct is a departure from the member's usual and customary behavior and the member does not have a propensity or intent to engage in homosexual acts). If the case involves a statement, the individual carries the burden throughout the proceeding of demonstrating that he or she is not a person who engages in or has a propensity or intent to engage in homosexual acts.

The July 19 Memorandum would make two changes in the way that the underlying policy is administered. First, it would continue the interim policy, established on January 29, 1993, that questions concerning homosexuality would not be asked as part of accession processing. Second, it would provide guidance on the conduct of investigations, including criminal investigations, administrative investigations, and commander's inquiries.

The July 19 Memorandum expressly states: "Any changes to existing policies shall be prospective only." The General Counsel confirmed in testimony on July 22 that there is nothing in the July 19 Memorandum which would cast doubt on the legal sufficiency of either the pre-January 29, 1993 policy or the January 29, 1993 interim policy; nor was there anything in the July 19 Memorandum that would provide a basis for a person to challenge successfully the validity of an administrative or court-martial action taken under either the pre-January 29, 1993 policy or under the January 29, 1993 interim policy.

The committee reviewed the investigative guidance during its hearings on July 20–22. The committee notes that military commanders and investigative agencies have broad powers to initiate inquiries, inspections, and investigations. These powers—which are essential to the commander's authority to maintain morale, good order and discipline, and unit cohesion—are subject to the limitations provided in the Uniform Code of Military Justice and the Manual for Courts-Martial. In addition, the Department of Defense and its components issue a variety of directives and guidelines that pertain to investigations.

The committee agrees that guidelines can provide a useful means of ensuring the proper allocation of scarce Department of Defense investigative resources and the establishment of reasonable investigative priorities. The committee is concerned, however, about the number of issues concerning the application of the guidelines that were raised in the committee's hearings. It is important that the

guidelines not be misinterpreted to establish new grounds for challenging administrative or disciplinary proceedings. The committee considered whether it should recommend legislation to clarify the guidance on investigations, but decided not to do so for the following reasons.

First, the July 19 Memorandum expressly states that it "creates no substantive or procedural rights". The significance of this provision was explained by the General Counsel on July 22:

> Chairman NUNN. Does the July 19th policy give an individual the right to invalidate an administrative or judicial proceeding or to exclude the use of any evidence in such a proceeding by alleging that an investigation was conducted in a manner contrary to the policy?
>
> Ms. GORELICK. No.
>
> Chairman NUNN. Tell us why.
>
> Ms. GORELICK. These are guidelines for commanders and investigators to try to improve internally our administration of this process. And it is not intended to create any substantive or procedural rights to encumber the necessary flexibility that the military must have in approaching the management of such a large group of personnel.

The General Counsel concurred with Senator Nunn's observation that the guidance does not "set up a whole set of legal obstacles that have to be adjudicated by a judge every time a commander makes a decision. This is * * * commonsense guidance and not a legal standard * * *." This means that the guidance can be reviewed, revised, and clarified on the basis of experience without disrupting past or pending cases.

Second, she confirmed that the references to "credible information" and "reasonable belief" as grounds for initiating investigations and inquiries constituted guidance for commanders to use in making commonsense judgments about the allocation of resources, and did not involve a legal standard, such as probable cause.

Third, the General Counsel assured the committee that the guidance will not be implemented in a manner that establishes unusual restrictions on the authority of commanders to initiate investigations. She noted that while the guidelines provided "additional guidance" for investigating homosexual cases, the guidance was "consistent with the way in which we approach other underlying offenses or problems." The discretion of commanders to initiate investigations was stressed by Secretary Aspin in his testimony before the committee on July 20, 1993:

> [I]n the last analysis, this policy leaves it up to the unit commanders. Now, there is going to be from each of [the military] departments and the Department of Defense generally some kind of guidelines for them, but we are essentially going to leave it up to the unit commanders to institute this policy and to make it work.

Secretary Aspin also noted: "It is up to the individual commander to determine when he has credible information."

Fourth, the General Counsel made it clear that a single statement, if the commander determined it to be credible, would provide

the basis for an investigation: "If service member A says to servicemember B 'I am homosexual' and * * * service member B then goes to the commander and says 'service member A said he was homosexual,' if the commander believes service member B, then that is absolutely grounds for initiating a discharge."

Fifth, the General Counsel clarified the guidance which provided that an activity such as "association with known homosexuals at a gay bar, possessing or reading homosexual publications, or marching in a gay rights rally" did not, by itself, provide a basis for initiating an investigation:

> In assessing what is credible information to initiate an inquiry, a commander may consider whether such actions as frequenting gay bars, reading gay literature, or marching in a gay rights parade are non-verbal statements which show a propensity to engage in homosexual acts. What the policy recognizes is that heterosexuals, as well as homosexuals, might march in gay rights parades, frequent a gay bar, [and] read gay literature. * * * [C]ommanders should be sensitive to the legitimate interests of service members in what they read and who their friends are and what they believe in.

The General Counsel also made it clear that the guidance regarding presence at gay bars did not restrict the authority of commanders to consider any conduct or statements occurring at such establishments, nor did it restrict the discretion of commanders to declare establishments off-limits or to consider information about conduct or statements occurring at such an establishment.

In summary, the committee finds that the July 19 Memorandum, as explained in the Department's authoritative testimony before the committee, is consistent with past DoD separation policy. The committee also received assurances from the Department of Defense that the investigative guidance would be implemented in a manner that would provide commanders with the discretion they need to maintain good order and discipline. In developing the committee's legislative recommendations, the committee specifically took into account the Department's position that the Memorandum does not affect past cases and does not establish substantive or procedural rights with respect to future cases. The committee will carefully monitor the implementation process to ensure that the policy is implemented in a manner consistent with the Department's testimony and the statutory framework recommended by the committee.

## IV. SECTIONAL ANALYSIS

Section 546 would establish an express statutory policy concerning homosexuality in the armed forces.

### Codification (sec. 546(a))

The statutory policy would be set forth in section 654 of title 10, United States Code.

## Findings (10 U.S.C. 654(a))

This provision would set forth the findings that describe the basis for the policy recommended by the committee. The findings reflect long standing Department of Defense policy, as set forth in DoD Directive 1332.14, that "[h]omosexuality is incompatible with military service * * * [because the] presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission."

## Policy (10 U.S.C. 654(b))

This provision would codify the standards and procedures for separation on the basis of homosexuality. Separation is authorized for persons who engage in homosexual acts, statements and marriages.

A servicemember would be discharged if there is an approved finding that the individual has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts. A homosexual act, as defined in 10 U.S.C. 654(f), means "any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires." It also includes any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in such an act. This reflects the definitions in DoD Directive 1332.14 and the July 19, 1993 Memorandum issued by the Secretary of Defense.

The servicemember who may be retained in such circumstances only if there is a further finding that the member has demonstrated that: the conduct is a departure from the servicemember's usual and customary behavior; it is unlikely to recur; it was not accomplished by use of force, coercion or intimidation; the member's continued presence is consistent with the interests of the service in proper discipline, good order, and morale; and the member does not have a propensity or intent to engage in homosexual acts. These standards reflect current Department of Defense policy in DoD Directive 1332.14 and the July 19, 1993 Memorandum issued by the Secretary of Defense.

A servicemember would be discharged if there is an approved finding that the member has made a statement that he or she is a homosexual. The committee intends that this provision be interpreted in accordance with the testimony of the General Counsel of the Department of Defense on July 21 and 22, 1993 that the term "statement" includes a nonverbal statement, and that an act may constitute a non-verbal statement. The servicemember has the opportunity to submit evidence in rebuttal, but the servicemember may be retained only if there is a further finding that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

The restriction concerning statements demonstrating a propensity or intent to engage in homosexual acts reflects current Department of Defense policy, as continued in the Secretary of Defense's July 19, 1993 Memorandum. It is based on the presumption that when a member of the armed forces makes a verbal or nonverbal

statement that "I am homosexual," or any other words to the same effect, the member is stating that he or she is a person who "engages in, attempts to engage in, has a propensity to engage in, or intends to engage in" homosexual conduct.

The committee agrees that it is reasonable for the armed forces to presume that when a person uses the term "I am homosexual," the individual engages in, attempts to engage in, has a propensity to engage in, or intends to engage in impermissible conduct. It is appropriate for the armed forces to separate the individual from military service without waiting until the individual's propensity or intent to violate the UCMJ ripens into specific conduct prejudicial to good order and discipline. *See ben Shalom* v. *Marsh*, 881 F.2d 454, 464 (7th Cir. 1989), *cert. denied* 110 S. Ct. 1296 (1990).

The committee intends that this provision be interpreted in accordance with the following points, which are consistent with the interpretations made by the General Counsel of the Department of Defense during her testimony before the committee on July 21 and 22.

First, once the government introduces evidence that the member has stated that he or she is a homosexual, the burden shifts to the member and remains with the member throughout the proceeding to demonstrate that he or she is not a homosexual as defined in the statute (i.e., a person who engages in, attempts to engage in or has the propensity or intent to engage in homosexual acts).

Second, a member cannot rebut the presumption simply through a promise to adhere to military standards of conduct in the future; nor can the member rebut the presumption by a statement to the effect that he or she has a propensity towards homosexuality but has not acted on it.

Third, if the member in rebuttal offers evidence to the effect that he or she does not engage in homosexual acts or has a propensity or intent to do so, that does not shift the burden to the government. Because the burden remains on the member throughout the proceeding, the member bears the burden of persuading the fact-finder by a preponderance of the evidence that the rebuttal is more credible than the original statement (e.g., by proving that the original statement was made in jest). If the fact-finder determines that the evidence in rebuttal does not overcome the presumption, the evidence is legally sufficient to sustain a discharge.

Fourth, the presumption applies when the individual makes a verbal or nonverbal statement that he or she is homosexual, or other words a reasonable person would take as such a statement, *e.g.*, "I am gay," "I am lesbian," "I have a homosexual orientation," "I am sexually attracted to person of the same sex", or nonverbal statements to the same effect. As noted by the General Counsel, the implementing regulations would make it clear that the final assessment as to what the words were intended to convey would be made by commanders.

The policy setting forth the grounds for discharge is conduct-based. There are no on-post/off-post, on-duty/off-duty, or public/private distinctions. The armed forces have a legitimate interest in the behavior of military personnel at all times and places, off-post as well as on-post. The Supreme Court has expressly rejected any requirement that military offenses be "service-connected." *Solorio*

v. *United States*, 483 U.S. 435 (1987). Accordingly, the prohibitions apply at all times and in all places. This is consistent with the July 19, 1993 Policy Memorandum and the testimony of the Department of Defense General Counsel.

The committee agrees with Department of Defense policy that acts and statements which form a basis for administrative discharge may include such conduct even when the act or statement occurs at a time when the conduct would not necessarily be subject to criminal prosecution under the Uniform Code of Military Justice (e.g., while the individual is acting in a civilian capacity, such as before joining the armed forces or when a reservist is in his or her civilian capacity). This is consistent with general military personnel policy, under which a person's qualifications for service may be affected by the circumstances of his or her civilian life, even if the act in question occurs at a time when the individual is not subject to military criminal jurisdiction under the Uniform Code of Military Justice. The committee's proposal continues current policy. The committee recognizes the authority of the Secretary of Defense, in developing implementing rules consistent with the statutory standards for discharge, to provide guidance on the treatment of information that involves isolated matters that are remote in time.

The committee notes that nothing in this provision precludes commanders from taking action to separate a member under another provision of law or to refer cases to trial by court-martial.

## Entry standards and documents (10 U.S.C. 654(c))

This provision would require the Secretary of Defense to ensure that the standards for enlistment and appointment of members of the armed forces reflect the restrictions based on homosexual acts, statements, and marriages. This reflects current DoD policy and the July 19, 1993 Memorandum issued by the Secretary of Defense.

The committee also recommended a provision that the codified restrictions in 10 U.S.C. 654(b) be set forth in the enlistment contract and in similar documents used in connection with the appointment of officers. The purpose of this provision is to provide potential members of the armed forces with an opportunity to consider the implications of the policy prior to making a commitment to join the armed forces. This document is not a prerequisite to separation action under this provision, and the government need not prove that the individual read or signed an accession document that contained a copy of subsection (b) in order to take administrative or disciplinary action.

## Required briefings (10 U.S.C. 654(d))

The committee recommends codifying the requirement, established in the January 29, 1993 interim policy and continued in the July 19, 1993 Memorandum by the Secretary of Defense, that the military justice briefings which military personnel receive upon entry into military service and periodically thereafter include a detailed explanation of the applicable laws and regulations governing sexual conduct by members of the armed forces, including sexual harassment as well as the restrictions based upon homosexual acts, statements, and marriages. This briefing is not a prerequisite to separation action under this provision, and the government need

not prove that the individual received such a briefing in order to take administrative or disciplinary action.

### Rule of construction concerning avoidance of military service (10 U.S.C. 654(e))

This provision would make it clear that nothing in this section could be construed to require separation processing when an individual has engaged in conduct or made a statement simply for the purpose of obtaining a discharge (e.g., to avoid combat duty or a deployment).

### Definitions (10 U.S.C. 654(f))

The provision recommended by the committee would define the terms "homosexual," "bisexual," and "homosexual act." These definitions reflect DoD Directive 1332.14 and the July 19, 1993 memorandum issued by the Secretary of Defense.

### Regulations (sec. 546(b))

Under the provision recommended by the committee, the Secretary of Defense would be required to revise Department of Defense regulations, and issue such new regulations as may be necessary, to implement the policy that would be set forth in 10 U.S.C. 654.

### Savings provision (sec. 546(c))

It is the committee's view that the policy in effect prior to January 29, 1993, the January 29, 1993 interim policy, the July 19, 1993 policy, and this provision are all consistent with applicable constitutional requirements. Section 546(c) would make it clear that nothing in this provision may be construed to invalidate any inquiry, investigation, administrative action or proceeding, court-martial, or judicial proceeding conducted before the effective date of regulations issued by the Secretary of Defense.

### Sense of Congress concerning accession questions (sec. 546(d)(1)

This provision expresses the sense of Congress that the suspension of questioning concerning homosexuality as part of accession processing under the January 29, 1993 interim policy should be continued, but the Secretary of Defense may reinstate such questions, or such revised questions as he deems appropriate, if necessary to effectuate the congressional policies concerning homosexuality in the armed forces.

Although the law has prohibited homosexual conduct expressly since the enactment of the Articles of War of 1920, the systemic questioning of recruits about sexual orientation was not initiated until World War II. Department of Defense records indicate that specific questions on enlistment documents were not introduced until 1956. Accession questioning was suspended as part of the January 29, 1993, based upon a recommendation of the Joint Chiefs of Staff. The Chiefs have recommended, and the President has agreed, that the policy of not asking questions about homosexuality during accession processing should be continued.

The committee notes that the current enlistment form does not ask about every possible indication of indiscipline as part of the ac-

cession processing. The committee, however, does not believe that the suspension of the question should be made permanent as a matter of statutory law. It may well be that experience under the suspension could lead the Department of Defense to conclude that the question should be reinstated. Therefore, the committee's recommendation makes it clear that the Secretary of Defense retains discretion to reinstate accession question if the Secretary determines that it is necessary to effectuate the restrictions on homosexuality.

*Sense of Congress concerning self-incrimination (sec. 546(d)(2))*

Article 31 of the Uniform Code of Military Justice provides members of the armed forces with a privilege against self-incrimination, including a rights-warning requirement, when they are accused or suspected of committing a criminal offense. This privilege does not apply, however, with respect to acts or statements which provide a basis for administrative action, including separation, when such acts or statements do not constitute technical criminal offenses.

The practical impact of the investigative guidance which the Secretary of Defense has drafted will not be clear until there has been some experience over a period of time. Should that experience demonstrate that there are a significant number of occasions involving questions related to homosexuality in which the rights warning requirement of Article 31 is not applicable, then it may be desirable to consider whether such questions should trigger protections similar to the privilege against self-incrimination. Accordingly, this provision expresses the Sense of Congress that the Secretary of Defense should consider issuing guidance governing the circumstances under which servicemembers questioned about homosexuality should be afforded warnings similar to the Article 31 warnings concerning the privilege against self-incrimination.



Department of Defense
# DIRECTIVE

NUMBER 1332.14
December 21, 1993

Administrative Reissuance Incorporating Change 1, March 4, 1994

ASD(P&R)

SUBJECT:  Enlisted Administrative Separations

References:  (a) DoD Directive 1332.14, subject as above, January 28, 1982 (hereby canceled)
(b) Section 977 of title 10, United States Code (Denial of Certain Benefits to Persons Who Fail to Complete at Least Two Years of an Original Enlistment)
(c) Pub. L. No. 97-66, "The Veterans' Disability Compensation, Housing, and Memorial Benefits Amendments Act of 1981", October 17, 1981, (95 Stat. 1035)
(d) Sections 801-940 of title 10, United States Code (Uniform Code of Military Justice, Articles 1-140)
(e) *through (z), see enclosure 1*

## 1. REISSUANCE AND PURPOSE

This Directive reissues reference (a) and updates policy, responsibilities, and procedures governing the administrative separation of enlisted members from the Military Services.

## 2. APPLICABILITY

This Directive applies to the Office of the Secretary of Defense and the Military Departments (including their Reserve components).  The term "Military Services," as used herein, refers to the Army, the Navy, the Air Force and the Marine Corps.

