# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| THOMAS COOK; MEGAN DRESCH; LAURA GALABURDA; JACK GLOVER; DAVID HALL; MONICA HILL; JENNY LYNN KOPFSTEIN; JENNIFER McGINN; JUSTIN PEACOCK; JAMES E. PIETRANGELO II; DEREK SPARKS; STACY VASQUEZ, | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 04-12546 GAO |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DONALD H. RUMSFELD, Secretary of Defense; MICHAEL CHERTOFF, Secretary of Homeland Security; UNITED STATES OF AMERICA, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____ )

## <u>CONSENT MOTION FOR LEAVE TO FILE NOTICE OF RECENT DECISIONS</u>

Pursuant to Local Rule 7.1(B)(3), Defendants Donald H. Rumsfeld, Secretary of Defense; Michael Chertoff, Secretary of Homeland Security; and the United States of America, hereby request leave to file a Notice of Recent Decisions, which would provide this Court with notice of the recent decisions of the United States Court of Appeals for the Seventh Circuit in <u>Muth</u> v. <u>Frank,</u> — F.3d —, 2005 WL 1463457 (7th Cir. June 22, 2005), and the United States District Court for the Central District of California in <u>Smelt</u> v. <u>County of Orange,</u> — F. Supp.2d —, 2005 WL 1429918 (C.D. Cal. June 16, 2005). For the reasons set forth in the Notice of Recent Decisions, a copy of which is attached, the decisions in <u>Muth</u> and <u>Smelt</u> are of relevance to certain of the issues that are presented in the instant case. Plaintiffs have graciously consented to this motion.

WHEREFORE, with good cause having been shown, defendants respectfully request that this Court grant them leave to file a Notice of Recent Decisions.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3606

Dated: June 28, 2005

CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)

Pursuant to Local Rule 7.1(a)(2), I certify that, on June 27, 2005, I conferred with co-counsel for the plaintiffs, Maura T. Healey, Esq., regarding this motion, and that Ms. Healey responded in an electronic mail message that plaintiffs had no objection to this motion.

 /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
THOMAS COOK; MEGAN DRESCH;                )
LAURA GALABURDA; JACK GLOVER;            )       Civil Action No. 04-12546 GAO
DAVID HALL; MONICA HILL; JENNY           )
LYNN KOPFSTEIN; JENNIFER McGINN;         )
JUSTIN PEACOCK; JAMES E.                  )
PIETRANGELO II; DEREK SPARKS;            )
STACY VASQUEZ,                            )
                                          )
       Plaintiffs,                          )
                                          )
  v.                                     )
                                          )
DONALD H. RUMSFELD, Secretary of         )
Defense; MICHAEL CHERTOFF, Secretary of )
Homeland Security; UNITED STATES OF      )
AMERICA,                                  )
                                          )
       Defendants.                          )
_____  )

## NOTICE OF RECENT DECISIONS

Defendants Donald H. Rumsfeld, Secretary of Defense; Michael Chertoff, Secretary of

Homeland Security; and the United States of America, hereby provide notice to this Court of the

recent decisions of the United States Court of Appeals for the Seventh Circuit in Muth v. Frank, —

F.3d —, 2005 WL 1463457 (7th Cir. June 22, 2005), and the United States District Court for the

Central District of California in Smelt v. County of Orange, — F. Supp.2d —, 2005 WL 1429918

(C.D. Cal. June 16, 2005), copies of which are attached hereto.

**1.** In Muth, the Seventh Circuit affirmed the dismissal of a writ of habeas corpus challenging

a Wisconsin incest statute.[1]  Of relevance to this case, the Seventh Circuit concluded that the

_____

[1] Judge Evans concurred in the judgment, but did not join in the opinion of the court.  Slip op.
at 18.

Supreme Court's decision in <u>Lawrence</u> v. <u>Texas</u>, 539 U.S. 558 (2003), did not establish a fundamental right that would trigger heightened scrutiny.  Slip op. at 14-17.  Specifically, the Seventh Circuit pointed to the fact that, "[i]n <u>Lawrence</u> in holding the state sodomy statute unconstitutional, the Court did not apply the specific method it had previously created for determining whether a substantive due process claim implicated a fundamental right."  Slip op. at 15.  The Seventh Circuit therefore cited with approval the Eleventh Circuit's decision in <u>Lofton</u> v. <u>Secretary of the Dept. of Children and Family Serv.</u>, 358 F.3d 804 (11th Cir. 2004), *cert. denied*, 125 S. Ct. 869 (2005), for the proposition that "<u>Lawrence</u> did not announce a 'fundamental right to private sexual intimacy.'"  Slip op. at 16 (citing <u>Lofton</u>, 358 F.3d at 816).

The Seventh Circuit also pointed to the fact that "[t]he Supreme Court in <u>Lawrence</u> did not apply strict scrutiny in reviewing the sodomy statute at issue," which the court of appeals noted was "the standard applicable where a fundamental liberty interest is at issue."  Slip op. at 16-17.  The Seventh Circuit concluded that "[t]he Court's refusal to apply that standard confirms that the Court was not creating a new fundamental right."  Slip op. at 16-17 (citing <u>Lofton</u>, 358 F.3d at 817).  The Seventh Circuit therefore held that, based on "the absence from the Court's opinion of its own 'established method' for resolving a claim that a particular practice implicates a fundamental liberty interest, and the absence of strict scrutiny review, we conclude that <u>Lawrence</u> does not announce a fundamental right of adults to engage in all forms of private consensual sexual contact."  Slip op. at 17.

**2.**  In <u>Smelt</u>, the district court (Taylor, J.) held that it was a proper exercise of discretion to abstain from deciding the constitutionality of California's "man-woman marriage" statutes until the state court review process was completed, and also held that section 3 of the Defense of Marriage

Act ("DOMA"), 1 U.S.C. §7; 28 U.S.C. §1738C, was constitutional. Of relevance to this case, the district court in <u>Smelt</u> held that rational basis review was the correct standard to apply both with respect to the plaintiffs' equal protection and due process challenges. <u>See</u> slip op. at 12 n.13 ("Under federal law, it is clear sexual orientation is not a suspect or quasi-suspect class, and federal equal protection jurisprudence subjects sexual orientation classifications to rational basis review.") (citing <u>Romer</u> v. <u>Evans</u>, 517 U.S. 620 (1996); <u>id</u>. at 23 ("Having found DOMA creates a sexual orientation classification, the Court will consider whether DOMA is rationally related to a legitimate interest for equal protection purposes."); <u>id</u>. at 30 ("The Court concludes the fundamental due process right to marry does not include a fundamental right to same-sex marriage or Plaintiffs' right to marry each other. Plaintiff's claimed interest is not part of a fundamental right. For due process purposes, the court reviews DOMA's 'one-man, one woman' restriction for rational basis."); <u>id</u>. at 30 ("When, as here, a law does not make a suspect or quasi-suspect classification (the equal protection issue) and does not burden a fundamental right (the due process issue), it will be upheld if it is rationally related to a legitimate government interest.") (citing <u>Romer</u>, 517 U.S. at 631).

    **3**. The Seventh Circuit's analysis in <u>Muth</u> and the Central District of California's analysis in <u>Smelt</u> are consistent with and support the arguments advanced by the defendants in support of their motion to dismiss. <u>See</u> Memorandum of Law in Support of Defendants' Motion to Dismiss at 16-21; Reply Memorandum of Law In Support of Defendants' Motion to Dismiss at 1-9.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Mark T. Quinlivan
    MARK T. QUINLIVAN
    Assistant United States Attorney
    United States Attorney's Office
    John Joseph Moakley U.S. Courthouse
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    617-748-3606

Dated: June 28, 2005

# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3984

ALLEN A. MUTH,

*Petitioner-Appellant,*

*v.*

MATTHEW J. FRANK, Secretary,

*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 398—**Lynn Adelman**, *Judge.*

———————

ARGUED NOVEMBER 12, 2004—DECIDED JUNE 22, 2005

———————

Before BAUER, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Allen Muth and his younger sister Patricia married and had three children. After they abandoned the middle child, who was disabled, the State of Wisconsin petitioned to terminate their parental rights because of their incestuous parenthood. After the courts approved the termination, both Allen and Patricia were convicted of incest and sentenced to years in prison. In this petition for a writ of habeas corpus, Allen Muth argues that Wisconsin's incest statute is unconstitutional insofar as it

seeks to criminalize a sexual relationship between two consenting adults. The district court denied the petition. We affirm.

## I.

Allen Muth and his adult sister, Patricia, were arrested by the State of Wisconsin in 1997 and charged with incest in violation of Wisconsin law. The facts leading up to this arrest are not pleasant.[1] Among fourteen children in a dysfunctional family, Allen was one of the oldest and Patricia one of the youngest. During their childhood they were in and out of foster care, and they and several other siblings were involved in a cycle of sexual abuse and incest. Although they were separated for some length of time, at about the time Patricia reached the age of majority she and Allen became reunited and got married. During their marriage they had three children (apparently she had one other child prior to the marriage). The incestuous relationship came to the State's attention when their middle child, Tiffany, was "removed from her parental home and placed in foster care because [Patricia] and Allen had abandoned her at the home of a baby-sitter." *Allen M.*, 571 N.W.2d at 873.

After a series of progressive separation procedures, the State filed a petition to terminate Patricia and Allen's parental rights to Tiffany because of their incestuous parenthood of Tiffany. Neither Patricia nor Allen contested the evidence of their incest, and consequently the trial court found Patricia and Allen unfit. The evidence at that trial

---

[1] The preliminary facts set out here are derived from *State v. Allen M.*, 571 N.W.2d 872, 873 (Wis. Ct. App. 1997) (hereinafter *Allen M.*).

No. 03-3984                                                3

indicated that Tiffany was significantly underdeveloped and that "she was a non-verbal, three and one-half year old who behaved and physically appeared to be more like a two-year-old child. She was not toilet trained or able to feed herself and she displayed little or no emotion." *Id.* at 874. Other evidence indicated that the child was significantly neglected and that Patricia and Allen had no relationship with the child. The court concluded that Tiffany's best interests would be served by the termination of the parental rights of her biological parents.

On appeal to the Wisconsin Court of Appeals, Patricia and Allen challenged the constitutionality of Wis. Stat. § 48.415(7), which provides that incestuous parenthood is a ground for termination of parental rights.[2] The Muths claimed that the termination of their parental rights based on their incestuous parenthood of Tiffany denied them due process of law and their rights to equal protection of the law. The court denied those claims and affirmed the trial court. *Allen M.*, 571 N.W.2d 872.

Given the facts exposed in *Allen M.*, the State of Wisconsin arrested Allen and Patricia and charged them with incest, in violation of Wisconsin's criminal incest statute, which provides that:

> Whoever marries or has nonmarital sexual intercourse with a person he or she knows is a blood relative and such relative is in fact related in a degree within which

---

[2] Wis. Stat. § 48.415 provides that: "Grounds for termination of parental rights shall be one of the following: . . . (7) Incestuous parenthood, which shall be established by proving that the person whose parental rights are sought to be terminated is also related, either by blood or adoption, to the child's other parent in a degree of kinship closer than 2nd cousin."

the marriage of the parties is prohibited by the law of this state is guilty of a Class F felony.

Wis. Stat. § 944.06.[3]

Prior to trial, Allen moved to dismiss the criminal complaint against him, on the basis that Wisconsin's incest statute was unconstitutional insofar as it sought to criminalize a sexual relationship between two consenting adults. The trial court denied the motion and conducted a bench trial. Both Allen and Patricia were convicted on November 11, 1997. Allen was sentenced to eight years in prison and Patricia was sentenced to five years' imprisonment.