## 3. DEFINITIONS

1

*DODD 1332.14, December 21, 93*

Terms used in this Directive are defined in enclosure 2.

## 4. POLICY

4.1.  It is DoD policy to promote the readiness of the Military Services by maintaining high standards of conduct and performance.   Separation policy promotes the readiness of the Military Services by providing an orderly means to:

4.1.1.  Judge the suitability of persons to serve in the Armed Forces on *the basis of their conduct and their ability to meet required standards of duty performance and discipline;*

4.1.2.  *Maintain standards of performance and conduct through* characterization of service in a system that emphasizes the importance of honorable service;

4.1.3.  *Achieve authorized force levels and grade distributions; and*

4.1.4.  *Provide for the orderly administrative separation of enlisted* personnel in a variety of circumstances.

4.2.  DoD separation policy is designed to strengthen the concept that military service is a calling different from any civilian occupation.

4.2.1.  The acquisition of military status, whether through enlistment or induction, involves a commitment to the United States, the Service, and one's fellow citizens and Service members to complete successfully a period of obligated service. Early separation for failure to meet required standards of performance or discipline represents a failure to fulfill that commitment.

4.2.2.  Millions of Americans from diverse backgrounds and with a wide variety of aptitudes and attitudes upon entering military service have served successfully in the Armed Forces.   It is DoD policy to provide Service members with the training, motivation, and professional leadership that inspires the dedicated enlisted member to emulate his or her predecessors and peers in meeting required standards of performance and discipline.

4.2.3.  The Military Services make a substantial investment in training, time, equipment, and related expenses when persons are enlisted or inducted into military

service.  Separation prior to completion of an obligated period of service is wasteful because it results in loss of this investment and generates a requirement for increased accessions.  Consequently, attrition is an issue of significant concern at all levels of responsibility within the Armed Forces.  Reasonable efforts should be made to identify enlisted members who exhibit a likelihood for early separation, and to improve their chances for retention through counseling, retraining, and rehabilitation before initiation of separation proceedings.  Enlisted members who do not demonstrate potential for further military service should be separated to avoid the high costs in terms of pay, administrative efforts, degradation of morale, and substandard mission performance that are associated with retention of enlisted members who do not conform to required standards of discipline and performance despite efforts at counseling, retraining, or rehabilitation.

## 5. RESPONSIBILITIES

5.1. The <u>Assistant Secretary of Defense for Personnel and Readiness</u> may supplement the enclosures to this Directive, and may delegate the authority to establish reporting requirements for the reasons for separation (Part l, enclosure 3) to a Deputy Assistant Secretary.

5.2. The <u>Secretaries of the Military Departments</u> shall prescribe implementing documents to ensure that the policies, standards, and procedures in this Directive are administered in a manner that provides consistency in separation policy to the extent practicable in a system that is based on command discretion.  The implementing documents also shall address the following matters:

5.2.1. *Commander Responsibilities.  The Secretary concerned, acting through his or her military commanders, shall ensure that the policies, standards and procedures of this Directive are applied consistently, that fact-finding inquiries are conducted properly, that no abuse of authority occurs, and that failure to follow the provisions of this directive results in appropriate corrective action.*

5.2.2. *Processing Goals.  The Secretary concerned shall establish* processing time goals for the types of administrative separations authorized by this Directive.  Such goals shall be designed to further the efficient administration of the Armed Forces and shall be measured from the date of notification to the date of separation.  Normally such goals should not exceed 15 working days for the notification procedure (E3.A3.1.2.) and 50 working days for the administrative board procedure (E3.A3.1.3.).  Goals for shorter processing times are encouraged,

particularly for cases in which expeditious action is likely. Variations may be established for complex cases or cases in which the separation authority is not located on the same facility as the respondent. The goals, and a program for monitoring effectiveness, shall be in the implementing document of the Military Department. Failure to process an administrative separation within the prescribed goal for processing times shall not create a bar to separation or characterization.

5.2.3. *Periodic Explanations*. *The Secretary concerned shall prescribe* appropriate internal procedures for periodic explanation to enlisted members of the types of separations, the basis for their issuance, the possible effects of various actions upon reenlistment, civilian employment, veterans' benefits, and related matters, and the effects of 10 U.S.C. 977 (reference (b)) and Pub. L. No. 97-66 (1981) (reference (c)) concerning denial of certain benefits to members who fail to complete at least 2 years of an original enlistment. Such explanation may be provided in the form of a written fact sheet or similar document. The periodic explanation shall take place at least each time the provisions of the Uniform Code of Military Justice (UCMJ) are explained under Article 137 of the UCMJ (reference (d)). The requirement that the effects of the various types of separations be explained to enlisted members is a command responsibility, not a procedural entitlement. Failure on the part of the member to receive or to understand such explanation does not create a bar to separation or characterization.

5.2.4. *Provision of Information During Separation Processing*. *The* Secretary concerned shall ensure that information concerning the purpose and authority of the Discharge Review Board and the Board for Correction of Military/Naval Records, established under 10 U.S.C. 1552 and 1553 (reference (e)) and DoD Directive 1332.28 (reference (f)) is provided during the separation processing of all members, except when the separation is for an immediate reenlistment. Specific counseling is required under 38 U.S.C. 3103(a) (reference (g)) which states that a discharge under other than honorable conditions, resulting from a period of continuous, unauthorized absence of 180 days or more, is a conditional bar to benefits administered by the Veterans Administration, notwithstanding any action by a Discharge Review Board. The information required by this paragraph should be provided in the form of a written fact sheet or similar document. Failure on the part of the member to receive or to understand such explanation does not create a bar to separation or characterization.


6. PROCEDURES

*DODD 1332.14, December 21, 93*

Procedures and standards for implementing the policy in section 4., above, are in enclosure 3.

7. <u>EFFECTIVE DATE AND IMPLEMENTATION</u>

    7.1.  This Directive is effective February 5, 1994.

    7.2.  This Directive applies only to administrative separation proceedings initiated on or after February 5, 1994 unless the Secretary of the Service concerned determines that it should be applied in a particular case in which proceedings were initiated before that date.

    7.3.  Forward two copies of proposed implementing documents to the Assistant Secretary of Defense for Personnel and Readiness within 30 days of the signature date.

Enclosures - 1
1. References
2. Definitions
3. Standards and Procedures
4. Guidelines for Fact-Finding Inquiries into Homosexual Conduct

5

E1.  ENCLOSURE 1

REFERENCES, continued

(e)  Section 1552 of title 10, United States Code (Correction of Military Records) and Section 1553 (Review of Discharge or Dismissal)

(f)  DoD Directive 1332.28, "Discharge Review Board (DRB) Procedures and Standards," August 11, 1982

(g)  Section 3103 of title 38, United States Code (Certain Bars to Benefits (Veterans Administration))

(h)  DoD Directive 1205.5, "Transfer of Members Between Reserve Components of the Military Services," May 16, 1980

(i)  DoD Instruction 1332.15, "Early Release of Military Enlisted Personnel for College or Vocational/Technical School Enrollment," June 1, 1976

(j)  DoD Directive 1344.10, "Political Activities by Members of the Armed Forces on Active Duty," June 15, 1990

(k)  DoD Directive 1300.6, "Conscientious Objectors," August 20, 1971

(l)  *DoD Directive 1315.15, "Special Separation Policies for Survivorship," September 26, 1988*

(m)  Section on Mental Disorders, International Classification of Diseases and Injuries - 8, Diagnostic and Statistical Manual (DSM-III) of Mental Disorders, 3rd Edition, Committee on Nomenclature & Statistics, American Psychiatric Association, Washington, D.C., 1978

(n)  Chapter 61 of title 10, United States Code (Retirement or Separation for Physical Disability)

(o)  Section 1170 of title 10, United States Code (Regular Enlisted Members: Minority Discharge)

(p)  DoD Directive 1215.13, "Unsatisfactory Performance of Ready Reserve Obligation," June 30, 1979

(q)  Manual for Courts-Martial, 1969 (Revised Edition), as amended

(r)  DoD 5200.2-R, "DoD Personnel Security Program," January 1987, authorized by DoD Directive 5200.2, May 6, 1992

(s)  DoD Instruction 1336.1, "Certificate of Release or Discharge from Active Duty," January 6, 1989

(t)  DoD Directive 1010.1, "Drug Abuse Testing Program," December 28, 1984

(u)  Section 1163 of title 10, United States Code (Reserve Components: Members; Limitations on Separations)

(v)  Section 504 of title 10, United States Code (Persons Not Qualified for Enlistment)

*DODD 1332.14, December 21, 93*

(w)  Section 505 of title 10, United States Code (Regular Components: Qualifications, Terms, Grade)

(x)  Section 266 of title 10, United States Code (Boards for Appointment, Promotion, and Certain Other Purposes:

(y)  Section 654 of title 10, United States Code (Policy concerning homosexuality in the Armed Forces)

(z)  *DoD Instruction 5505.8, "Investigations of Sexual Misconduct by the Defense Criminal Investigative Organizations and Other DoD Law Enforcement Organizations," February 28, 1994*

ENCLOSURE 1

*DODD 1332.14, December 21, 93*

## E2.  ENCLOSURE 2

## DEFINITIONS

E2.1.1.  Bisexual.    A person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual and heterosexual acts.

E2.1.2.  Convening Authority.    (1) The Separation Authority or (2) a commanding officer who has been authorized by the Secretary concerned to process the case except for final action and who otherwise has the qualifications to act as a Separation Authority.

E2.1.3.  Discharge.    Complete severance from all military status gained by the enlistment or induction concerned.

E2.1.4.  Entry-Level Status.    Upon enlistment, a member qualifies for entry-level status during (1) the first 180 days of continuous active military service or (2) the first 180 days of continuous active service after a service break of more than 92 days of active service.   A member of a Reserve component who is not on active duty or who is serving under a call or order to active duty for 180 days or less begins entry level status upon enlistment in a Reserve component.   Entry level status for such a member of a Reserve component terminates as follows: (a) 180 days after beginning training if the member is ordered to active duty for training for one continuous period of 180 days or more; or (b) 90 days after the beginning of the second period of active duty training if the member is ordered to active duty for training under a program that splits the training into two or more separate periods of active duty.   For the purposes of characterization of service or description of separation, the member's status is determined by the date of notification as to the initiation of separation proceedings.

E2.1.5.  Homosexual.    A person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

E2.1.6.  Homosexual Act

E2.1.6.1.  Any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires, and

E2.1.6.2.  Any bodily contact that a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subsection E2.1.6.1., above.

*DODD 1332.14, December 21, 93*

E2.1.7.  Homosexual Conduct.    A homosexual act, a statement by the Service member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage.

E2.1.8.  Member.    An enlisted member of a Military Service.

E2.1.9.  Military Record.    An individual's overall performance while a member of a Military Service, including personal conduct and performance of duty.

E2.1.10.  Propensity.    Propensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts.

E2.1.11.  Release from Active Duty.    Termination of active duty status and transfer or revision to a Reserve component not on active duty, including transfer to the Individual Ready Reserve (IRR).

E2.1.12.  Respondent.    A member of a Military Service who has been notified that action has been initiated to separate the member.

E2.1.13.  Separation.    A general term that includes discharge, release from active duty, release from custody and control of the Armed Forces, transfer to the IRR, and similar changes in Active or Reserve status.

E2.1.14.  Separation Authority.    An official authorized by the Secretary concerned to take final action with respect to a specified type of separation.

E2.1.15.  *Sexual Orientation.    An abstract sexual preference for persons of a particular sex, as distinct from a propensity or intent to engage in sexual acts.*

E2.1.16.  *Statement that a Member Is a Homosexual or Bisexual or Words to That Effect.    Language or behavior that a reasonable person would believe was intended to convey the statement that a person engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts.*

*DODD 1332.14, December 21, 93*

# E3. ENCLOSURE 3

## TABLE OF CONTENTS

E3.A1.1.  PART 1  REASONS FOR SEPARATION                                    15

E3.A1.1.1.  Expiration of Service Obligation                                15
    E3.A1.1.1.1.  Basis                                                     15
    E3.A1.1.1.2.  Characterization or Description                           15

E3.A1.1.2.  Selected Changes in Service Obligations                         15
    E3.A1.1.2.l.  Basis                                                     15
    E3.A1.1.2.2.  Characterization or Description                           16

E3.A1.1.3.  Convenience of the Government                                   16
    E3.A1.1.3.1.  Basis                                                     16
    E3.A1.1.3.2.  Characterization or Description                           16
    E3.A1.1.3.3.  Procedures                                               16
    E3.A1.1.3.4.  Reasons                                                  17
        E3.A1.1.3.4.1.  Early release to further education                  17
        E3.A1.1.3.4.2.  Early release to accept public office              17
        E3.A1.1.3.4.3.  Dependency or hardship                            17
        E3.A1.1.3.4.4.  Pregnancy or childbirth                            17
        E3.A1.1.3.4.5.  Parenthood                                        18
        E3.A1.1.3.4.6.  Conscientious objection                           18
        E3.A1.1.3.4.7.  Surviving family member                           18
        E3.A1.1.3.4.8.  Other designated physical or mental conditions     18
        E3.A1.1.3.4.9.  Additional grounds                                 19

E3.A1.1.4.  Disability                                                      19
    E3.A1.1.4.1.  Basis                                                    19
    E3.A1.1.4.2.  Characterization or Description                          19
    E3.A1.1.4.3.  Procedures                                              19

E3.A1.1.5.  Defective Enlistments and Inductions                            20
    E3.A1.1.5.1.  Minority                                                 20
        E3.A1.1.5.1.1.  Basis                                             20
            E3.A1.1.5.1.1.1.  Under age 17                                 20
            E3.A1.1.5.1.1.2.  Age 17                                       20
        E3.A1.1.5.1.2.  Description of Separation                          20
        E3.A1.1.5.1.3.  Procedure                                         20

*DODD 1332.14, December 21, 93*

E3.A1.1.5.2.  Erroneous                                              20
  E3.A1.1.5.2.1.  Basis                                    20
  E3.A1.1.5.2.2.  Characterization or Description           21
  E3.A1.1.5.2.3.  Procedure                                 21
E3.A1.1.5.3.  Defective enlistment agreements                       21
  E3.A1.1.5.3.1.  Basis                                    21
  E3.A1.1.5.3.2.  Characterization or Description           22
  E3.A1.1.5.3.3.  Procedures                                22
E3.A1.1.5.4.  Fraudulent Entry into the Military Service             22
  E3.A1.1.5.4.1.  Basis                                    22
  E3.A1.1.5.4.2.  Characterization of Description           22
  E3.A1.1.5.4.3.  Procedures                                23
E3.A1.1.5.5.  Separation from the Delayed Entry Program             23
  E3.A1.1.5.5.1.  Basis                                    23
  E3.A1.1.5.5.2.  Description of Separation                 24
  E3.A1.1.5.5.3.  Procedure                                 24

E3.A1.1.6.  Entry Level Performance and Conduct                     24
  E3.A1.1.6.1.  Basis                                      24
  E3.A1.1.6.2.  Counseling and Rehabilitation               24
  E3.A1.1.6.3.  Description of Separation                   24
  E3.A1.1.6.4.  Procedures                                  25

E3.A1.1.7.  Unsatisfactory Performance                              25
  E3.A1.1.7.1.  Basis                                      25
  E3.A1.1.7.2.  Counseling and Rehabilitation               25
  E3.A1.1.7.3.  Characterization or Description             25
  E3.A1.1.7.4.  Procedures                                  25

E3.A1.1.8.  Homosexual Conduct                                      25
  E3.A1.1.8.1.  Basis                                      25
  E3.A1.1.8.2.  Burden of Proof                             27
  E3.A1.1.8.3.  Characterization or Description             27
  E3.A1.1.8.4.  Procedures                                  28

E3.A1.1.9.  Drug Abuse Rehabilitation Failure                       30
  E3.A1.1.9.1.  Basis                                      30
  E3.A1.1.9.2.  Characterization or Description             31
  E3.A1.1.9.3.  Procedures                                  31

E3.A1.1.10.  Alcohol Abuse Rehabilitation Failure                   31
  E3.A1.1.10.1.  Basis                                     31
  E3.A1.1.10.2.  Characterization or Description            32
  E3.A1.1.10.3.  Procedures                                 32

E3.A1.1.11.  Misconduct                                                          32
 E3.A1.1.11.1.  Basis                                                       32
 E3.A1.1.11.2.  Counseling and Rehabilitation                              33
 E3.A1.1.11.3.  Characterization or Description                            34
 E3.A1.1.11.4.  Procedures                                                 34

E3.A1.1.12.  Separation in Lieu of Trial by Court-Martial                       34
 E3.A1.1.12.1.  Basis                                                       34
 E3.A1.1.12.2.  Characterization or Description                            34
 E3.A1.1.12.3.  Procedures                                                 35

E3.A1.1.13.  Security                                                            36
 E3.A1.1.13.1.  Basis                                                       36
 E3.A1.1.13.2.  Characterization or Description                            36

E3.A1.1.14.  Unsatisfactory Participation in the Ready Reserve                   36
 E3.A1.1.14.1.  Basis                                                       36
 E3.A1.1.14.2.  Characterization or Description                            36
 E3.A1.1.14.3.  Procedures                                                 36