The Wisconsin Court of Appeals affirmed Allen's conviction in January 2000. In its opinion, the court noted that the issue before it was whether Wisconsin's incest statute was unconstitutional. *Wisconsin v. Muth*, 98-1137-CR, slip op. at 1 (Wis. Ct. App. Jan. 20, 2000) (hereinafter *Muth I*). The Court of Appeals also noted that it agreed with the trial court's conclusion that Allen Muth (hereinafter Muth) had no privacy right in having sexual relations with his sister but

---

[3] Wisconsin thus criminalizes a sexual and/or marital relationship as incest if the parties could not marry due to a close blood relationship. Section 765.03(1) of the Wisconsin Statutes, in turn, prohibits marriage between "persons who are nearer of kin than 2nd cousins. . . ." Wis. Stat. § 765.30(1). There is an exception to this prohibition of marriage for "first cousins where the female has attained the age of 55 years or where either party, at the time of application for a marriage license, submits an affidavit signed by a physician stating that either party is permanently sterile." *Id.*

Read together, these statutes criminalize sexual intercourse where the following blood relationships exist: parent/child; siblings; grandparent/grandchild; uncle or aunt/niece or nephew; and first cousins (with certain exceptions). At the time of Muth's conviction and sentencing, incest was a Class C Felony.

ultimately concluded that "we need not address [the trial court's conclusion] because we have already concluded in [*Allen M.*] that the State may legitimately prohibit incestuous relationships." *Id.* at 2. The Wisconsin Supreme Court denied Muth's petition for discretionary review.

Having exhausted all state remedies, on April 20, 2001, Muth filed this petition for a writ of habeas corpus with the United States District Court for the Eastern District of Wisconsin. He challenged the constitutionality of the statute that criminalized incestuous relationships. Before the completion of briefing by the parties, the United States Supreme Court issued its decision in *Lawrence v. Texas*, 539 U.S. 558 (2003). In that case, the Supreme Court held that a Texas statute prohibiting homosexual sodomy[4] was unconstitutional insofar as it applied to the private conduct of two consenting adults. *Id.* at 578-79.

---

[4] In his concurring opinion, our colleague suggests that the term "homosexual sodomy" is used by this court in a pejorative fashion. Use of the word sodomy or "homosexual sodomy" to discuss the sexual conduct *Lawrence* addressed is not original to this decision. The majority opinion in *Lawrence* used the term "sodomy" no less than seventeen times and the phrase "homosexual sodomy" twice. Justice O'Connor's concurring opinion described the Texas law (and similar laws) at issue in *Lawrence* as a law relating to sodomy twenty-four times. We also note that several federal cases and innumerable commentators post-*Lawrence* have described the holding of that case, or the Texas law at issue in the case, as relating to sodomy or, more precisely, homosexual (or some equivalent such as "same-sex") sodomy. *See, e.g., Williams v. Attorney Gen. of Ala.*, 378 F.3d 1232, 1236 (11th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S.Ct. 1335 (2005); *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004); *Anderson v. Morrow*, 371 F.3d 1027, 1034 n.4 (9th Cir. 2004).

On October 3, 2003, the district court denied Muth's peti-
tion. *Muth v. Wisconsin*, No. 01-C-0398 (E.D. Wis. Oct. 3,
2003) [hereinafter *Muth II*]. The court, applying the standard
of review provisions set forth in the Antiterrorism and
Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1)
("AEDPA"), held that *Lawrence* was not "clearly estab-
lished" Supreme Court precedent at the time of the
Wisconsin Court of Appeals' decision on direct appeal. As
such, the district court held that it could not grant habeas
relief even if the Court of Appeals' decision was contrary to
*Lawrence. Muth II*, at 5. The district court subsequently
denied Muth a certificate of appealability. This court, how-
ever, granted a certificate to determine if *Lawrence* should
apply retroactively. This appeal followed.

## II.

Because of the limited power of a federal court to issue a
writ of habeas corpus in a matter involving a state prisoner,
a central focus of this case is whether and to what extent this
court should even consider the Supreme Court's decision in
*Lawrence*. AEDPA instructs a federal court reviewing a state
conviction on habeas review to determine whether the
decision of the last state court to adjudicate the merits of the
petitioner's claim was reasonably correct *as of the time the
decision was made*. As discussed below, only in limited
circumstances are legal developments occurring after the
state court's decision considered.

*Lawrence* was decided after Muth's conviction and the
exhaustion of his state post-conviction remedies. Muth has
not identified, and we have not found, a federal court deci-
sion (and certainly not a Supreme Court decision) prior to
the Wisconsin Court of Appeals decision in *Muth I* that even
discussed whether criminal penalties for incest might be

unconstitutional. The closest decision having some bearing and still valid in 2001 was the Supreme Court's decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986), *overruled by Lawrence*, 539 U.S. at 578. In that case, the Court held that a Georgia law banning sodomy was not unconstitutional even when applied to consenting adults. Although *Bowers* did not deal with incest, it can be safely assumed that a court unwilling to find a law banning sodomy unconstitutional would be no more inclined to find a law prohibiting incest unconstitutional.

Because *Lawrence* overruled *Bowers*, and because there is no other related precedent, Muth understandably invokes *Lawrence* as his only hope for success. The district court held, however, that *Lawrence* could not be considered because it was not clearly established in 2001 when the Wisconsin Court of Appeals issued its decision in *Muth I*. At this point we need first to review the district court's decision that *Muth I* was an adjudication on the merits and if so, whether AEDPA standards of review applied to Muth's claim (Part A). Next, we consider the question raised *sua sponte* by this court in its order granting Muth the certificate of appealability: whether *Lawrence* is retroactively applicable (Part B).

## A. Whether *Muth I* was an adjudication on the merits.

Under AEDPA, a federal court may issue a writ of habeas corpus in cases involving prisoners convicted by a state only where the applicable state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unrea-
sonable determination of the facts in light of the evi-
dence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). This case is concerned only with
subsection (d)(1).

"[A] state court decision is 'contrary to' federal law if
the state court either incorrectly laid out governing Supreme
Court precedent, or, having identified the correct rule of
law, decided a case differently than a materially factually
indistinguishable Supreme Court case." *Conner v. McBride*,
375 F.3d 643, 649 (7th Cir. 2004), *cert. denied*, ___ U.S. ___,
125 S.Ct. 1399 (2005). "An 'unreasonable application' of
Supreme Court precedent occurs when 'the state court
identifies the correct governing legal rule . . . but unreason-
ably applies it to the facts of the particular state prisoner's
case' or 'if the state court either unreasonably extends a
legal principle from [the Court's] precedent to a new context
where it should not apply or unreasonably refuses to extend
that principle to a new context where it should apply.'"
*Dixon v. Snyder*, 266 F.3d 693, 700 (7th Cir. 2001) (quoting
*Williams v. Taylor*, 529 U.S. 362, 405 (2000)). "Clearly estab-
lished" Supreme Court precedent is "the holdings, as
opposed to the dicta, of the [Supreme] Court's decisions as
of the time of the relevant state-court decision." *Lockyer v.
Andrade*, 538 U.S. 63, 71 (2003).

The district court held that because *Lawrence* had not been
decided at the time the Wisconsin Court of Appeals denied
Muth's appeal, it obviously could not be clearly established
Supreme Court precedent. Importantly, however, before
applying the "clearly established" standard of review, the
reviewing court must first determine whether the claim
"was *adjudicated on the merits* in State court proceedings." 28
U.S.C. § 2254(d) (emphasis added). In other words, § 2254's

No. 03-3984                                                          9

standards apply only when a state court has decided the merits of the issue raised by the petitioner. If the state court did not reach the merits, § 2254 does not apply and this court applies the general habeas standard set forth at 28 U.S.C. § 2243. *Braun v. Powell*, 227 F.3d 908, 916-17 (7th Cir. 2000).

The question then is whether the Wisconsin Court of Appeals reached the merits of Muth's constitutional claim. If it did, a writ will issue only if pre-*Lawrence* precedents of the Supreme Court (leaving aside for the moment whether *Lawrence* is retroactive and whether it even applies) clearly established that criminalizing incestuous conduct between two consenting adults was unconstitutional. As we indicated above, Muth has no hope for a writ if *Lawrence* cannot be considered. If, however, the Court of Appeals did not reach the merits, AEDPA does not apply and this court may consider *Lawrence* in determining whether to issue a writ.

Muth argues that the Wisconsin Court of Appeals did not reach the merits of his constitutional claim. As noted above, in *Muth I* the Court of Appeals stated that it agreed with the decision of the trial court that Muth did not have a privacy right to have sexual intercourse with his sister. It also decided, however, that it did not have to reach the conclusion reached by the trial court because it had already decided that the state could prohibit incestuous relationships in an earlier case—*State v. Allen M. Muth I*, slip op. at 2 ("Because we have already concluded that the State has a compelling interest in prohibiting incest, we reject Muth's challenges to the constitutionality of the incest statute."). Muth argues that the Court of Appeals did not adjudicate the merits of his claim because the court in *Allen M.* did not consider the criminal statute at issue here. Instead, *Allen M.* considered Wisconsin's statute that permits the termination of parental rights where the children are the product of an

incestuous relationship. *Allen M.*, 571 N.W.2d at 876. Muth thus argues that the Court of Appeals misread or misapplied its earlier decision in *Allen M.* According to Muth, *Allen M.* dealt with a different statute and did not stand for the proposition the court in *Muth I* suggested it did. Because the Court of Appeals relied solely on *Allen M.* to decide *Muth I*, and *Allen M.* did not resolve the claim under Wis. Stat. § 944.06 at issue in *Muth I*, according to Muth, *Muth I* was not an adjudication on the merits.

We disagree. Even assuming the Wisconsin Court of Appeals misread or misapplied *Allen M.*, the decision in *Muth I* was an adjudication on the merits of Muth's claim that Wisconsin's criminal prohibition of incest was unconstitutional insofar as it applied to the private conduct of two consenting adults. AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court.[5] In fact, several circuits

---

[5]  If a state court specifically identifies a claim it must identify and review the correct claim. In *Appel v. Horn*, 250 F.3d 203, 210-11 (3d Cir. 2001), the Third Circuit found that the AEDPA standards of review did not apply where "petitioner had properly presented in the state courts a claim of *the constructive denial of counsel* but that the state courts had misconstrued the claim as one of *the ineffective assistance of counsel.*" *Chadwick v. Janecka*, 312 F.3d 597, 605 (3d Cir. 2003) (describing *Appel*) (emphasis in the original). It stands to reason that a petition is subject to AEDPA's standards of review only when a petitioner has had *his* claim reviewed by a state court. If a court considers another claim, it has not considered *his* claim. In this case, however, Muth does not suggest that the Wisconsin Court of Appeals did not correctly identify his claim. The Wisconsin Court correctly identified Muth's claim on the first page of its opinion: "The issue
(continued...)

No. 03-3984                                          11

have held that a state court need not offer *any* reasons and summarily dispose of a petitioner's claim and that summary disposition would be an adjudication on the merits. *Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir.), *cert. denied*, 538 U.S. 1000 (2003); *Wright v. Dep't of Corr.*, 278 F.3d 1245, 1254-55 (11th Cir. 2002), *cert. denied*, 538 U.S. 906 (2003); *Sellan v. Kuhlman*, 261 F.3d 303, 310-12 (2d Cir. 2001); *Bell v. Jarvis*, 236 F.3d 149, 158-62 (4th Cir. 2000) (en banc); *Harris v. Stovall*, 212 F.3d 940, 943 n.1 (6th Cir. 2000); *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir. 1999); *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999); *Delgado v. Lewis*, 181 F.3d 1087, 1091-92 n.3 (9th Cir. 1999), *vacated on other grounds by*, 528 U.S. 1133 (2000); *see also Weeks v. Angelone*, 528 U.S. 225, 237 (2000).[6]

An adjudication on the merits is perhaps best understood by stating what it is not: it is not the resolution of a claim on procedural grounds. *See Sellan*, 261 F.3d at 311 (" 'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."); *Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002) ("adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to

---

[5] (...continued)
on appeal is whether Wisconsin's incest statute, Wis. Stat. § 944.06 (1997-98) is constitutional." *Muth I*, slip op. at 1.