E3.A1.1.15.  Secretarial Plenary Authority                                       37
 E3.A1.1.15.1.  Basis                                                       37
 E3.A1.1.15.2.  Characterization or Description                            37
 E3.A1.1.15.3.  Procedures                                                 37

E3.A1.1.16.  Reasons Established by the Military Departments                      37
 E3.A1.1.16.1.  Basis                                                       37
 E3.A1.1.16.2.  Counseling and Rehabilitation                              37
 E3.A1.1.16.3.  Characterization or Description                            37
 E3.A1.1.16.4.  Procedures                                                 37

E3.A1.1.17.  Weight Control Failure                                              37
 E3.A1.1.17.1.  Basis                                                       37
 E3.A1.1.17.2.  Counseling and Rehabilitation                              38
 E3.A1.1.17.3.  Characterization or Description                            38
 E3.A1.1.17.4.  Procedures                                                 38

E3.A2.1.  PART 2  GUIDELINES ON SEPARATION AND CHARACTERIZATION                   39

E3.A2.1.1.  Separation                                                           39
 E3.A2.1.1.1.  Scope                                                        39

*DODD 1332.14, December 21, 93*

E3.A2.1.1.2.  Guidance                                                              39
E3.A2.1.1.3.  Limitations on separation actions                                     40

E3.A2.1.2.  Suspension of Separation                                                41
E3.A2.1.2.1.  Suspension                                                            41
E3.A2.1.2.2.  Action during the period of suspension                               41

E3.A2.1.3.  Characterization of Service or Description of Separation                42
E3.A2.1.3.1.  Types of characterization or description                             42
E3.A2.1.3.2.  Characterization of service                                          43
E3.A2.1.3.2.1.  General considerations                                             43
E3.A2.1.3.2.2.  Types of characterization                                          44
E3.A2.1.3.2.2.1.  Honorable                                                         44
E3.A2.1.3.2.2.2.  General (under honorable conditions)                             44
E3.A2.1.3.2.2.3.  Under Other Than Honorable Conditions                            44
E3.A2.1.3.2.3.  Limitations on characterization                                    45
E3.A2.1.3.3.  Uncharacterized separation                                           46
E3.A2.1.3.3.1.  Entry-Level Separation                                             46
E3.A2.1.3.3.2.  Void Enlistments or Inductions                                     47
E3.A2.1.3.3.3.  Dropping from the rolls                                            48


E3.A3.1.  PART 3  PROCEDURES FOR SEPARATION                                         49

E3.A3.1.1.  Scope                                                                   49

E3.A3.1.2.  Notification Procedure                                                  49
E3.A3.1.2.1.  Notice                                                               49
E3.A3.1.2.2.  Additional notice requirements                                       50
E3.A3.1.2.3.  Response                                                             51
E3.A3.1.2.4.  Separation Authority                                                 51

E3.A3.1.3.  Administrative Board Procedure                                          52
E3.A3.1.3.1.  Notice                                                               52
E3.A3.1.3.2.  Additional notice requirements                                       54
E3.A3.1.3.3.  Response                                                             54
E3.A3.1.3.4.  Waiver                                                               55
E3.A3.1.3.5.  Hearing procedure                                                    55
E3.A3.1.3.5.1.  Composition                                                        55
E3.A3.1.3.5.2.  Presiding Officer                                                  55
E3.A3.1.3.5.3.  Witnesses                                                          55
E3.A3.1.3.5.4.  Record of Proceedings                                             57
E3.A3.1.3.5.5.  Presentation of Evidence                                          58

ENCLOSURE 3

E3.A3.1.3.5.6.  Rights of the Respondent     58

E3.A3.1.3.5.7.  Findings and Recommendations     58

E3.A3.1.3.6.  Separation Authority     59

E3.A3.1.4.  Additional Provisions Concerning Members Confined by Civil Authorities     61

E3.A3.1.5.  Additional Requirements for Certain Members of Reserve Components     62

E3.A3.1.5.l.  Members of reserve components not on active duty     62

E3.A3.1.5.2.  Transfer to the IRR     63

E3.A3.1.6.  Additional Requirements for Members Beyond Military Control by Reason of Unauthorized Absence     64

E3.A3.1.6.1.  Determination of applicability     64

E3.A3.1.6.2.  Notice     64

E3.A3.1.6.3.  Members of Reserve components     64

ENCLOSURE 3

*DODD 1332.14, December 21, 93*

E3.A1.  ATTACHMENT 1 TO ENCLOSURE 3

PART 1

## E3.A1.1.  REASONS FOR SEPARATION

E3.A1.1.1.  Expiration of Service Obligation

E3.A1.1.1.1.  Basis.    A member may be separated upon expiration of enlistment or fulfillment of service obligation.    This includes separation authorized by the Secretary concerned when the member is within 30 days of the date of expiration of term of service under the following circumstances:

E3.A1.1.1.1.1.  The member is serving outside the continental United States (CONUS); or

E3.A1.1.1.1.2.  The member is a resident of a State, territory, or possession outside CONUS and is serving outside the member's State, territory, or possession of residence.

E3.A1.1.1.2.  Characterization or Description.    Honorable, unless:

E3.A1.1.1.2.1.  An Entry-Level Separation is required under subsection E3.A2.1.3.3. of Part 2;

E3.A1.1.1.2.2.  Characterization of service as General (under honorable conditions) is warranted under section E3.A2.1.3. of Part 2 on the basis of numerical scores accumulated in a formal, Servicewide rating system that evaluates conduct and performance on a regular basis; or

E3.A1.1.1.2.3.  Another characterization is warranted upon discharge from the IRR under section E3.A3.1.5. of Part 3.

E3.A1.1.2.  Selected Chances in Service Obligations

E3.A1.1.2.1.  Basis.    A member may be separated for the following reasons:

E3.A1.1.2.1.1.  General demobilization or reduction in authorized strength.

E3.A1.1.2.1.2.  Early separation of personnel under a program established by the Secretary concerned.    A copy of the document authorizing such

*DODD 1332.14, December 21, 93*

program shall be forwarded to the Assistant Secretary of Defense for Personnel and Readiness (ASD(P&R)) on or before the date of implementation.

E3.A1.1.2.1.3.  Acceptance of an active duty commission or appointment, or acceptance into a program leading to such commission or appointment in any branch of the Military Services.

E3.A1.1.2.1.4.  Immediate enlistment or reenlistment

E3.A1.1.2.1.5.  Interservice transfer of inactive reserves in accordance with DoD Directive 1205.5 (reference (h)).

E3.A1.1.2.2.  Characterization or description.    Honorable, unless:

E3.A1.1.2.2.1.  An Entry Level Separation is required under section E3.A2.1.3. of Part 2;

E3.A1.1.2.2.2.  Characterization of service as General (under honorable conditions) is warranted under section E3.A2.1.3. of Part 2 on the basis of numerical scores accumulated in a formal, service-wide rating system that evaluates conduct and performance on a regular basis; or

E3.A1.1.2.2.3.  Another characterization is warranted upon discharge from the IRR under section E3.A3.1.5. of Part 3.

E3.A1.1.3.  Convenience of the Government

E3.A1.1.3.1.  Basis.    A member may be separated for convenience of the government for the reasons set forth in subsection E3.A1.1.3.4., below.

E3.A1.1.3.2.  Characterization or description.    Honorable, unless:

E3.A1.1.3.2.1.  An Entry Level Separation is required under section E3.A2.1.3. of Part 2; or

E3.A1.1.3.2.2.  Characterization of service as General (under honorable conditions) is warranted under section E3.A2.1.3. of Part 2.

E3.A1.1.3.3.  Procedures.    Procedural requirements may be established by the Secretary concerned, subject to procedures established in subsection E3.A1.1.3.4., below.  Prior to characterization of service as General (under honorable conditions),

the member shall be notified of the specific factors in the service record that warrant such a characterization, and the Notification Procedure (section E3.A3.1.2. of Part 3) shall be used.   Such notice and procedure is not required, however, when characterization of service as General (under honorable conditions) is based upon numerical scores accumulated in a formal, service-wide rating system that evaluates conduct and performance on a regular basis.

E3.A1.1.3.4.  Reasons

E3.A1.1.3.4.1.  <u>Early release to further education</u>.   A member may be separated under DoD Directive 1332.15 (reference (i)) to attend a college, university, vocational school, or technical school.

E3.A1.1.3.4.2.  <u>Early release to accept public office</u>.   A member may be separated to accept public office only under circumstances authorized by the Military Department concerned and consistent with DoD Directive 1344.10 (reference (j)).

E3.A1.1.3.4.3.  <u>Dependency or hardship</u>.

E3.A1.1.3.4.3.1.  Upon request of the member and concurrence of the government, separation may be directed when genuine dependency or undue hardship exists under the following circumstances:

E3.A1.1.3.4.3.1.1.  The hardship or dependency is not temporary;

E3.A1.1.3.4.3.1.2.  Conditions have arisen or have been aggravated to an excessive degree since entry into the Service, and the member has made every reasonable effort to remedy the situation;

E3.A1.1.3.4.3.1.3.  The administrative separation will eliminate or materially alleviate the condition; and

E3.A1.1.3.4.3.1.4.  There are no other means of alleviation reasonably available.

E3.A1.1.3.4.3.2.  Undue hardship does not necessarily exist solely because of altered present or expected income, family separation, or other inconveniences normally incident to Military Service.

E3.A1.1.3.4.4.  <u>Pregnancy or childbirth</u>.   A female member may be

*DODD 1332.14, December 21, 93*

separated on the basis of pregnancy or childbirth upon her request, unless retention is determined to be in the best interests of the service under section E3.A2.1.1. of Part 2 and guidance established by the Military Department concerned.

E3.A1.1.3.4.5.  Parenthood.  A member may be separated by reason of parenthood if as a result thereof it is determined under the guidance set forth in section E3.A2.1.1. of Part 2 that the member is unable satisfactorily to perform his or her duties or is unavailable for worldwide assignment or deployment.  Prior to involuntary separation under this provision, the Notification Procedure (section E3.A3.1.2. of Part 3) shall be used.  Separation processing may not be initiated until the member has been counseled formally concerning deficiencies and has been afforded an opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records.

E3.A1.1.3.4.6.  Conscientious objection.  A member may be separated if authorized under DoD Directive 1300.6 (reference (k)).

E3.A1.1.3.4.7.  Surviving family member.  A member may be separated if authorized under DoD Directive 1315.15 (reference (l)).

E3.A1.1.3.4.8.  Other designated physical or mental conditions.

E3.A1.1.3.4.8.1.  The Secretary concerned may authorize separation on the basis of other designated physical or mental conditions, not amounting to Disability (section E3.A1.1.4., below), that potentially interfere with assignment to or performance of duty under the guidance set forth in section E3.A2.1.1. of Part 2. Such conditions may include but are not limited to chronic seasickness or airsickness, enuresis, and personality disorder.[1]

E3.A1.1.3.4.8.2.  Separation processing may not be initiated until the member has been counseled formally concerning deficiencies and has been afforded an opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records.

E3.A1.1.3.4.8.3.  Separation on the basis of personality disorder is authorized only if a diagnosis by a psychiatrist or psychologist, completed in accordance with procedures established by the Military Department concerned, concludes that the disorder is so severe that the member's ability to function effectively in the military environment is significantly impaired.

---

[1] Personality disorders are described in the Diagnostic and Statistical Manual (DSM-III) of Mental Disorders (reference (m)).

E3.A1.1.3.4.8.4.  Separation for personality disorder is not appropriate when separation is warranted under sections E3.A1.1.1. through E3.A1.1.14. or section E3.A1.1.16. of this Part.   For example, if separation is warranted on the basis of unsatisfactory performance (section E3.A1.1.7.) or misconduct (section E3.A1.1.11.), the member should not be separated under this section regardless of the existence of a personality disorder.

E3.A1.1.3.4.8.5.  Nothing in this provision precludes separation of a member who has such a condition under any other basis set forth under this section (Convenience of the Government) or for any other reason authorized by this Directive.

E3.A1.1.3.4.8.6.  Prior to involuntary separation under this provision, the Notification Procedure (section E3.A3.1.2. of Part 3) shall be used.

E3.A1.1.3.4.8.7.  The reasons designated by the Secretary concerned shall be separately reported.

E3.A1.1.3.4.9.  Additional grounds.   The Secretary concerned may provide additional grounds for separation for the convenience of the government.  A copy of the document authorizing such grounds shall be forwarded to the ASD(P&R) on or before the date of implementation.

E3.A1.1.4.  Disability.

E3.A1.1.4.1.  Basis.   A member may be separated for disability under the provisions of 10 U.S.C., chapter 6l (reference (n)).

E3.A1.1.4.2.  Characterization or description.   Honorable, unless:

E3.A1.1.4.2.1.  An Entry Level Separation is required under section E3.A2.1.3. of Part 2; or

E3.A1.1.4.2.2.  Characterization of service as General (under honorable conditions) is warranted under section E3.A2.1.3. of Part 2.

E3.A1.1.4.3.  Procedures.   Procedural requirements for separation may be established by the Military Departments consistent with chapter 61 (reference (n)).   If separation is recommended, the following requirements apply prior to characterization of service as General (under honorable conditions): the member shall be notified of the specific factors in the service record that warrant such a characterization, and the

*DODD 1332.14, December 21, 93*

Notification Procedure (section E3.A3.1.2. of Part 3) shall be used. Such notice and procedure is not required, however, when characterization of service as General (under honorable conditions) is based upon numerical scores accumulated in a formal, service-wide rating system that evaluates conduct and performance on a regular basis.

E3.A1.1.5.  Defective Enlistments and Inductions

E3.A1.1.5.1.  Minority

E3.A1.1.5.1.1.  Basis

E3.A1.1.5.1.1.1.  Under age 17.  If a member is under the age of 17, the enlistment of the member is void, and the member shall be separated.

E3.A1.1.5.1.1.2.  Age 17.  A member shall be separated under 10 U.S.C. 51170 (reference (o)) in the following circumstances except when the member is retained for the purpose of trial by court-martial:

E3.A1.1.5.1.1.2.1.  There is evidence satisfactory to the Secretary concerned that the member is under 18 years of age;

E3.A1.1.5.1.1.2.2.  The member enlisted without the written consent of the member's parent or guardian; and

E3.A1.1.5.1.1.2.3.  An application for the member's separation is submitted to the Secretary concerned by the parent or guardian within 90 days of the member's enlistment.

E3.A1.1.5.1.2.  Description of separation.  A member separated under subparagraph E3.A1.5.1.1.1., above, shall receive an order of release from the custody and control of the armed forces (by reason of void enlistment or induction).  The separation of a member under subparagraph E3.A1.5.1.1.2., above, shall be described as an Entry Level Separation.

E3.A1.1.5.1.3.  Procedure.  The Notification Procedure (section E3.A2.1.1. of Part 3) shall be used.

E3.A1.1.5.2.  Erroneous

E3.A1.1.5.2.1.  Basis.  A member may be separated on the basis of an erroneous enlistment, induction, or extension of enlistment under the guidance set forth

*DODD 1332.14, December 21, 93*

in section E3.A2.1.1. of Part 2.   An enlistment, induction, or extension of enlistment is erroneous in the following circumstances, if:

E3.A1.1.5.2.1.1.  It would not have occurred had the relevant facts been known by the government or had appropriate directives been followed;

E3.A1.1.5.2.1.2.  It was not the result of fraudulent conduct on the part of the member; and

E3.A1.1.5.2.1.3.  The defect is unchanged in material respects.

E3.A1.1.5.2.2.  <u>Characterization or description</u>.   Honorable, unless an Entry Level Separation or an order of release from the custody and control of the Military Services (by reason of void enlistment or induction) is required under section E3.A2.1.3. of Part 2.

E3.A1.1.5.2.3.  <u>Procedure</u>

E3.A1.1.5.2.3.1.  If the command recommends that the individual be retained in military service, the initiation of separation processing is not required in the following circumstances:

E3.A1.1.5.2.3.1.1.  The defect is no longer present; or

E3.A1.1.5.2.3.1.2.  The defect is waivable and a waiver is obtained from appropriate authority.

E3.A1.1.5.2.3.2.  If separation processing is initiated, the Notification Procedure (section E3.A3.1.2. of Part 3) shall be used.

E3.A1.1.5.3.  <u>Defective enlistment agreements</u>

E3.A1.1.5.3.1.  <u>Basis</u>.   A defective enlistment agreement exists in the following circumstances:

E3.A1.1.5.3.1.1.  As a result of a material misrepresentation by recruiting personnel, upon which the member reasonably relied, the member was induced to enlist with a commitment for which the member was not qualified;

E3.A1.1.5.3.1.2.  The member received a written enlistment commitment from recruiting personnel for which the member was qualified, but which

*DODD 1332.14, December 21, 93*

cannot be fulfilled by the Military Service; or

E3.A1.1.5.3.1.3. The enlistment was involuntary. See 10 U.S.C. 802 (reference (d))

E3.A1.1.5.3.2. Characterization or Description. Honorable, unless an Entry Level Separation or an order of release from the custody and control of the Military Services (by reason of void enlistment) is required under section E3.A2.1.3. of Part 2.