[6] In *Weeks*, the Supreme Court considered, under the deference rules set forth in AEDPA, a claim rejected without explanation by the Virginia Supreme Court. *Weeks*, 528 U.S. at 237. Thus, the Supreme Court implicitly treated a summary disposition by a state court as an adjudication on the merits.

procedural"), *cert. denied*, 537 U.S. 1104 (2003). It is only after
a federal court has determined that a state court has adjudi-
cated a claim on the merits that the correctness of the state
court's decision is considered.[7] Only then can a federal court
consider a court's reasoning (assuming it has provided one,
see above). The district court in this case put it quite suc-
cinctly:

> Nevertheless, the fact that the court of appeals may
> have misread or misapplied its own precedent does not
> mean that it did not adjudicate the merits of Muth's
> constitutional challenge as required by § 2254(d). As
> noted, the court of appeals framed the issue as whether
> the incest statute was constitutional and went on to hold
> that it was. The court's poor reasoning may provide a
> basis for finding that its decision was "contrary to" or
> involved an "unreasonable application" of clearly es-
> tablished federal law, but it is not grounds for finding
> that the court failed to adjudicate the claim on the
> merits.

*Muth II*, slip op. at 7.

Viewed thus, it is clear the Wisconsin Court of Appeals
adjudicated Muth's appeal on the merits. Because it did, our
review is limited to determining whether the decision
reached by *Muth I* was contrary to "clearly established
Federal law" at the time that *Muth I* was decided. Unless
*Lawrence* is retroactive, that is unless it applies to cases that
became final prior to June 26, 2003 (the date *Lawrence* was

---

[7]  Under AEDPA, a state court decision need not even be correct
in the view of the reviewing federal court. The decision need only
not be "contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme
Court of the United States." 28 U.S.C. § 2254(d)(1).

No. 03-3984                                    13

decided), it should not even be considered in resolving Muth's claim. We thus turn next to the retroactivity question.

## B. Whether *Lawrence* should be retroactively applied to Muth.

As noted above, this court, in its order granting Muth a certificate of appealability, raised *sua sponte* the following issue: whether the *Lawrence* decision should be retroactively applied to Muth. In considering this issue, the parties focused primarily on the Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288 (1989). In *Teague*, a plurality of justices held that a petitioner for a writ of habeas corpus would not have the benefit of new constitutional rules of criminal procedure announced by the Supreme Court after the petitioner's conviction had become final. *Teague*, 489 U.S at 310 (O'Connor, J., plurality opinion).[8] There are two "exceptions" to this doctrine of non-retroactivity: 1) the rule "places a class of private conduct beyond the power of the State to proscribe," *id.* at 311 (quoting *Mackey v. United States*, 401 U.S. 667, 692 (1971) (Harlan, J., concurring in part and dissenting in part)), or; 2) the rule is a "watershed rule" that implicates the fundamental fairness and accuracy of the criminal proceeding, *id.*

Muth argues that the first exception applies here, that is, *Lawrence* announced a new rule that placed his private conduct (an act of incest with a consenting adult) beyond

---

[8]  A majority of the Court's justices have since ratified the plurality decision in *Teague*. *See, e.g., Gray v. Netherland*, 518 U.S. 152 (1996); *see also* 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure*, 1025 n.3 (4th ed. 2001) (collecting cases).

Wisconsin's power to criminalize. But *Teague* is not strictly applicable to this case. *Teague* is concerned with the retro- activity of new constitutional rules of criminal *procedure*. *Bousley v. United States*, 523 U.S. 614, 620 (1998) ("*Teague* by its own terms applies only to procedural rules . . . ."). Confusion on this point is not surprising. *See Schriro v. Summerlin*, ___U.S. ___, 124 S.Ct. 2519, 2522 n.4 (2004) ("We have sometimes referred to rules of this latter type as falling under an exception to *Teague*'s bar on retroactive application of procedural rules; they are more accurately characterized as substantive rules not subject to the bar.") (internal citation omitted); *see also Beard v. Banks*, ___U.S. ___, 124 S.Ct. 2504, 2510 n.3 (2004).

*Lawrence* did not announce, and Muth does not seek to have this court find retroactive, a new *procedural* rule. *Lawrence* held that a state cannot enact laws that criminalize homosexual sodomy. *Lawrence* is a new substantive rule and is thus retroactive. *Anderson v. Morrow*, 371 F.3d 1027, 1033 (9th Cir. 2004). Accordingly, an adult imprisoned for violating a state's sodomy law (provided that person's conduct took place with another consenting adult) would be eligible for a writ of habeas corpus. If it would be unconsti- tutional to punish a person for an act that cannot be subject to criminal penalties it is no less unconstitutional to keep a person in prison for committing the same act. *See Mackey*, 401 U.S. at 693 (Harlan, J., concurring in part and dissenting in part) ("There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose.").

Muth, however, is not in prison for homosexual sodomy. The ultimate question then is not whether *Lawrence* is retro- active, but, rather, whether Muth is a beneficiary of the rule *Lawrence* announced. He is not. *Lawrence* did not address the constitutionality of incest statutes. Rather, the statute at

issue in *Lawrence* was one proscribing homosexual sodomy and the Court, as noted above, viewed its decision as a reconsideration of *Bowers*, another case involving homosexual sodomy. *Lawrence*, 539 U.S. at 564 ("[W]e deem it necessary to reconsider the Court's holding in *Bowers*."). There is no mention of incest in the Court's opinion.

*Lawrence* also did not announce, as Muth claims it did, a fundamental right, protected by the Constitution, for adults to engage in all manner of consensual sexual conduct, specifically in this case, incest. The Court certainly had not announced such a right prior to *Lawrence*, *see Carey v. Population Servs. Int'l*, 431 U.S. 678, 688 n.5 & n.17 (1977) ("[T]he Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits statutes regulating private consensual sexual behavior among adults, and we do not purport to answer that question now.") (internal citation and punctuation omitted), and *Lawrence*, whatever its ramifications, does not, in and of itself, go so far.

This is clear from the Court's analysis in *Lawrence*. In *Lawrence* in holding the state sodomy statute unconstitutional, the Court did not apply the specific method it had previously created for determining whether a substantive due process claim implicated a fundamental right:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest.

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted). This method, referred to by the Court as "established," *id.* at 720, is absent from *Lawrence. See Lawrence*, 539 U.S. at 586 (Scalia, J., dissenting) ("[N]owhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right' under the Due Process Clause. . .").

This omission led the Eleventh Circuit to conclude that *Lawrence* did not announce a "fundamental right to private sexual intimacy":

> [T]he *Lawrence* opinion contains virtually no inquiry into the question of whether the petitioners' asserted right is one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." [T]he opinion [also] notably never provides the " 'careful description' of the asserted fundamental liberty interest" that is to accompany fundamental-rights analysis.

*Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 816 (11th Cir. 2004), *cert. denied*, 125 S. Ct. 869 (2005).

The Supreme Court in *Lawrence* also did not apply strict scrutiny in reviewing the sodomy statute at issue. *See Lawrence*, 539 U.S. at 586 (Scalia, J., dissenting) (stating that "[the majority does not] subject the Texas law to the standard of review that would be appropriate (strict scrutiny) if homosexual sodomy were a 'fundamental right' " and concluding that the majority "proceeded to apply an unheard-of form of rational-basis review"); *Lofton*, 358 F.3d 817 ("Most significant, however, is the fact that the *Lawrence* Court never applied strict scrutiny, the proper standard when fundamental rights are implicated, but instead inval-

idated the Texas statute on rational-basis grounds, holding that it 'furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.' ") (quoting *Lawrence*, 539 U.S. at 578). Strict scrutiny is the standard applicable to challenges where a fundamental liberty interest is at issue. The Court's refusal to apply that standard confirms that the Court was not creating a new fundamental right. *See Lofton*, 358 F.3d at 817.

Given, therefore, the specific focus in *Lawrence* on homosexual sodomy, the absence from the Court's opinion of its own "established method" for resolving a claim that a particular practice implicates a fundamental liberty interest, and the absence of strict scrutiny review, we conclude that *Lawrence* did not announce a fundamental right of adults to engage in all forms of private consensual sexual conduct.

It may well be that future litigants will insist that *Lawrence* has broader implications for challenges to other state laws criminalizing consensual sexual conduct. However, because this case is here on habeas review, the only question before this court is whether *Lawrence* announced a new rule proscribing laws prohibiting the conduct for which Muth was convicted. We have concluded that it does not. Applying this standard to the case at hand, there was no clearly established federal law in 2001 that supports Allen Muth's claim that he has a fundamental right to engage in incest free from government proscription.

### III.

Allen Muth is not entitled to a writ of habeas corpus. There was no clearly established federal law in 2001 that would have made his conviction for incest unconstitutional. The decision of the district court is

AFFIRMED.

EVANS, *Circuit Judge*, concurring in the judgment. I concur in the judgment, but not the opinion, of the court. Muth can only prevail (1) if he can rely on *Lawrence v. Texas* and (2) if *Lawrence v. Texas* can be read to decriminalize incest. He can't satisfy either "if," but even if he could slip past the first one, he could never get by the second.

*Lawrence v. Texas* established an important principle: States cannot demean the existence of homosexuals or control their destiny by making their private sexual conduct a crime. Certain varieties of sexual conduct clearly remain outside the reach of *Lawrence*, things like prostitution, public sex, nonconsensual sex, sex involving children, and certainly incest, a condition universally subject to criminal prohibitions. To argue that *Lawrence v. Texas* renders laws prohibiting sex between a brother and a sister unconstitutional demeans the importance of its holding which deals a fatal blow to criminal laws aimed at punishing homosexuals.

As I read the majority opinion, I sense a certain degree of unease, even disdain, for the majority opinion in *Lawrence*. The citations to Justice Scalia's dissent in *Lawrence*, I submit, are unnecessary. I also don't care for the repetitive (seven mentions in Part B) paraphrasings of the Texas law (which prohibited "engaging in consensual sexual activity with a person of the same sex") as a law prohibiting "homosexual sodomy." I realize that term is used twice in the majority opinion in *Lawrence*, but I think its use is ill-advised and outdated as well. As I see it, the term "homosexual sodomy" is pejorative. It should be scrubbed from court decisions in the future. For these reasons, I join the judgment of the court without embracing certain aspects of the majority opinion.

No. 03-3984                                                    19

A true Copy:
    Teste:

                                  _____

                                  *Clerk of the United States Court of*
                                  *Appeals for the Seventh Circuit*

[FOR PUBLICATION]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ARTHUR SMELT, et al., | ) | Case No. SA CV 04-1042-GLT (MLGx) |
| Plaintiffs, | ) | |
| | ) | ORDER ON CROSS-MOTIONS FOR |
| vs. | ) | SUMMARY JUDGMENT; JUDGMENT |
| | ) | |
| COUNTY OF ORANGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

In a federal constitutional challenge to same-sex marriage limitations, the Court holds (1) it is a proper exercise of discretion for federal courts to abstain from deciding the constitutionality of state "man-woman marriage" statutes until the state court review process is completed, and (2) section 3 of the federal Defense of Marriage Act is constitutional.