E3.A1.1.5.3.3. Procedures. This provision does not bar appropriate disciplinary action or other administrative separation proceedings regardless of when the defect is raised. Separation is appropriate under this provision only in the following circumstances:

E3.A1.1.5.3.3.1. The member did not knowingly participate in creation of the defective enlistment;

E3.A1.1.5.3.3.2. The member brings the defect to the attention of appropriate authorities within 30 days after the defect is discovered or reasonably should have been discovered by the member;

E3.A1.1.5.3.3.3. The member requests separation instead of other authorized corrective action; and

E3.A1.1.5.3.3.4. The requests otherwise meets such criteria as may be established by the Secretary concerned.

E3.A1.1.5.4. Fraudulent Entry Into the Military Service

E3.A1.1.5.4.1. Basis. A member may be separated under guidance in section E3.A2.1.1. of Part 2 on the basis of procurement of a fraudulent enlistment, induction, or period of military service through any deliberate material misrepresentation, omission, or concealment that, if known at the time of enlistment, induction, or entry onto a period of military service might have resulted in rejection.

E3.A1.1.5.4.2. Characterization of Description. Characterization of service or description of separation shall be in accordance with section E3.A2.1.3. of Part 2. If the fraud involves concealment of a prior separation in which service was not characterized as Honorable, characterization normally shall be Under Other Than Honorable Conditions.

E3.A1.1.5.4.3. <u>Procedures</u>.    The Notification Procedure (section E3.A3.1.2. of Part 3) shall be used except as follows:

E3.A1.1.5.4.3.1.    Characterization of service Under Other Than Honorable Conditions may not be issued unless the Administrative Board Procedure (section E3.A3.1.3., of Part 3) is used.

E3.A1.1.5.4.3.2.    When the sole reason for separation is fraudulent entry, suspension of separation (section E3.A2.1.2. of Part 2) is not authorized.    When there are approved reasons for separation in addition to fraudulent entry, suspension of separation is authorized only in the following circumstances:

E3.A1.1.5.4.3.2.1.    A waiver of the fraudulent entry is approved; and

E3.A1.1.5.4.3.2.2.    The suspension pertains to reasons for separation other than the fraudulent entry.

E3.A1.1.5.4.3.3.    If the command recommends that the member be retained in military service, the initiation of separation processing is unnecessary in the following circumstances:

E3.A1.1.5.4.3.3.1.    The defect is no longer present; or

E3.A1.1.5.4.3.3.2.    The defect is waivable and a waiver is obtained from appropriate authority.

E3.A1.1.5.4.3.4.    If the material misrepresentation includes preservice or prior service homosexual conduct (subsection E3.A1.1.8.1. of this enclosure, below), the standards of paragraph E3.A1.1.8.1.2. and procedures of subsection E3.A1.1.8.3. below, shall be applied in processing a separation under this section.    In such a case, the characterization or description of the separation shall be determined under paragraph E3.A1.1.5.4.2., above.

E3.A1.1.5.5.    <u>Separation from the Delayed Entry Program</u>

E3.A1.1.5.5.1.    <u>Basis</u>.    A person who is in the Delayed Entry Program may be separated because of ineligibility for enlistment under standards prescribed by the Secretary concerned or upon his or her request when authorized by the Secretary concerned.

*DODD 1332.14, December 21, 93*

E3.A1.1.5.5.2.  Description of Separation.    Entry level separation.

E3.A1.1.5.5.3.  Procedure.    The person shall be notified of the proposed separation and the reasons therefor.  The member shall be given the opportunity to submit to the separation authority a statement in rebuttal by a specified date (not less than 30 days from the date of delivery).  The notice shall be delivered personally or sent by registered or certified mail, return receipt requested (or by an equivalent form of notice if such service is not available by the U.S. mail at an address outside the United States).  If the person fails to acknowledge receipt of notice, the individual who mails the notification shall prepare a Sworn Affidavit of Service by Mail (see DoD Directive 1215.13, reference (p)) that shall be inserted in the file along with postal Service Form 3800.

E3.A1.1.6.  Entry Level Performance and Conduct

E3.A1.1.6.1.  Basis

E3.A1.1.6.1.1.  A member may be separated while in entry level status (section E2.1.9. of enclosure 2) when it is determined under the guidance in section E3.A2.1.1. of Part 2 that the member is unqualified for further military service by reason of unsatisfactory performance or conduct (or both), as evidenced by inability, lack of reasonable effort, failure to adapt to the military environment, or minor disciplinary infractions.

E3.A1.1.6.1.2.  When separation of a member in entry-level status is warranted by unsatisfactory performance or minor disciplinary infractions (or both), the member normally should be separated under this section.  Nothing in this provision precludes separation under another provision of this Directive when such separation is authorized and warranted by the circumstances of the case.

E3.A1.1.6.2.  Counseling and Rehabilitation.    Separation processing may not be initiated until the member has been counseled formally concerning those deficiencies and has been afforded an opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records.  Counseling and rehabilitation requirements are important with respect to this reason for separation.  Because military service is a calling different from any civilian occupation, a member should not be separated when this is the sole reason unless there have been efforts at rehabilitation under standards prescribed by the Secretary concerned.

E3.A1.1.6.3.  Description of Separation.    Entry-Level Separation.

ENCLOSURE 3, ATTACHMENT 1

E3.A1.1.6.4. Procedures.    The Notification Procedure (section E3.A3.1.2. of Part 3) shall be used.

E3.A1.1.7. Unsatisfactory Performance

E3.A1.1.7.1. Basis.    A member may be separated when it is determined under the guidance in section E3.A2.1.1. of Part 2 that the member is unqualified for further military service by reason of unsatisfactory performance.    This reason shall not be used if the member is in entry-level status (section E2.1.12. of enclosure 2)

E3.A1.1.7.2. Counseling and Rehabilitation.    Separation processing may not be initiated until the member has been counseled formally concerning deficiencies and has been afforded an opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records.    Counseling and rehabilitation requirements are of particular importance with respect to this reason for separation. Because military service is a calling different from any civilian occupation, a member should not be separated when unsatisfactory performance is the sole reason unless there have been efforts at rehabilitation under standards prescribed by the Secretary concerned.

E3.A1.1.7.3. Characterization or Description.    The service shall be characterized as Honorable or General (under honorable conditions) in accordance with section E3.A2.1.3. of Part 2.

E3.A1.1.7.4. Procedures.    The Notification Procedure (section E3.A3.1.2. of Part 3) shall be used.

E3.A1.1.8. Homosexual Conduct

E3.A1.1.8.1. Basis

E3.A1.1.8.1.1.  Homosexual conduct is grounds for separation from the Military *Services under the terms set forth in paragraph E3.A1.1.8.1.2., below. Homosexual* conduct includes homosexual acts, a statement by a member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage.   A statement by a member that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates *a likelihood that the member engages in or will engage in homosexual acts.   A member's sexual orientation is considered a personal and private matter, and is not a*

this Part apply.

E3.A3.1.2.2.3.  Additional notification requirements are set forth in Part 1, sections E3.A1.1.3. and E3.A3.1.4., when characterization of service as General (under honorable conditions) is authorized and the member is processed for separation by reason of Convenience of the Government or Disability.

E3.A3.1.2.3.  Response.    The respondent shall be provided a reasonable period of time, but not less than 2 working days, to act on the notice.    An extension may be granted upon a timely showing of good cause by the respondent.    The decision of the respondent on each of the rights set forth in paragraphs E3.A3.1.2.1.4. through E3.A3.1.2.1.7., above, and applicable provisions referenced in subsection 2. shall be recorded and signed by the respondent and counsel, subject to the following limitations:

E3.A3.1.2.3.1.  If notice by mail is authorized under sections E3.A3.1.4., E3.A3.1.5., or E3.A3.1.6. of this Part and the respondent fails to acknowledge receipt or submit a timely reply, that fact shall constitute a waiver of rights and an appropriate notation shall be recorded on a retained copy of the appropriate form.

E3.A3.1.2.3.2.  If the respondent declines to respond as to the selection of rights, such declination shall constitute a waiver of rights and an appropriate notation will be made on the form provided for respondent's reply.    If the respondent indicates that one or more of the rights will be exercised, but declines to sign the appropriate form, the selection of rights will be noted and an appropriate notation as to the failure to sign will be made.

E3.A3.1.2.4.  Separation Authority

E3.A3.1.2.4.1.  The Separation Authority for actions initiated under the Notification Procedure shall be a special court-martial convening authority or higher authority.    Also, subject to approval by the ASD(P&R), the Secretary concerned also may authorize a commanding officer in grade O-5 or above, or a commanding officer in the grade of O-4 who is on an approved recommended list for promotion to O-5 and who is assigned to command a unit authorized a commanding officer in the grade of O-5 or above, with a judge advocate or legal advisor available to the command, to act as a Separation Authority for a specified reason for separation.    If the case was initiated under the Administrative Board Procedure and the member waived the right to a hearing under subsection E3.A3.1.3.4., below, the Separation Authority shall be an official designated under subsection E3.A3.1.3.6., below.

E3.A3.1.2.4.2.  The action of the Separation Authority shall be recorded.

E3.A3.1.2.4.3.  The Separation Authority shall determine whether there is sufficient evidence to verify the allegations set forth in the notification of the basis for separation.   If an allegation is not supported by a preponderance of the evidence, it may not be used as a basis for separation.

E3.A3.1.2.4.4.  If there is a sufficient factual basis for separation, the Separation Authority shall determine whether separation is warranted under the guidance in sections E3.A2.1.1. and E3.A2.1.2. of Part 2.   On the basis of that guidance, the Separation Authority shall direct one of the following actions:

E3.A3.1.2.4.4.1.  Retention;

E3.A3.1.2.4.4.2.  Separation for a specific reason under Part 1;

E3.A3.1.2.4.4.3.  Suspended separation in accordance with the guidance in section E3.A2.1.2. of Part 2.

E3.A3.1.2.4.5.  If the Separation Authority directs separation or suspended separation on the basis of more than one reason under Part 1, the Separation Authority shall designate the most appropriate basis as the primary reason for reporting purposes.

E3.A3.1.2.4.6.  If separation or a suspended separation is directed, the Separation Authority shall assign a characterization or description in accordance with section E3.A2.1.3. of Part 2.

E3.A3.1.2.4.7.  Except when characterization Under Other Than Honorable Conditions is directed or the member is separated on the basis of homosexual conduct or a void enlistment or induction, the Secretary concerned may authorize the Separation Authority or higher authority to make a recommendation or determination as to whether the respondent should be retained in the Ready Reserve as a mobilization asset to fulfill the respondent's total military obligation.   This option applies in cases involving separation from active duty or from the Selected Reserve. Section E3.A3.1.5. of this Part is applicable if such action is approved.

E3.A3.1.3.  Administrative Board Procedure

E3.A3.1.3.1.  Notice.    If an Administrative Board is required, the respondent

*DODD 1332.14, December 21, 93*

shall be notified in writing of the matters in this section.

E3.A3.1.3.1.1.  The basis of the proposed separation, including the circumstances upon which the action is based and reference to the application provisions of the Military Department's implementing regulation.

E3.A3.1.3.1.2.  Whether the proposed separation could result in discharge, release from active duty to a Reserve component, transfer from the Selected Reserve to the IRR, release from the custody or control of the Military Services, or other form of separation.

E3.A3.1.3.1.3.  The least favorable characterization of service or description of separation authorized for the proposed separation.

E3.A3.1.3.1.4.  The respondent's right to consult with counsel as prescribed in paragraph E3.A3.1.2.1.6. of this Part.  However, nonlawyer counsel may not represent a respondent before an Administrative Board unless (1) the respondent expressly declines appointment of counsel qualified under Article 27(b)(1) of the UCMJ (reference (d)) and requests a specific nonlawyer counsel; or (2) the Separation Authority assigns nonlawyer counsel as assistant counsel.

E3.A3.1.3.1.5.  The right to obtain copies of documents that will be forwarded to the Separation Authority supporting the basis of the proposed separation.  Classified documents may be summarized.

E3.A3.1.3.1.6.  The respondent's right to request a hearing before an Administrative Board.

E3.A3.1.3.1.7.  The respondent's right to present written statements instead of board proceedings.

E3.A3.1.3.1.8.  The respondent's right to representation at the Administrative Board either by military counsel appointed by the Convening Authority or by military counsel of the respondent's own choice (if counsel of choice is determined to be reasonably available under regulations of the Secretary concerned) but not both.

E3.A3.1.3.1.9.  The right to representation at the Administrative Board by civilian counsel at the respondent's own expense.

E3.A3.1.3.1.10.  The right to waive the rights in paragraphs

*DODD 1332.14, December 21, 93*

E3.A3.1.3.1.4. through E3.A3.1.3.1.9., above.

E3.A3.1.3.1.11.  That failure to respond after being afforded a reasonable opportunity to consult with counsel constitutes a waiver of the rights in paragraphs E3.A3.1.3.1.4. through E3.A3.1.3.1.9., above.

E3.A3.1.3.1.12.  Failure to appear without good cause at a hearing constitutes waiver of the right to be present at the hearing.

E3.A3.1.3.2.  <u>Additional notice requirements</u>

E3.A3.1.3.2.1.  If separation processing is initiated on the basis of more than one reason under Part 1, the requirements of paragraph E3.A3.1.3.1.1. apply to all proposed reasons for separation.

E3.A3.1.3.2.2.  If the respondent is in civil confinement, absent without leave, or in a reserve component not on active duty or upon transfer to the IRR, the relevant notification procedures in sections E3.A3.1.4., E3.A3.1.5., or E3.A3.1.6. of this Part apply.

E3.A3.1.3.2.3.  Additional notification requirements are set forth in sections E3.A1.1.3. and E3.A1.1.4., Part 1, when characterization of service as General (under honorable conditions) is authorized and the member is processed for separation by reason of Convenience of the Government or Disability.

E3.A3.1.3.3.  <u>Response</u>.    The respondent shall be provided a reasonable period of time, but not less than 2 working days, to act on the notice.   An extension may be granted upon a timely showing of good cause by the respondent.   The decision of the respondent on each of the rights set forth in paragraphs E3.A3.1.3.1.4. through E3.A3.1.3.1.9., above, and applicable provisions referenced in subsection 2., above, shall be recorded and signed by the respondent and counsel, subject to the following limitations:

E3.A3.1.3.3.1.  If notice by mail is authorized under sections E3.A3.1.4., E3.A3.1.5., or E3.A3.1.6. of this Part and the respondent fails to acknowledge receipt or submit a timely reply, that fact shall constitute a waiver of rights and an appropriate notation shall be recorded on a retained copy of the appropriate form.

E3.A3.1.3.3.2.  If the respondent declines to respond as to the selection of rights, such declination shall constitute a waiver of rights and an appropriate notation will be made on the form provided for respondent's reply.   If the respondent

ENCLOSURE 3, ATTACHMENT 3

*DODD 1332.14, December 21, 93*

indicates that one or more of the rights will be exercised, but declines to sign the appropriate form, the selection of rights will be noted and an appropriate notation as to the failure to sign will be made.

E3.A3.1.3.4.  Waiver.

E3.A3.1.3.4.1.  If the right to a hearing before an Administrative Board is waived, the case will be processed under subsection E3.A3.1.2.4. of this Part (Notification Procedure), but the Separation Authority in such cases shall be an official designated under subsection E3.A3.1.3.6.

E3.A3.1.3.4.2.  When authorized by the Secretary concerned, a respondent entitled to an Administrative Board may exercise a conditional waiver after a reasonable opportunity to consult with counsel under paragraph E3.A3.1.3.1.4.  A conditional waiver is a statement initiated by a respondent waiving the right to a board proceeding contingent upon receiving a characterization of service or description of separation higher than the least favorable characterization or description authorized for the basis of separation set forth in the notice to the respondent.

E3.A3.1.3.5.  Hearing procedure.   If a respondent requests a hearing before an Administrative Board, the following procedures are applicable:

E3.A3.1.3.5.1.  Composition

E3.A3.1.3.5.1.1.  The Convening Authority shall appoint to the Administrative Board at least three experienced commissioned, warrant, or noncommissioned officers.  Enlisted personnel appointed to the Board shall be in grade E-7 or above, and shall be senior to the respondent.  At least one member of the Board shall be serving in the grade of O-4 or higher, and a majority shall be commissioned or warrant officers.  The senior member shall be the president of the board.  The Convening Authority also may appoint to the Board a nonvoting recorder.  A nonvoting legal advisor may be appointed to assist the Board if authorized by the Secretary concerned.

E3.A3.1.3.5.1.2.  If the respondent is an enlisted member of a Reserve component or holds an appointment as a Reserve commissioned or warrant officer, the Board shall include at least one Reserve officer as a voting member. Additionally, all Board members will be commissioned officers if an Under Other Than Honorable Characterization (UOTHC) from the Reserve component is authorized to be issued.  (See 10 U.S.C., Section 1163 (reference (u)).   Voting members shall be

senior to the respondent's reserve grade.  (See 10 U.S.C. Section 266 (reference (x)).

E3.A3.1.3.5.1.3.  The Convening Authority shall insure that the opportunity to serve on Administrative Boards is given to women and minorities.  The mere appointment or failure to appoint a member of such a group to the Board, however does not provide a basis for challenging the proceeding.

E3.A3.1.3.5.1.4.  The respondent may challenge a voting member of the Board or the legal advisor, if any, for cause only.