## I.    BACKGROUND

This suit tests the constitutionality of California's man-woman marriage laws and the federal Defense of Marriage Act.  The facts are agreed.  Each of the Plaintiffs is an adult male, desiring and intending

1  to enter into a civil marriage with each other in the State of

2  California.  In February 2004, and again in March 2004, Plaintiffs

3  applied for a marriage license from the County Clerk, Orange County,

4  California.  On both occasions, the Clerk refused to issue a marriage

5  license because Plaintiffs are of the same sex.  In all other respects,

6  Plaintiffs meet the qualifications for issuance of a marriage license.

7  Earlier, in 2000, Plaintiffs applied for and received a Declaration of

8  Domestic Partnership from the State of California.

9      Plaintiffs sued the County of Orange and the Orange County Clerk

10  (collectively "County Defendants") and the State Registrar of Vital

11  Statistics and California Department of Health Services (collectively

12  "State Defendants").  Plaintiffs contend California Family Code sections

13  300,[1/] 301,[2/] and 308.5[3/] violate the Equal Protection and Due Process

14  Clauses of the Fourteenth Amendment of the U.S. Constitution,

15  Plaintiffs' right to privacy, the First Amendment, the Ninth Amendment,

16  and the right to travel.  Plaintiffs further allege section 308.5

17  violates the Full Faith and Credit Clause of the U.S. Constitution.

18      Plaintiffs also challenge the federal Defense of Marriage Act

19

20      [1/] "Marriage is a personal relation arising out of a civil
21  contract between a man and a woman, to which the consent of the
    parties capable of making that contract is necessary.  Consent
22  alone does not constitute marriage.  Consent must be followed by
    the issuance of a license and solemnization as authorized by this
23  division, except as provided by Section 425 and Part 4
    (commencing with Section 500)."  Cal. Fam. Code § 300 (West
24  2004).

25      [2/] "An unmarried male of the age of 18 years or older, and
    an unmarried female of the age of 18 years or older, and not
26  otherwise disqualified, are capable of consenting to and
    consummating marriage."  Cal. Fam. Code § 301 (West 2004).
27

28      [3/] "Only marriage between a man and a woman is valid or
    recognized in California."  Cal. Fam. Code § 308.5 (West 2004).

("DOMA").[4/]  They assert section 2[5/] of DOMA violates the Full Faith and Credit Clause of the U.S. Constitution, and section 3[6/] violates the Equal Protection and Due Process Clauses of the U.S. Constitution and Plaintiffs' right to privacy.

The United States of America intervened at this Court's invitation pursuant to 28 U.S.C. § 2403(a).  The Court also allowed the Proposition 22 Legal Defense and Education Fund and the Campaign for California Families to intervene as Defendants.[7/]

The parties agree there is no genuine issue of material fact to be tried.  All parties filed cross-motions for summary judgment on the legal issues presented.  A motion was also made for the Court to abstain on the state statutory issues.

---

[4/] Defense of Marriage Act, 1 U.S.C. § 7 (2005), 28 U.S.C. § 1738C (Supp. 2005).

[5/] "No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship."  28 U.S.C. § 1738C (Supp. 2005).

[6/] "In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."  1 U.S.C. § 7 (2005).

[7/] The Court received amicus curiae briefs from the City and County of San Francisco and the plaintiffs in Woo v. Lockyer, one of the cases consolidated into the coordinated proceeding in California state court, Coordination Proceeding, Special Title [Rule 1550(c)], Marriage Cases, Judicial Council Coordination Proceeding No. 4365, slip op. (Cal. Super. Ct. Apr. 13, 2005) (tentative decision at 2005 WL 583129 (Cal. Super. Ct. Mar. 14, 2005)) [hereinafter Marriage Cases].  The Court's editorial coordinator was Erin Smith.

1        II.   <u>DISCUSSION</u>

2        The sensitive legal and political issue of same-sex marriage in

3   this country is developing rapidly.   This case tests the

4   constitutionality of California's marriage laws under the federal

5   Constitution and the constitutionality of the federal DOMA.

6        A.   <u>The California Statutes -- Federal Abstention</u>

7        The State Defendants filed a motion for this Court to abstain and

8   stay the part of the case challenging the California statutes pending

9   resolution of the <u>Marriage Cases</u>, a consolidated proceeding of six cases

10  in California state court.   <u>See</u> <u>supra</u> note 7.   The <u>Marriage Cases</u>

11  challenge California Family Code sections 300, 301, and 308.5 under the

12  California state constitution.[8/]   The trial court's decision will

13  apparently eventually reach the California Supreme Court.   The Court

14  concludes abstention is appropriate.

15       Under the abstention doctrine articulated in <u>Railroad Commission</u>

16  <u>v. Pullman Co.</u>, 312 U.S. 496 (1941), this Court should postpone the

17  exercise of jurisdiction "when 'a federal constitutional issue . . .

18  might be mooted or presented in a different posture by a state court

19  determination of pertinent state law.'"   <u>C-Y Dev. Co. v. City of</u>

20  <u>Redlands</u>, 703 F.2d 375, 377 (9th Cir. 1983) (omission in original)

21  (quoting <u>County of Allegheny v. Frank Mashuda Co.</u>, 360 U.S. 185, 189

22

23       [8/]  The trial court decision in the <u>Marriage Cases</u> held only
    Family Code sections 300 and 308.5 are unconstitutional under the
24  state constitution.   <u>Marriage Cases</u>, slip op. at *1-2, 2005 WL
    583129, at *1.   It appears the court interpreted section 301 as
25  designating the minimum age to get married, but not as
    prohibiting same-sex marriages.   <u>Marriage Cases</u>, slip op. at *11,
26  2005 WL 583129, at *5 (stating the perceived ambiguity in the
    language of section 301 as to whether it prohibits same-sex
27  marriages led to the passage of section 300).   The court
    apparently did not find section 301 raised any constitutional
28  issues.

4

1 (1959)).[9/]

2    <u>Pullman</u> abstention is a narrow exception to this Court's "duty to

3 decide cases properly before it." <u>Id.</u>  The doctrine exists to avoid

4 collision between federal courts and state legislatures and to prevent

5 premature determination of constitutional issues.  <u>Porter v. Jones</u>, 319

6 F.3d 483, 492 (9th Cir. 2003); <u>San Remo Hotel v. City & County of San</u>

7 <u>Francisco</u>, 145 F.3d 1095, 1101 (9th Cir. 1998) ("[O]ur precedents

8 require abstention in order to avoid an unnecessary conflict between

9 state law and the federal Constitution."); <u>see also</u> <u>Arizonans for</u>

10 <u>Official English v. Arizona</u>, 520 U.S. 43, 79 (1997) ("Warnings against

11 premature adjudication of constitutional questions bear heightened

12 attention when a federal court is asked to invalidate a State's law, for

13 the federal tribunal risks friction-generating error when it endeavors

14 to construe a novel state Act not yet reviewed by the State's highest

15 court.").  Abstention is designed to respect "'the rightful independence

16 of the state governments'" and to enable "the smooth working of the

17 ─────────────────

18    [9/] A dismissal or stay pursuant to <u>Colorado River Water</u>
   <u>Conservation District v. United States</u>, 424 U.S. 800 (1976),
19 would not apply here.  <u>Colorado River</u> applies when there is
   parallel litigation in a federal and state court.  <u>Moses H. Cone</u>
20 <u>Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 28 (1983)
   ("When a district court decides to dismiss or stay under <u>Colorado</u>
21 <u>River</u>, it presumably concludes that the parallel state-court
   litigation will be an adequate vehicle for the complete and
22 prompt resolution of the issues between the parties.  If there is
   any substantial doubt as to this, it would be a serious abuse of
23 discretion to grant the stay or dismissal at all.").  Federal and
   state cases are parallel if they are "substantially similar."
24 <u>Nakash v. Marciano</u>, 882 F.2d 1411, 1416 (9th Cir. 1989)
   (citations omitted).
25    This case and the California state court <u>Marriage Cases</u> are
   not substantially similar.  The cases involve different parties.
26 Although both cases challenge the same state statutes, this case
   challenges them under the U.S. Constitution, while the <u>Marriage</u>
27 <u>Cases</u> challenge them under the California state constitution.
   The <u>Marriage Cases</u> will not decide the federal constitutional
28 issues raised in this case.

federal judiciary." _Pullman_, 312 U.S. at 501 (quoting _Di Giovanni v._ _Camden Fire Ins. Ass'n_, 296 U.S. 64, 73 (1935)).  In order to respect a plaintiff's choice of forum, _Pullman_ abstention should rarely be applied.  _Porter_, 319 F.3d at 492.

_Pullman_ abstention is appropriate when:

> "(1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the proper resolution of the possible determinative issue of state law is uncertain."

_Id._ (alteration omitted) (quoting _Confederated Salish v. Simonich_, 29 F.3d 1398, 1407 (9th Cir. 1994)).

### 1.  Sensitive Area of Social Policy

An important _Pullman_ element is whether the case involves a sensitive area of social policy best left to the states to address. _Fireman's Fund Ins. Co. v. City of Lodi_, 302 F.3d 928, 939 (9th Cir. 2002); _see also_ _In re Eastport Assocs._, 935 F.2d 1071, 1078 (9th Cir. 1991) ("[T]he predominance of particularly sensitive state law issues should weigh in favor of abstention."); _Almodovar v. Reiner_, 832 F.2d 1138, 1140 (9th Cir. 1987) (finding the first _Pullman_ element "protects state sovereignty over matters of local concern").  When a sensitive area of social policy is at issue, abstention may be appropriate.

Here, the California state statutes touch an important and sensitive area of a social institution particularly within the province of a state.  While federal constitutionality of the state statutes is a federal question appropriate for federal court adjudication, the underlying statutes relate to California's definition of and recognition

of the institution of marriage.  "[M]arriage is a social relation subject to the State's police power . . . ."  Loving v. Virginia, 388 U.S. 1, 7 (1967); see also Sosna v. Iowa, 419 U.S. 393, 404 (1975) (stating regulation of domestic relations is "an area that has long been regarded as a virtually exclusive province of the States"); Pennoyer v. Neff, 95 U.S. 714, 734-35 (1878) ("The State . . . has absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created . . . ."), overruled on other grounds by Shaffer v. Heitner, 433 U.S. 186 (1977).

DOMA implicitly recognizes regulation of marriage is a state issue.  Section 2 of DOMA provides states do not have to give effect to a marriage "under the laws of such other State."  28 U.S.C. § 1738C (Supp. 2005).  This acknowledges the laws of the states -- not the federal government -- govern marriage.  While federal law provides certain rights and responsibilities to married individuals, how those individuals become married is a matter of state law.  This is true in California as in other states.  See, e.g., Lockyer v. City & County of San Francisco, 33 Cal. 4th 1055, 1074 (2004) ("It is well settled in California that 'the Legislature has full control of the subject of marriage and may fix the conditions under which the marital status may be created or terminated . . . .'") (omission in original) (quoting McClure v. Donovan, 33 Cal. 2d 717, 728 (1949)).  California Family Code sections 300, 301, and 308.5 involve a sensitive area of social policy best left to the state.

It is argued this case involves a First Amendment challenge for violation of free association and free expression from which the Court should not abstain.  When a case involves an area of particular federal concern, or when the federal courts are particularly well-suited to hear

the case, <u>Pullman</u> abstention is not appropriate.  <u>Porter</u>, 319 F.3d at

492.  First Amendment questions are issues of particular federal concern

from which a federal court normally should not abstain.  <u>Id.</u>  However,

"there is no absolute rule against abstention in first amendment cases."

<u>Almodovar</u>, 832 F.2d at 1140.  An important consideration in deciding

whether to abstain from a First Amendment challenge is whether

abstention will chill the exercise of protected activities.  <u>Porter</u>, 319

F.3d at 492-93.