E3.A3.1.3.5.2.  Presiding Officer.   The president shall preside and rule finally on all matters of procedure and evidence, but the rulings of the president may be overruled by a majority of the Board.  If appointed, the legal advisor shall rule finally on all matters of evidence and challenges except challenges to him or herself.

E3.A3.1.3.5.3.  Witnesses

E3.A3.1.3.5.3.1.  The respondent may request the attendance of witnesses in accordance with the implementing instructions of the Military Department concerned.

E3.A3.1.3.5.3.2.  In accordance with such instructions, the respondent may submit a written request for temporary duty (TDY) or invitational travel orders for witnesses.   Such a request shall obtain the following matter:

E3.A3.1.3.5.3.2.1.  A synopsis of the testimony that the witness is expected to give.

E3.A3.1.3.5.3.2.2.  An explanation of the relevance of such testimony to the issues of separation or characterization.

E3.A3.1.3.5.3.2.3.  An explanation as to why written or recorded testimony would not be sufficient to provide for a fair determination.

E3.A3.1.3.5.3.3.  The Convening Authority may authorize expenditure of funds for production of witnesses only if the presiding officer (after consultation with a judge advocate) or the legal advisor (if appointed) determines that:

E3.A3.1.3.5.3.3.1.  The testimony of a witness is not cumulative;

*DODD 1332.14, December 21, 93*

E3.A3.1.3.5.3.3.2.  The personal appearance of the witness is essential to a fair determination on the issues of separation or characterization;

E3.A3.1.3.5.3.3.3.  Written or recorded testimony will not accomplish adequately the same objective;

E3.A3.1.3.5.3.3.4.  The need for live testimony is substantial, material, and necessary for a proper disposition of the case; and

E3.A3.1.3.5.3.3.5.  The significance of the personal appearance of the witness, when balanced against the practical difficulties in producing the witness, favors production of the witness.  Factors to be considered in relation to the balancing test include, but are not limited to, the cost of producing the witness, the timing of the request for production of the witness, the potential delay in the proceeding that may be caused by producing the witness, or the likelihood of significant interference with military operational deployment, mission accomplishment, or essential training.

E3.A3.1.3.5.3.4.  If the Convening Authority determines that the personal testimony of a witness is required, the hearing will be postponed or continued if necessary to permit the attendance of the witness.

E3.A3.1.3.5.3.5.  The hearing shall be continued or postponed to provide the respondent with a reasonable opportunity to obtain a written statement from the witness if a witness requested by the respondent is unavailable in the following circumstances:

E3.A3.1.3.5.3.5.1.  When the presiding officer determines that the personal testimony of the witness is not required;

E3.A3.1.3.5.3.5.2.  When the commanding officer of a military witness determines that military necessity precluded the witness' attendance at the hearing; or

E3.A3.1.3.5.3.5.3.  When a civilian witness declines to attend the hearing.

E3.A3.1.3.5.3.6.  Subparagraph E3.A3.1.3.5.3., above, does not authorize a Federal employee to decline to appear as a witness if directed to do so in accordance with applicable procedures of the employing agency.

ENCLOSURE 3, ATTACHMENT 3

*DODD 1332.14, December 21, 93*

E3.A3.1.3.5.4.  Record of Proceedings.    In cases where the Board recommends separation, the record of the proceedings shall be kept in summarized form unless a verbatim record is required by the Secretary concerned.    In cases where the Board recommends retention, a record of the proceedings is optional unless required by the Secretary concerned.    However, a summarized or verbatim record shall be prepared in any case where the board recommends retention and the Separation Authority elects to forward the matter to the Secretary concerned under subparagraph E3.A3.1.3.6.4.2.2., below.    The Board reporter shall retain all materials necessary to prepare a transcript should the Separation Authority elect to forward the case to the Secretary.    In all cases, the findings and recommendations of the Board shall be in verbatim form.

E3.A3.1.3.5.5.  Presentation of Evidence.    The rules of evidence for courts-martial and other judicial proceedings are not applicable before an Administrative Board.    Reasonable restriction shall be observed, however, concerning relevancy and competency of evidence.

E3.A3.1.3.5.6.  Rights of the Respondent

E3.A3.1.3.5.6.1.  The respondent may testify in his or her own behalf, subject to the provisions of Article 31(a), UMCJ (reference (d)).

E3.A3.1.3.5.6.2.  At any time during the proceedings, the respondent or counsel may submit written or recorded matter for consideration by the Board.

E3.A3.1.3.5.6.3.  The respondent or counsel may call witnesses in his or her behalf.

E3.A3.1.3.5.6.4.  The respondent or counsel may question any witness who appears before the Board.

E3.A3.1.3.5.6.5.  The respondent or counsel may present argument prior to when the Board closes the case for deliberation on findings and recommendations.

E3.A3.1.3.5.7.  Findings and Recommendations

E3.A3.1.3.5.7.1.  The Board shall determine its findings and recommendations in closed sessions.    Only voting members of the board shall be

present.

E3.A3.1.3.5.7.2.  The Board shall determine whether each allegation in the notice of proposed separation is supported by a preponderance of the evidence.

E3.A3.1.3.5.7.3.  The Board shall then determine under the guidance in section E3.A2.1.1. of Part 2 whether the findings warrant separation with respect to the reason for separation set forth in the Notice.   If more than one reason was contained in the Notice, there shall be a separate determination for each reason.

E3.A3.1.3.5.7.4.  The Board shall make recommendations on the following:

E3.A3.1.3.5.7.4.1.  Retention or Separation.    The Board shall recommend retention or separation.

E3.A3.1.3.5.7.4.2.  Suspension of Separation.    If the Board recommends separation, it may recommend that the separation be suspended in accordance with section E3.A2.1.2. of Part 2, but the recommendation of the Board as to suspension is not binding on the Separation Authority.

E3.A3.1.3.5.7.4.3.  Characterization of Service or Description of Separation.    If separation or suspended separation is recommended, the Board shall recommend a characterization of service or description of separation as authorized in Part 1 (Reasons for Separation) in accordance with the guidance in section E3.A2.1.3. of Part 2.

E3.A3.1.3.5.7.4.4.  Transfer to the Ready Reserve.    Except when the Board has recommended separation on the basis of homosexual conduct or has recommended characterization of service Under Other Than Honorable Conditions, the Secretary concerned may authorize the Board to make a recommendation as to whether the respondent should be retained in the Ready Reserve as a mobilization asset to fulfill the respondent's total military obligation.   This option applies to cases involving separation from active duty or from the Selected Reserve.   Section E3.A3.1.5. of this Part it is applicable if the action is approved.

E3.A3.1.3.6.  Separation Authority

E3.A3.1.3.6.1.  The Separation Authority for actions initiated under the Administrative Board Procedure shall be a general court-martial convening authority or higher authority.   The Secretary concerned also may authorize a commanding officer

*DODD 1332.14, December 21, 93*

in grade O-7 or above with a judge advocate or legal advisor available to his command to act as a separation authority in specified circumstances.   When an Administrative board recommends Characterization of service as Honorable or General (under honorable conditions), the Separation Authority may be exercised by an officer designated under subsection E3.A3.1.2.4.   When the case has been initiated under the Notification Procedure and the hearing is a result of a request under paragraph E3.A3.1.2.1.7., the Separation Authority shall be as designated in subsection E3.A3.1.2.4.

E3.A3.1.3.6.2.  In every case in which characterization of Service Under Other Than Honorable Conditions is recommended, the record of the Board's proceedings will be reviewed by a judge advocate or civilian attorney employed by the Military Department prior to action by the Separation Authority.   Such review is not required when another characterization is recommended unless the respondent identifies specific legal issues for consideration by the Separation Authority.

E3.A3.1.3.6.3.  The respondent will be provided with a copy of the Board's statement of facts and recommendations.

E3.A3.1.3.6.4.  The Separation Authority shall take action in accordance with this subparagraph, the requirements of Part 1 with respect to the reason for separation, and the guidance in Part 2 on separation and characterization.

E3.A3.1.3.6.4.1.  If the Separation Authority approves the recommendations of the Board on the issue of separation or characterization (or both) this constitutes approval of the board's findings and recommendations under paragraph E3.A3.1.3.5.7. unless the Separation Authority expressly modifies such findings or recommendations.

E3.A3.1.3.6.4.2.  If the Board recommends retention, the Separation Authority may take one of the following actions:

E3.A3.1.3.6.4.2.1.  Approve the recommendation.

E3.A3.1.3.6.4.2.2.  Forward the matter to the Secretary concerned with a recommendation for separation based upon the circumstances of the case.   In such a case, the Secretary may direct retention or separation.   If the Secretary approves separation, the characterization of service or description of separation will be Honorable, General (under honorable conditions) or an Entry Level Separation under the guidance in section E3.A2.1.3. of Part 2.

*DODD 1332.14, December 21, 93*

E3.A3.1.3.6.4.3.  If the Board recommends separation, the Separation Authority may:

E3.A3.1.3.6.4.3.1.  Approve the Board's recommendation;

E3.A3.1.3.6.4.3.2.  Approve the Board's recommendations, but modify the recommendations by one or more of the following actions when appropriate:

E3.A3.1.3.6.4.3.2.1.  Approve the separation but suspend execution as provided in section E3.A2.1.2. of Part 2.

E3.A3.1.3.6.4.3.2.2.  Change the character of service or description of separation to a more favorable characterization or description.

E3.A3.1.3.6.4.3.2.3.  Change the Board's recommendation, if any, concerning transfer to the IRR.

E3.A3.1.3.6.4.3.3.  Disapprove the Board's recommendation and retain the respondent.

E3.A3.1.3.6.4.4.  If the Separation Authority approves the Board's findings and recommendations in whole or in part with respect to more than one reason under Part 1, the Separation Authority shall designate the most appropriate basis as the primary reason for reporting purposes.

E3.A3.1.3.6.4.5.  If the Separation Authority finds legal prejudice to a substantial right of the respondent or determines that the findings of the Board have been obtained by fraud or collusion, the case may be referred to a new board.  No member of the new board shall have served on a prior board that considered the case. The Separation Authority may not approve findings and recommendations less favorable to the respondent than those rendered by the previous board unless the Separation Authority finds that fraud or collusion in the previous board is attributable to the respondent or an individual acting on the respondent's behalf.

E3.A3.1.4.  Additional Provisions Concerning Members Confined by Civil Authorities

E3.A3.1.4.1.  If proceedings under this Part have been initiated against a respondent confined by civil authorities, the case may be processed in the absence of

the respondent. Paragraph E3.A3.1.3.1. of this Part is not applicable except insofar as such rights can be exercised by counsel on behalf of the respondent.

E3.A3.1.4.2.  The following requirements apply:

E3.A3.1.4.2.1.  The notice shall contain the matter set forth in subsection E3.A3.1.2.1. of this Part or subsection E3.A3.1.3.1.  (Notice in the Administrative Board Procedure), as appropriate.  The notice shall be delivered personally to the respondent or sent by registered mail or certified mail, return receipt requested (or by an equivalent form of notice if such service is not available for delivery by U.S. mail at an address outside the United States.  If the member refuses to acknowledge receipt of notice, the individual who mails the notification shall prepare a Sworn Affidavit of Service by Mail (see DoD Directive 1215.13, (reference (r)) which will be inserted in the member's personnel file together with PS Form 3800.

E3.A3.1.4.2.2.  If delivered personally, receipt shall be acknowledged in writing by the respondent.  If the respondent does not acknowledge receipt, the notice shall be sent by mail as provided in paragraph E3.A3.1.4.2.1., above.

E3.A3.1.4.2.3.  The notice shall state that the action has been suspended until a specific date (not less than 30 days from the date of delivery) in order to give the respondent the opportunity to exercise the rights set forth in the notice.  If respondent does not reply by such date, the separation authority shall take appropriate action under subsection E3.A3.1.2.4. of this Part.

E3.A3.1.4.2.4.  The name and address of the military counsel for appointed consultation shall be specified in the notice.

E3.A3.1.4.2.5.  If the case involves entitlement to an Administrative Board, the respondent shall be notified that the board will proceed in the respondent's absence and that the case may be presented on respondent's behalf by counsel for the respondent.

E3.A3.1.5.  Additional Requirements for Certain Members of Reserve Components

E3.A3.1.5.1.  Members of reserve components not on active duty

E3.A3.1.5.1.1.  If proceedings under this Chapter have been initiated against a member of a reserve component not on active duty, the case may be processed in the absence of the member in the following circumstances:

*DODD 1332.14, December 21, 93*

E3.A3.1.5.1.1.1.  At the request of the member;

E3.A3.1.5.1.1.2.  If the member does not respond to the notice of proceedings on or before the suspense date provided therein; or

E3.A3.1.5.1.1.3.  If the member fails to appear at a hearing as provided in paragraph E3.A3.1.3.1.12.

E3.A3.1.5.1.2.  The notice shall contain the matter set forth in subsections E3.A3.1.2.1. or E3.A3.1.3.1. of this Part, as appropriate.

E3.A3.1.5.1.3.  If the action involves a transfer to the IRR under circumstances in which the procedures in this enclosure are applicable, the member will be notified that the character of service upon transfer to the IRR also will constitute the character of service upon discharge at the completion of the military service obligation unless specified conditions established by the Secretary concerned are met.

E3.A3.1.5.2.  Transfer to the IRR.   Upon transfer to the IRR, the member will be notified of the following:

E3.A3.1.5.2.1.  The character of service upon transfer from active duty or the Selected Reserve to the IRR, and that the character of service upon completion of the military service obligation will be the same unless specified conditions established by the Secretary concerned are met.

E3.A3.1.5.2.2.  The date upon which the military service obligation will expire.

E3.A3.1.5.2.3.  The date by which the member must submit evidence of satisfactory completion of the specified conditions.

E3.A3.1.5.3.  If the member submits evidence of completion of the specified conditions but the Military Department proposes to issue a discharge other than an Honorable Discharge, the Notification Procedure shall be used.   An Administrative Board is not required at this point notwithstanding the member's years of service.

E3.A3.1.5.4.  If the member does not submit such information on or before the date specified in the notice, no further proceedings are required.   The character of discharge at the completion of the military service obligation shall be the same as the

character of service upon transfer from the Selected Reserve to the IRR.

E3.A3.1.5.5. The following requirements apply to the notices required by subsections E3.A3.1.5.1. and E3.A3.1.5.2. of this Part.

E3.A3.1.5.5.1. Reasonable effort should be made to furnish copies of the notice to the member through personal contact by a representative of the command. In such a case, a written acknowledgment of the notice shall be obtained.

E3.A3.1.5.5.2. If the member cannot be contacted or refuses to acknowledge receipt of the notice, the notice shall be sent by registered or certified mail, return receipt requested (or by an equivalent form of notice if such service by U.S. Mail is not available for delivery at an address outside the United States) to the most recent address furnished by the member as an address for receipt or forwarding of official mail. The individual who mails the notification shall prepare a Sworn Affidavit of Service by Mail (see DoD Directive 1215.13 (reference (r)), which will be inserted in the member's personnel file together with PS Form 3800.

E3.A3.1.6. <u>Additional Requirements for Members Beyond Military Control by Reason of Unauthorized Absence</u>

E3.A3.1.6.1. <u>Determination of applicability.</u>   If the general court-martial convening authority or higher authority determines that separation is otherwise appropriate under this Directive, a member may be separated without return to military control in one or more of the following circumstances:

E3.A3.1.6.1.1. Absence without authority after receiving notice of initiation of separation processing.

E3.A3.1.6.1.2. When prosecution of a member who is absent without authority appears to be barred by the statute of limitations, Article 43, UCMJ (reference (d)).

E3.A3.1.6.1.3. When a member who is an alien is absent without leave and appears to have gone to a foreign country where the United States has no authority to apprehend the member under a treaty or other agreement.

E3.A3.1.6.2. <u>Notice.</u>   Prior to execution of the separation under paragraphs E3.A3.1.6.1.2. or E3.A3.1.6.1.3., the member will be notified of the imminent action by registered mail or certified mail, return receipt requested (or by an equivalent form of Notice if such service by U.S. Mail is not available for delivery at an address

outside the United States) to the member's last known address or to the next of kin under regulations prescribed by the Military Department concerned.   The notice shall contain the matter set forth in subsections E3.A3.1.2.1. or E3.A3.1.3.1., as appropriate, and shall specify that the action has been suspended until a specific date (not less than 30 days from the date of mailing) in order to give the respondent the opportunity to return to military control.   If the respondent does not return to military control by such date, the separation authority shall take appropriate action under subsection E3.A3.1.2.4. of this Part.

E3.A3.1.6.3.  <u>Members of reserve components</u>.   See 10 U.S.C. Sec. 1163 (reference (x)) with respect to limitations on separation of members of reserve components.

ENCLOSURE 3, ATTACHMENT 3

## E3.A4.  ATTACHMENT 4 TO ENCLOSURE 3

### GUIDELINES FOR FACT-FINDING INQUIRIES INTO HOMOSEXUAL CONDUCT

### E3.A4.1.1.  RESPONSIBILITY

E3.A4.1.1.1.  Only the member's commander is authorized to initiate fact-finding inquiries involving homosexual conduct.  A commander may initiate a fact-finding inquiry only when he or she has received credible information that there is basis for discharge.  Commanders are responsible for ensuring that inquiries are conducted properly and that no abuse of authority occurs.