Here, postponing federal jurisdiction on the First Amendment

question poses little danger of chilling protected activity.  It is not

readily apparent obtaining a marriage license is protected First

Amendment activity.  <u>See, e.g.</u>, <u>Baker v. Nelson</u>, 191 N.W.2d 185, 186 n.2

(Minn. 1971) (dismissing without discussion petitioners' claim that

state laws prohibiting same-sex marriage violated the First Amendment),

<u>appeal dismissed on other grounds</u>, 409 U.S. 810 (1972); <u>Goodridge v.</u>

<u>Dep't of Pub. Health</u>, 14 Mass. L. Rptr. 591, 2002 WL 1299135, at *12

(Super. Ct. 2002) (stating issuing a marriage license is speech by the

government, not protected speech by individuals), <u>rev'd on other</u>

<u>grounds</u>, 798 N.E.2d 941 (Mass. 2003).[10/]  Cases where it was not

_____

[10/] The recent Nebraska federal case <u>Citizens for Equal
Protection, Inc. v. Bruning</u> is not to the contrary.  No.
4:03CV3155, 2005 U.S. Dist. LEXIS 9086 (D. Neb. May 12, 2005).
There, the court found a state constitutional provision much
broader than the statutes in this case violated the First
Amendment's protections of free association and the right to
petition the government for redress of grievances.  <u>Id.</u> at *16-
41.  The state constitutional provision in <u>Bruning</u> prohibited
same-sex marriages as well as same-sex civil unions, domestic
partnerships, and other similar same-sex relationships.  <u>Id.</u> at
*3.  The breadth of the constitutional provision was significant
in the court's analysis.  <u>Id.</u> at *35 ("The amendment goes far
beyond merely defining marriage as between a man and a woman.").
The California statues in this case are limited to marriage, and
(continued...)

appropriate for federal courts to abstain from First Amendment questions involved activities more clearly within the protections of the First Amendment than this issue.  See, e.g., Porter, 319 F.3d at 487-89 (considering a website with a discussion forum and written information on the electoral college, a presidential election, and voting).

The California Marriage Cases are well under way in state court. They are past the trial level and apparently will be appealed to the California Supreme Court.  The Ninth Circuit has found, in this situation, abstention from a First Amendment question may be appropriate because the fear of chilling protected First Amendment activity is not present.  See Almodovar, 832 F.2d at 1140 (holding abstention was appropriate even on a First Amendment issue because the state case was already before the California Supreme Court); see also Porter, 319 F.3d at 493-94 (reaffirming Almodovar).

The constitutionality of the state statutes under the state constitution can be resolved in the single Marriage Cases proceeding. There will be no need to file additional cases to resolve the issues. This weighs in favor of abstention.  Almodovar, 832 F.2d at 1140 (finding abstention from a First Amendment question appropriate when a single, already-pending state case may resolve the issues presented). Abstention by this Court will not cause undue expense or delay in the ultimate resolution of the constitutionality of the state statutes under

---

[10]/(...continued)
other state provisions permit domestic partnerships.  Cal. Fam. Code §§ 297-299.6 (West 2004 & Supp. 2005).  Bruning's holding is not applicable here.
But see David B. Cruz, "Just Don't Call It Marriage": The First Amendment and Marriage as an Expressive Resource, 74 S. Cal. L. Rev. 925 (2001) (arguing denying same-sex couples access to the expressive resource of marriage violates the First Amendment's proscriptions against viewpoint- and content-based discrimination).

either the state or the federal Constitution.  Postponing federal

consideration of the federal constitutional challenges will avoid a

premature determination of a constitutional question and a potentially

unnecessary conflict between the state legislature and the federal

court.

### 2.    Avoidance of Constitutional Adjudication

If there is a decision by the California Supreme Court that the

state statutes violate the California constitution, it would resolve the

California statutory issue, making unnecessary a decision whether the

statutes also violate the federal Constitution.  See Columbia Basin

Apartment Ass'n v. City of Pasco, 268 F.3d 791, 802 (9th Cir. 2001)

("[I]nterpretation of the validity of [a city ordinance] under the

Washington Constitution may eliminate the need to determine whether it

also violates the federal Constitution.").  It is appropriate for the

Court to abstain in this situation.  Reetz v. Bozanich, 397 U.S. 82,

86-87 (1970) (finding the district court should have abstained when a

state court ruling on a state statute under the state constitution

"could conceivably avoid any decision" under the federal Constitution);

San Remo Hotel, 145 F.3d at 1105 (reversing district court's refusal to

abstain when a state court's decision on the meaning of municipal zoning

laws would moot the federal constitutional claim).

### 3.    Uncertain Resolution of State Law

The eventual outcome in the California Supreme Court in the

Marriage Cases is uncertain.  "Uncertainty for purposes of Pullman

abstention means that a federal court cannot predict with any confidence

how the state's highest court would decide an issue of state law."

Pearl Inv. Co. v. City & County of San Francisco, 774 F.2d 1460, 1465

(9th Cir. 1985).  Resolution of an issue of state law may be uncertain

when "the question is novel and of sufficient importance that it ought
to be addressed first by a state court." Id.; see also Columbia Basin
Apartment Ass'n, 268 F.3d at 806 (stating uncertainty exists when the
law at issue has not been interpreted by a state court under the
particular state constitutional provision).

Here, the state statutes have not yet been considered on these
issues by the California Supreme Court under the state constitution.
This weighs in favor of abstention.

Abstention would not be necessary if the state constitution had
parallel provisions to the federal Constitution. Haw. Hous. Auth. v.
Midkiff, 467 U.S. 229, 237 n.4 (1984); Columbia Basin Apartment Ass'n,
268 F.3d at 806 (citing authorities). When this is the case, it is
easier for a federal court to predict how the state's highest court will
decide the issue of state law. However, when the state constitutional
provision "differs significantly" from the federal Constitution,
abstention is "particularly appropriate." Columbia Basin Apartment
Ass'n, 268 F.3d at 806.

The California constitution differs significantly from the federal
Constitution on the issues involved in this case. The California
constitution has a right to privacy clause.[11/] The federal Constitution
does not, but federal courts have interpreted the Constitution to
include a right of privacy. "[I]n many contexts, the scope and
application of the state constitutional right of privacy is broader and
more protective of privacy than the federal constitutional right of

---

[11/] "All people are by nature free and independent and have
inalienable rights. Among these are enjoying and defending life
and liberty, acquiring, possessing, and protecting property, and
pursuing and obtaining safety, happiness, and privacy." Cal.
Const. art I, § 1.

privacy as interpreted by the federal courts." <u>Am. Acad. of Pediatrics</u>

<u>v. Lungren</u>, 16 Cal. 4th 307, 326 (1997).  The equal protection and due

process clauses of the state and federal constitutions are worded

similarly.[12/]  However, California courts have construed the state

clauses more broadly than federal courts have construed the federal

clauses.[13/]

The differences between California and federal constitutional

principles, and the fact the state's highest court has not yet

considered the constitutionality of the state statutes, show the final

_____

[12/] <u>Compare</u> Cal. Const. art. I, § 7(a) ("A person may not be
deprived of life, liberty, or property without due process of law
or denied equal protection of the laws . . . ."), <u>with</u> U.S.
Const. amend. XIV, § 1 ("No state shall . . . deprive any person
of life, liberty, or property, without due process of law; nor
deny to any person within its jurisdiction the equal protection
of the laws."), <u>and</u> U.S. Const. amend. V ("No person shall . . .
be deprived of life, liberty, or property, without due process of
law . . . .").

[13/] For example, although it is not clearly established
whether sexual orientation is a suspect classification entitled
to heightened scrutiny under California equal protection
doctrine, at least one state court has suggested it is.  <u>See</u>
<u>Children's Hosp. & Med. Ctr. v. Bonta</u>, 118 Cal. Rptr. 2d 629, 650
(Ct. App. 2002) (identifying sexual orientation as an example of
a suspect classification for purposes of equal protection
analysis).  Under federal law, it is clear sexual orientation is
not a suspect or quasi-suspect class, and federal equal
protection jurisprudence subjects sexual orientation
classifications to rational basis review.  <u>Romer v. Evans</u>, 517
U.S. 620, 632-33 (1996) (applying rational basis review to state
law creating sexual orientation classification).  In California,
sex-based classifications receive strict scrutiny.  <u>Catholic</u>
<u>Charities of Sacramento, Inc. v. Superior Court</u>, 32 Cal. 4th 527,
564 (2004) ("[D]iscrimination based on gender violates the equal
protection clause of the California Constitution (art. I, § 7(a))
and triggers the highest level of scrutiny.").  Under federal
law, sex-based classifications are subject to intermediate
scrutiny.  <u>E.g.</u>, <u>Craig v. Boren</u>, 429 U.S. 190, 197 (1976)
("[C]lassifications by gender must serve important governmental
objectives and must be substantially related to achievement of
those objectives.").

1  resolution of the <u>Marriage Cases</u> is uncertain.

2          4.   <u>Appropriateness of Abstention</u>

3      The question of the constitutionality of California's statutory

4  prohibition on same-sex marriage is novel and of sufficient importance

5  that the California courts ought to address it first.  In order to give

6  California courts the first opportunity to evaluate the

7  constitutionality of California statutes under the California

8  constitution, this Court will exercise its discretion to abstain for now

9  from deciding whether the state statutes violate the federal

10  Constitution.  <u>See</u> <u>Baggett v. Bullitt</u>, 377 U.S. 360, 375 (1964) (stating

11  abstention is "a discretionary exercise of a court's equity powers").

12      B.   <u>The Federal DOMA -- Constitutionality</u>

13      Plaintiffs contend the federal Defense of Marriage Act is

14  unconstitutional.  The Court concludes Plaintiffs do not have standing

15  to contest section 2, but they do have standing as to section 3.  The

16  Court determines section 3 of DOMA is constitutional.

17          1.   <u>Standing</u>

18      Defendants contend Plaintiffs do not have standing to challenge

19  section 2 of DOMA, which provides, in part: "No State . . . shall be

20  required to give effect to any public act, record, or judicial

21  proceeding of any other State . . . respecting a relationship between

22  persons of the same sex that is treated as a marriage under the laws of

23  such other State . . . or a right or claim arising from such

24  relationship."  28 U.S.C. § 1738C.

25      There are three requirements to establish standing:

26      First, the plaintiff must have suffered an "injury in fact"--an

27      invasion of a legally protected interest that is (a) concrete

28      and particularized, and (b) actual or imminent, not conjectural

1    or hypothetical.  Second, there must be a causal connection

2    between the injury and the conduct complained of . . . .  Third,

3    it must be likely, as opposed to merely speculative, that the

4    injury will be redressed by a favorable decision.

5  United States v. Hays, 515 U.S. 737, 742-43 (1995) (quoting Lujan v.

6  Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  Plaintiffs, as the

7  parties seeking the exercise of federal jurisdiction, have the burden of

8  showing they have standing.  Id. at 743.

9      Plaintiffs have not shown they have standing to challenge section

10 2 of DOMA.  They have not shown what "injury in fact" they have

11 suffered as a result of the statute.  Plaintiffs do not have a

12 relationship "treated as a marriage" in any state.  Plaintiffs are

13 registered domestic partners in California, but California does not

14 treat domestic partnerships as "marriages."  Marriages and domestic

15 partnerships "are different legal relationships."  Knight v. Superior

16 Court, 26 Cal. Rptr. 3d 687, 693 (Ct. App. 2005).  The separate

17 statutory schemes for domestic partnerships and marriages are not

18 coextensive.  Compare Cal. Fam. Code §§ 297-299.6 (West 2004 & Supp.