E3.A4.1.1.2.  A fact-finding inquiry may be conducted by the commander personally or by a person he or she appoints.  It may consist of an examination of the information reported or a more extensive investigation, as necessary.

E3.A4.1.1.3.  The inquiry should gather all credible information that directly relates to the grounds for possible separation.  Inquiries shall be limited to the factual circumstances directly relevant to the specific allegations.

E3.A4.1.1.4.  If a commander has credible evidence of possible criminal conduct, he or she shall follow the procedures outlined in the Manual for Courts-Martial and implementing regulations issued by the Secretaries of the Military Departments concerned (reference (y)).

E3.A4.1.1.5.  *The guidelines in this enclosure do not apply to activities of Defense Criminal Investigative Organizations and other DoD law enforcement organizations, which are governed by DoD Instruction 5505.8 (reference (z)).*

### E3.A4.1.2.  DEFINITIONS

E3.A4.1.2.1.  Bisexual.   A person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual and heterosexual acts.

E3.A4.1.2.2.  Commander.   A commissioned or warrant officer who, by virtue of rank and assignment, exercises primary command authority over a military organization or prescribed territorial area that under pertinent official directives is recognized as a "command."

E3.A4.1.2.3.  Homosexual.   *A person, regardless of sex, who engages in,*

*DODD 1332.14, December 21, 93*

*attempts to* engage in, has a propensity to engage in, or intends to engage in homosexual acts.

E3.A4.1.2.4.  Homosexual Conduct.    *"Homosexual conduct" is a homosexual act, a* statement by the member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage.

E3.A4.1.2.4.1.  A "homosexual act" means any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires and any bodily contact (for example, hand-holding or kissing, in most circumstances) that a reasonable person would understand to demonstrate a propensity or intent to engage in such an act.

E3.A4.1.2.4.2.  A "statement that a member is a homosexual or bisexual, or words to that effect," means (1) language or behavior that (2) a reasonable person *would believe (3) was intended to convey the statement (4) that a person engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts. This may include statements such as "I am a homosexual," "I* am gay," "I am a lesbian," "I have a homosexual orientation," and the like.

E3.A4.1.2.4.3.  A "homosexual marriage or attempted marriage" is when a member has married or attempted to marry a person known to be of the same biological sex.

E3.A4.1.2.4.4.  "Propensity to engage in homosexual acts" means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts.

E3.A4.1.2.5.  Sexual Orientation.    *An abstract sexual preference for persons of a particular sex, as distinct from a propensity or intent to engage in sexual acts.*

E3.A4.1.3.  BASES FOR CONDUCTING INQUIRIES

E3.A4.1.3.1.  *A commander will initiate an inquiry only if he or she has credible information that there is a basis for discharge.  Credible information exists when the information, considering its source and the surrounding circumstances, supports a reasonable belief that there is a basis for discharge.  It requires a determination based on articulable facts, not just a belief or suspicion.*

E3.A4.1.3.2.  *A basis for discharge exists if:*

*DODD 1332.14, December 21, 93*

E3.A4.1.3.2.1. *The member has engaged in a homosexual act.*

E3.A4.1.3.2.2. *The member has said that he or she is a homosexual or bisexual,* or made some other statement that indicates a propensity or intent to engage in homosexual acts; or

E3.A4.1.3.2.3. *The member has married or attempted to marry a person of the same* sex.

E3.A4.1.3.3. *Credible information does not exist, for example, when:*

E3.A4.1.3.3.1. *The individual is suspected of engaging in homosexual conduct,* but there is no credible information, as described, to support that suspicion; or

E3.A4.1.3.3.2. *The only information is the opinions of others that a member is* homosexual; or

E3.A4.1.3.3.3. *The inquiry would be based on rumor, suspicion, or capricious* claims concerning a member's sexual orientation; or

E3.A4.1.3.3.4. *The only information known is an associational activity such as* going to a gay bar, possessing or reading homosexual publications, associating with known homosexuals, or marching in a gay rights rally in civilian clothes.   Such activity, in and of itself, does not provide evidence of homosexual conduct.

E3.A4.1.3.4. *Credible information exists, for example, when:*

E3.A4.1.3.4.1. *A reliable person states that he or she observed or heard* a Service member engaging in homosexual acts, or saying that he or she is a homosexual or bisexual or is married to a member of the same sex; or

E3.A4.1.3.4.2. *A reliable person states that he or she heard, observed, or* discovered a member make a spoken or written statement that a reasonable person would believe was intended to convey the fact that he or she engages *in, attempts to engage in, or has a propensity or intent to engage in* homosexual acts; or

E3.A4.1.3.4.3. *A reliable person states that he or she observed behavior that* amounts to a non-verbal statement by a member that he or she is a homosexual *or bisexual; i.e., behavior that a reasonable person would believe was intended to convey the statement that the member engages in, attempts to engage in, or has a propensity*

*DODD 1332.14, December 21, 93*

*or intent to engage in homosexual acts.*

### E3.A4.1.4. PROCEDURES

E3.A4.1.4.1.  Informal fact-finding inquiries and administrative separation procedures are the preferred method of addressing homosexual conduct.  This does not prevent disciplinary action or trial by courts-martial when appropriate.

E3.A4.1.4.2.  Commanders shall exercise sound discretion regarding when credible information exists.  They shall examine the information and decide whether an inquiry is warranted or whether no action should be taken.

E3.A4.1.4.3.  Commanders or appointed inquiry officials shall not ask, and members *shall not be required to reveal, whether a member is a heterosexual, a homosexual, or a bisexual.  However, upon receipt of credible information of homosexual conduct (as described in section E3.A4.1.3., above) commanders or appointed inquiry officials may ask members if they engaged in such conduct.  But the member should first be advised of the DoD policy on homosexual conduct (and rights under Article 31, UCMJ, if applicable).  Should the member choose not to discuss the matter further, the commander should consider other available information.  Nothing in this provision precludes questioning a member about any information provided by the member in the course of the fact-finding inquiry or any related proceeding, nor does it provide the member with any basis for challenging the validity of any proceeding or the use of any evidence, including a statement by the member, in any proceeding.*

E3.A4.1.4.4.  At any given point of the inquiry, the commander or appointed inquiry official must be able clearly and specifically to explain which grounds for separation he or she is attempting to verify and how the information being collected relates to those specific separation grounds.

E3.A4.1.4.5.  A statement by a Service member that he or she is a homosexual or bisexual creates a rebuttable presumption that the Service member engages in, *attempts to engage in, has a propensity to engage in, or intends to engage in* homosexual acts.  The Service member shall be given the opportunity to *present evidence demonstrating that he or she does not engage in, attempt to engage in, or have a propensity or intent to engage in homosexual acts.*

E3.A4.1.4.6.  The Service member bears the burden of proving, by a preponderance of *the evidence, that he or she is not a person who engages in, attempts*

*DODD 1332.14, December 21, 93*

*to engage in, has a propensity to engage in, or intends to engage in homosexual acts.*

E3.A4.1.5. <u>LEGAL EFFECT</u>

The procedures in this enclosure create no substantive or procedural rights.

*DODD 1332.14, December 21, 93*

*bar to continued service under this section unless manifested by homosexual conduct in the manner described in paragraph E3.A1.1.8.1.2.*

E3.A1.1.8.1.2.  A member shall be separated under this section if one or more of the following approved findings is made:

E3.A1.1.8.1.2.1.  The member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts, unless there are approved further findings that:

E3.A1.1.8.1.2.1.1.  Such acts are a departure from the member's usual and customary behavior;

E3.A1.1.8.1.2.1.2.  Such acts under all the circumstances are unlikely to recur;

E3.A1.1.8.1.2.1.3.  Such acts were not accomplished by use of force, coercion, or intimidation;

E3.A1.1.8.1.2.1.4.  Under the particular circumstances of the case, the member's continued presence in the Armed Forces is consistent with the interest of the Armed Forces in proper discipline, good order, and morale; and

E3.A1.1.8.1.2.1.5.  The member does not have a propensity or intent to engage in homosexual acts.

E3.A1.1.8.1.2.2.  The member has made a statement that he or she is a homosexual or bisexual, or words to that effect, unless there is a further approved finding that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.  A statement by a Service member that he or she is a homosexual or bisexual, or words to that effect, creates *a rebuttable presumption that the Service member engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual* acts.  The Service member shall be advised of this presumption and given the *opportunity to rebut the presumption by presenting evidence demonstrating that he or she does not engage in, attempt to engage in, have a propensity to engage in, or intend to engage in homosexual acts.  Propensity to engage in* homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts.  In determining whether a member has successfully *rebutted the presumption that he or she engages in, attempts to engage in, or* has a propensity or

intent to engage in homosexual acts, some or all of the following may be considered:

E3.A1.1.8.1.2.2.1.  Whether the member has engaged in homosexual acts;

E3.A1.1.8.1.2.2.2.  The member's credibility;

E3.A1.1.8.1.2.2.3.  Testimony from others about the member's past conduct, character, and credibility;

E3.A1.1.8.1.2.2.4.  The nature and circumstances of the member's statement;

E3.A1.1.8.1.2.2.5.  Any other evidence relevant to whether the member is likely to engage in homosexual acts.

(This list is not exhaustive; any other relevant evidence may also be considered.)

E3.A1.1.8.1.2.3.  The member has married or attempted to marry a person known to be of the same biological sex (as evidenced by the external anatomy of the persons involved).

E3.A1.1.8.2.  <u>Burden of Proof</u>.  See paragraphs E3.A1.1.8.4.5. and E3.A1.1.8.4.6., below, for guidance as to the burden of proof and when a finding regarding retention is required.

E3.A1.1.8.3.  <u>Characterization or Description</u>.  Characterization of service or description of separation shall be in accordance with the guidance in section E3.A2.1.3. of Part 2.  When the sole basis for separation is homosexual conduct, a characterization Under Other Than Honorable Conditions may be issued only if such a characterization is warranted under section E3.A2.1.3. of Part 2 and there is a finding that during the current term of service the member attempted, solicited, or committed a homosexual act in the following circumstances:

E3.A1.1.8.3.1.  By using force, coercion, or intimidation;

E3.A1.1.8.3.2.  With a person under 16 years of age;

E3.A1.1.8.3.3.  With a subordinate in circumstances that violate customary military superior-subordinate relationships;

*DODD 1332.14, December 21, 93*

E3.A1.1.8.3.4.  Openly in public view;

E3.A1.1.8.3.5.  For compensation;

E3.A1.1.8.3.6.  Aboard a military vessel or aircraft; or

E3.A1.1.8.3.7.  In another location subject to military control under aggravating circumstances noted in the finding that have an adverse impact on discipline, good order, or morale comparable to the impact of such activity aboard a vessel or aircraft.

E3.A1.1.8.4.  Procedures.    The Administrative Board Procedure (section C. of Part 3) shall be used, subject to the following guidance:

E3.A1.1.8.4.1.  Separation processing shall be initiated if there is probable cause to believe separation is warranted under paragraph E3.A1.1.8.1.2., above.   Fact finding procedures for inquiries into homosexual conduct are in E3.A3.

E3.A1.1.8.4.2.  The Administrative Board shall follow the procedures set forth inn subsection E3.A3.1.3.5. of Part 3, except with respect to the following matters:

E3.A1.1.8.4.2.1.  If the Board finds that one or more of the circumstances authorizing separation under paragraph E3.A1.1.8.1.2., above, is supported by the evidence, the Board shall recommend separation unless the Board finds that retention is warranted under the limited circumstances described in that paragraph.

E3.A1.1.8.4.2.2.  If the Board does not find that there is sufficient evidence that one or more of the circumstances authorizing separation under paragraph E3.A1.1.8.1.2. has occurred, the Board shall recommend retention unless the case involves another basis for separation of which the member has been duly notified.

E3.A1.1.8.4.3.  In any case in which characterization of service Under Other Than Honorable Conditions is not authorized, the Separation Authority may be exercised by an officer designated under paragraph E3.A3.1.2.4.1. of Part 3.

E3.A1.1.8.4.4.  The Separation Authority shall dispose of the case according to the following provisions:

E3.A1.1.8.4.4.1. If the Board recommends retention, the Separation Authority shall take one of the following actions:

E3.A1.1.8.4.4.1.1. Approve the finding and direct retention; or

E3.A1.1.8.4.4.1.2. Forward the case to the Secretary concerned with a recommendation that the Secretary separate the member under the Secretary's authority (section E3.A1.1.15. of this Part)

E3.A1.1.8.4.4.2. If the Board recommends separation, the Separation Authority shall take one of the following actions:

E3.A1.1.8.4.4.2.1. Approve the finding and direct separation; or

E3.A1.1.8.4.4.2.2. Disapprove the finding on the basis of the following considerations:

E3.A1.1.8.4.4.2.2.1. There is insufficient evidence to support the finding; or

E3.A1.1.8.4.4.2.2.2. Retention is warranted under the limited circumstances described in paragraph E3.A1.1.8.1.2., above.

E3.A1.1.8.4.4.3. If there has been a waiver of Board proceedings, the Separation Authority shall dispose of the case in accordance with the following provisions:

E3.A1.1.8.4.4.3.1. If the Separation Authority determines that there is not sufficient evidence to support separation under paragraph E3.A1.1.8.1.2., above, the Separation Authority shall direct retention unless there is another basis for separation of which the member has been duly notified.

E3.A1.1.8.4.4.3.2. If the Separation Authority determines that one or more of the circumstances authorizing separation under paragraph E3.A1.1.8.1.2., has occurred, the member shall be separated unless retention is warranted under the limited circumstances described in that paragraph.

E3.A1.1.8.4.5. *The member shall bear the burden of proving throughout the proceeding, by a preponderance of the evidence, that retention is warranted under the limited circumstances described in subparagraphs E3.A1.1.8.1.2.1. and*

*DODD 1332.14, December 21, 93*

*E3.A1.1.8.1.2.2.*

E3.A1.1.8.4.6.  Findings regarding whether or not retention is warranted under the limited circumstances of paragraph E3.A1.1.8.1.2., are required if the member clearly and specifically raises such limited circumstances.

E3.A1.1.8.4.7.  Nothing in these procedures:

E3.A1.1.8.4.7.1.  Limits the authority of the Secretary concerned to take appropriate action in a case to ensure that there has been compliance with this Directive;

E3.A1.1.8.4.7.2.  Requires that a member be processed for separation when a determination is made in accordance with regulations prescribed by the Secretary concerned that:

E3.A1.1.8.4.7.2.1.  The member engaged in acts, made statements, or married or attempted to marry a person known to be of the same biological sex for the purpose of avoiding or terminating military service; and

E3.A1.1.8.4.7.2.2.  Separation of the member would not be in the best interest of the Armed Forces.

E3.A1.1.8.4.7.3.  Precludes retention of a member for a limited period of time in the interests of national security as authorized by the Secretary concerned;

E3.A1.1.8.4.7.4.  Authorizes a member to seek Secretarial review unless authorized in procedures promulgated by the Secretary concerned;

E3.A1.1.8.4.7.5.  Precludes separation in appropriate circumstances for another reason in this Directive; or

E3.A1.1.8.4.7.6.  Precludes trial by court-martial in appropriate cases.

E3.A1.1.9.  Drug Abuse Rehabilitation Failure

E3.A1.1.9.1.  Basis

E3.A1.1.9.1.1.  A member who has been referred to a program of

*DODD 1332.14, December 21, 93*

rehabilitation for personal drug and alcohol abuse may be separated for failure through inability or refusal to participate in, corporate in, or successfully complete such a program in the following circumstances:

E3.A1.1.9.1.1.1. There is a lack of potential for continued military service; or

E3.A1.1.9.1.1.2. Long-term rehabilitation is determined necessary and the member is transferred to a civilian medical facility for rehabilitation.

E3.A1.1.9.1.2. Nothing in this provision precludes separation of a member who has been referred to such a program under any other provision of this Directive in appropriate cases.

E3.A1.1.9.1.3. Drug abuse rehabilitation failures shall be reported separately from alcohol abuse rehabilitation failures. If separation is based on both, the primary basis shall be used for reporting requirements.

E3.A1.1.9.2. Characterization or Description. When a member is separated under this provision, characterization of service as Honorable or General (under honorable conditions) is authorized except when an Entry-Level Separation is required under section E3.A2.1.3. of Part 2. The relationship between voluntary submission for treatment and the evidence that may be considered on the issue of characterization is set forth in subparagraph E3.A2.1.3.2.3.6. of Part 2. The relationship between mandatory urinalysis and the evidence that may be considered on the issue of characterization is in paragraph E3.A2.1.3.2.3.7. of Part 2.

E3.A1.1.9.3. Procedures. The Notification Procedure (section E3.A3.1.2. of Part 3) shall be used.

E3.A1.1.10. Alcohol Abuse Rehabilitation Failure

E3.A1.1.10.1. Basis

E3.A1.1.10.1.1. A member who has been referred to a program of rehabilitation for drug and alcohol abuse may be separated for failure through inability or refusal to participate in, cooperate in, or successfully complete such a program in the following circumstances:

E3.A1.1.10.1.1.1. There is a lack of potential for continued military service; or

*DODD 1332.14, December 21, 93*

E3.A1.1.10.1.1.2.  Long term rehabilitation is determined necessary and the member is transferred to a civilian medical facility for rehabilitation.

E3.A1.1.10.1.2.  Nothing in this provision precludes separation of a member who has been referred to such a program under any other provision of this Directive in appropriate cases.