19 2005) (domestic partnerships), with id. §§ 300-2452 (marriages).[14/]

20 Plaintiffs also do not have a marriage in Massachusetts.[15/]  Because they

21 lack a relationship treated as a marriage in any state, Plaintiffs are

22 not injured by the fact section 2 permits states to choose not to give

23 effect to other states' same-sex marriages.

24

25  [14/] For example, domestic partnerships do not receive the
    same state tax benefits as marriages.  Cal. Fam. Code § 297.5(g);
26  see also Knight, 26 Cal. Rptr. 3d at 699-700 (listing statutory
    and other differences between domestic partnerships and marriages
27  in California).

28  [15/] At present, Massachusetts is the only state that gives
    marriage licenses to same-sex couples.

1    Plaintiffs also have not shown they will suffer an imminent injury

2    as a result of section 2.  They do not claim to have plans or a desire

3    to get married in Massachusetts or elsewhere and attempt to have the

4    marriage recognized in California.  They do not claim to have plans to

5    seek recognition of their eventual California marriage in another state.

6    Without definite plans to engage in an act that will cause them to

7    suffer an injury in fact, Plaintiffs have not established an imminent

8    injury sufficient to confer standing to challenge section 2.  Lujan, 504

9    U.S. at 564 (finding "concrete plans" to return to the place where the

10   injury is suffered is required to show imminence for standing purposes).

11   Under the facts of this case, Plaintiffs do not have standing to

12   challenge section 2 of DOMA.

13   There is also a question whether Plaintiffs have standing to

14   challenge section 3 of DOMA, which states, for purposes of federal laws

15   and regulations, "the word 'marriage' means only a legal union between

16   one man and one woman as husband and wife, and the word 'spouse' refers

17   only to a person of the opposite sex who is a husband or a wife."  1

18   U.S.C. § 7 (2005).

19   Plaintiffs are registered domestic partners in California, which

20   is a "legal union" recognized by the state.  For purposes of federal

21   law, DOMA defines "marriage" as a legal union between one man and one

22   woman.  Plaintiffs' legal union is excluded from the federal definition

23   of marriage because it is not between a man and a woman.  Because of

24   DOMA's definition, Plaintiffs' legal union cannot receive the rights or

25   responsibilities afforded to marriages under federal law.  This is a

26   concrete injury personally suffered by Plaintiffs, caused by DOMA's

27   definition of marriage.  The United States concedes, and the Court

28

1    agrees, Plaintiffs have standing to challenge section 3.[16/]

2         2.   Effect of *Baker v. Nelson*

3        The parties dispute whether the U.S. Supreme Court's 1972

4    dismissal for want of substantial federal question in Baker v. Nelson,

5    409 U.S. 810 (1972), is binding on the issues presented in this case.

6    Baker v. Nelson came to the Supreme Court on appeal from the Minnesota

7    Supreme Court.  191 N.W.2d 185 (Minn. 1971).  The Minnesota court found

8    state laws prohibiting same-sex marriage did not violate the Due Process

9    or Equal Protection Clauses of the Fourteenth Amendment.  Id. at 186-87.

10

11

12

---

13       [16/] A previous decision in this District supports the
position Plaintiffs have standing to challenge section 3.  In

14    Adams v. Howerton, two male plaintiffs received a marriage
license and completed a marriage ceremony in Colorado.  486 F.

15    Supp. 1119, 1120 (C.D. Cal. 1980).  The court held, under both
Colorado and federal law, plaintiffs were not married.  Id. at

16    1123-24.  The court went on to consider whether this definition
of marriage as between a man and a woman violated federal

17    constitutional principles of equal protection and due process.
Id. at 1124-25.  The court did not discuss whether plaintiffs, as

18    non-married individuals, had standing to raise the constitutional
challenge.  Either the court concluded plaintiffs had standing or

19    it did not consider the issue, but in either case the court
reached the merits of the constitutional challenge.  The Ninth

20    Circuit affirmed, but not on the constitutional grounds.  Adams
v. Howerton, 673 F.2d 1036, 1038-39, 1039 n.2 (9th Cir. 1982).

21    It also did not address plaintiffs' standing.

22       Also, an Oregon state court in an unpublished opinion held
same-sex couples without marriage licenses had standing to

23    challenge state laws limiting marriage to opposite-sex couples
under the state constitution.  Li v. State, No. 0403-03057, 2004

24    WL 1258167, at *2-3 (Or. Cir. Ct. Apr. 20, 2004), rev'd on other
grounds by 110 P.3d 91 (Or. 2005) (en banc).  Under Oregon's

25    standing rules, plaintiffs had to show the court's decision would
have a practical effect on them.  Id. at *2.  The court held its

26    decision would have a practical effect and allowed plaintiffs to
bring their constitutional challenge.  Id. at *3.  Oregon's

27    practical effect requirement appears to be similar to federal
standing rules requiring an injury in fact, causation, and

28    redressability.

1  Under the Supreme Court's then-mandatory appellate jurisdiction,[17/] it
2  dismissed the appeal for want of substantial federal question.

3      A dismissal for want of substantial federal question is a decision
4  on the merits that is binding on lower courts. <u>Hicks v. Miranda</u>, 422
5  U.S. 332, 344-45 (1975). The scope of the rule is narrow, however. It
6  is dispositive only of "the specific challenges presented in the
7  statement of jurisdiction." <u>Mandel v. Bradley</u>, 432 U.S. 173, 176 (1977)
8  (per curiam). It prevents "lower courts from coming to opposite
9  conclusions on the precise issues presented and necessarily decided" by
10 the dismissal, but it does not affirm the reasoning or the opinion of
11 the lower court whose judgment is appealed. <u>Id.</u>; <u>Washington v.</u>
12 <u>Confederated Bands & Tribes</u>, 439 U.S. 463, 476 n.20 (1979). It remains
13 a decision on the merits of the precise questions presented "'except
14 when doctrinal developments indicate otherwise.'" <u>Hicks</u>, 422 U.S. at
15 344 (quoting <u>Port Auth. Bondholders Protective Comm. v. Port of N.Y.</u>
16 <u>Auth.</u>, 387 F.2d 259, 26[2] n.3 (2d Cir. 1967)).

17     The jurisdictional statement in <u>Baker v. Nelson</u> presented the
18 questions of whether the county clerk's refusal to authorize a same-sex
19 marriage deprived plaintiffs of their liberty to marry and of their
20 property without due process of law under the Fourteenth Amendment,
21 their rights under the Equal Protection Clause of the Fourteenth
22 Amendment, or their right to privacy under the Ninth and Fourteenth
23 Amendments. <u>Baker v. Nelson</u>, Jurisdictional Statement, No. 71-1027
24 (Oct. Term 1972).

25     Plaintiffs here challenge DOMA under the same constitutional
26 principles presented in <u>Baker</u>: due process, equal protection, and the

27  ─────────────

28     [17/] Until 1988, the Supreme Court had mandatory appellate
   jurisdiction under 28 U.S.C. § 1257(2) (repealed 1988).

right to privacy.  But here, Plaintiffs challenge a different type of statute.  The Minnesota laws in Baker prescribed the type of relationship the county could sanctify as a marriage -- that is, who could get a marriage license.  DOMA does not address what relationships states may recognize as marriages.  It leaves that decision to the states.  See In re Kandu, 315 B.R. 123, 132 (Bankr. W.D. Wash. 2004) (concluding DOMA's definition of marriage is not binding on states, and the determination of who may marry is an exclusive function of state law).  Instead, DOMA defines who will receive the federal rights and responsibilities of marriage.  This issue of allocating benefits is different from the issue of sanctifying a relationship presented in Baker's jurisdictional statement.

DOMA is a relatively new law reflecting new interests and its own legislative history.  These interests must be considered in an equal protection and due process analysis, but they were not before the Minnesota Supreme Court or the U.S. Supreme Court at the time of Baker.  It is doubtful the U.S. Supreme Court will hold Baker is binding on whether these new interests pass constitutional muster.

The difference between DOMA and the state statutes in Baker is relatively minor, and the governmental interests advanced by each may be similar.  However, it cannot be determined whether these differences have constitutional significance until the Court reaches the merits of this case.  The Court must consider the precise questions presented by this case and cannot conclude Baker "necessarily decided" the questions raised by the constitutional challenge to DOMA.  See Mandel, 432 U.S. at 176 (stating summary dismissals are binding only as to the "precise issues presented and necessarily decided"); Ill. State Bd. v. Socialist Workers Party, 440 U.S. 173, 182-83 (1979) ("[N]o more may be read into

18

1   our [summary dismissal] than was essential to sustain that judgment.");

2   Adams v. Howerton, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980) (stating

3   Baker is binding as to whether state laws prohibiting same-sex marriages

4   are constitutional, but implicitly finding Baker is not binding on

5   whether a federal statutory definition of "spouses" is constitutional);

6   In re Kandu, 315 B.R. at 137-38 (finding the difference between DOMA and

7   the state laws in Baker is one reason Baker is not binding on the

8   question of DOMA's constitutionality).[18]

9       Doctrinal developments show it is not reasonable to conclude the

10  questions presented in the Baker jurisdictional statement would still be

11  viewed by the Supreme Court as "unsubstantial."  See Hicks, 422 U.S. at

12  344 ("'[I]f the Court has branded a question as unsubstantial, it

13  remains so except when doctrinal developments indicate otherwise' . . .

14  .") (quoting Port Auth. Bondholders Protective Comm., 387 F.2d at 26[2]

15  n.3)).  Supreme Court cases decided since Baker show the Supreme Court

16  does not consider unsubstantial a constitutional challenge brought by

17  homosexual individuals on equal protection grounds, Romer v. Evans, 517

18  U.S. 620 (1996), or on due process grounds, Lawrence v. Texas, 539 U.S.

19  558 (2003).  It seems unlikely the Supreme Court would bypass the

20  rational basis analysis prescribed in Romer by relying on the binding

21  effect of Baker.

22      Plaintiffs also allege DOMA contains a sex-based classification.

23  Although a sex-based classification was first recognized one year before

24  Baker in Reed v. Reed, 404 U.S. 71, 75-77 (1971) (finding an automatic

25  preference of men over women to administer decedents' estates violates

26  _____

27       [18] The Court disagrees with Wilson v. Ake's finding a
     constitutional challenge to DOMA presents the "same issues" as
28  Baker v. Nelson.  354 F. Supp. 2d 1298, 1304-05 (M.D. Fla. 2005).
     Wilson did not explain what issues it found to be the same.

1  equal protection), the concept did not fully develop until later.  See,

2  e.g., United States v. Virginia, 518 U.S. 515, 532 (1996) (stating the

3  Supreme Court's post-Reed decisions "carefully inspected official action

4  that closes a door or denies opportunity to women (or to men)").  Also,

5  the application of the intermediate -- or "heightened" -- scrutiny

6  standard to sex-based classifications came after Baker.  See, e.g., id.

7  (noting post-Reed decisions developed the intermediate scrutiny

8  standard); Craig v. Boren, 429 U.S. 190, 197 (1976) (articulating the

9  intermediate scrutiny standard for the first time five years after

10  Baker).  It is unlikely Baker, decided before these concepts developed,

11  could be held to be binding precedent on these issues.