E3.A1.1.10.1.3.  Alcohol abuse rehabilitation failures shall be reported separately from drug abuse rehabilitation failures.   If separation is based on both, the primary basis shall be used for reporting purposes.

E3.A1.1.10.2.  Characterization or Description.    When a member is separated under this provision, characterization of service as Honorable or General (under honorable conditions) is authorized except when an Entry-Level Separation is required under section E3.A2.1.3. of Part 2.

E3.A1.1.10.3.  Procedures.    The Notification Procedures (section E3.A3.1.2. of Part 3) shall be used.

E3.A1.1.11.  Misconduct

E3.A1.1.11.1.  Basis.

E3.A1.1.11.1.1.  Reasons.    A member may be separated for misconduct when it is determined under the guidance set forth in section E3.A2.1.1. of Part 2 that the member is unqualified for further military service by reason of one or more of the following circumstances:

E3.A1.1.11.1.1.1.  Minor Disciplinary Infractions.    A pattern of misconduct consisting solely of minor disciplinary infractions.   If separation of a member in entry-level status is warranted solely by reason of minor disciplinary infractions, the action should be processed under Entry-Level Performance and Conduct (section E3.A1.1.6. of this enclosure, above).

E3.A1.1.11.1.1.2.  A pattern of Misconduct.    A pattern of misconduct consisting of (a) discreditable involvement with civil or military authorities or (b) conduct prejudicial to good order and discipline.

E3.A1.1.11.1.1.3.  Commission of a Serious Offense.    Commission of a serious military or civilian offense if in the following circumstances:

*DODD 1332.14, December 21, 93*

E3.A1.1.11.1.1.3.1.  The specific circumstances of the offense warrant separation; and

E3.A1.1.11.1.1.3.2.  A punitive discharge would be authorized for the same or a closely related offense under the Manual for Courts-Martial (reference (q)).

E3.A1.1.11.1.1.4.  Civilian Conviction

E3.A1.1.11.1.1.4.1.  Conviction by civilian authorities or action taken that is tantamount to a finding of guilty, including similar adjudications in juvenile proceedings, when the specific circumstances of the offense warrant separation, and the following conditions are present:

E3.A1.1.11.1.1.4.1.1.  A punitive discharge would be authorized for the same or a closely related offense under the Manual for Courts-Martial (reference (q)); or

E3.A1.1.11.1.1.4.1.2.  The sentence by civilian authorities includes confinement for 6 months or more without regard to suspension or probation.

E3.A1.1.11.1.1.4.2.  Separation processing may be initiated whether or not a member has filed an appeal of a civilian conviction or has stated an intention to do so.  Execution of an approved separation should be withheld pending outcome of the appeal or until the time for appeal has passed, but the member may be separated before final action on the appeal upon request of the member or upon direction of the Secretary concerned.

E3.A1.1.11.1.2.  Reporting.   The Deputy Assistant Secretary of Defense (Military Manpower & Personnel Policy), Office of the ASD(P&R), shall require separate reports under each subparagraph in paragraph E3.A1.1.11.1.1. for misconduct by reason of drug abuse, unauthorized absence, and such other categories as may be appropriate .

E3.A1.1.11.1.3.  Related Separations.   Homosexual conduct shall be processed under section E3.A1.1.8.  Misconduct involving a fraudulent enlistment is considered under subsection E3.A1.1.5.4., above.

E3.A1.1.11.2.  Counseling and Rehabilitation.   Separation processing for a pattern of misconduct (subparagraph E3.A1.1.11.1.1.1. and E3.A1.1.11.1.1.2. of this

*DODD 1332.14, December 21, 93*

enclosure, above) may not be initiated until the member has been counseled formally concerning deficiencies and has been afforded an opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records.   If the sole basis of separation is a single offense (subparagraph E3.A1.1.11.1.1.3.) or a civilian conviction or a similar juvenile adjudication (subparagraph E3.A1.1.11.1.1.4.), the counseling and rehabilitation requirements are not applicable.

E3.A1.1.11.3.  Characterization or Description.   Characterization of service normally shall be Under Other Than Honorable Conditions, but characterization as General (under honorable conditions) may be warranted under the guidelines in section E3.A2.1.3. of Part 2.   For respondents who have completed entry-level status, characterization of service as Honorable is not authorized unless the respondent's record is otherwise so meritorious that any other characterization clearly would be inappropriate.   In such cases, separations for misconduct with an Honorable characterization shall be approved by a commander exercising general court-martial jurisdiction or higher authority as specified by the Secretary concerned.   (As an exception, the Secretary concerned may authorize general court-martial convening authorities to delegate authority to the special court-martial convening authorities to approve separations with service characterized as Honorable when the sole evidence of misconduct is command-directed urinalysis results, which cannot be used for characterization of service, or when an administrative discharge board has recommended separation with an Honorable discharge.) When characterization of service Under Other than Honorable Conditions is not warranted for a member in entry-level status under section E3.A2.1.3. of Part 2, the separation shall be described as an Entry-Level Separation.

E3.A1.1.11.4.  Procedures.   The Administrative Board Procedure (section E3.A3.1.3. of Part 3) shall be used; however, use of the Notification Procedure (section E3.A3.1.2. of Part 3) is authorized if characterization of service Under Other Than Honorable Conditions is not warranted under section E3.A2.1.3. of Part 2.

E3.A1.1.12.  Separation in Lieu of Trial by Court-Martial

E3.A1.1.12.1.  Basis.   A member may be separated upon request of trial by court-martial if charges have been preferred with respect to an offense for which a punitive discharge is authorized and it is determined that the member is unqualified for further military service under the guidance set forth in section E3.A2.1.1. of Part 2. This provision may not be used when section B. of paragraph 127c of the Manual for Courts-Martial (reference (q)) provides the sole basis for a punitive discharge unless the charges have been referred to a court-martial empowered to adjudge a punitive

*DODD 1332.14, December 21, 93*

discharge.

E3.A1.1.12.2.  Characterization or Description.    Characterization of service normally shall be Under Other Than Honorable Conditions, but characterization as General (under honorable conditions) may be warranted under the guidelines in section E3.A2.1.3. of Part 2.   For respondents who have completed entry-level status, characterization of service as Honorable is not authorized unless the respondent's record is otherwise so meritorious that any other characterization clearly would be inappropriate.   When characterization of service Under Other Than Honorable Conditions is not warranted for a member in entry level status under section E3.A2.1.3. of Part 2, the separation shall be described as an Entry Level Separation.

E3.A1.1.12.3.  Procedures

E3.A1.1.12.3.1.  The request for discharge must be submitted in writing and signed by the member.

E3.A1.1.12.3.2.  The member shall be afforded opportunity to consult with counsel qualified under Article 27 (b) (1) of the UCMJ (reference (d)).   If the member refuses to do so, counsel shall prepare a statement to this effect, which shall be attached to the file, and the member shall state that he or she has waived the right to consult with counsel.

E3.A1.1.12.3.3.  Except when the member has waived the right to counsel, the request shall be signed by counsel.

E3.A1.1.12.3.4.  In the written request, the member shall state that he or she understands the following:

E3.A1.1.12.3.4.1.  The elements of the offense or offenses charged;

E3.A1.1.12.3.4.2.  That characterization of service Under Other Than Honorable Conditions is authorized; and

E3.A1.1.12.3.4.3.  The adverse nature of such a characterization and possible consequences thereof.

E3.A1.1.12.3.5.  The Secretary concerned shall also require that one or both of the following matters be included in the request:

E3.A1.1.12.3.5.1.  An acknowledgment of guilt of one or more of

*DODD 1332.14, December 21, 93*

the offenses or any lesser included offenses for which a punitive discharge is authorized; or

E3.A1.1.12.3.5.2.  A summary of the evidence or list of documents (or copies thereof) provided to the member pertaining to the offenses for which a punitive discharge is authorized.

E3.A1.1.12.3.6.  The Separation Authority shall be a commander exercising general court-martial jurisdiction or higher authority as specified by the Secretary concerned.  (As an exception, the Secretary concerned may authorize general court-martial convening authorities to delegate authority to the special court-martial convening authorities to approve requests for discharge in the case of enlisted members who have been absent without leave for more than 30 days, have been dropped from the rolls of their units as absent in desertion, have been returned to military control, are assigned to a regional personnel control/separation processing facility, and are charged only with being absent without leave for more than 30 days.)

E3.A1.1.12.3.7.  Statements by the member or the member's counsel submitted in connection with a request under this subsection are not admissible against the member in a court-martial except as authorized under Military Rule of Evidence 410, Manual for Courts-Martial (reference (q)).

E3.A1.1.13.  Security

E3.A1.1.13.1.  Basis.   When retention is clearly inconsistent with the interest of national security, a member may be separated by reason of security and under conditions and procedures established by the Secretary of Defense in DoD 5200.2-R (reference (r)).

E3.A1.1.13.2.  Characterization or Description.   Characterization of service or description of a separation shall be in accordance with section E3.A2.1.3. of Part 2.

E3.A1.1.14.  Unsatisfactory Participation in the Ready Reserve

E3.A1.1.14.1.  Basis.   A member may be separated for unsatisfactory participation in the Ready Reserve under criteria established by the Secretary concerned under DoD Directive 1215.13 (reference (p)).

E3.A1.1.14.2.  Characterization or Description.   Characterization of service or description of a separation shall be in accordance with section E3.A2.1.3. of Part 2 and DoD Directive 1215.13 (reference (p)).

*DODD 1332.14, December 21, 93*

E3.A1.1.14.3. Procedures.   The Administrative Board Procedure (section E3.A3.1.3. of Part 3) shall be used, except that the Notification Procedure (section E3.A3.1.2. of Part 3) may be used if characterization of service Under Other Than Honorable Conditions is not warranted under section E3.A2.1.3. of Part 2.

E3.A1.1.15. Secretarial Plenary Authority

E3.A1.1.15.1. Basis.   Notwithstanding any limitation on separations provided in this Directive, the Secretary concerned may direct the separation of any member prior to expiration of term of service after determining it to be in the best interests of the Service.

E3.A1.1.15.2. Characterization or Description.   Honorable or General (under honorable conditions) as warranted under section E3.A2.1.3. of Part 2 unless an Entry Level Separation is required under section E3.A2.1.3. of Part 2.

E3.A1.1.15.3. Procedures.   Prior to involuntary separation, the Notification Procedure (section E3.A3.1.2. of Part 3) shall be used, except the procedure for requesting an Administrative Board (paragraph E3.A3.1.2.1.7. of Part 3) is not applicable.

E3.A1.1.16. Reasons Established by the Military Departments

E3.A1.1.16.1. Basis.   The Military Departments may establish additional reasons for separation for circumstances not otherwise provided for in this Directive to meet their specific requirements, subject to approval by the ASD(P&R).

E3.A1.1.16.2. Counseling and Rehabilitation.   Separation processing may not be initiated until the member has been counseled formally concerning deficiencies and has been afforded an opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records except when the Military Department concerned provides in its implementing document that counseling and rehabilitation requirements are not applicable for the specific reason for separation.

E3.A1.1.16.3. Characterization or Description.   Characterization of service or description of a separation shall be in accordance with section E3.A2.1.3. of Part 2.

E3.A1.1.16.4. Procedures.   The procedures established by the Military Departments shall be consistent with the procedures contained in this Directive insofar as practicable.

*DODD 1332.14, December 21, 93*

E3.A1.1.17.  <u>Weight Control Failure</u>

E3.A1.1.17.1.  <u>Basis</u>.    A member may be separated for failure to meet the weight control standards established under DoD Directive 1308.1, when it is determined that the member is unqualified for further military service and meets both of the following conditions:

E3.A1.1.17.1.1.  The member is not medically diagnosed with a medical condition that precludes or interferes with weight control.  Members with a medically diagnosed condition that precludes or interferes with weight control may be separated either through medical channels, if appropriate, or under the guidance in paragraph E3.A1.1.3.4.8. of this enclosure, above.

E3.A1.1.17.1.2.  The member fails to meet weight control standards, and the sole reason for separation is failure to meet the weight control standard.

E3.A1.1.17.2.  <u>Counseling and Rehabilitation</u>.    Separation processing may not be initiated until the member has been counseled formally concerning deficiencies and has been afforded an opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records.

E3.A1.1.17.3.  <u>Characterization or Description</u>.    Honorable, unless characterization of service as General (under honorable conditions) is warranted under section E3.A2.1.3. of Part 2 on the basis of numerical scores accumulated in a formal, service-wide rating system that evaluated conduct and performance on a regular basis, or when an entry level separation is required under section E3.A3.1.2. of Part 2.

E3.A1.1.17.4.  <u>Procedures</u>.    The Notification Procedure (section B. of Part 3) shall be used.

*DODD 1332.14, December 21, 93*

## E3.A2.  ATTACHMENT 2 TO ENCLOSURE 3

### PART 2

### E3.A2.1.  GUIDELINES ON SEPARATION AND CHARACTERIZATION

E3.A2.1.1.  Separation

E3.A2.1.1.1.  Scope    This general guidance applies when referenced in Part 1.  Further guidance is set forth under the specific reasons for separation in Part 1.

E3.A2.1.1.2.  Guidance

E3.A2.1.1.2.1.  There is a substantial investment in the training of persons enlisted or inducted into the Military Services.  As a general matter, reasonable efforts at rehabilitation should be made prior to initiation of separation proceedings.

E3.A2.1.1.2.2.  Unless separation is mandatory, the potential for rehabilitation and further useful military service shall be considered by the Separation Authority and, where applicable, the Administrative Board.  If separation is warranted despite the potential for rehabilitation, consideration should be given to suspension of the separation, if authorized.

E3.A2.1.1.2.3.  Counseling and rehabilitation efforts are a prerequisite to initiation of separation proceedings only insofar as expressly set forth under specific requirements for separation in Part 1.  An alleged or established inadequacy in previous rehabilitative efforts does not provide a legal bar to separation

E3.A2.1.1.2.4.  The following factors may be considered on the issue of retention or separation, depending on the circumstances of the case:

E3.A2.1.1.2.4.1.  The seriousness of the circumstances forming the basis for initiation of separation proceedings, and the effect of the members continued retention on military discipline, good order, and morale.

E3.A2.1.1.2.4.2.  The likelihood of continuation or recurrence of the circumstances forming the basis for initiation of separation proceedings.

E3.A2.1.1.2.4.3.  The likelihood that the member will be a disruptive or undesirable influence in present or future duty assignments.

E3.A2.1.1.2.4.4.  The ability of the member to perform duties effectively in the present and in the future, including potential for advancement or leadership.

E3.A2.1.1.2.4.5.  The member's rehabilitative potential.

E3.A2.1.1.2.4.6.  The member's entire military record.

E3.A2.1.1.2.4.6.1.  This may include:

E3.A2.1.1.2.4.6.1.1.  Past contributions to the Service, assignments, awards and decorations, evaluation ratings, and letters of commendation;

E3.A2.1.1.2.4.6.1.2.  Letters of reprimand or admonition, counseling records, records of nonjudicial punishment, records of conviction by court-martial and records of involvement with civilian authorities; and

E3.A2.1.1.2.4.6.1.3.  Any other matter deemed relevant by the Board, if any, or the Separation Authority, based upon the specialized training, duties, and experience of persons entrusted by this Directive with recommendations and decisions on the issue of separation or retention.

E3.A2.1.1.2.4.6.2.  The following guidance applies to consideration of matter under subparagraph E3.A2.1.1.2.4.6.1.:

E3.A2.1.1.2.4.6.2.1.  Adverse matter from a prior enlistment or period of military service, such as records of nonjudicial punishment and convictions by courts-martial, may be considered only when such records would have a direct and strong probative value in determining whether separation is appropriate. The use of such records ordinarily shall be limited to those cases involving patterns of conduct manifested over an extended period of time.

E3.A2.1.1.2.4.6.2.2.  Isolated incidents and events that are remote in time normally have little probative value in determining whether administrative separation should be effected.

E3.A2.1.1.3.  Limitations on separation actions.   A member may not be Separated on the basis of the following:

E3.A2.1.1.3.1.  Conduct that has been the subject of judicial proceedings

resulting in the acquittal or action having the effect thereof except in the following circumstances:

E3.A2.1.1.3.1.1.  When such action is based upon a judicial determination not going to the guilt or innocence of the respondent; or

E3.A2.1.1.3.1.2.  When the judicial proceeding was conducted in a State or foreign court and the separation is approved by the Secretary concerned; or

E3.A2.1.1.3.1.3.  When the acquittal from the judicial proceedings was based on a finding of not guilty only by reason of lack of mental responsibility. Members in this category normally shall be separated under Secretarial plenary authority (Enclosure 3, Part 1, Section E3.A1.1.15.) unless separation for disability (Enclosure 3, Part 1, Section E3.A1.1.4.) is appropriate.

E3.A2.1.1.3.2.  Conduct that has been the subject of a prior Administrative Board in which the Board entered an approved finding that the evidence did not sustain the factual allegations concerning the conduct except when the conduct is the subject of a rehearing ordered on the basis of fraud or collusion; or

E3.A2.1.1.3.3.  Conduct that has been the subject of an administrative separation proceeding resulting in a final determination by a Separation Authority that the member should be retained, except in the following circumstances:

E3.A2.1.1.3.3.1.  When there is subsequent conduct or performance forming the basis, in whole or in part, for a new proceeding;

E3.A2.1.1.3.3.2.  When there is new or newly discovered evidence that was not reasonably available at the time of the prior proceeding; or

E3.A2.1.1.3.3.3.  When the conduct is the subject of a rehearing ordered on the basis of fraud or collusion.