12      The Court concludes Baker v. Nelson is not binding precedent on

13  Plaintiffs' constitutional challenge to section 3 of DOMA.[19/]

14          3.  Equal Protection

15      Plaintiffs argue the federal DOMA violates their equal protection

16  rights under the Fifth Amendment.  The first step of analysis of the

17  merits of an equal protection claim is to "determine what classification

18

19      [19/] This view is not inconsistent with Rodriguez de Quijas v.
    Shearson/Am. Express, Inc., 490 U.S. 477 (1989).  That case held
20  it was improper for a lower court to refuse to follow a Supreme
    Court opinion because it believed later Supreme Court decisions
21  reduced its reasoning to "obsolescense."  Id. at 479, 484.  It
    stated lower courts are not free to disregard Supreme Court
22  opinions due to doctrinal developments unless the Supreme Court
    has overruled them.  Id. at 484.  However, the case considered
23  the binding effect of full opinions of the Supreme Court, not a
    dismissal for want of substantial federal question.
24      The Supreme Court has stated summary dismissals "do not . .
    . have the same precedential value . . . as does an opinion of
25  this Court after briefing and oral argument on the merits."
    Confederated Bands & Tribes, 439 U.S. at 476 n.20.  In contrast
26  to full opinions of the Supreme Court, the Court also has stated
    doctrinal developments may show a summary dismissal is no longer
27  binding.  Hicks, 422 U.S. at 344.  Rodriguez de Quijas is not
    analogous to this case.  Agostini v. Felton, 521 U.S. 203 (1997),
28  is not applicable here for the same reason.

1  has been created." Aleman v. Glickman, 217 F.3d 1191, 1195 (9th Cir.

2  2000).  Plaintiffs assert DOMA creates a sexual orientation

3  classification and a sex-based classification.

4            a.  Sexual Orientation Classification

5       Where there has been a claimed sexual orientation classification,

6  several courts have proceeded to equal protection review without first

7  stating why the laws create a sexual orientation classification.  See,

8  e.g., Wilson v. Ake, 354 F. Supp. 2d 1298, 1308 (M.D. Fla. 2005)

9  (DOMA); In re Kandu, 315 B.R. at 143-44 (DOMA); Hernandez v. Robles, 794

10 N.Y.S.2d 579, 604-05 (Sup. Ct. 2005) (state statutes); Standhardt v.

11 Superior Court ex rel. County of Maricopa, 77 P.3d 451, 464 (Ariz. Ct.

12 App. 2003).  This Court finds it is necessary first to state clearly

13 whether DOMA creates a sexual orientation classification before

14 conducting equal protection review of it.

15      On its face, DOMA does not classify based on sexual orientation.

16 It states, "'marriage' means only a legal union between one man and one

17 woman."  1 U.S.C. § 7.  It does not mention sexual orientation or make

18 heterosexuality a requirement for obtaining federal marriage benefits.

19 However, equal protection analysis is not invoked only by a facial

20 classification.  A facially neutral law may be subjected to equal

21 protection scrutiny if its disproportionate effect on a certain class

22 reveals a classification.  Pers. Adm'r v. Feeney, 442 U.S. 256, 275

23 (1979); see also Standhardt, 77 P.3d at 464.  If a law is designed to

24 benefit one class over another, it must withstand equal protection

25 scrutiny.  See Feeney, 442 U.S. at 273 (finding "any state law overtly

26 or covertly designed to prefer males over females" triggers equal

27 protection analysis based on sex).

28      The U.S. Supreme Court and the Ninth Circuit recognize homosexuals

as a constitutionally protected class -- although not a suspect or
quasi-suspect class -- for equal protection purposes. <u>Romer</u>, 517 U.S.
at 631-32; <u>High Tech Gays v. Def. Indus. Sec. Clearance Office</u>, 895 F.2d
563, 573-74 (9th Cir. 1990).  The Supreme Court has found a burden or
hardship imposed on the class of homosexual individuals is an adverse
impact on the class.  <u>See, e.g.</u>, <u>Romer</u>, 517 U.S. at 631 (stating
Colorado's Amendment 2 "imposes a special disability upon [homosexual]
persons alone").  "A law declaring that in general it shall be more
difficult for one group of citizens than for all others to seek aid
from the government is itself a denial of equal protection of the laws
in the most literal sense." <u>Id.</u> at 633.

DOMA has a disproportionate effect on homosexual individuals.
DOMA excludes from receipt of federal marriage benefits a type of
relationship -- a same-sex union -- most likely to be entered into by
homosexual individuals.  <u>See Lawrence</u>, 539 U.S. at 581 (O'Connor, J.,
concurring) ("Those harmed by this law are people who have a same-sex
sexual orientation and thus are more likely to engage in behavior
prohibited . . . .").  This disparate effect of the law on homosexual
individuals creates a classification based on sexual orientation.  <u>See</u>
<u>id.</u> at 583.[20]

---

[20] This finding is apparently consistent with all previous
decisions on the constitutionality of DOMA or state laws
prohibiting same-sex marriage.  At least one other court
explicitly found a sexual orientation classification.  <u>Li</u>, 2004
WL 1258167, at *7 (finding, under Oregon law, there was a
classification because of the law's discriminatory effect on
homosexuals); <u>Baker v. State</u>, 744 A.2d 864, 890 (Vt. 1999)
(Dooley, J., concurring) ("The marriage statutes do not facially
discriminate on the basis of sexual orientation.  There is,
however, no doubt that the requirement that civil marriage be a
union of one man and one woman has the effect of discriminating
against lesbian and gay couples . . . who are unable to marry the
(continued...)

1    Having found DOMA creates a sexual orientation classification, the
2  Court will consider whether DOMA is rationally related to a legitimate
3  government interest for equal protection purposes.  <u>Romer</u>, 517 U.S. at
4  624, 631-32 (identifying a sexual orientation classification and
5  considering whether "it bears a rational relation to some legitimate
6  end"); <u>High Tech Gays</u>, 895 F.2d at 574 ("[H]omosexuals do not constitute
7  a suspect or quasi-suspect class entitled to greater than rational basis
8  scrutiny under the equal protection component of the Due Process Clause
9  of the Fifth Amendment.").

10               b.  <u>Sex-Based Classification</u>

11    Plaintiffs argue DOMA also creates a sex-based classification.
12  Previous courts to consider the question have split on the issue.
13  Several state courts have concluded laws limiting marriages to opposite-
14  sex couples create sex-based classifications.  <u>See, e.g.</u>, <u>Brause v.</u>
15  <u>Bureau of Vital Statistics</u>, No. 3AN-95-6562 CI, 1998 WL 88743, at *6
16  (Alaska Super. Ct. Feb. 27, 1998), <u>superseded by constitutional</u>
17  <u>amendment</u>, Alaska Const. art. I, § 25 (amended 1999); <u>Marriage Cases</u>,
18  slip op. at *16-19, 2005 WL 583129, at *8-10; <u>Baehr v. Lewin</u>, 852 P.2d
19  44, 64 (Haw. 1993), <u>superseded by constitutional amendment</u>, Haw. Const.
20  art. I, § 23 (amended 1998); <u>Li v. State</u>, No. 0403-03057, 2004 WL
21  1258167, at *5-6 (Or. Cir. Ct. Apr. 20, 2004), <u>rev'd on other grounds</u>
22  <u>by</u> 110 P.3d 91 (Or. 2005) (en banc).  Other courts found the laws did
23  not create sex-based classifications.  <u>See, e.g.</u>, <u>Wilson</u>, 354 F. Supp.

24

25         [20]/(...continued)
26  life partners of their choice.").  Other courts apparently
   implicitly found such a classification because they proceeded to
27  rational basis review.  <u>See, e.g.</u>, <u>Wilson</u>, 354 F. Supp. 2d at
   1308; <u>In re Kandu</u>, 315 B.R. at 141.  No court has declined to
28  conduct rational basis review altogether on the ground that there
   is no sexual orientation classification.

2d at 1307-08; In re Kandu, 315 B.R. at 143; Shields v. Madigan, 783

N.Y.S.2d 270, 276 (Sup. Ct. 2004); Baker v. State, 744 A.2d 864, 880

n.13 (Vt. 1999).  Still others did not discuss the issue.  See, e.g.,

Standhardt, 77 P.3d at 454-65; Morrison v. Sadler, 821 N.E.2d 15, 19-35

(Ind. Ct. App. 2005); Hernandez, 794 N.Y.S.2d at 591-610.

Plaintiffs assert Loving v. Virginia, 388 U.S. 1 (1967), supports

their position.  In Loving, the Supreme Court found laws prohibiting

interracial marriages classified based on race, and the Court applied

strict scrutiny in the equal protection analysis.  The Court rejected

the argument there was no racial classification because the laws applied

equally to whites and blacks.  "[W]e reject the notion that the mere

'equal application' of a statute containing racial classifications is

enough to remove the classifications from the Fourteenth Amendment's

proscription of all invidious racial discriminations . . . ."  Id. at

8.  The Supreme Court has followed this principle on other occasions as

well: "Judicial inquiry under the Equal Protection Clause . . . does not

end with a showing of equal application among the members of the class

defined by the legislation."  McLaughlin v. Florida, 379 U.S. 184, 191

(1964) (analyzing laws preventing interracial couples from cohabiting).

The Court found the equal application argument represented "a limited

view of the Equal Protection Clause which has not withstood analysis."

Id. at 188.  Defining the classification as one between interracial

couples and intraracial couples, the Court held the laws created a

racial classification subject to strict scrutiny.  Id. at 188-96.

Under this view of Loving and McLaughlin, the conclusion might be

that, although DOMA applies equally to men and women, it creates a sex-

based classification.  The classification would not be between men and

women, but would be between opposite-sex couples and same-sex couples.

1     Defendants contend <u>Loving</u> is not controlling because the <u>Loving</u>

2  Court recognized the true discriminatory purpose behind the anti-

3  miscegenation laws was to "maintain White Supremacy."  388 U.S. at 11.

4  Here, Defendants argue, the purpose of DOMA is not to elevate one sex

5  over the other.  This Court cannot accept this "lack of discriminatory

6  intent" argument.  First, <u>Loving</u> stated the laws' discriminatory intent

7  was not essential to its holding: "[W]e find the racial classifications

8  in these statutes repugnant to the Fourteenth Amendment, even assuming

9  an even-handed state purpose to protect the 'integrity' of all races."

10 <u>Id.</u> at 11 n.11.  Second, <u>McLaughlin</u> did not discuss any discriminatory

11 purpose of the cohabitation law, yet still found a racial

12 classification.  <u>See generally</u> 379 U.S. at 184-96.

13     The Court does not accept Plaintiffs' <u>Loving</u> analogy, but for a

14 different reason.  To date, the laws in which the Supreme Court has

15 found sex-based classifications have all treated men and women

16 differently.  <u>See, e.g.</u>, <u>United States v. Virginia</u>, 518 U.S. at 519-20

17 (law prevented women from attending military college); <u>Miss. Univ. for</u>

18 <u>Women v. Hogan</u>, 458 U.S. 718, 719 (1982) (law excluded men from

19 attending nursing school); <u>Craig</u>, 429 U.S. at 191-92 (law allowed women

20 to buy low-alcohol beer at a younger age than men); <u>Frontiero v.</u>

21 <u>Richardson</u>, 411 U.S. 677, 678-79 (1973) (law imposed a higher burden on

22 female servicewomen than on male servicemen to establish dependency of

23 their spouses); <u>Reed</u>, 404 U.S. at 73 (law created an automatic

24 preference of men over women to administer estates); <u>see also</u> <u>Baker</u>, 744

25 A.2d at 880 n.13 (discussing Supreme Court precedent on sex-based

26 classifications).  Supreme Court precedent has only found sex-based

27 classifications in laws that have a disparate impact on one sex or the

28 other.  This case is not in that category.

1     This Court applies binding precedent on sex-based classifications

2  as it now exists.  That precedent finds sex-based classifications in

3  laws that treat men and women differently.  DOMA does not treat men and

4  women differently.  The Court concludes there is no sex-based

5  classification.