E3.A2.1.2.  Suspension of Separation

E3.A2.1.2.1.  Suspension

E3.A2.1.2.1.1.  Unless prohibited by this Directive, a separation may be suspended for a specified period of not more than 12 months by the Separation Authority or higher authority if the circumstances of the case indicate a reasonable likelihood of rehabilitation.

*DODD 1332.14, December 21, 93*

E3.A2.1.2.1.2.  During the period of suspension, the member shall be afforded an opportunity to meet appropriate standards of conduct and duty performance.

E3.A2.1.2.1.3.  Unless sooner vacated or remitted, execution of the approved separation shall be remitted upon completion of the probationary period, upon termination of the member's enlistment or period of obligated service, or upon decision of the Separation Authority that the goal of rehabilitation has been achieved.

E3.A2.1.2.2.  <u>Action during the period of suspension</u>

E3.A2.1.2.2.1.  During the period of suspension, if there are further grounds for separation under Part 1, one or more of the following actions may be taken:

E3.A2.1.2.2.1.1.  Disciplinary action;

E3.A2.1.2.2.1.2.  New administrative action; or

E3.A2.1.2.2.1.3.  Vacation of the suspension accompanied by execution of the separation if the member engages in conduct similar to that for which separation was approved (but suspended) or otherwise fails to meet appropriate standards of conduct and duty performance

E3.A2.1.2.2.2.  Prior to vacation of a suspension, the member shall be notified in writing of the basis for the action and shall be afforded the opportunity to consult with counsel (as provided in paragraph E3.A3.1.2.1.6. of Part 3) and to submit a statement in writing to the Separation Authority.  The respondent shall be provided a reasonable period of time, but not less than 2 working days, to act on the notice.  If the respondent identifies specific legal issues for consideration by the Separation Authority, the matter shall be reviewed by a judge advocate or civilian lawyer employed by the government prior to final action by the Separation Authority.

E3.A2.1.3.  <u>Characterization of Service or Description of Separation</u>

E3.A2.1.3.1.  <u>Types of characterization or description</u>

E3.A2.1.3.1.1.  At separation, the following types of characterization of service or description of separation are authorized under this Directive:

E3.A2.1.3.1.1.1.  Separation with characterization of service as

*DODD 1332.14, December 21, 93*

Honorable, General (under honorable conditions), or Under Other Than Honorable Conditions.

E3.A2.1.3.1.1.2.  Entry Level Separation.

E3.A2.1.3.1.1.3.  Order of release from the custody and control of the Military Services by reason of void enlistment or induction.

E3.A2.1.3.1.1.4.  Separation by being dropped from the rolls of the Service.

E3.A2.1.3.1.2.  Any of the types of separation listed in this section may be used in appropriate circumstances unless a limitation is set forth in this section or in Part 1 (Reasons for Separation).

E3.A2.1.3.2.  <u>Characterization of service</u>

E3.A2.1.3.2.1.  <u>General considerations</u>

E3.A2.1.3.2.1.1.  Characterization at separation shall be based upon the quality of the member's service, including the reason for separation and guidance in paragraph E3.A2.1.3.2.2., below, subject to the limitations set forth under various reasons for separation in Part 1.  The quality of service will be determined in accordance with standards of acceptable personal conduct and performance of duty for military personnel.  These standards are found in the UCMJ (reference (d)), directives and regulations issued by the Department of Defense and the Military Departments, and the time-honored customs and traditions of military service.

E3.A2.1.3.2.1.2.  The quality of service of a member on active duty or active duty for training is affected adversely by conduct that is of a nature to bring discredit on the Military Services or is prejudicial to good order and discipline, regardless of whether the conduct is subject to UCMJ jurisdiction.  Characterization may be based on conduct in the civilian community, and the burden is on the respondent to demonstrate that such conduct did not adversely affect the respondent's service.

E3.A2.1.3.2.1.3.  The reasons for separation, including the specific circumstances that form the basis for the separation, shall be considered on the issue of characterization.  As a general matter, characterization will be based upon a pattern of behavior rather than an isolated incident.  There are circumstances, however, in which the conduct or performance of duty reflected by a single incident provides the basis for

characterization.

E3.A2.1.3.2.1.4.  Due consideration shall be given to the member's age, length of service, grade, aptitude, physical and mental condition, and the standards of acceptable conduct and performance of duty.

E3.A2.1.3.2.2.  <u>Types of characterization</u>

E3.A2.1.3.2.2.1.  <u>Honorable</u>.   The Honorable characterization is appropriate when the quality of the member's service generally has met the standards of acceptable conduct and performance of duty for military personnel, or is otherwise so meritorious that any other characterization would be clearly inappropriate.   In the case of an Honorable Discharge, an Honorable Discharge Certificate (DD Form 256) will be awarded and a notation will be made on the appropriate copies of The DD Form 214/5 in accordance with DoD Directive 1336.1 (reference (s)).

E3.A2.1.3.2.2.2.  <u>General (under honorable conditions)</u>.   If a member's service has been honest and faithful, it is appropriate to characterize that service under honorable conditions.   Characterization of service as General (under honorable conditions) is warranted when significant negative aspects of the member's conduct or performance of duty outweigh positive aspects of the member's military conduct or performance of duty outweigh positive aspects of the record.

E3.A2.1.3.2.2.3.  <u>Under Other Than honorable Conditions</u>.

E3.A2.1.3.2.2.3.1.  This characterization may be issued in the following circumstances:

E3.A2.1.3.2.2.3.1.1.  When the reason for separation is based upon a pattern of behavior that constitutes a significant departure from the conduct expected of members of the Military Services.

E3.A2.1.3.2.2.3.1.2.  When the reason for separation is based upon one or more acts or omissions that constitute a significant departure from the conduct expected of members of the Military Services.   Examples of factors that may be considered include the use of force or violence to produce serious bodily injury or death, abuse of a special position of trust, disregard by a superior of customary superior-subordinate relationships, acts or omissions that endanger the security of the United States or the health and welfare of other members of the Military Services, and deliberate acts or omissions that seriously endanger the health and safety of other persons.

*DODD 1332.14, December 21, 93*

E3.A2.1.3.2.2.3.2.  This characterization is authorized only if the member has been afforded the opportunity to request an Administrative Board, except as provided in section E3.A1.1.12. of Part 1 (Separation in Lieu of Trial by Courts-Martial).

E3.A2.1.3.2.3.  Limitations on characterization.   Except as otherwise provided in this paragraph, characterization will be determined solely by the member's military record during the current enlistment or period of service to which the separation pertains, plus any extensions thereof prescribed by law or regulation or effected with the consent of the member.

E3.A2.1.3.2.3.1.  Prior service activities, including records of conviction by courts-martial, records of absence without leave, or commission of other offenses for which punishment was not imposed shall not be considered on the issue of characterization.   To the extent that such matters are considered on the issue of retention or separation (subsection E3.A2.1.1.2. of this Part), the record of proceedings may reflect express direction that such information shall not be considered on the issue of characterization.

E3.A2.1.3.2.3.2.  Preservice activities may not be considered on the issue of characterization except as follows: in a proceeding concerning fraudulent entry into military service (subsection E3.A1.1.5.4. of Part 1), evidence of preservice misrepresentations about matters that would have precluded, postponed, or otherwise affected the member's eligibility for enlistment or induction may be considered on the issue of characterization.

E3.A2.1.3.2.3.3.  The limitations in subsection E3.A2.1.1.3. of this Part, above, as to matters that may be considered on the issue of separation are applicable to matters that may be considered on the issue of characterization.

E3.A2.1.3.2.3.4.  When the sole basis for separation is a serious offense that resulted in a conviction by a court-martial that did not impose a punitive discharge, the member's service may not be characterized Under Other Than Honorable Conditions unless such characterization is approved by the Secretary concerned.

E3.A2.1.3.2.3.5.  Conduct in the civilian community of a member of a Reserve component who is not on active duty or active duty for training may form the basis for characterization Under Other Than Honorable Conditions only if such

conduct affects directly the performance of military duties.   Such conduct may form the basis of characterization as General (under honorable conditions) only if such conduct has an adverse impact on the overall effectiveness of the service, including military morale and efficiency.

E3.A2.1.3.2.3.6.  A member's voluntary submission to a DoD treatment and rehabilitation program and voluntarily disclosed evidence of prior personal drug use by the member as part of a course of treatment in such a program may not be used against the member on the issue of characterization.   This limitation does not apply to:

E3.A2.1.3.2.3.6.1.  The introduction of evidence for impeachment or rebuttal purposes in any proceeding in which the evidence of drug abuse (or lack thereof) has been introduced first by the member.

E3.A2.1.3.2.3.6.2.  Taking action based on independently derived evidence, including evidence of continued drug abuse after initial entry into the a treatment and rehabilitation program.

E3.A2.1.3.2.3.7.  The results of mandatory urinalysis may be used on the issue of characterization except as provided in DoD Directive 1010.1 (reference (t)).

E3.A2.1.3.3.  Uncharacterized Separation

E3.A2.1.3.3.1.  Entry-Level Separation

E3.A2.1.3.3.1.1.  A separation shall be described as an Entry-Level Separation if separation processing is initiated while a member is in entry-level status, except in the following circumstances:

E3.A2.1.3.3.1.1.1.  When characterization Under Other than Honorable Conditions is authorized under the reason for separation (Part 1) and is warranted by the circumstances of the case; or

E3.A2.1.3.3.1.1.2.  The Secretary concerned, on a case-by-case basis, determines that characterization of service as Honorable is clearly warranted by the presence of unusual military duty.   The characterization is authorized when the member is separated under Part 1 by reason of Selected Changes in Service Obligation (section E3.A1.1.2.), Convenience of the Government (section E3.A1.1.3.), Disability (section E3.A1.1.4.), Secretarial Plenary Authority (section E3.A1.1.15.), or an

*DODD 1332.14, December 21, 93*

approved reason established by the Military Department (section E3.A1.1.16.).

E3.A2.1.3.3.1.2.  In time of mobilization or in other appropriate circumstances, the ASD(P&R) may authorize the Secretary concerned to delegate the authority in subparagraph E3.A2.1.3.3.1.1.2., above, (concerning the Honorable Characterization) to a general court-martial convening authority with respect to members serving in operational units.

E3.A2.1.3.3.1.3.  With respect to administrative matters outside this Directive that require a characterization as Honorable or General, an Entry-Level Separation shall be treated as the required characterization.  This provision does not apply to administrative matters that expressly require different treatment of an Entry-Level Separation except as provided in subparagraph E3.A2.1.3.3.1.4., below.

E3.A2.1.3.3.1.4.  In accordance with 10 U.S.C. 1163 (reference (u)), an Entry-Level Separation for a member of a Reserve component separated from the Delayed Entry Program is "under honorable conditions."

E3.A2.1.3.3.2.  <u>Void Enlistments or Inductions</u>.   A member shall not receive a discharge, characterization of service at separation, or an Entry-Level Separation of the enlistment or induction is void except when a constructive enlistment arises and such action is required under subparagraph E3.A2.1.3.3.2.3., below.   If characterization or an Entry-Level Separation is not required, the separation shall be described as an order of release from custody or control of the Military Services.

E3.A2.1.3.3.2.1.  An enlistment is void in the following circumstances:

E3.A2.1.3.3.2.1.1.  If it was effected without the voluntary consent of a person who has the capacity to understand the significance of enlisting in the Military Services, including enlistment of a person who is intoxicated or insane at the time of enlistment.   10 U.S.C. Sec. 504 (reference (v)); Article 2(b), UCMJ (reference (d)).

E3.A2.1.3.3.2.1.2.  If the person is under 17 years of age.   10 U.S.C. Sec. 505 (reference (w)).

E3.A2.1.3.3.2.1.3.  If the person is a deserter from another Military Service.   10 U.S.C. Sec. 504 (reference (v)).

E3.A2.1.3.3.2.2.  Although an enlistment may be void at its

*DODD 1332.14, December 21, 93*

inception, a constructive enlistment shall arise in the case of a person serving with a Military Service who:

> E3.A2.1.3.3.2.2.1.  Submitted voluntarily to military authority;

> E3.A2.1.3.3.2.2.2.  Met the mental competency and minimum 10 U.S.C. age qualifications of Sections 504 and 505 of (references (v) and (w)), at the time of voluntary submission to military authority;

> E3.A2.1.3.3.2.2.3.  Received military pay or allowances; and

> E3.A2.1.3.3.2.2.4.  Performed military duties.

E3.A2.1.3.3.2.3.  If an enlistment that is void at its inception is followed by a constructive enlistment within the same term of service, characterization of service or description of separation shall be in accordance with subsection E3.A2.1.3.2. or paragraph E3.A2.1.3.3.1. of this Part, as appropriate; however, if the enlistment was void by reason of desertion from another Military Service, the member shall be separated by an order of release from the custody and control of the Service regardless of any subsequent constructive enlistment.   The occurrence of such a constructive enlistment does not preclude the Military Departments, in appropriate cases, from either retaining the member or separating the member under section E3.A1.1.5. of Part 1 on the basis of the circumstances that occasioned the original void enlistment or upon any other basis for separation provided in this Directive.

E3.A2.1.3.3.3.  <u>Dropping from the rolls.</u>   A member may be dropped from the rolls of the Service when such action is authorized by the Military Department concerned and a characterization of service or other description of separation is not authorized or warranted.

ENCLOSURE 3, ATTACHMENT 2

*DODD 1332.14, December 21, 93*

E3.A3.  ATTACHMENT 3 TO ENCLOSURE 3

PART 3

E3.A3.1.  PROCEDURES FOR SEPARATION

E3.A3.1.1.  Scope

E3.A3.1.1.1.  The supplementary procedures in this Part are applicable only when required under a specific reason for separation (Part 1).  These procedures are subject to the requirements set forth in Part 1 with respect to specific reasons for separation.

E3.A3.1.1.2.  When a member is processed on the basis of multiple reasons for separation, the following guidelines apply to procedural requirements (including procedural limitations on characterization of service or description of separation):

E3.A3.1.1.2.1.  The requirements for each reason will be applied to the extent practicable.

E3.A3.1.1.2.2.  If a reason for separation set forth in the notice of proposed action requires processing under the Administrative Board Procedure (section E3.A3.1.3., below), the entire matter shall be processed under section E3.A3.1.3.

E3.A3.1.1.2.3.  If more than one reason for separation is approved, the guidance on characterization that provides the greatest latitude may be applied.

E3.A3.1.1.2.4.  When there is any other clear conflict between a specific requirement applicable to one reason and a general requirement applicable to another reason, the specific requirement shall be applied.

E3.A3.1.1.2.5.  If a conflict in procedures cannot be resolved on the basis of the foregoing principles, the procedure most favorable to the respondent shall be used.

E3.A3.1.2.  Notification Procedure

E3.A3.1.2.1.  Notice.    If the Notification Procedure is initiated under Part 1, the respondent shall be notified in writing of the matter set forth in this section.

E3.A3.1.2.1.1.  The basis of the proposed separation, including the circumstances upon which the action is based and a reference to the applicable

ENCLOSURE 3, ATTACHMENT 3

*DODD 1332.14, December 21, 93*

provisions of the Military Department's implementing regulation.

E3.A3.1.2.1.2. Whether the proposed separation could result in discharge, release from active duty to a reserve component, transfer from the Selected Reserve to the IRR, release from custody or control of the Military Services, or other form of separation.

E3.A3.1.2.1.3. The least favorable characterization of service or description of separation authorized for the proposed separation.

E3.A3.1.2.1.4. The right to obtain copies of documents that will be forwarded to the Separation Authority supporting the basis of the proposed separation. Classified documents may be summarized.

E3.A3.1.2.1.5. The respondent's right to submit statements.

E3.A3.1.2.1.6. The respondent's right to consult with counsel qualified under Article 27(b)(1) of the UCMJ (reference (d)). Nonlawyer counsel may be appointed when the respondent is deployed aboard a vessel or in similar circumstances of separation from sufficient judge advocate resources as determined under standards and procedures specified by the Secretary concerned. The respondent also may consult with civilian counsel retained at the member's own expense.

E3.A3.1.2.1.7. If the respondent has 6 or more years of total active and reserve military service, the right to request an Administrative Board (section E3.A3.1.3.).

E3.A3.1.2.1.8. The right to waive paragraphs E3.A3.1.2.1.4., E3.A3.1.2.1.5., E3.A3.1.2.1.6., or E3.A3.1.2.1.7., above, after being afforded a reasonable opportunity to consult with counsel, and that failure to respond shall constitute a waiver of the right.

E3.A3.1.2.2. Additional notice requirements

E3.A3.1.2.2.1. If separation processing is initiated on the basis of more than one reason under Part 1, the requirements of paragraph E3.A3.1.2.1.1. apply to all proposed reasons for separation.

E3.A3.1.2.2.2. If the respondent is in civil confinement, absent without leave, or in a reserve component not on active duty or upon transfer to the IRR, the relevant notification procedures in sections E3.A3.1.4., E3.A3.1.5., or E3.A3.1.6. of