6           4.   Due Process

7     Plaintiffs argue DOMA denies them the fundamental right to marry

8  in violation of the Due Process Clause.  If what the law recognizes as

9  a "fundamental" right is implicated, the Court applies a "strict

10  scrutiny" analysis that forbids infringement of the right "unless the

11  infringement is narrowly tailored to serve a compelling state interest."

12  Reno v. Flores, 507 U.S. 292, 301-02 (1993).  If, however, the interest

13  infringed is not a fundamental right, the Court uses a more liberal

14  "rational basis" analysis that requires upholding the legislation if it

15  is rationally related to a legitimate government interest.  Washington

16  v. Glucksberg, 521 U.S. 702, 728 (1997).

17     It is important to define the due process fundamental right with

18  precision.  The Supreme Court has stated, "[W]e have required in

19  substantive-due-process cases a 'careful description' of the asserted

20  fundamental liberty interest."  Id. at 721 (quoting Flores, 507 U.S. at

21  302).  Courts should exercise the utmost care in conferring fundamental

22  right status on a newly asserted interest.  Id. at 720.

23     It is undisputed there is a fundamental right to marry.  Planned

24  Parenthood v. Casey, 505 U.S. 833, 851 (1992) ("Our law affords

25  constitutional protection to personal decisions relating to marriage,

26  procreation, contraception, family relationships, child rearing, and

27  education. . . .  These matters, involving the most intimate and

28  personal choices a person may make in a lifetime, choices central to

personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.") (citations omitted); Turner v. Safley, 482 U.S. 78, 95 (1987) ("[T]he decision to marry is a fundamental right . . . ."); Zablocki v. Redhail, 434 U.S. 374, 383-86, 384 (1978) ("[T]he right to marry is of fundamental importance for all individuals."); Loving, 388 U.S. at 12 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); Griswold v. Connecticut, 381 U.S. 479, 486 (1965) ("We deal with a right of privacy older than the Bill of Rights--older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred.  It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.  Yet it is an association for as noble a purpose as any involved in our prior decisions.").

No Supreme Court case addressing the fundamental right to marry apparently defines the fundamental right in narrower terms.  In Loving, the Court defined the fundamental right as the right to marry, not the right to interracial marriage.  388 U.S. at 12.  In Turner, the fundamental right was the right to marry, not the right to inmate marriage.  482 U.S. at 94-96.  In Zablocki, the fundamental right was the right to marry, not the right of people owing child support to marry.  434 U.S. at 383-86.

Plaintiffs assert they are not asking the Court to find a new fundamental right, but only to find the existing fundamental right to marry includes their right to marry each other.  In effect, Plaintiffs contend the fundamental right to marry includes the right to same-sex

1  marriage.[21]

2      The Due Process Clause "protects those fundamental rights and

3  liberties which are, objectively, deeply rooted in this Nation's history

4  and tradition, and implicit in the concept of ordered liberty, such that

5  neither liberty nor justice would exist if they were sacrificed."

6  Glucksberg, 521 U.S. at 720-71 (internal quotations and citations

7  omitted).  Reliance on history is not absolute: "'[H]istory and

8  tradition are the starting point but not in all cases the ending point

9  of the substantive due process inquiry.'"  Lawrence, 539 U.S. at 572

10  (alteration in original) (quoting County of Sacramento v. Lewis, 523

11  U.S. 833, 857 (1998) (Kennedy, J., concurring)).[22]  With respect to

12  homosexual conduct, the Supreme Court has stated "our laws and

13  traditions in the past half century are of most relevance here," id. at

14  _____

15  [21] Some state courts have defined the right protected by

16  their state constitutions as the fundamental right to marry the
person of one's choice.  See, e.g., Brause, 1998 WL 88743, at *1

17  ("The court finds that marriage, i.e., the recognition of one's
choice of a life partner, is a fundamental right."); Perez v.

18  Sharp, 198 P.2d 17, 19 (Cal. 1948) ("[T]he right to marry is the
right to join in marriage with the person of one's choice . . .

19  ."); Marriage Cases, slip op. at *21, 2005 WL 583129, at *11
("Family Code sections 300 and 308.5 implicate the basic human

20  right to marry a person of one's choice."); Goodridge v. Dep't of
Pub. Health, 798 N.E.2d 941, 958 (Mass. 2003) ("[T]he right to

21  marry means little if it does not include the right to marry the
person of one's choice, subject to appropriate government

22  restrictions in the interests of public health, safety, and
welfare."); Hernandez, 794 N.Y.S.2d at 596 ("[T]he right to

23  choose one's life partner is fundamental to the right of privacy

24  . . . .").

25  [22] The Court does not engage in the "circular reasoning"
feared by some courts.  See, e.g., Goodridge, 798 N.E.2d at 961

26  n.23 ("[I]t is circular reasoning, not analysis, to maintain that
marriage must remain a heterosexual institution because that is

27  what it historically has been.").  The Court does not here hold
marriage must remain a heterosexual institution.  The Court holds

28  that, for defining the fundamental right, marriage historically
has been a heterosexual institution.

571-72, because "there is no longstanding history in this country of laws directed at homosexual conduct as a distinct matter," id. at 568.

The history and tradition of the last fifty years have not shown the definition of marriage to include a union of two people regardless of their sex. Until 2003, when Massachusetts became the first state to recognize a right to same-sex marriages, marriage in the United States uniformly had been a union of two people of the opposite sex. A definition of marriage only recognized in Massachusetts and for less than two years cannot be said to be "'deeply rooted in this Nation's history and tradition'" of the last half century. Glucksberg, 521 U.S. at 721 (quoting Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977) (plurality opinion)).

At the time of Loving in 1967, it is argued, the definition of marriage was a union of an intraracial couple, but, despite history and tradition, the Court found the fundamental right to marry extended to the interracial plaintiffs in the case. Loving, 388 U.S. at 12. It is argued this supports the conclusion Plaintiffs here have a fundamental right to marry a person of their choice.

However, there is nothing in Loving that suggests an extension of the definition of the fundamental right. In its short reference to due process, the Supreme Court held the fundamental right to marry is long-recognized as "fundamental to our very existence and survival," and to deny this fundamental freedom on so unsupportable a basis as the racial classification in the subject statutes is subversive of the principle of equality. Id. Limiting its application to racial discrimination, the Supreme Court held due process "requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry or not marry, a person of another

1 race resides with the individual and cannot be infringed by the State."
2 Id.  Loving held, in effect, the race restriction on the fundamental
3 right to marry was invidious discrimination, unsupportable under any
4 standard.  Loving did not confer a new fundamental right or hold the
5 fundamental right to marry included the unrestricted right to marry
6 whomever one chooses.

7     The Court concludes the fundamental due process right to marry
8 does not include a fundamental right to same-sex marriage or Plaintiffs'
9 right to marry each other.  Plaintiffs' claimed interest is not part of
10 a fundamental right.  For due process purposes, the Court reviews DOMA's
11 "one man, one woman" restriction for rational basis.[23/]

12     5.  Rational Basis Review

13     When, as here, a law does not make a suspect or quasi-suspect
14 classification (the equal protection issue) and does not burden a
15 fundamental right (the due process issue), it will be upheld if it is
16 rationally related to a legitimate government interest.  Romer, 517 U.S.
17 at 631.  This rational basis scrutiny "'is not a license for courts to
18 judge the wisdom, fairness, or logic of legislative choices.'"  Heller
19 v. Doe, 509 U.S. 312, 319 (1993) (quoting FCC v. Beach Communications,
20 Inc., 508 U.S. 307, 313 (1993)).  The Court must accept Congress's
21 generalizations "even when there is an imperfect fit between means and
22 ends," id. at 321, as long as the generalization is "at least
23 debatable," id. at 326 (internal quotations omitted).  Government
24 interests for the law do not have to be the actual interests of

25

26     [23/] Plaintiffs also separately challenge DOMA under the
"right to privacy" recognized in Griswold v. Connecticut, 381
27 U.S. 479 (1965).  The "right to privacy" is not an independent
right.  It is "implicit in the . . . Due Process Clause."
28 Zablocki, 434 U.S. at 384.  Having decided to review Plaintiffs'
due process claim, there is no separate claim to be decided.

Congress, and they do not have to be supported with evidence. <u>Id.</u> at 320-21.  Even if the rationale for the law seems tenuous, it is rationally related to the government interest if it bears some relation to that interest.  <u>Romer</u>, 517 U.S. at 632-33.  DOMA is afforded a "strong presumption of validity."  <u>Heller</u>, 509 U.S. at 319.  To overcome the presumption here, Plaintiffs have the burden of negating "'every conceivable basis'" that may support section 3 of DOMA.  <u>Id.</u> at 320 (quoting <u>Lehnhausen v. Lake Shore Auto Parts Co.,</u> 410 U.S. 356, 364 (1973)).

The parties in this case have variously suggested DOMA is rationally related to the legitimate government interest of encouraging procreation, or of encouraging the creation of stable relationships that facilitate rearing children by both biological parents.  Similar statements of a legitimate interest have been made by various courts.  <u>See</u> <u>Wilson</u>, 354 F. Supp. 2d at 1308 (collecting court-recognized legitimate interest descriptions); <u>In re Kandu</u>, 315 B.R. at 145-46 (same).  The Court finds it is a legitimate interest to encourage the stability and legitimacy of what may reasonably be viewed as the optimal union for procreating and rearing children by both biological parents.

Because procreation is necessary to perpetuate humankind, encouraging the optimal union for procreation is a legitimate government interest.  Encouraging the optimal union for rearing children by both biological parents is also a legitimate purpose of government.  The argument is not legally helpful that children raised by same-sex couples may also enjoy benefits, possibly different, but equal to those experienced by children raised by opposite-sex couples.  It is for Congress, not the Court, to weigh the evidence.

By excluding same-sex couples from the federal rights and

1    responsibilities of marriage, and by providing those rights and

2    responsibilities only to people in opposite-sex marriages,[24/] the

3    government is communicating to citizens that opposite-sex relationships

4    have special significance.  Congress could plausibly have believed

5    sending this message makes it more likely people will enter into

6    opposite-sex unions, and encourages those relationships.  This question

7    is at least debatable.  See Heller, 509 U.S. at 326 ("[S]ince the

8    question is at least debatable, rational-basis review permits a

9    legislature to use just this sort of generalization.") (internal

10   quotation and citations omitted).

11       Plaintiffs have not met their burden of showing DOMA is not

12   rationally related to any legitimate government interest.  Section 3 of

13   DOMA passes rational basis scrutiny.  It does not violate the due

14   process or equal protection guarantees of the Fifth Amendment.

15                      III.   DISPOSITION

16       The Court ABSTAINS for now on the question of the

17   constitutionality of the California statutes.  Plaintiffs lack standing

18   to challenge the constitutionality of section 2 of DOMA.  Section 3 of

19   DOMA does not violate the equal protection or due process guarantees of

20   the Fifth Amendment.

21       JUDGMENT is entered in favor of Defendants and against Plaintiffs

22   on the constitutionality of the federal Defense of Marriage Act.[25/]  The

23   matter of the constitutionality of the California state statutes is

24   _____

25       [24/] Plaintiffs assert, and Defendants do not contest, federal
     law bestows over 1,000 rights and responsibilities on opposite-
26   sex married couples.

27       [25/] Pursuant to Federal Rule of Civil Procedure 54(b), the
     Court directs the entry of final judgment as to this claim and
28   finds there is no just reason for delay.

1    STAYED.[26/]  This stay is immediately appealable.[27/]

2

3    DATED: June ____, 2005

4

5                                    _____
                                     GARY L. TAYLOR
6                                    UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
          [26/] A stay, rather than dismissal, is appropriate.
27   Almodovar, 832 F.2d at 1141.

28        [27/] 28 U.S.C. § 1292(a)(1) (1993); Porter, 319 F.3d at 489.