# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| THOMAS COOK; MEGAN DRESCH; LAURA GALABURDA; JACK GLOVER; DAVID HALL; MONICA HILL; JENNY LYNN KOPFSTEIN; JENNIFER McGINN; JUSTIN PEACOCK; JAMES E. PIETRANGELO II; DEREK SPARKS; STACY VASQUEZ, | ) ) ) ) ) ) ) ) ) ) |
|     Plaintiffs, | ) ) |
| v. | ) ) |
| DONALD H. RUMSFELD, Secretary of Defense; MICHAEL CHERTOFF, Secretary of Homeland Security; UNITED STATES OF AMERICA, | ) ) ) ) ) |
|     Defendants. | ) ) ) |

Civil Action No. 04-12546 GAO

## <u>CONSENT MOTION FOR LEAVE TO FILE NOTICE OF RECENT DECISIONS</u>

Pursuant to Local Rule 7.1(B)(3), Defendants Donald H. Rumsfeld, Secretary of Defense; Michael Chertoff, Secretary of Homeland Security; and the United States of America, hereby request leave to file a Notice of Recent Decisions, which would provide this Court with notice of the recent decisions of the United States Court of Federal Claims in <u>Loomis</u> v. <u>United States</u>, — Fed. Cl. —, 2005 WL 2995372 (Fed. Cl. Nov. 7, 2005); and the Kansas Supreme Court in <u>State</u> v. <u>Limon</u>, — Kan. —, 122 P.3d 22 (Kan. Oct. 21, 2005). For the reasons set forth in the Notice of Recent Decisions, these decisions are of relevance to the issues that are presented in the instant case. Counsel for the plaintiffs has graciously consented to the filing of this motion.

WHEREFORE, with good cause having been shown, defendants respectfully request that this Court grant them leave to file a Notice of Recent Decisions.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3606

Dated: December 9, 2005

<u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)</u>

Pursuant to Local Rule 7.1(a)(2), I certify that, on December 9, 2005, I conferred with co-counsel for the plaintiffs, Stuart F. Delery, Esq., regarding this motion, and that Mr. Delery graciously stated that plaintiffs would consent to this motion.

 /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

THOMAS COOK; MEGAN DRESCH; )
LAURA GALABURDA; JACK GLOVER; )
DAVID HALL; MONICA HILL; JENNY )
LYNN KOPFSTEIN; JENNIFER McGINN; )
JUSTIN PEACOCK; JAMES E. )
PIETRANGELO II; DEREK SPARKS; )
STACY VASQUEZ, )

          Plaintiffs, )

    v. )

DONALD H. RUMSFELD, Secretary of )
Defense; MICHAEL CHERTOFF, Secretary of )
Homeland Security; UNITED STATES OF )
AMERICA, )

          Defendants. )
_____ )

Civil Action No. 04-12546 GAO

## NOTICE OF RECENT DECISIONS

Defendants Donald H. Rumsfeld, Secretary of Defense; Michael Chertoff, Secretary of Homeland Security; and the United States of America, hereby provide notice to this Court of the recent decisions of the United States Court of Federal Claims in Loomis v. United States, — Fed. Cl. —, 2005 WL 2995372 (Fed. Cl. Nov. 7, 2005); and the Kansas Supreme Court in State v. Limon, — Kan. —, 122 P.3d 22 (Kan. Oct. 21, 2005), copies of which are attached hereto.

**1.** In Loomis, the United States Court of Federal Claims ruled that an Army officer had a right to suspension of his separation proceedings before a Board of Inquiry pending consideration of his request for retirement, but otherwise upheld the officer's separation. Of relevance to this case, the Court of Federal Claims rejected the officer's contention that 10 U.S.C. § 654 violated his rights to due process and equal protection. The Court of Federal Claims first rejected the officer's

contention that, in <u>Lawrence</u> v. <u>Texas</u>, 539 U.S. 558 (2003), the Supreme Court established a fundamental right that would trigger strict scrutiny. Noting that the Supreme Court "undermined the inference that such a right is fundamental by searching for a legitimate state interest, as required by rational basis review, rather than applying the strict scrutiny invoked by fundamental rights," the Court of Federal Claims concluded that, "[t]he fact remains that the Court did not hold that sodomy is a fundamental right. Like the United States Court of Appeals for the Armed Forces in [<u>United States</u> v. <u>Marcum</u>, 60 M.J. 198, 207 (C.A.A.F. 2004)], we will not presume that such a right exists where the Supreme Court has declined to do so explicitly." — Fed. Cl. —, 2005 WL 2995372, at **15-16. The Court of Federal Claims therefore determined that, "[b]ecause there is no fundamental right implicated, rational basis is the appropriate level of review." <u>Id</u>. at *16.

The Court of Federal Claims next held that § 654 did not violate the officer's right to substantive due process because it was rationally related to the government's interest in achieving military success, including maintaining unit cohesion and reducing sexual tension:

> Maintenance of unit cohesion comes, in part, from providing men and women with separate living quarters, as it reduces sexual tension. General Powell testified that unit "[c]ohesion is strengthened or weakened in the intimate living arrangements we force upon our people." [S. Rep. No. 112, 103d Cong., 1st Sess. 278 (1993)]. Because members of the military "must live and work under close conditions affording minimal privacy" during deployment, the military personnel policy must reflect what is required under those conditions. <u>Id</u>. at 277. The committee points out that "[i]n civilian life people are not compelled to live with individuals who are sexually attracted to members of the same sex, and the committee finds no military necessity to compel persons to do so in the military." <u>Id</u>. at 281. Additionally, as defendant points out, reducing sexual tension and maintaining privacy for heterosexual servicemembers under deployment conditions can be achieved with same-sex living arrangements. The only way to maintain privacy and reduce sexual tension with homosexual service members would be to offer them separate individual living quarters-something that is clearly impossible under deployment conditions. DADT's prohibition on homosexual conduct and upon open discussion of one's

homosexuality are a rational means to attain the end of reducing sexual tension and promoting unit cohesion.

The Senate Armed Services Committee further concluded that even if the Supreme Court were to reverse Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841– which in fact it later did in Lawrence – "and hold that private consensual homosexual acts between adults may not be prosecuted in civilian society," its judgment on the matter would be no different.  Id. at 287.   Additionally, Lawrence can be distinguished on the basis that discharge proceedings under DADT are not criminal in nature.   Unlike the petitioners in Lawrence, plaintiff was eliminated from the military--the military equivalent of being fired--pursuant to an administrative, rather than criminal proceeding.   We are, in any event, bound by [Woodward v. United States, 871 F.2d 1068 (Fed. Cir. 1989)], a Federal Circuit decision upholding the military's former policy on due process grounds.   We conclude that § 654 is rationally related to the end of achieving military success.

— Fed. Cl. —, 2005 WL 2995372, at **19-20.

The Court of Federal Claims likewise rejected the officer's contention that § 654 violated his

rights to equal protection:

Applying the rational basis standard, we conclude that the classification contained in DADT is rationally related to the government's interest in promoting unit cohesion and reducing sexual tension and thus does not violate the equal protection clause.   Every circuit court which has addressed the matter has held that DADT survives rational basis review when subjected to an equal protection challenge.   See Able v. United States, 155 F.3d 628 (1998); Holmes v. California Army Nat'l Guard, 124 F.3d 1126 (1997); Philips v. Perry, 106 F.3d 1420 (1997); Richenberg v. Perry, 97 F.3d 256 (1996); Thomasson v. Perry, 80 F.3d 915 (1996). Plaintiff argues that these cases are not persuasive as they relied upon Bowers before it was overruled by Lawrence.   We are not persuaded.   Each of these cases applied rational basis review, the same standard used in Lawrence, and held that the classification was rationally related to the military's interest in promoting unit cohesion, reducing sexual tension, and protecting privacy.

We owe Congress a great deal of deference in matters concerning the military. While DADT draws a distinction between those who practice homosexual conduct and those that do not, we cannot say that this classification is not rationally related to a legitimate state interest.

— Fed. Cl. —, 2005 WL 2995372, at *21.

-3-

Finally, the Court of Federal Claims rejected the officer's contention that § 654 could not withstand scrutiny in view of Romer v. Evans, 517 U.S. 620 (1996), City of Cleburne v. Cleburne Living Center, 473 U.S. 472 (1985); and Palmore v. Sidoti, 466 U.S. 429 (1984).  In particular, the Court of Federal Claims held that, in contradistinction to Palmore and Cleburne Living Center, § 654 "does not give effect to private biases.  Rather it seeks, in the most logical and least burdensome way possible, to ensure that sexual tension is minimized in order to promote the unit cohesion necessary for military success." — Fed. Cl. —, 2005 WL 2995372, at *21.  The Court of Federal Claims also held that, in contradistinction to Romer, § 654's effect "is not so discontinuous from the goal of reducing sexual tension and promoting unit cohesion that it is inexplicable by anything but animus toward homosexuals.  By contrast, here we have no basis for questioning Congress' stated view that DADT promotes unit cohesion, reduces sexual tension, and protects personal privacy--all things necessary for an effective military." — Fed. Cl. —, 2005 WL 2995372, at *21.

**2.**  In State v. Limon, the Kansas Supreme Court held that Kansas' unlawful voluntary sexual relations statute violates both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Constitution Bill of Rights, because it results in a punishment for unlawful voluntary sexual conduct between members of the opposite sex that is less severe than the punishment for the same conduct between members of the same sex.  Of relevance to this case, the Kansas Supreme Court rejected the defendant's contention that, under Lawrence, the court should apply strict scrutiny to the challenged statute, reasoning that:

> Despite not deciding the case on equal protection grounds and never explicitly identifying the standard utilized for its due process analysis, the Lawrence majority, by approvingly citing and discussing the equal protection analysis in Romer, at least implied that the rational basis test is the appropriate standard when a statute is attacked because of its classification of homosexual conduct.  In Romer, the Court

considered whether "Amendment 2" to the Colorado Constitution, which prohibited government protection of the status "homosexual, lesbian, bisexual orientation, conduct, practices or relationships," violated the Equal Protection Clause. In <u>Lawrence</u>, the Court summarized the <u>Romer</u> decision, noting that the amendment named a "solitary class * * * and deprived them of protection under state antidiscrimination laws. We concluded that the provision was 'born of animosity toward the class of persons affected' and further that it had no rational relation to a legitimate governmental purpose." 539 U.S. at 574, 123 S.Ct. 2472.

The <u>Lawrence</u> opinion contains another oblique indication that the rational basis test would apply, stating: "The Texas statute furthers no <u>legitimate</u> state interest which can justify its intrusion into the personal and private life of the individual." 539 U.S. at 578, 123 S.Ct. 2472. (Emphasis added.) Typically, a search for a legitimate interest signifies a rational basis analysis.

Hence, we apply the rational basis test to determine whether the Romeo and Juliet statute is unconstitutional because of its exclusion of homosexual conduct.

— Kan. —, 122 P.3d at 30.

The decisions of these courts are consistent with and support the arguments advanced by the defendants in support of their motion to dismiss.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _/s/ Mark T. Quinlivan_____
MARK T. QUINLIVAN
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3606

Dated: December 9, 2005

Westlaw.

2005 WL 2995372                                                              Page 1
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
**(Cite as: 2005 WL 2995372 (Fed.Cl.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States Court of Federal Claims.
Loren Stephen **LOOMIS**, Plaintiff,
v.
The UNITED STATES, Defendant.
**No. 03-1653C.**

Nov. 7, 2005.

**Background:** Officer who was administratively separated from the Army due to homosexual conduct and conduct unbecoming an officer filed suit against the United States seeking review of two decisions of the Army Board for the Correction of Military Records (ABCMR). Parties filed cross-motions for judgment upon the administrative record.

**Holdings:** The Court of Federal Claims, Bruggink, J., held that:

(1) Army's violation of regulation requiring that elimination proceedings be suspended pending resolution of officer's request for retirement in lieu of elimination was not harmless;

(2) substantial evidence supported administrative separation of plaintiff for conduct unbecoming an officer; and

(3) application of military's sodomy prohibition to justify administrative separation of officer who seduced junior enlisted soldier to engage in homosexual conduct did not violate substantive due process.

Motions granted in part and denied in part; remanded.

**[1] Armed Services** ☞4

34k4 Most Cited Cases
The military must comply with its own regulations, even if those regulations are not required by statute.

**[2] Armed Services** ☞11

34k11 Most Cited Cases
Army officer had a right under Army regulation to suspension of his elimination proceedings pending decision on his request for retirement in lieu of elimination, and fact that officer had not accrued 20

years of active service credit at the time he made his request for retirement should not have affected whether the elimination proceedings were suspended.

**[3] Armed Services** ☞11

34k11 Most Cited Cases
Army's violation of regulation requiring that elimination proceedings be suspended pending resolution of officer's request for retirement in lieu of elimination was not harmless, where officer would have accumulated enough active service credit to qualify for a regular retirement if the Army had suspended the elimination proceedings while it processed his request.

**[4] Armed Services** ☞11

34k11 Most Cited Cases
Officer who was administratively separated from the Army due to homosexual conduct and conduct unbecoming an officer failed to establish that he was denied an impartial elimination hearing before a board of inquiry (BOI) because legal advisor allowed three BOI members to participate in the hearing despite statements during voir dire that they personally disagreed with homosexual conduct and felt that homosexuals should be eliminated from the military, where members also made statements that they could set aside their personal beliefs and follow Army regulations.

**[5] Armed Services** ☞11

34k11 Most Cited Cases
Exclusionary rule was not applicable to preclude admission of videotape containing images of Army officer engaged in homosexual acts in officer's elimination hearing, as the exclusionary rule does not apply to administrative proceedings.

**[6] Armed Services** ☞11

34k11 Most Cited Cases
Army board of inquiry (BOI) which recommended that officer be administratively separated due to homosexual conduct and conduct unbecoming an officer did not err by not considering and making specific findings of relevant retention factors, where officer did not clearly and specifically raise before the BOI the issue of whether the retention factors were met.

**[7] Armed Services** ☞11

34k11 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
(Cite as: 2005 WL 2995372 (Fed.Cl.))

Page 2

Substantial evidence supported administrative separation of Army officer for conduct unbecoming an officer, where officer seduced junior enlisted soldier to engage in conduct prohibited by the military's sodomy prohibition. UCMJ, Article 125, 10 U.S.C.A. § 925.

**[8] Armed Services** ☞11
34k11 Most Cited Cases
Application of military's sodomy prohibition to justify administrative separation of officer who seduced junior enlisted soldier to engage in homosexual conduct did not violate substantive due process, as nature of the relationship between officer and enlisted soldier, while not directly within a chain of command, was such that consent might not easily be refused, and thus it was outside protected liberty interest. U.S.C.A. Const.Amend. 5.

**[8] Constitutional Law** ☞278.6(1)
92k278.6(1) Most Cited Cases
Application of military's sodomy prohibition to justify administrative separation of officer who seduced junior enlisted soldier to engage in homosexual conduct did not violate substantive due process, as nature of the relationship between officer and enlisted soldier, while not directly within a chain of command, was such that consent might not easily be refused, and thus it was outside protected liberty interest. U.S.C.A. Const.Amend. 5.

**[9] Armed Services** ☞11
34k11 Most Cited Cases
Military's "Don't Ask, Don't Tell" policy with regard to homosexuality does not violate substantive due process, as it has a rational basis in legitimate military interests of promoting unit cohesion, reducing sexual tension, and protecting privacy. U.S.C.A. Const.Amend. 5.

**[9] Constitutional Law** ☞278.6(1)
92k278.6(1) Most Cited Cases
Military's "Don't Ask, Don't Tell" policy with regard to homosexuality does not violate substantive due process, as it has a rational basis in legitimate military interests of promoting unit cohesion, reducing sexual tension, and protecting privacy. U.S.C.A. Const.Amend. 5.

**[10] Armed Services** ☞11
34k11 Most Cited Cases
Military's "Don't Ask, Don't Tell" policy with regard to homosexuality does not violate equal protection, as the classification contained in the policy is rationally

related to the government's legitimate interest in promoting unit cohesion and reducing sexual tension. U.S.C.A. Const.Amend. 5.

**[10] Constitutional Law** ☞224(2)
92k224(2) Most Cited Cases
Military's "Don't Ask, Don't Tell" policy with regard to homosexuality does not violate equal protection, as the classification contained in the policy is rationally related to the government's legitimate interest in promoting unit cohesion and reducing sexual tension. U.S.C.A. Const.Amend. 5.

David P. Sheldon, Washington, D.C., for plaintiff. Philip Sundel, and Raymond J. Toney, Washington, D.C., of counsel.

Paul G. Freeborne, U.S. Department of Justice, Civil Division, Federal Programs Branch, for defendant. With him on the briefs were Peter Keisler, Assistant Attorney General, Vincent M. Garvey, Deputy Branch Director, and Major Susan J. Burger, U.S. Army Litigation Division, of counsel.

*OPINION*

BRUGGINK, Judge.

*1 Pending in this military pay case are the parties' cross-motions for judgment upon the administrative record. Plaintiff's motion asks the court to review two decisions of the Army Board for the Correction of Military Records ("ABCMR"). The first ABCMR decision, issued in 2000, reviewed a prior Army Board of Inquiry ("BOI") decision which recommended that plaintiff be administratively separated due to homosexual conduct and conduct unbecoming an officer. Pursuant to the BOI decision, plaintiff was given a discharge "Under Other Than Honorable Conditions." The 2000 ABCMR decision reversed some of the findings of the BOI inquiry and, as a result, upgraded plaintiff's discharge to "General, Under Honorable Conditions." The second ABCMR decision, issued in 2004, denied plaintiff's request for an upward adjustment of his active federal service credit, which would have allowed him to retire with twenty years of active federal service.

Plaintiff asks the court to set aside the ABCMR decisions on the following grounds: he had a right to suspension of his BOI elimination proceedings, pending consideration of his retirement in lieu of elimination request; the Army improperly processed plaintiff's request for retirement in lieu of elimination; plaintiff presented substantial and sufficient evidence that he had accrued twenty years

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of active federal service credit at the date of separation; plaintiff's discharge should have been characterized as honorable; plaintiff did not receive a fair and impartial hearing before the BOI; the BOI unlawfully admitted and considered videotape evidence; the ABCMR erroneously found that the BOI considered all retention factors; the Army's criminal punishment of sodomy is unconstitutional; and the Army's "Don't Ask, Don't Tell" policy violates due process and equal protection under the Fifth Amendment of the Constitution.

Defendant makes the following responses: plaintiff had no right to have his elimination proceedings suspended pending consideration of his retirement application, and, even if he did, the error was harmless; plaintiff's request for retirement in lieu of elimination was properly processed and denied; ABCMR's decision characterizing plaintiff's discharge as less than honorable is non-justiciable; plaintiff received a fair and impartial hearing; plaintiff had no legal right to exclusion of the videotape; plaintiff had no legal right to specific findings on the retention factors; notwithstanding the Army's "Don't Ask, Don't Tell" policy, plaintiff's discharge is amply and independently supported by ABCMR's finding of conduct unbecoming an officer; the Army's "Don't Ask, Don't Tell" policy is not unconstitutional.

The issues have been fully briefed. Oral argument was held on September 7, 2005. For the reasons set out below, we conclude that plaintiff had a right to suspension of his elimination proceedings while his request for retirement in lieu of elimination was being processed; that plaintiff's procedural and constitutional rights were not violated in either the discharge hearing or in the characterization of his discharge; that ample evidence exists to support the finding of conduct unbecoming and that plaintiff had violated the "Don't Ask, Don't Tell" policy; and that the Army's "Don't Ask, Don't Tell" policy is not unconstitutional. We remand the matter to the Secretary of the Army for further action consistent with this opinion.

### BACKGROUND

**\*2** Plaintiff was formerly a Lieutenant Colonel ("LTC") in the U.S. Army. Plaintiff joined the Regular Army in 1967 and was commissioned in 1969. He then served in the Army Reserve on active duty, during which time he completed a tour in Vietnam. He was awarded the Purple Heart and the Bronze Star Medal and was released from active duty in 1972. He continued serving in the Army Reserve

not on active duty until he voluntarily returned to active guard/reserve status in 1983. Plaintiff remained on active guard/reserve status until the Army initiated involuntary elimination proceedings against plaintiff on August 19, 1996, based on homosexual conduct and conduct unbecoming an officer. What follows is a summary of the relevant, uncontested facts.

On August 2, 1996, plaintiff's home was intentionally set on fire. A witness gave the local police a description of a suspicious vehicle seen in the area near plaintiff's home at the time of the fire. Military police at the Fort Hood Military Reservation stopped a vehicle matching the description. The driver of the vehicle was identified as a 19-year-old Private First Class ("PFC") stationed on base. The PFC initially denied any involvement in setting the fire. Based on a number of inconsistencies not relevant here, however, the local police continued to investigate the PFC as a suspect. Because the arson involved Army personnel, the Criminal Investigation Command ("CID") also began investigating.

On August 9, 1996, according to CID Agent Meyer's report, dated the same day, the PFC later recanted his earlier statements and admitted to breaking into plaintiff's home and setting the fire. The PFC signed a statement declaring that he set the fire in order to destroy pictures and video of himself, taken by plaintiff, showing him naked in various poses. He claimed that he met plaintiff on base while walking back to his barracks from a movie sometime in March 1995. Plaintiff offered to drive him to the barracks and the soldier accepted. Before arriving at the barracks, however, plaintiff offered to first stop at his home off base to show the PFC his amateur photography collection. The PFC accepted. At some point after arriving, plaintiff began taking pictures and video of the PFC, first fully clothed, then unclothed in various poses. Eventually, the plaintiff took the PFC back to the barracks. The PFC claims that only then did he realize the gravity of what had happened and begin to fear what plaintiff would do with the photos and videotape. The PFC subsequently received two letters from plaintiff to which he did not respond.

In September 1995, the PFC met plaintiff again at plaintiff's home, allegedly in an attempt to gain access to remove the photographs and video. The PFC's statement represents that this was the first time he learned that plaintiff was an LTC in the military. The PFC alleged that sexual contact between himself and plaintiff took place during this second meeting.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

He claims that he allowed the sexual contact to occur out of fear of what plaintiff would do with the photographs. Afterwards, plaintiff drove the PFC back to his barracks.

**\*3** The PFC stated that he continued to despair over the photos and video. He returned to plaintiff's home on the night of August 2, 1996, and broke in, seeking to retrieve the pictures. After being unable to locate them, he set fire to plaintiff's home in an attempt to destroy them.

Local officials also investigated the fire. The local fire marshal, after responding to the fire at plaintiff's home, collected a videotape from plaintiff's video camera on the chance that it contained evidence of the arsonist's identity. After reviewing the tape, however, he determined that it did not contain images of the arsonist. It showed plaintiff engaged in homosexual acts with two men who appeared to be soldiers. The tape was later given to CID agents. [FN1]

As a result of the enlisted soldier's statements and the videotape, elimination proceedings were initiated against plaintiff on August 19, 1996. On December 16, 1996, a BOI hearing took place. The BOI recommended that plaintiff be discharged for homosexual conduct and conduct unbecoming an officer. The BOI also recommended that plaintiff's discharge be characterized as Under Other Than Honorable Conditions ("UOTHC") based on a finding that plaintiff's homosexual acts involved "force, coercion, or intimidation," an aggravating factor under Army regulations. *See* Army Regulation ("AR") 600-8-24, para. 4- 22h(1). The BOI decision was forwarded to a Board of Review ("BOR") which approved the BOI's recommendation on June 16, 1997. On July 14, 1997, plaintiff was discharged from the Army UOTHC.

Army regulations allow a soldier to request retirement once elimination proceedings are commenced. AR 600-8-24, para. 4-24. Such a request must be properly styled, however, as one for "retirement in lieu of elimination." During the elimination proceedings, plaintiff requested retirement in various forms. Plaintiff requested an early retirement in lieu of separation around the same time elimination proceedings were initiated. This type of retirement allows soldiers to retire with less than 20 years of active service credit. It was denied, as there was no early retirement program for officers on active guard/reserve status and plaintiff had a pending adverse action. On January 14, 1997,

plaintiff requested a voluntary retirement. This request was returned without action, again because the pending elimination proceedings rendered plaintiff ineligible. Plaintiff requested retirement in lieu of elimination on May 12, 1997, with an effective date of July 23, 1997. This request was denied 30 days later by the chief of the Army Reserve on June 12, 1997.

After his discharge, plaintiff appealed his elimination to the ABCMR. His appeal was filed on May 14, 1999. On September 20, 2000, at ABCMR's recommendation, the Secretary of the Army upheld plaintiff's elimination. The board reasoned:
> While [the PFC] may not have been his subordinate within the meaning of AR 600-20, the [plaintiff] was a senior commissioned officer and a leader and [the PFC] was a junior soldier.... [E]ven if the relationship had been heterosexual, the acts and military status of the participants would have constituted sufficient misconduct to justify elimination.

**\*4** Admin. Rec. 76. Nevertheless, the board upgraded plaintiff's discharge to General, Under Honorable Conditions, because the record lacked any of the aggravating factors necessary to justify a discharge UOTHC. As a result, the Army directed that plaintiff be transferred to the Retired Reserve, making him eligible for a reserve retirement at age 60.

Plaintiff had also challenged the Army's denial of regular retirement benefits. The ABCMR upheld that denial, finding that the there was no provision for early retirement of active guard/reserve members at that time and that, in any event, the pending elimination proceedings would have rendered him ineligible. Likewise, the board decided that the Army properly denied plaintiff's January 1997 request for voluntary retirement because the pending elimination proceedings rendered him ineligible.

The board also upheld the Army's decision to deny plaintiff's May 1997 request for retirement in lieu of elimination. It concluded that plaintiff had not acquired 20 years of credible active duty service at the time of his request. Though plaintiff argued that Army regulations required a 30-day suspension of his elimination proceedings until a decision was reached on the request for retirement, the board held that the relevant regulations could not be used to allow plaintiff to accrue additional active duty service credit and, in any event, that any error was harmless.

Plaintiff filed a second ABCMR appeal on May 23,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
(Cite as: 2005 WL 2995372 (Fed.Cl.))

2003, requesting 11 days of active service credit which, he claimed, would have made him eligible for a regular retirement prior to his separation from the Army. The board denied his request. The board noted that plaintiff's last official Statement of Service (DA Form 1506) enjoyed a presumption of regularity and evidenced that plaintiff had completed 19 years, 11 months, and 25 days of active military service. It found that an independent review of his military records likely would have resulted in less active service credit. It therefore concluded that the documents presented by plaintiff were not sufficient to demonstrate that he was entitled to more days of active service credit. It doubted, however, that any accurate adjustment of his active service could be obtained from the record of his service over the past 25 years. It therefore left the calculation in plaintiff's DA Form 1506 intact.

## DISCUSSION

The Tucker Act, 28 U.S.C. § 1491 (2000), authorizes certain actions for monetary claims in the Court of Federal Claims. *Martinez v. United States,* 333 F.3d 1295, 1302 (Fed.Cir.2003). To bring such a claim, however, a plaintiff must identify an appropriate "money-mandating statute" which provides a basis for the claim. *Id.* at 1303. In military discharge cases, the applicable statute is the Military Pay Act, 37 U.S.C. § 307 (2000). *See also Martinez,* 333 F.3d at 1302. As the plaintiff alleges that he was unlawfully discharged and is entitled to pay that he would have received but for the unlawful discharge, we have jurisdiction. *See id.* Although the court does not have general equity jurisdiction, the Tucker Act also provides that, in cases based on actions for monetary relief, the court may issue such orders as are necessary "[t]o provide an entire remedy and to complete the relief afforded by the judgment," including "as an incident of and collateral to any such judgment, ... orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." 28 U.S.C. § 1491(a)(2); *see also Martinez,* 333 F.3d at 1302.

**\*5** When reviewing a military pay case under RCFC 56.1, our review is necessarily limited to the record before the agency. *Rebosky v. United States,* 60 Fed.Cl. 305, 310 (2004). Nor may we substitute our judgment for that of the agency. *Id.* at 311. Rather, we are bound by the agency's decision unless the plaintiff can demonstrate that "the [agency] acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence." *Id.* (citing *Dodson v. United States,* 988

F.2d 1199, 1204-05 (Fed.Cir.1993)).

Though this deferential standard seems similar to a review of the decisions of administrative agencies, it is not. In *Fisher v. United States,* 402 F.3d 1167 (Fed.Cir.2005), the Federal Circuit drew a distinction between cases that implicate who should serve in the military and cases which merely implicate the denial of benefits. In cases that challenge the military's determination of who should serve (and in what capacity), courts are limited to the standard of review set forth in *Adkins v. United States,* 68 F.3d 1317 (Fed.Cir.1995). The Federal Circuit in *Adkins* held that courts may not address the merits of such a decision, but may only examine whether the decision was made in a proper procedural manner. *Id.* at 1323; *see also Fisher,* 402 F.3d at 1180. In cases merely implicating the denial of benefits, such as disability or retirement benefits, the Federal Circuit explained that a broader standard of review, similar to that applied to other administrative agency decisions, is appropriate, allowing the court to examine the merits of an agency's decision. In either case, the standard of review is deferential; " 'judges are not given the task of running the Army.' " *Fisher,* 402 F.3d at 1182 (quoting *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953)).

### A. Regular Retirement

Plaintiff argues that the elimination proceedings should have been suspended when he requested retirement in lieu of elimination. Plaintiff points to AR 600-8-24, Section VI, para. 4-24a, which states, "An officer identified for elimination may, at any time during or prior to the final action in an elimination case, elect one of the following options ... (3) Apply for retirement in lieu of elimination if otherwise eligible." Further, paragraph 4- 24b provides that "when an option is elected, elimination proceedings will be suspended pending final action on the option elected by the officer." Plaintiff claims that if elimination proceedings had been suspended as required, he would have been on active duty for an additional 30 days, making him eligible for regular retirement.

According to the ABCMR, the "intent behind suspending board proceedings until a request for retirement is acted upon is to save the Army time and money (there being no sense to continuing board proceedings if the government approves the request for retirement)." Admin. Rec. 77. The Board noted that suspension was not required by statute and found that any error was harmless because even if a 30-day

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
**(Cite as: 2005 WL 2995372 (Fed.Cl.))**

Page 6

delay had been granted, the Army still could have eliminated plaintiff before he accrued 20 years. In addition, it concluded that plaintiff had not yet accrued 20 years of active federal service at the time he submitted his request. Defendant argues that the Army's decision that the regulation was inapplicable should be upheld.

**\*6** [1] It is well established that the military must comply with its own regulations, even if those regulations are not required by statute. *Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir.1993) (citing *Sargisson v. United States,* 913 F.2d 918 (Fed.Cir.1990)). The regulation at issue plainly directs that elimination proceedings be suspended once an officer applies for retirement in lieu of elimination. The use of the word "will" indicates an absolute and leaves the Army no discretion to determine whether elimination proceedings should be suspended. It was therefore improper to disregard the mandate of the regulation, unless the regulation itself was not applicable. *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) ("In construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight *unless it is plainly erroneous or inconsistent with the regulation.*' " (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)) (emphasis added)).

[2] The regulation provides that a service member may apply for retirement in lieu of elimination "if otherwise eligible." The ABCMR's decision, although not completely clear, apparently upheld the military's decision not to suspend the elimination proceedings on the ground that plaintiff was not "otherwise eligible" for retirement at the time he made his request. We disagree. The fact that plaintiff had not accrued 20 years of active service credit at the time he made his request for retirement should not have affected whether the elimination proceedings were suspended. The eligibility limitation speaks to whether the service member's request for retirement will be granted, not whether the elimination proceedings themselves must be suspended. We view the phrase as a clarification that facing elimination does not make one eligible for retirement. If the "otherwise eligible" language was read as a threshold requirement, a service member would be unable to request retirement in lieu of elimination unless he or she first proved eligibility. Such an interpretation puts the cart before the horse. The suspension mandate makes no reference to eligibility. Presumably, such a limitation is absent

because in close cases such as the one here--where a service member is within days of accruing 20 years of active service credit--it is impossible to determine whether the service member is eligible for retirement unless the request is fully processed and a final determination is made. The eligibility determination and suspension operate independently.

Defendant counters that the suspension requirement was never meant to allow a service member who had not accrued enough active service credit at the time of his request to accrue enough days to retire. It cites no authority for its position. Even assuming this is correct, the Army is not free to disregard its own regulations. It is worth noting, moreover, that, while the suspension requirement was likely not for the purpose of allowing service members to accrue further active service credit, the Army recognized that such a consequence might result. The notice given to service members who are selected for elimination proceedings states:

**\*7** In accordance with AR 600-8-24 paragraph 4-11, you may--

....

c. Apply for retirement in lieu of elimination if otherwise eligible, according to AR 600-8-24, chapters 4 and 6. The effective date for retirement will be *(as applicable, if you have at least 19 years and 6 months of AFS* [FN2] *but less than 20 years AFS, the effective date will not be later than 60 days from the date you attain 20 years AFS. If you have 20 or more years AFS, the effective date will be no later than 60 days from the date you elect retirement in lieu of elimination).*

AR 600-8-24 figure 4-3 (emphasis original). The Army itself plainly envisioned a scenario under which a service member who requests retirement in lieu of elimination might have less than 20 years active service credit, but would accrue such credit while the retirement request was being processed.

[3] We also disagree with the board's decision that this error was harmless. The record shows that it took 64 days from the date plaintiff submitted his request for retirement in lieu of elimination to complete the elimination proceedings and discharge him (from May 12 through July 14). Contemporaneously, it took 30 days to process plaintiff's retirement request (from May 12 through June 12). The date that plaintiff would have acquired 20 years of active service credit was July 22. Though its opinion is less than clear, the board apparently reasoned that, if the elimination proceedings had been suspended, the work completed during the 64 days above could have been completed within the 39 days from June 12 through July 22,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

after a 30-day suspension for considering and rejecting the retirement request. We find no support in the record for such a conclusion.

The best measure of the relevant time periods is the actual time taken. There is no basis for assuming that elimination proceedings would have been completed more quickly if the proceedings had been suspended. What is much more likely is that plaintiff would have been discharged 30 days later than he actually was. Had the proceedings been suspended, plaintiff would have been on active duty an additional 30 days.

Consequently, if the Army had suspended the elimination proceedings while it processed his request for retirement in lieu of elimination, plaintiff would have accumulated enough active service credit to qualify for a regular retirement. The ABCMR's 2004 decision concluded that plaintiff had obtained 19 years, 11 months, and 25 days of active service credit at the time of his discharge. Had the elimination proceedings been suspended as required by regulation, plaintiff would have been discharged at least five service days beyond July 14, 1997, the actual date of his discharge. This would have resulted in his accruing the necessary additional days of active service credit. He, therefore, would have been eligible for a regular retirement with over 20 years of active service credit.

We need not address in any detail plaintiff's allegation that his request for retirement in lieu of elimination was improperly processed. Neither do we need to address plaintiff's challenge to ABCMR's second decision declining to credit plaintiff with eleven days of additional service credit. It is sufficient to note that the board found, and we have no reason to disagree, that it would be impossible to make an accurate adjustment of plaintiff's service record more than 20 years after the alleged active service took place based on the evidence offered by plaintiff. This determination was due to the poor condition of plaintiff's service records. Plaintiff was charged with knowledge of, and on several occasions did challenge, the government's computation of his military service upon receiving periodic statements of his active service. The appropriate time to challenge the government's computation was then.

### B. Plaintiff's Discharge

**\*8** Plaintiff challenges the regulations providing for his discharge, the characterization of his discharge, and also claims that the elimination proceedings violated due process requirements. He argues that his

discharge should have been characterized as honorable; that he did not receive a fair and impartial hearing before the BOI; that the BOI unlawfully admitted and considered videotape evidence; that the ABCMR erroneously found that the BOI considered all retention factors; that the Army's punishment of sodomy is unconstitutional; and that the Army's "Don't Ask, Don't Tell" policy violates due process and equal protection. We discuss each assertion in turn below.

### 1. Characterization of Plaintiff's Discharge

Plaintiff asks the court to review the ABCMR's decision that plaintiff's service was less than totally honorable. As discussed above, plaintiff was originally discharged UOTHC based on the BOI's finding of force, coercion, or intimidation in conjunction with homosexual acts and conduct unbecoming an officer. The ABCMR, however, reviewed the evidence before the BOI and found that, while there was evidence of misconduct, there was insufficient evidence to support the finding of force, coercion, or intimidation. Accordingly, it upgraded plaintiff's discharge to General, Under Honorable Conditions. Plaintiff seeks an upgrade of his discharge to Honorable.

Defendant responds that the matter is nonjusticiable. To the extent that plaintiff asks the court to substitute its judgment for that of the ABCMR, we agree. There are simply no "tests or standards" by which to compare ABCMR's decision on the merits, except for regulations which limit the military's discretion in such matters. See _Adkins,_ 68 F.3d at 1323. Plaintiff was found to have engaged in homosexual conduct and conduct unbecoming an officer. Both of these findings fall within the category of "[m]isconduct." See AR 600-8-24, 4-2b. Finding misconduct, the ABCMR was well within its discretion to characterize plaintiff's discharge as less than honorable. The only relevant limitation in the regulation is that "[a]n officer may receive a discharge Under Other Than Honorable Conditions when there is a finding that during the current term of service, the officer attempted, solicited, or committed a homosexual act ... [b]y using force, coercion, or intimidation." AR 600-8-24, 4-22h (1). If the ABCMR had found that no force, coercion, or intimidation was involved in the homosexual acts but had upheld the characterization of plaintiff's service, there would clearly be a standard by which to judge the board's decision. However, the board upgraded plaintiff's discharge to General, Under Honorable Conditions. We cannot substitute our judgment for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that of the military.

Accordingly, to set aside the ABCMR's characterization of plaintiff's service, plaintiff would have to show that the BOI's finding of misconduct was in error. He would have to show that there was some procedural error in the elimination proceedings, that the BOI's findings of homosexual conduct and conduct unbecoming an officer were unsupported by substantial evidence, that he was denied due process, or that the regulations themselves were unconstitutional. Plaintiff's arguments regarding such matters are discussed below.

2. Fair and Impartial Hearing

**\*9** [4] Plaintiff claims that he was denied an impartial hearing because the Legal Advisor allowed three BOI members to participate in his elimination hearing despite statements during voir dire that they personally disagreed with homosexual conduct and felt that homosexuals should be eliminated from the military:

[Plaintiff's Counsel]: How do feel about homosexuals in general?

[President of the Board]: I don't believe in homosexual conduct. I think homosexual conduct is immoral, therefore, I think homosexuals are immoral.

[Member Graham]: My feelings about homosexuals has varied over the years. When I was younger I thought it was an abhorrence against society and mankind. As I have matured, I feel that they have either a physiological or psychological problem as a deviant from society.

[Member Sasser]: My religious beliefs are against homosexuality. I'm a Methodist.

Admin. Rec. 185.

[Plaintiff's Counsel]: .... If the choice were yours, what would the Army's policy be on homosexuals in the Army?

[President of the Board]: If the choice were mine, it would be the old policy, no tolerance.

[Member Graham]: If I were king for a day my policy on homosexuals in the military forces would be that it is a [detriment] to the military and not to be allowed. Displayed behavior should not be allowed. If you have a homosexual persuasion and you don't display behavior, then how does anyone know you're a homosexual unless you acknowledge it.

[Member Sasser]: No tolerance.

Admin. Rec. 186.

Plaintiff argues that these responses demonstrate an

inherent unfairness in the panel's composition. Defendant responds that, as military officers, there is a presumption that the BOI members acted properly. It notes that the BOI members also made statements that they could set aside their personal beliefs and follow Army regulations:

[Plaintiff's Counsel]: What is your feeling about homosexuals in the Army?

[President of the Board]: I abide by the current policy, "Don't ask, Don't tell."

[Member Graham]: As a soldier, I am governed by the rules that our country sets forth on the behavior, I concur with those rules....

[Member Sasser]: I concur with the current UCMJ [Uniform Code of Military Justice] and the actions that we're supposed to abide by....

Admin. Rec. 185-86. Defendant also notes that all members stated that they could envision instances in which a soldier who was homosexual or engaged in homosexual conduct could be retained in the Army.

Both due process and Army regulations require that plaintiff be given a fair and impartial hearing. *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); AR 600-8-24, Section II, para. 4-6 ("The Board of Inquiry's purpose is to give the officer a fair and impartial hearing determining if the officer will be retained in the Army."). There is a rebuttable presumption that military officials, such as officers serving on boards of inquiry, "discharge their duties correctly, lawfully, and in good faith." *Milas v. United States,* 42 Fed.Cl. 704, 719 (1999) (quoting *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979)). To show bias in an administrative proceeding, plaintiff must show "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Bieber v. Dep't of the Army,* 287 F.3d 1358, 1362 (Fed.Cir.2002) (citing *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). Such bias may be shown where remarks during the course of trial "reveal an opinion that derives from an extrajudicial source." *Id.*

**\*10** Plaintiff has not met his burden. Primarily, this is because the facts considered by the BOI members were uncontested. As noted above, plaintiff stipulated to the contents of the videotape depicting plaintiff committing homosexual acts. The only truly contested issue at the hearing was whether these acts involved "force, coercion, or intimidation," an aggravating factor which, if found to be present, required that the board recommend that plaintiff be discharged UOTHC. To the extent there were contested facts, they have been resolved in plaintiff's favor. The ABCMR reversed the BOI's determination

that force, coercion, or intimidation was present and upgraded plaintiff's discharge to General, Under Honorable Conditions. Nevertheless, the underlying uncontested facts still constitute misconduct under Army regulations sufficient to justify plaintiff's separation under a less than honorable characterization. Plaintiff has received all the relief to which he is entitled on this issue, therefore, it is moot.

### 3. Admissibility of Videotape Evidence

[5] Plaintiff also challenges the admission of a videotape containing images of plaintiff engaged in homosexual acts. He argues that the videotape was seized without a warrant in violation of the Fourth Amendment. Plaintiff argues that the exclusionary rule should have prohibited the tape from being admitted at trial because the tape was seized without a warrant.

The videotape was seized by a local fire marshal who was present at plaintiff's home to investigate the cause of the fire. The justification for seizing the videotape is contested by the parties. According to the government, the fire marshal took the tape in hope that it contained images of the arsonist. Plaintiff contests this, and argues that the fire marshal seized the tape in bad faith when he observed homosexual pornography in the same area as the videotape. This videotape was given to the CID, and was used at plaintiff's hearing as evidence of plaintiff's homosexual conduct.

Regardless of the fire marshal's actual justification for seizing the tape, the exclusionary rule does not apply to administrative hearings such as the BOI proceeding. _Kindred v. United States,_ 41 Fed.Cl. 106, 114 (1998); _Martinez v. United States,_ 26 Cl.Ct. 1471, 1476 (1992), _aff'd,_ 11 F.3d 1069 (Fed.Cir.1993). Plaintiff argues that AR 15-6, para. 3-6(c)(7) makes the exclusionary rule applicable. However, this regulation is quite different, as it only applies to "[b]ad [f]aith unlawful searches" where "members of the Armed Forces acting in their official capacity ... conduct or direct a search that they know is unlawful under the Fourth Amendment." AR 15-6, para. 3- 6(c)(7). Even assuming that the search and seizure were unlawful, which we do not decide, they were conducted by civilian law enforcement personnel and were not at the direction of the Army. The regulation, therefore, does not apply.

It is also worth noting that, even if the videotape were admitted in error, the plaintiff stipulated to its

contents. Moreover, even if the videotape had been excluded, the written statements of the PFC constituted substantial evidence upon which the BOI could make its decision. Finally, to the extent that the videotape was inflammatory, any prejudicial effect was corrected by the ABCMR when it reversed the BOI's finding of aggravating factors. Plaintiff's elimination, in short, was based on substantial evidence irrespective of the videotape and admission, and any error was harmless.

### 4. Consideration of Retention Factors

**\*11** [6] Plaintiff also argues that the BOI erred by not considering and making specific findings of the relevant retention factors. [FN3] This issue was raised before the ABCMR, which ruled that the BOI did consider the appropriate retention factors, but found them lacking, as the evidence showed that plaintiff had a propensity to engage in homosexual acts. The government concurs with the ABCMR ruling and also argues that the BOI was not required to make specific findings regarding the retention factors unless the officer "clearly and specifically raises such circumstances." _Kindred,_ 41 Fed.Cl. at 116 n. 8; AR 600-8-24, para. 4-22b(f).

The record does not indicate that plaintiff "clearly and specifically" raised before the BOI the issue of whether the retention factors were met. Therefore, the BOI was not required to make specific findings regarding those factors. In any event, it is also clear that there was substantial evidence that plaintiff had a propensity to engage in homosexual acts, thus making any error harmless.

### 5. Constitutional Challenges Based on _Lawrence v. Texas_

[7] Plaintiff challenges article 125 of the Uniform Code of Military Justice (UCMJ), the military's sodomy prohibition, on the grounds that criminal punishment for sodomy has been ruled unconstitutional by the Supreme Court in _Lawrence v. Texas,_ 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). While plaintiff was not charged under article 125, the elimination proceedings as well as the characterization of his discharge were based upon conduct prohibited by article 125. He also asks the court to strike down the Army's "Don't Ask Don't Tell" policy ("DADT") on the same grounds.

Defendant argues that we do not need to reach the constitutional arguments because it has met its burden of proving an independent basis for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
(Cite as: 2005 WL 2995372 (Fed.Cl.))

discharging plaintiff. It contends that both plaintiff's discharge and the characterization of his service are based upon a relationship that, even if heterosexual, would still be unacceptable under Army custom and thus would support the Board's finding of conduct unbecoming. Defendant also argues that the question of whether plaintiff's conduct, absent its homosexual content, was prohibited by Army custom is nonjusticiable. It further asserts that the mere fact that plaintiff solicited another to violate a federal statute, regardless of the content of that statute, supports the conduct unbecoming charge.

Before reaching the constitutional arguments, we must consider whether the ABCMR's determination that the alternative ground of conduct unbecoming an officer justified plaintiff's elimination, irrespective of the homosexual nature of the relationship. As to defendant's first and second argument, in its briefing and at oral argument, it could not point to Army case-law or Army regulations that would support its notion of Army custom. While we owe a great deal of deference to the Army's determination of its own custom, the matter is justiciable. We require some regulation or case law as proof of what that custom is before we will affirm that determination. We turn next to defendant's third argument.

**\*12** In its 2000 decision, the ABCMR upheld the plaintiff's discharge for conduct unbecoming an officer because "[i]t was not within the standards of acceptable personal conduct for him to seduce a junior soldier when it was known by him to be illegal under the UCMJ. It was his responsibility to ensure such junior soldiers do not violate military discipline." Admin. Rec. at 76.

As the U.S. Court of Military Appeals stated in _U.S. v. Bilby_:

We do not believe that it seriously can be doubted that a military officer's act of soliciting another person to violate a Federal statute is disgraceful and dishonorable, see _Parker v. Levy,_ 417 U.S. 733, 761, 94 S.Ct. 2547, 2564, 41 L.Ed.2d 439 (1974), without regard for the nature of the statute (that is, what it prohibits) or for the lawfulness of the statute (that is, whether it ultimately is upheld as constitutional).... Simply stated, it is unbecoming for an officer to solicit someone to violate a Federal statute-- period. 39 M.J. 467, 470 (1994).

The record is clear that plaintiff intentionally persuaded the PFC to breach the UCMJ and Army regulations regarding homosexual acts which could

have subjected the PFC to criminal sanctions. Regardless of the constitutionality of such laws, plaintiff, as an officer in the military, was charged with ensuring military discipline and the well-being of junior soldiers. An officer is not free to encourage other service members to breach military laws and regulations. [FN4]

Moreover, it is worth noting that, unlike the appellee in _Parker v. Levy,_ the Supreme Court case cited by _Bilby,_ plaintiff's motives in soliciting the PFC are not arguably "noble" in any sense. 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). There, an Army captain publicly urged enlisted personnel to refuse to obey orders which might send them into combat in Vietnam. _Id._ at 736-37, 94 S.Ct. 2547. Here, plaintiff did not ask the PFC to engage in some form of civil disobedience, he simply sought to persuade him to commit homosexual acts. Even worse, a close examination of the facts shows that plaintiff did so by hiding his true intentions from the PFC and, when his true intentions became known and the PFC clearly became distraught, continued in this behavior. [FN5]

Plaintiff first approached the PFC by offering him a ride back to his barracks. Before arriving there, however, plaintiff steered the conversation towards photography and convinced the PFC to take a detour to plaintiff's home to see his amateur photography. During this visit, according to the PFC's written statements, plaintiff took nude photographs and video of the PFC under the pretense that they were artistic in nature and could be given to his girlfriend:

He told me he was always on trips and taking pictures.... We continued to talk and then he asked me if I would let him take some photos of me ... and began telling me how he took photos of people and ... how he could combine the photos of people with scenes to make it look like a person was at a certain place. He began taking pictures of me fully clothed....Then he asked me to remove my shirt He took a couple more and asked me to remove my shirt .... [T]hen he asked me if I minded removing all my clothing .... At first I hesitated and then he started explaining that he did it all the time and he presented it to me like he did it as a form of art or photography class type thing. Then he asked me if I had a girlfriend and told me that this would be a great way for me to give my girlfriend a picture of me nude.... He did it in such a way that I thought he was a professional photographer.... Then he told me that we could take a couple of athletic pictures .... He had me do different exercises.... The entire time while I was doing this and he was telling me what to do he continued a conversation with me

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
(Cite as: 2005 WL 2995372 (Fed.Cl.))

and it seemed to me that he was trying to keep my mind off of what he was doing.... Before I knew it he had taken many photographs of me.
*13 Admin. Rec. at 285-86.

Eventually, plaintiff's true motives became apparent. In the process of setting up various photographic poses, he touched the soldier's genitals. *Id.* at 286. After plaintiff took more pictures of the PFC in various "S & M" outfits and unsuccessfully offered the PFC a back massage, the PFC told plaintiff that he wanted to go home. The PFC noted his feelings during the ride back to his barracks:

All I kept thinking about w[ ]ere the pictures and video he had taken of me. He drove up to my barracks and then gave m[e] his telephone number and told me to call him if I wanted to eat dinner or something. He then asked me for my address again and I gave it to him. I thought if I went alon[g] with the things he asked of me there would be a chance that I could get the pictures and videos back from him.... When I got back to my barracks it really hit me about what had happened. I was terrified and I realized everything that had happen[ed] to me. I felt very much abused by LOOMIS and didn't know what to do or who to go to for help. I was scared to go to anyone for fear of what they may think of me or think that I was homosexual .... I was concerned about the photographs and the videos and what LOOMIS was going to do with them if he found out I wanted them back to destroy them. I felt very low and felt that he had taken advantage of me.
*Id.* at 287.

Plaintiff mailed letters to the PFC periodically after their encounter. The PFC never replied to these letters. However, almost a year later, the PFC contacted plaintiff by phone and offered to meet plaintiff a second time. He did not tell plaintiff why he had agreed to meet him, however. He apparently hoped to steal the photographs and video. He was not successful, however:

I wanted to go back over to the house and try to find the pictures without him knowing about it. I felt if I could get back into his house I could get the photographs and video tape and destroy them.... He drove me to his house and we went into the house and we began talking about my leave and he asked me if I wanted a glass of wine. I told him that would be fine and he brought it to me in the living room. We began to talk and he told me that he had gone on a trip and had new photographs to show me.... I then told him I wanted to see his computer.... I remembered the last time I was at the

house he had taken the rolls of film out of the camera and placed them in the video camera case. I knew if I walked into the area where the computer was located I could pass by the case and see if the film was still in there.... [T]he film was gone. We went into the room where the computer was and he began showing things on the computer.... I saw an icon that said something like "Picture Show or Slide Show." I asked LOOMIS what program that was and he told me it was nothing, just something he was putting together. He then wanted to leave the room and go back into the living room. I tried to look around the room for any photos or videos but could not find any.... While I was in the room where the computer was located I saw a name plate that had LOOMIS' name and LTC rank on one side and a unit crest on the other. After I saw this I figured LOOMIS was a LTC in the Army. We went back into the living room and sat down on the couch. At this point I felt there was nothing I could do to ever get the photographs back. LOOMIS had the photographs and he was a LTC. If he ever decided to use the photos against me no one would ever believe me, a PFC against a LTC. I was very scared and was trying to think of what to do to get the photographs back. After we sat down LOOMIS asked if I wanted a massage. I did not want to get a massage from him, but at this point I felt there was nothing I could do but go along with what he wanted to prevent him [from] doing something with the photos. Nothing could be worse than doing something with the photos. Out of fear, I told him that [I] would allow him to give me a massage.
*14 *Id.* at 288.

Their encounter eventually became much more serious and clearly violated the Army's regulations regarding homosexual acts. Plaintiff massaged and touched the soldier and eventually tried to achieve sexual penetration. Although there was no penetration, the balance of plaintiff's actions clearly violated the military's "Don't Ask Don't Tell" policy, codified at 10 U.S.C. § 654. This section provides for separation for any member of the military who: (1) "engaged in, attempted to engage in, or solicited another to engage in a homosexual act;" (2) "stated that he or she is a homosexual or bisexual, ... unless ... the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts;" (3) or has "married or attempted to marry a person known to be of the same biological sex." 10 U.S.C. § 654(b)(1), (2), (3). A homosexual act is "(A) any bodily contact, actively undertaken or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372                                                      Page 12
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
**(Cite as: 2005 WL 2995372 (Fed.Cl.))**

passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A)." 10 U.S.C. § 654(f)(3).

After this encounter, plaintiff drove the PFC back to his barracks in silence. The PFC had no direct contact with plaintiff after this encounter, though he tried:

> Since that night I have called **LOOMIS** twice. I called to try and make contact with him to get the photos and video. I even thought about going back to the house again just to get in and try to distract him and find the photos. I never wanted to go back to the house and allow him to do anything sexual to me again.... I didn't want to go back into the house and do that again because it did not get me anywhere further with the photos the second time. I even drove by his house once, but could not go in because I got too torn up over what had happen[ed] before and I could not allow that to happen again. *Id.* at 289.

The PFC states that, ultimately, he was so afraid of directly confronting plaintiff that he broke into plaintiff's home and, after searching unsuccessfully, set it on fire in an attempt to destroy the photos and video. When asked to sum up how he felt about what had occurred between himself and plaintiff he stated, "I feel he has destroyed my life and I feel that he abused me. I also feel he manipulated me into this and did it for his own sexual pleasure." *Id.* at 291.

Though the PFC's statements show he did not know until their second meeting that plaintiff was a LTC, or even in the military, it is very likely that plaintiff knew, or should have known that, the PFC was a very young, junior enlisted soldier. In sum, plaintiff, a senior officer, inappropriately sought a sexual relationship with a junior soldier. He attempted to persuade the junior soldier to engage in a course of conduct which clearly violated the UCMJ and other military regulations. Further, he used deception to mask his true intentions and continued his course of conduct despite the soldier's apparent discomfort with the relationship. According to *Bilby,* this itself is disgraceful and dishonorable conduct regardless of the constitutionality of the statute or regulation violated. These facts clearly support the finding that plaintiff's action constituted conduct unbecoming an officer. Nevertheless, even if that were insufficient, the present state of the law does not allow us to find that homosexual conduct in violation of Army regulations does not constitute conduct unbecoming.

a. Substantive Due Process

**\*15** [8] Plaintiff challenges both article 125 and DADT on substantive due process grounds. Plaintiff challenges DADT on equal protection grounds as well.

The due process clause of the United States Constitution states that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The liberty protected has been held to include substantive as well as procedural rights. *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Of these substantive rights, those that are deemed fundamental trigger a more stringent level of review, strict scrutiny, and those that are not fundamental we review using the rational basis standard.

Plaintiff argues that in *Lawrence,* the Supreme Court recognized a fundamental right to same-sex intimate conduct. This right, plaintiff contends, was infringed both by his discharge and the Board's characterization of his service as they were based upon his conduct prohibited by DADT and article 125. Defendant's response is that the Court in *Lawrence,* while recognizing a liberty interest sufficient to strike a sodomy statute under the rational basis standard, did not hold that homosexual sodomy was a fundamental right.

The Supreme Court in *Lawrence* struck a criminal prohibition on private, consensual sodomy between adults. *Lawrence,* 539 U.S. at 579, 123 S.Ct. 2472. While *Lawrence* did not state that private consensual sodomy is a fundamental right, courts' and commentators' interpretations vary as to whether the Court impliedly recognized such a right. *See Lofton v. Sec'y of the Dep't of Children & Family Servs.,* 358 F.3d 804, 816 (11th Cir.2004) (holding that *Lawrence* does not characterize sodomy as a fundamental right); Sarah Catherine Mowchan, Comment and Note: *A Supreme Court that Is "Willing to Start Down that Road": The Slippery Slope of Lawrence v. Texas,* 17 Regent U.L.Rev. 125, 144 (2004) ("Under *Lawrence,* homosexual sodomy has not been raised to a fundamental right."); *Laurence Tribe, Lawrence v. Texas: The Fundamental Right that Dare Not Speak Its Name,* 117 Harv. L.Rev. 1893 (2004) (arguing that *Lawrence* recognized sexual conduct as a fundamental right, although it never explicitly named it as such). The United States Court of Appeals for the Armed Forces stated in *United States v. Marcum*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
(Cite as: 2005 WL 2995372 (Fed.Cl.))

that "[i]n _Lawrence_, the Court did not expressly identify the liberty interest as a fundamental right. Therefore, we will not presume the existence of a fundamental right ... when the Supreme Court declined ... to expressly identify such a fundamental right." 60 M.J. 198, 205 (2004). Support for the notion that sodomy is a fundamental right can be found in the fact that the _Lawrence_ Court linked the right to sodomy to other fundamental rights recognized as part of the scope of liberty protected by substantive due process. _Lawrence_, 539 U.S. at 564-66, 123 S.Ct. 2472; _see also Planned Parenthood of Southeastern Pa. v. Casey,_ 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); _Carey v. Population Servs. Int'l,_ 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); _Roe v. Wade,_ 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); _Eisenstadt v. Baird,_ 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); _Griswold v. Connecticut,_ 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); _Pierce v. Soc'y of Sisters,_ 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); _Meyer v. Nebraska,_ 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). On the other hand, the Court also undermined the inference that such a right is fundamental by searching for a legitimate state interest, as required by rational basis review, rather than applying the strict scrutiny invoked by fundamental rights. _Lawrence,_ 539 U.S. at 578, 123 S.Ct. 2472 ("The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.").

**\*16** The fact remains that the Court did not hold that sodomy is a fundamental right. Like the United States Court of Appeals for the Armed Forces in _Marcum,_ we will not presume such a right exists where the Supreme Court has declined to do so explicitly. Furthermore, the United States Court of Appeals for the Federal Circuit held in _Woodward v. United States_ that homosexual conduct is not a fundamental right. 871 F.2d 1068, 1074 (1989). While that case was decided before _Lawrence_ and relied on _Bowers v. Hardwick,_ 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (overruled by _Lawrence_ ) for the assertion that heightened review does not apply to homosexual conduct, we still find it applicable. While _Lawrence_ overruled _Bowers, Lawrence_ used rational basis review, the same standard used in _Woodward_ when evaluating the military's policy against homosexual conduct and, thus, _Woodward_ still has value to our analysis. As binding precedent that sodomy is not a fundamental right that has not been expressly overruled, we are bound by it.

Because there is no fundamental right implicated,

rational basis is the appropriate level of review. The United States Court of Appeals for the Armed Forces has developed an as-applied approach to challenges of article 125, and we choose to analyze DADT on its face. Accordingly, we will address the constitutionality of the two provisions separately.

Article 125 of the UCMJ criminalizes sodomy. Plaintiff argues that if we decline to recognize homosexual conduct as a fundamental right, article 125 still fails even rational basis review. Plaintiff contends that the Army's purposes for article 125 are to enforce morality and private biases, which he asserts are not legitimate state interests sufficient to uphold it. Furthermore, plaintiff points out that while _Lawrence_ contains a list of situations to which it does not apply, the military is not on that list. [FN6]

Defendant's only response is that plaintiff lacks standing to challenge article 125 because he was not prosecuted under it. If article 125 is unconstitutional, the ABCMR has little upon which to base plaintiff's discharge and the characterization of his service. Thus, it is plainly necessary that we address the constitutionality of article 125 in order to uphold the charge of conduct unbecoming.

When article 125 was challenged based on _Lawrence_ in the United States Court of Appeals for the Armed Forces, the court opted to address the constitutionality of article 125 using an as-applied approach, rather than through a facial challenge approach. In _Marcum,_ the court held the following:

This as-applied analysis requires consideration of three questions. First, was the conduct that the accused was found guilty of committing of a nature to bring it within the liberty interest identified by the Supreme Court? Second, did the conduct encompass any behavior or factors identified by the Supreme Court as outside the analysis in _Lawrence?_ Third, are there additional factors relevant solely in the military environment that affect the nature and reach of the _Lawrence_ liberty interest?
**\*17** 60 M.J. at 206-07 (citations omitted); _see also United States v. Stirewalt,_ 60 M.J. 297 (2004). The Court in _Lawrence_ found that certain conduct fell within a protected liberty interest. 539 U.S. at 578, 123 S.Ct. 2472. Next, it listed situations that were clearly not within its holding. _Id._ It then looked for a legitimate state interest for prohibiting this conduct in the civilian context. _Id._

_Marcum_ mirrors the _Lawrence_ analysis in the military context. The first question of the _Marcum_

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
**(Cite as: 2005 WL 2995372 (Fed.Cl.))**

Page 14

test addresses whether the conduct in the military context falls within the liberty interest protected by *Lawrence.* The second *Marcum* question asks whether the particular conduct was specifically excepted from *Lawrence's* holding. The third question asks whether there is any reason unique to the military for prohibiting that conduct that would qualify as a legitimate state interest. The three questions posed by *Marcum* are an effective approach to challenges to article 125.

The first question, then, is whether plaintiff's conduct was of a nature to bring it within the liberty interest protected by *Lawrence,* namely, private consensual sodomy between adults. The conduct in question took place off base between adults in private. While the ABCMR found that there was no evidence of coercion, it is questionable whether the conduct was consensual. Assuming however that this conduct was within the liberty interest protected by *Lawrence,* we move onto the second question of whether the conduct was identified by the Court as outside its analysis. The Court in *Lawrence* specifically excepted from its holding, conduct involving "persons who might be injured or coerced or who are situated in relationships where consent might not be easily be refused." 539 U.S. at 578, 123 S.Ct. 2472. As the court in *Marcum* noted, when evaluating such situations, "the nuance of military life is significant." 60 M.J. at 207. The ABCMR found that there was no evidence of coercion. Plaintiff was significantly higher in rank than the PFC, however. The PFC might not have known during their first interaction that plaintiff was a lieutenant but he surely knew during their later interaction. The PFC's testimony demonstrates that he felt intimidated both by plaintiff's rank and by the fact that plaintiff already had incriminating photographs of him. We hold that the nature of the relationship between plaintiff and the PFC, while not directly within a chain of command, is such that consent might not easily be refused and thus it is outside of the liberty interest protected by *Lawrence.* We do not need to reach the third question

In asking us to examine article 125 on its face rather than as-applied, plaintiff would have us ask the second *Marcum* question about the military as a whole rather than about this particular relationship. It is not necessary that "military" be specifically listed as excepted by *Lawrence* from its holding because we hold that this particular relationship was specifically excepted as one where consent might not easily be refused. Thus article 125, as applied to plaintiff, does not violate due process.

**\*18** [9] Plaintiff's arguments for why DADT violates substantive due process are largely the same as those offered with respect to article 125, namely that the purpose of the provision is to enforce morality or private bias. Defendant responds that, because homosexual sodomy is not a fundamental right, rational basis review is invoked under substantive due process. Defendant proffers three justifications for the policy: promoting unit cohesion, reducing sexual tension, and protecting privacy. Support for the link between DADT and these justifications, according to defendant can be found in the congressional findings upon which the policy is based. Those findings, set out in 10 U.S.C. § 654(a), include the following:

(6) Success in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion.

...

(8) Military life is fundamentally different from civilian life in that--... (B) the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.

...

(12) The worldwide deployment of United States military forces, the international responsibilities of the United States and the potential for involvement of the armed forces in actual combat routinely make it necessary for members of the armed forces involuntarily to accept living conditions and working conditions that are often spartan, primitive, and characterized by forced intimacy with little or no privacy.

Defendant also cites at length from the report of the Senate Armed Services Committee to support the link between the policy on homosexuality and the ends sought: promoting unit cohesion, reducing sexual tension, and protecting personal privacy. S.Rep. No. 112, 103rd Cong., 1st sess. 265-270 (1993) (hereinafter "Senate Report"). Defendant argues that, rather than discriminating based on sexual orientation, the current policy assumes that both heterosexual and homosexual members are likely to act in accordance with their sexual drives. However, given this assumption, the nature of the differences between homosexuals and heterosexuals requires that the military treat them differently. "The military is able to promote unit cohesion, reduce sexual tension, and protect personal privacy in the case of heterosexual servicemembers by providing separate quarters for men and women, such an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
**(Cite as: 2005 WL 2995372 (Fed.Cl.))**

Page 15

accommodation is not available for those individuals who engage in homosexual conduct." Defendant's Reply Brief at 24.

Defendant also cites to *Woodward* as Federal Circuit precedent for the proposition that the military policy on homosexual conduct does not violate the due process clause. In that case, Woodward was released from active duty in the Navy based upon his statements professing homosexuality. The policy challenged was the Navy's policy in place before DADT. The court held that it was "rationally related to a permissible end." *Woodward,* 871 F.2d at 1076. The permissible ends identified by the court included maintenance of discipline, insuring the integrity of the system of rank and command, and mutual confidence among service members.

**\*19** As discussed *supra,* DADT does not implicate a fundamental right and thus will be reviewed under the rational basis standard for substantive due process purposes. In order to survive rational basis review, for purposes of substantive due process, a law must be rationally related to a legitimate state purpose. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *Reno v. Flores,* 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). The burden is on the party challenging the provision to " 'negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller,* at 320-21, 113 S.Ct. 2637. Our review of statutes regarding military matters is especially deferential. *Goldman v. Weinberger,* 475 U.S. 503, 507-08, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (citing *Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)) ("[Judicial] deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged."). Additionally "[t]he framers did not view the federal judiciary--appointed with life tenure--as the appropriate body to exercise military authority and therefore gave the judiciary 'no influence over either the sword or the purse.' " *Able v. United States,* 155 F.3d 628, 633 (1998) (quoting The Federalist No. 78, at 520 (Alexander Hamilton) (Heritage Press ed., 1945)).

The congressional findings contained in § 654(a) as well as the Senate Report shed meaningful light on DADT's purpose. General H. Norman Schwarzkopf testified to the committee "that unit cohesion 'is the single most important factor in a unit's ability to succeed on the battlefield." ' Senate Report at 274. Similarly, General Colin Powell testified that:

[t]o win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies. We cannot allow anything to happen which would disrupt that feeling of cohesion within the force.

*Id.* at 275. Certainly unit cohesion is a legitimate state interest.

Maintenance of unit cohesion comes, in part, from providing men and women with separate living quarters, as it reduces sexual tension. General Powell testified that unit "[c]ohesion is strengthened or weakened in the intimate living arrangements we force upon our people." *Id.* at 278. Because members of the military "must live and work under close conditions affording minimal privacy" during deployment, the military personnel policy must reflect what is required under those conditions. *Id.* at 277. The committee points out that "[i]n civilian life people are not compelled to live with individuals who are sexually attracted to members of the same sex, and the committee finds no military necessity to compel persons to do so in the military." *Id.* at 281. Additionally, as defendant points out, reducing sexual tension and maintaining privacy for heterosexual servicemembers under deployment conditions can be achieved with same-sex living arrangements. The only way to maintain privacy and reduce sexual tension with homosexual service members would be to offer them separate individual living quarters-something that is clearly impossible under deployment conditions. DADT's prohibition on homosexual conduct and upon open discussion of one's homosexuality are a rational means to attain the end of reducing sexual tension and promoting unit cohesion.

**\*20** The Senate Armed Services Committee further concluded that even if the Supreme Court were to reverse *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841-which in fact it later did in *Lawrence* "and hold that private consensual homosexual acts between adults may not be prosecuted in civilian society," its judgment on the matter would be no different. *Id.* at 287. Additionally, *Lawrence* can be distinguished on the basis that discharge proceedings under DADT are not criminal in nature. Unlike the petitioners in *Lawrence,* plaintiff was eliminated from the military--the military equivalent of being fired--pursuant to an administrative, rather than criminal proceeding. We are, in any event, bound by *Woodward,* a Federal Circuit decision upholding the military's former

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

policy on due process grounds. We conclude that §
654 is rationally related to the end of achieving
military success.

b. Equal Protection

[10] The equal protection clause of the fourteenth
amendment guarantees that "no State shall ... deny to
any person within its jurisdiction the equal protection
of the laws." U.S. Const. amend IV § 1. The equal
protection clause is applicable to the federal
government through the due process clause of the
fifth amendment. *United States v. Iron Shell,* 633
F.2d 77, 89 n. 17 (8th Cir.1980) (citing *Bolling v.
Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884
(1954)). Statutes drawing a classification are
generally held to be valid if the classification is
rationally related to a legitimate government interest.
*City of Cleburne v. Cleburne Living Ctr.,* 473 U.S.
432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).
Strict scrutiny is invoked by statutes that classify
based on exercise of a fundamental right.
*Massachusetts Bd. of Retirement v. Murgia,* 427 U.S.
307, 312-13, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)
("[E]qual protection analysis requires strict scrutiny
of a legislative classification only when the
classification impermissibly interferes with the
exercise of a fundamental right or operates to the
peculiar disadvantage of a suspect class.").

Plaintiff argues that DADT fails rational basis
review because the classification's only purpose is to
enforce morality and private bias. His arguments for
DADT's failure of rational basis review largely
parallel those offered to support the proposition that
DADT violates substantive due process, discussed
*supra.* However plaintiff additionally argues that
*Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620
(1996), *City of Cleburne v. Cleburne Living Center,*
and *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879,
80 L.Ed.2d 421 (1984), are decisive in this matter in
that they prohibit any laws that give effect to private
bias.

Defendant's arguments largely mirror those offered
in defense of the substantive due process challenge.
Additionally, it contends that every circuit court to
consider DADT in the equal protection context has
held that it satisfies rational basis review. Defendant,
again, cites to *Woodward* as controlling precedent
that the military's policy on homosexual conduct is
consistent with the equal protection clause.

**\*21** Applying the rational basis standard, we
conclude that the classification contained in DADT is

rationally related to the government's interest in
promoting unit cohesion and reducing sexual tension
and thus does not violate the equal protection clause.
Every circuit court which has addressed the matter
has held that DADT survives rational basis review
when subjected to an equal protection challenge. *See
Able v. United States,* 155 F.3d 628 (1998); *Holmes
v. California Army Nat'l Guard,* 124 F.3d 1126
(1997); *Philips v. Perry,* 106 F.3d 1420 (1997);
*Richenberg v. Perry,* 97 F.3d 256 (1996); *Thomasson
v. Perry,* 80 F.3d 915 (1996). Plaintiff argues that
these cases are not persuasive as they relied upon
*Bowers* before it was overruled by *Lawrence.* We are
not persuaded. Each of these cases applied rational
basis review, the same standard used in *Lawrence,*
and held that the classification was rationally related
to the military's interest in promoting unit cohesion,
reducing sexual tension, and protecting privacy.

We owe Congress a great deal of deference in
matters concerning the military. While DADT draws
a distinction between those who practice homosexual
conduct and those that do not, we cannot say that this
classification is not rationally related to a legitimate
state interest.

*Palmore* and *Cleburne Living Center* are not to the
contrary. In *Cleburne Living Center,* the Court
invalidated a zoning ordinance that required a special
use permit for group homes for the mentally retarded.
473 U.S. at 435, 105 S.Ct. 3249. The Court held that
the statute was based on nothing more than private
bias because the statute singled out the mentally
retarded and there was no legitimate interest
furthered by requiring a permit from this particular
group but not other groups, such as fraternities and
hospitals. *Id.* at 447-48, 105 S.Ct. 3249. Similarly, in
*Palmore,* the Court held that the law cannot give
effect to private biases. DADT does not give effect to
private biases. Rather it seeks, in the most logical and
least burdensome way possible, to ensure that sexual
tension is minimized in order to promote the unit
cohesion necessary for military success.

Plaintiff's reliance on *Romer v. Evans,* 517 U.S. 620,
116 S.Ct. 1620, 134 L.Ed.2d 855, is also misplaced.
That case involved an amendment to the Colorado
constitution, which prohibited the state of Colorado
or any of its political subdivisions from enacting or
enforcing any statute whereby one could claim
discrimination or minority or protected status based
on homosexual conduct. *Id.* at 624, 116 S.Ct. 1620.
The Court, applying rational basis review, struck
down the amendment because it imposed "a broad
and undifferentiated disability on a single named

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372                                                          Page 17
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
(Cite as: 2005 WL 2995372 (Fed.Cl.))

group" and because "its sheer breadth [was] so discontinuous with the reasons offered for it that the amendment seem[ed] inexplicable by anything but animus toward the class it affect[ed]." *Id.* at 632, 116 S.Ct. 1620. DADT's effect is not so discontinuous from the goal of reducing sexual tension and promoting unit cohesion that it is inexplicable by anything but animus toward homosexuals. By contrast, here we have no basis for questioning Congress' stated view that DADT promotes unit cohesion, reduces sexual tension, and protects personal privacy--all things necessary for an effective military.

### CONCLUSION

**\*22** For the reasons set out above, plaintiff's motion is granted with respect to his assertion that he had a right to suspension of his elimination proceedings before the BOI pending consideration of his request for retirement in lieu of elimination. In all other respects it is denied. Defendant's motion is denied with respect to plaintiff's right to have his elimination proceedings suspended, as explained above. In all other respects, defendant's motion for judgment on the record is granted.

 The parties agree that it is appropriate to remand the matter to the Secretary of the Army for further proceedings consistent with this opinion. Accordingly,
    (1) Pursuant to RCFC 56.2(a)(1) and 28 U.S.C. § 1491(a)(2), plaintiff's claim is hereby remanded to the Secretary of the Army, to have the opportunity to make the determinations detailed below.
    (2) The Army shall, *inter alia,* address the following:
    (a) Make a grade determination as provided in Army Regulation 15-80; and,
    (b) Make a determination regarding what monies plaintiff is entitled to with respect to his claim for back pay, allowances, and interest, if any.
    (3) Defendant is directed to file a status report, on or before January 13, 2006, indicating the status of proceedings on remand, pursuant to RCFC 56.2(a)(5).
    (4) The agency's determination on remand shall be filed by defendant no later than February 24, 2006.

    FN1. This videotape is apparently a second videotape, unrelated to the videotape on which plaintiff's first encounter with the PFC was recorded.

    FN2. Active Federal Service. We note that the clause refers specifically to a request for

retirement in lieu of elimination. It does not refer to early retirement, which ABCMR held that plaintiff would have been plainly ineligible for due to his being flagged for adverse action.

    FN3. 10 U.S.C. § 654(b)(1) (2000), mirrored in AR 600-8-24, para. 4-22(b)(1) states that a member of the armed forces shall be separated for engaging in or attempting to engage in homosexual conduct unless the court finds all of the following five retention factors:
    (A) such conduct is a departure from the member's usual and customary behavior;
    (B) such conduct, under all the circumstances, is unlikely to recur;
    (C) such conduct was not accomplished by use of force, coercion, or intimidation;
    (D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
    (E) the member does not have a propensity or intent to engage in homosexual acts.

    FN4. Plaintiff knew of the PFC's military status, as he picked up the junior enlisted soldier on base under the pretense of giving him a ride back to his barracks. The PFC's age, nineteen, should have made it obvious that he was a very junior enlisted soldier. Further, the PFC's written statements, introduced as evidence at trial, indicate that he and plaintiff discussed his military career during their first encounter.

    FN5. These facts are from the PFC's written statements given to CID agents. They were introduced at the BOI hearing. Plaintiff stipulated to the sexual acts contained in them and did not attempt to rebut these statements by testifying. It is worth noting that after the hearing, however, he filed a letter with the BOR, dated January 14, 1997, challenging the PFC's characterization of these acts. Admin. Rec. at 330. Plaintiff, along with arguing a number of legal errors, attempted to offer additional evidence at that time in an affidavit attached to the letter. *Id.* at 346. In this affidavit he states that he had three visits from the PFC, not two; that he had made it clear to the PFC during their first encounter that the photography was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2995372
--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)
(Cite as: 2005 WL 2995372 (Fed.Cl.))

nude and that plaintiff was homosexual; and that the PFC was an active participant who dressed up and noticeably used cologne in the second visit. *Id.* Though the PFC had ample motive to color the events in a favorable light, plaintiff had the right to offer these statements at his hearing but did not. Further, even assuming that it would be proper for this court to consider his statements, plaintiff does not contest that these sexual acts occurred and that such acts violate federal regulations and statutes regarding the military.

FN6. The Court stated that "[t]he present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence,* 539 U.S. at 578, 123 S.Ct. 2472.

--- Fed.Cl. ----, 2005 WL 2995372 (Fed.Cl.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv01653 (Docket) (Jul. 07, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

122 P.3d 22                                                                                    Page 1
122 P.3d 22
(Cite as: 122 P.3d 22)

# H

**Briefs and Other Related Documents**

Supreme Court of Kansas.
STATE of Kansas, Appellee,
v.
Matthew R. LIMON, Appellant.
No. 85,898.

Oct. 21, 2005.

**Background:** Defendant was convicted in the Miami District Court, Richard M. Smith, J., of criminal sodomy. Defendant appealed. The Court of Appeals affirmed. After state Supreme Court denied defendant's petition for review, defendant filed for writ of certiorari. The United States Supreme Court granted the petition, vacated the judgment, and remanded to the Court of Appeals for further consideration in light of the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508. The Court of Appeals, 32 Kan.App.2d 369, 83 P.3d 229, affirmed.

**Holdings:** On grant of defendant's petition for review, the state Supreme Court, Luckert, J., held that:

(1) statute which punished sodomy between adults and children of the opposite sex less severely than sodomy between adults and children of the same sex violated equal protection provisions under Federal and State Constitutions, and

(2) equal protection violation was cured by severance of the "members of the opposite sex" language.

Reversed and remanded with directions.

West Headnotes

**[1] Criminal Law** ⬤➞1134(3)
110k1134(3) Most Cited Cases
Whether a statute violates equal protection is a question of law over which Supreme Court has unlimited review. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § § 1, 2.

**[2] Constitutional Law** ⬤➞211(1)
92k211(1) Most Cited Cases
The guiding principle of the equal protection clause

is that similarly situated individuals should be treated alike. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § § 1, 2.

**[3] Constitutional Law** ⬤➞213.1(1)
92k213.1(1) Most Cited Cases

**[3] Constitutional Law** ⬤➞213.1(2)
92k213.1(2) Most Cited Cases
When analyzing an equal protection claim, courts employ three levels of scrutiny: strict scrutiny, intermediate scrutiny, and the rational basis test; level of scrutiny applied depends on the nature of the legislative classification and the rights affected by that classification. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § § 1, 2.

**[4] Constitutional Law** ⬤➞213.1(2)
92k213.1(2) Most Cited Cases
If a law neither burdens a fundamental right or targets a suspect class, Supreme Court will uphold the legislative classification against an equal protection challenge so long as it bears a rational relation to some legitimate end. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § § 1, 2.

**[5] Constitutional Law** ⬤➞224(5)
92k224(5) Most Cited Cases
Homosexuals were not a suspect class, nor was there a fundamental right to engage in homosexual sodomy, and thus rational basis test, rather than strict scrutiny, was appropriate to determine whether statute which punished heterosexual sodomy between adults and children less severely than homosexual sodomy between adults and children violated equal protection provision of Federal and State Constitutions. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 1; K.S.A. § 21-3522.

**[6] Constitutional Law** ⬤➞224(5)
92k224(5) Most Cited Cases

**[6] Sodomy** ⬤➞1
357k1 Most Cited Cases
Statute which punished heterosexual sodomy between adults and children less severely than homosexual sodomy between adults and children violated equal protection provisions under Federal and State Constitutions; no evidence justified position that homosexual sexual activity was more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
**(Cite as: 122 P.3d 22)**

Page 2

harmful to minors than adults, no basis existed to believe that adults who engage in voluntary sex with minors who are same sex would have higher tendency to be more coercive than adults who engaged in voluntary sex with minors of opposite sex, and no evidence indicated that prohibited sexual activities would be more likely to transmit disease when engaged in by homosexuals than by heterosexuals. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 1; K.S.A. § 21-3522.

**[7] Constitutional Law** ☞224(5)
92k224(5) Most Cited Cases

**[7] Sodomy** ☞1
357k1 Most Cited Cases
Equal protection violation inherent in statute which punished sodomy between adults and children who members of opposite sex less severely than sodomy between adults and children who members of the same sex was cured by severance of the "members of the opposite sex" language; principal legislative purpose of the statute was to accommodate the situation where a teen relationship reduced the level of coercion potentially involved in a sexual relationship between an adult and a minor and to adjust the proportionality of sentences, and such purposes would not be harmed by striking the language. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 1; K.S.A. § 21-3522.

**[8] Statutes** ☞63
361k63 Most Cited Cases
When an alteration of a statute--either through striking language or adding judicial requirements to the statute--would be contrary to legislative intent, courts must nullify the statute.

**[9] Criminal Law** ☞1179
110k1179 Most Cited Cases
Question of whether increasing defendant's sentence based on his prior juvenile adjudications violated the principles of *Apprendi v. New Jersey* was not before Supreme Court on appeal, where defendant did not raise such issue during his appeal to Court of Appeals.

West Codenotes
Held Unconstitutional

K.S.A. § 21-3522

**\*23 Syllabus by the Court**
1. K.S.A.2004 Supp. 21-3522 violates the equal protection provisions of the Fourteenth Amendment

to the United States Constitution and § 1 of the Kansas Constitution Bill of Rights.

2. The equal protection violation inherent in K.S.A.2004 Supp. 21-3522 is cured by the severance of the words "and are members of the opposite sex" from the statute.

James D. Esseks, of American Civil Liberties Union Foundation, Lesbian & Gay Rights Project, of New York, New York, argued the cause, and Tamara Lange, of American Civil Liberties Union Foundation, Lesbian & Gay Rights Project, of San Francisco, California, and Paige A. Nichols, of Lawrence, were with him on the briefs for appellant.

Jared S. Maag, deputy attorney general, argued the cause, and Phill Kline, attorney general, was with him on the briefs for appellee.

Jeffrey E. Goering, of Thompson, Stout & Goering, LLC, of Wichita, and Mathew D. Staver, of Liberty Counsel, of Longwood, Florida, were on the brief for amicus curiae Kansas Legislators.

Timothy M. O'Brien and Chelsi K. Hayden, of Shook, Hardy & Bacon, L.L.P., of Overland Park, and Julie M. Carpenter and Nicole G. Berner, of Jenner & Block, LLC of Washington, D.C., were on the brief for amicus curiae DKT Liberty Project.

Eric D. Barton, of Wagstaff & Cartmell, LLP, of Kansas City, Missouri, and Hayley Gorenberg, of Lambda Legal, of New York, New York, were on the brief for amici curiae Kansas Public Health Association, American Public Health Association, American Academy of HIV Medicine, American Foundation for AIDS Research, HIV Medicine Association, International Association of Physicians in AIDS Care, National Alliance of State and Territorial AIDS Directors, and National Minority AIDS Council.

Melanie S. Morgan, of Kansas City, and Ruth N. Borenstein, Leecia Welch, and Sylvia M. Sokol, of Morrison & Foerster, LLP, of San Francisco, California, were on the brief for amici curiae National Association of Social Workers and Kansas Chapter of the National Association of Social Workers.

**\*24** The opinion was delivered by LUCKERT, J.:

The principal issue presented in this case is whether the Kansas unlawful voluntary sexual relations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statute, K.S.A.2004 Supp. 21-3522, violates the equal protection provision of the Fourteenth Amendment to the United States Constitution. Matthew Limon argues that the United States Supreme Court decision in _Lawrence v. Texas,_ 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), requires this court to find the statute unconstitutional because it results in a punishment for unlawful voluntary sexual conduct between members of the opposite sex that is less harsh than the punishment for the same conduct between members of the same sex.

The statute subject to this challenge, commonly referred to as the Romeo and Juliet statute, applies to voluntary sexual intercourse, sodomy, or lewd touching when, at the time of the incident, (1) the victim is a child of 14 or 15; (2) the offender is less than 19 years of age and less than 4 years older than the victim; (3) the victim and offender are the only ones involved; and (4) the victim and offender are members of the opposite sex. K.S.A.2004 Supp. 21-3522. Limon's conduct meets all of the elements of the Romeo and Juliet statute except the one limiting application to acts between members of the opposite sex.

When the Romeo and Juliet statute applies, prison terms are shorter and other consequences, such as postrelease supervision periods and sex offender registration requirements, are less harsh than when general rape, sodomy, and lewd touching statutes apply. Because these disparities are based upon the homosexual nature of Limon's conduct, he argues the Romeo and Juliet statute creates a classification which violates the equal protection principles announced by the United States Supreme Court. Limon suggests we apply a strict level of scrutiny when reviewing his claim, but asserts that even if the rational basis test applies, under the guidance of _Lawrence,_ the classification bears no rational relationship to legitimate State interests.

We agree that the United States Supreme Court's decision in _Lawrence_ controls our analysis and, when considered in conjunction with several equal protection decisions of the United States Supreme Court, requires us to hold that the State does not have a rational basis for the statutory classification created in the Romeo and Juliet statute.

Because we reach this conclusion, we will not reach Limon's other constitutional attacks upon his conviction. However, we will discuss his argument that his sentence violates the principles enunciated by the United States Supreme Court in _Apprendi v. New_

_Jersey,_ 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

_Factual and Procedural Background_

Limon was convicted of criminal sodomy pursuant to K.S.A. 21-3505(a)(2) after a bench trial on stipulated facts. The stipulation established that on February 16, 2000, Limon had consensual oral contact with the genitalia of M.A.R. Both Limon and M.A.R. are male. Limon turned 18 years of age just 1 week before the incident; his date of birth is February 9, 1982. He was less than 4 years older than M.A.R., who turned 15 years of age the month following the incident. M.A.R.'s date of birth is March 17, 1985.

After his conviction, Limon filed a motion for a downward durational departure from the presumptive sentence under the Kansas sentencing guidelines. He also renewed his argument that his equal protection rights had been violated by the conviction. These motions were argued and evidence was presented at the sentencing hearing.

The contact occurred at a school for developmentally disabled children where Limon and M.A.R. were residents. Although there is a discrepancy between Limon's and M.A.R.'s functioning, the difference is minor. Intellectually, Limon falls between the ranges described as borderline intellectual functioning and mild mental retardation. M.A.R. functions in the upper limits of the range of mild mental retardation. M.A.R. consented to the sexual contact, and when he asked Limon to stop, Limon did so.

**\*25** The trial court rejected Limon's equal protection argument and denied the motion for downward durational departure. The trial court found that Limon's criminal history category was B because of two prior juvenile adjudications for aggravated criminal sodomy. Limon was sentenced to 206 months' imprisonment, which was the mitigated term under the Kansas sentencing guidelines for a severity level 3 crime where the defendant has a criminal history falling in category B. As a consequence of Limon's conviction, he is subject to 60 months' of postrelease supervision and is required to register as a persistent sexual offender. K.S.A. 22-4902 _et seq._ By contrast, had Limon been convicted of sodomy under the unlawful sexual relations statute, the presumptive sentence at the time of the offense (and now) would have been only 13, 14, or 15 months' imprisonment. K.S.A.1999 Supp. 21-4704. Moreover, those sentenced under the unlawful sexual relations statute are not subject to the provisions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regarding sentencing of persistent sexual offenders (K.S.A.2004 Supp. 21-4704[j] and K.S.A.2004 Supp. 22-3717[d][2] ) or required to register as a sex offender (K.S.A.22-4902).

Limon appealed, and the Court of Appeals affirmed his conviction and sentence in *State v. Limon*, No. 85,898, 41 P.3d 303 unpublished opinion filed February 1, 2002, *rev. denied* 274 Kan. 1116 (2002) (*Limon I*). The Court of Appeals' decision was based primarily upon *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

Limon sought this court's review of the Court of Appeals' decision; his petition was denied. Limon then filed a petition for writ of certiorari to the United States Supreme Court. While his petition was pending, the Supreme Court issued its decision in *Lawrence v. Texas*, which involved two adult men who engaged in private, consensual anal sex; they were charged and convicted under a Texas statute which prohibited "deviate sexual intercourse" between persons of the same sex.

In an opinion authored by Justice Kennedy and joined by Justices Stevens, Souter, Ginsburg, and Breyer, the Court held that the Texas statute violated the Due Process Clause. In doing so, the Court focused upon *Bowers*, the decision upon which the Kansas Court of Appeals had relied in the instant case. In *Bowers*, the United States Supreme Court sustained a Georgia criminal sodomy statute against a claim the provision violated the Due Process Clause. In a turnabout of the holding in *Bowers*, the *Lawrence* Court concluded: "*Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers v. Hardwick* should be and now is overruled." 539 U.S. at 578, 123 S.Ct. 2472.

The *Lawrence* Court recognized a liberty interest and considered whether the State's infringement of that interest was justified by a legitimate State interest:

"The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. 'It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter.'

[Citation omitted.] The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." 539 U.S. at 578, 123 S.Ct. 2472.

Justice O'Connor concurred, finding the Texas statute unconstitutional. However, she did not join in the majority's analysis that the statute violated the Due Process Clause. She would have found the statute unconstitutional as a violation of equal protection. She concluded her analysis by stating: "A law branding one class of persons as criminal based solely on the State's moral disapproval of that class and the conduct associated with that class runs contrary to the values of the Constitution and the Equal Protection Clause, under any standard of review." 539 U.S. at 585, 123 S.Ct. 2472 (O'Connor, concurring).

Justice Scalia wrote a dissenting opinion which Chief Justice Rehnquist and Justice Thomas joined. For our purposes, the dissent *26 is instructive because of its discussion of what the majority opinion does or does not do. Especially significant to our review is Justice Scalia's conclusion that the majority opinion means that "the promotion of majoritarian sexual morality is not even a *legitimate* state interest" and that criminal legislation on matters such as "fornication, bigamy, adultery, adult incest, bestiality, and obscenity" cannot "survive rational-basis review." 539 U.S. at 599, 123 S.Ct. 2472 (Scalia, J., dissenting).

One day after issuing this decision, the Supreme Court granted Limon's petition, vacated the judgment, and remanded the case to the Kansas Court of Appeals "for further consideration in light of *Lawrence v. Texas*." *Limon v. Kansas*, 539 U.S. 955, 123 S.Ct. 2638, 156 L.Ed.2d 652 (2003).

The decision upon remand was fractured; each judge on the three judge panel of the Court of Appeals filed a separate opinion. Although stating a different rationale, two judges agreed that Limon's conviction and sentence should once again be affirmed. The Court of Appeals majority opinion, authored by Judge Green, dismissed the application of *Lawrence*, concluding it "is factually and legally distinguishable from the present case." *State v. Limon*, 32 Kan.App.2d 369, 373, 83 P.3d 229 (2004). The Court of Appeals majority focused upon Justice Kennedy's explanation that "[t]he present case does not involve minors." 32 Kan.App.2d at 373-74, 83 P.3d 229 (quoting *Lawrence*, 539 U.S. at 578, 123 S.Ct. 2472). Rather, *Lawrence* involved "two adults

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle." 539 U.S. at 578, 123 S.Ct. 2472. Additionally, the Court of Appeals majority distinguished the legal analysis, noting that the *Lawrence* majority declined to apply an equal protection analysis and instead determined the Texas statute violated the Due Process Clause. In contrast, Limon does not assert a due process challenge.

Judge Green applied the lowest level of scrutiny, the rational basis test, when analyzing Limon's equal protection claim and found that the legislature "could have rationally determined that heterosexual sodomy between a child and an adult could be put in a class by itself and could be dealt with differently than homosexual sodomy between a child and an adult." 32 Kan.App.2d at 375, 83 P.3d 229. Judge Green identified four interests which he believed provided a rational basis for the classification:

(1) Protection of Children. "[T]he legislature could well have concluded that homosexual sodomy between children and young adults could disturb the traditional sexual development of children.... K.S.A. [2004 Supp.] 21-3522 is designed to discourage voluntary sexual behavior between young adults and children which deviates from traditional sexual mores." 32 Kan.App.2d at 377, 83 P.3d 229. The classification which gives a more lenient sentence to members of the opposite sex is proper "because it is rationally related to the purpose of protecting and preserving the traditional sexual mores of society and the historical sexual development of children." 32 Kan.App.2d at 377, 83 P.3d 229.

(2) Marriage and Procreation. Judge Green concluded that the government has a legitimate interest in protecting marriage and procreation because the survival of society requires replenishment of its members. Since sexual acts between same-sex couples do not lead to procreation, he reasoned that the classification contained in K.S.A.2004 Supp. 21-3522 advances the government's interest in protecting and advancing the family as the commonly recognized unit for procreation. 32 Kan.App.2d at 378, 83 P.3d 229.

(3) Parental Responsibility. Judge Green also observed that the legislature might have determined that lengthy incarceration of a young adult offender who has become a parent as a result of a heterosexual relationship with a minor would be counterproductive to that young adult's duty to support his or her child. Because same-sex relationships do not generally lead to unplanned pregnancies, the need to release a same-sex offender from incarceration is absent. Thus, Judge Green concluded, K.S.A.2004 Supp. 21-3522 advances the government's interest in getting a young adult parent involved in providing financial support for the child. 32 Kan.App.2d at 378-79, 83 P.3d 229.

*27 (4) Prevention of Sexually Transmitted Disease. Finally, Judge Green concluded that the legislature could have considered the fact "that certain health risks are more generally associated with homosexual activity than with heterosexual activity," thus K.S.A.2004 Supp. 21-3522 is rationally related to the government's legitimate interest in protecting public health. 32 Kan.App.2d at 379, 83 P.3d 229.

Judge Green also rejected Limon's claims that K.S.A.2004 Supp. 21-3522 impermissibly discriminates on the basis of gender and that his conviction and sentence violated the Eighth Amendment prohibition against cruel and unusual punishment because his sentence was disproportionate to the crime of criminal sodomy. 32 Kan.App.2d at 380-81, 83 P.3d 229.

In his concurring opinion, Judge Malone agreed that K.S.A.2004 Supp. 21-3522 does not discriminate on the basis of gender. He also agreed that *Lawrence* was both factually and legally distinguishable because it involved adults and was decided on due process rather than equal protection grounds. 32 Kan.App.2d at 386, 83 P.3d 229. Judge Malone agreed with Judge Green's analysis that the Romeo and Juliet law should be evaluated under the rational basis test and stated:

"I cannot embrace every rational basis suggested in the majority opinion for upholding the constitutionality of K.S.A. [2004] Supp. 21-3522, and in fact I disagree with many of the positions advanced in the majority opinion. However, if the only rational basis justifying the statute is the legislature's intention to protect children from increased health risks associated with homosexual activity until they are old enough to be more certain of their choice, it is within the legislature's prerogative to make that determination. This rationale, although tenuous in some respects, provides a 'reasonably conceivable state of facts' sufficient to justify the statutory classification." 32 Kan.App.2d at 388, 83 P.3d 229.

Judge Pierron dissented. Although he, too, applied the rational basis test in determining whether K.S.A.2004 Supp. 21-3522 was constitutional, he emphasized that "[l]egislative disapproval of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
**(Cite as: 122 P.3d 22)**

Page 6

homosexuality alone is not enough to justify any measures the legislature might choose to express its disapproval. Under the rational basis test, there must be a showing that the measures adopted have a rational relationship to a legitimate legislative concern." 32 Kan.App.2d at 396, 83 P.3d 229. Reviewing each of the reasons offered by the State to justify the discriminatory sentencing provision, Judge Pierron determined that none of them bore any rational relationship to the statute's classification. 32 Kan.App.2d at 396-400, 83 P.3d 229. He concluded: "The purpose of the law is not to accomplish any of the stated aims other than to punish homosexuals more severely than heterosexuals for doing the same admittedly criminal acts." 32 Kan.App.2d at 400, 83 P.3d 229. Judge Pierron would hold that the classification violates the Due Process Clause of the Fifth and Fourteenth Amendments and would strike the unconstitutional classification from the statute. 32 Kan.App.2d at 400, 83 P.3d 229.

Limon filed a petition for review which this court granted.

### Analysis

In this appeal, Limon primarily argues that to punish criminal voluntary sexual conduct between teenagers of the same sex more harshly than criminal voluntary sexual conduct between teenagers of the opposite sex is a violation of the equal protection provision of the United States Constitution.

[1] "Whether a statute violates equal protection is a question of law over which this court has unlimited review." *State v. Mueller,* 271 Kan. 897, 902, 27 P.3d 884 (2001).

[2] The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution demands that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." The guiding principle of the Equal Protection Clause is that similarly situated individuals should be treated alike. *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Chiles v. State,* 254 Kan. 888, 895, 869 P.2d 707, *cert. denied* \*28513 U.S. 850, 115 S.Ct. 149, 130 L.Ed.2d 88 (1994).

Limon's arguments are constructed entirely upon the precedent of United States Supreme Court cases, and those precedents command our decision in this case. However, Limon also cites § 1 of the Kansas Constitution Bill of Rights and, thus, preserves a state constitutional claim.

Sections 1 and 2 of the Kansas Constitution Bill of Rights "are given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law." *Farley v. Engelken,* 241 Kan. 663, 667, 740 P.2d 1058 (1987). Section 1 applies in cases such as this one when an equal protection challenge involves individual rights. 241 Kan. at 667, 740 P.2d 1058.

[3][4] Traditionally, when analyzing an equal protection claim, the United States and Kansas Supreme Courts employ three levels of scrutiny: strict scrutiny, intermediate scrutiny, and the rational basis test. *Chiles,* 254 Kan. at 891-92, 869 P.2d 707. The level of scrutiny applied by the court depends on the nature of the legislative classification and the rights affected by that classification. *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). The general rule is that a law will be subject to the rational basis test unless the legislative classification targets a suspect class or burdens a fundamental right. 517 U.S. at 631, 116 S.Ct. 1620. In *Farley,* this court stated:

"When a statute is attacked on equal protection grounds, the general rule is that the statute is presumed constitutional, and the burden is on the party attacking the statute to prove otherwise. Only in cases involving 'suspect classifications' or 'fundamental interests' is the presumption of constitutionality displaced and the burden placed on the party asserting constitutionality to demonstrate a compelling state interest which justifies the classification." 241 Kan. at 667, 740 P.2d 1058.

Thus, when an equal protection claim is made, the first step of the analysis is to determine the nature of the legislative classification and the rights which are affected by the classification. That determination will dictate the level of scrutiny which applies. The final step of the analysis requires determining whether the classification withstands the scrutiny.

### Classification

In the first step, we must examine the nature of the classification created by the Romeo and Juliet statute. The State argues that the statute applies only to conduct and does not discriminate against any class of individual, in particular against homosexual persons. The State also argues that nothing in the record establishes that either Limon or M.A.R. is homosexual.

Indeed, there is no per se classification of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

homosexuals, bisexuals, or heterosexuals in the statute, nor do we know which classification applies to Limon or M.A.R. However, that does not mean that Limon's argument fails. As Justice Scalia noted in his dissent in *Romer,* "there can hardly be more palpable discrimination against a class than making the *conduct* that defines the class criminal." (Emphasis added.) 517 U.S. at 641, 116 S.Ct. 1620. The majority in *Lawrence* similarly noted that making homosexual conduct criminal and not legislating against "deviate sexual intercourse" committed by persons of different sexes "in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres."    539 U.S. at 575, 123 S.Ct. 2472. Throughout the *Lawrence* opinion, the majority refers to the stigmatizing and demeaning effect of criminalizing conduct commonly engaged in by homosexuals and concludes that a state may not "demean their existence or control their destiny." 539 U.S. at 578, 123 S.Ct. 2472. Additionally, *Lawrence* makes it clear that *Romer* applies to "persons who were homosexuals, lesbians, or bisexual either by 'orientation, conduct, practices or relationships.' " *Lawrence,* 539 U.S. at 574, 123 S.Ct. 2472 (quoting *Romer,* 517 U.S. at 624, 116 S.Ct. 1620).

This case is different from *Lawrence,* where homosexual conduct was criminal and heterosexual conduct was not. The *Lawrence* Court focused upon the "stigma" the criminal statute imposed which it characterized *29 as "not trivial." 539 U.S. at 575, 123 S.Ct. 2472. Here, both types of conduct are criminalized and, thus, stigma attaches to the heterosexual conduct covered by the Romeo and Juliet statute. However, there is an enormous escalation in the severity of punishment for those punished under the general rape, sodomy, and lewd act statutes. The Kansas Sentencing Guidelines impose a presumptive sentence of prison upon all defendants, including those with no prior criminal history, who are convicted of a severity level 3 felony, the severity level applying to Limon's conviction. In contrast, a presumption of probation applies to all sentences, except those for defendants with criminal histories of "A" or "B," who are sentenced for a severity level 9 crime, which would be the applicable severity level for sodomy if the Romeo and Juliet statute applied.

Additionally, the presumptive terms of imprisonment for a severity level 3 felony, as noted earlier, are approximately 15 times that of a severity level 9 felony. As also discussed earlier, for Limon, whose

criminal history score was a B, this classification means the difference between a 13-, 14-, or 15-month prison sentence and a 206-month prison sentence.   K.S.A.2004 Supp. 21- 4704.   For a defendant with no criminal history, a conviction of criminal sodomy (as charged in this case) entails a sentencing range of 55-59-61 months' presumptive imprisonment while a conviction of unlawful voluntary sexual relations under the Romeo and Juliet statute entails a sentencing range of 5-6- 7 months with the presumption of *probation.*   K.S.A.2004 Supp. 21-4704. This represents an extreme disparity in sentencing.

There is also the distinction that Limon faces the stigma of sex offender registration; those convicted under the Romeo and Juliet statute do not. K.S.A. 22-4902.

Furthermore, the demeaning and stigmatizing effect upon which the *Lawrence* Court focused is at least equally applicable to teenagers, both the victim and the offender, as it is to adults and, according to some, the impact is greater upon a teen.

Based upon these considerations we conclude there is a discriminatory classification requiring us to examine the level of scrutiny to be applied in testing the constitutionality of the classification.

### *Level of Scrutiny*

[5] The next step of our analysis is to determine the appropriate level of scrutiny to apply. Limon argues that under the holding in *Lawrence* the highest level of scrutiny should apply because the statute creates a classification of homosexuals which the *Lawrence* Court recognized as suspect.    Contrary to this argument, the United States Supreme Court has not recognized homosexuals as a suspect classification. In addition, as Justice Scalia notes in his dissenting opinion in *Lawrence,* "Though there is discussion of 'fundamental proposition[s]' and 'fundamental decisions,' nowhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right.' " 539 U.S. at 586, 123 S.Ct. 2472 (Scalia, J., dissenting).   See *Lofton v. Secretary of Dept. of Children & Family,* 358 F.3d 804, 817 (11th Cir.2004) (concluding it would be "a strained and ultimately incorrect reading of *Lawrence* to interpret it to announce a new fundamental right"); *Standhardt v. Superior Court ex rel. County of Maricopa,* 206 Ariz. 276, 77 P.3d 451 (2003), *rev. denied* May 26, 2004 (no fundamental right to same-sex marriage where *Lawrence* did not recognize fundamental right to engage in same-sex sexual conduct). Thus, strict

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
**(Cite as: 122 P.3d 22)**

Page 8

scrutiny does not apply to our analysis of whether the Romeo and Juliet provision unconstitutionally discriminates based upon sexual orientation.

Justice O'Connor, in her concurring opinion in *Lawrence*, suggests "a more searching form of rational basis review" applies when a law exhibits a "desire to harm a politically unpopular group." 539 U.S. at 580, 123 S.Ct. 2472 (O'Connor, J., concurring). Her suggestion was not discussed by the *Lawrence* majority, which did not analyze the Texas statute on equal protection grounds. The majority did note that the "alternative" argument that the Texas statute was invalid under the Equal Protection Clause

"is a tenable argument, but we conclude the instant case requires us to address whether *Bowers* itself has continuing validity. Were we to hold the statute invalid **\*30** under the Equal Protection Clause some might question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants." 539 U.S. at 574-75, 123 S.Ct. 2472.

Despite not deciding the case on equal protection grounds and never explicitly identifying the standard utilized for its due process analysis, the *Lawrence* majority, by approvingly citing and discussing the equal protection analysis in *Romer*, at least implied that the rational basis test is the appropriate standard when a statute is attacked because of its classification of homosexual conduct. In *Romer*, the Court considered whether "Amendment 2" to the Colorado Constitution, which prohibited government protection of the status "homosexual, lesbian, bisexual orientation, conduct, practices or relationships," violated the Equal Protection Clause. In *Lawrence*, the Court summarized the *Romer* decision, noting that the amendment named a "solitary class ... and deprived them of protection under state antidiscrimination laws. We concluded that the provision was 'born of animosity toward the class of persons affected' and further that it had no rational relation to a legitimate governmental purpose." 539 U.S. at 574, 123 S.Ct. 2472.

The *Lawrence* opinion contains another oblique indication that the rational basis test would apply, stating: "The Texas statute furthers no *legitimate* state interest which can justify its intrusion into the personal and private life of the individual." 539 U.S. at 578, 123 S.Ct. 2472. (Emphasis added.) Typically, a search for a legitimate interest signifies a rational basis analysis.

Hence, we apply the rational basis test to determine whether the Romeo and Juliet statute is unconstitutional because of its exclusion of homosexual conduct.

*Rational Basis Test*

[6] The Court of Appeals applied the rational basis test and upheld the statute upon finding minimal congruence between the classifying means and the one legislative end upon which the two judges who comprised the majority could agree: public health.

As the Court of Appeals noted, the basic contours of the rational basis test are well-defined: "For a statute to pass constitutional muster under the rational basis standard, it therefore must meet a two-part test: (1) It must implicate legitimate goals, and (2) the means chosen by the legislature must bear a rational relationship to those goals." *Mudd v. Neosho Memorial Regional Med. Center*, 275 Kan. 187, 198, 62 P.3d 236 (2003).

In explaining the test, the United States Supreme Court has said that, although the rational basis test is "the most deferential of standards, we insist on knowing the relation between the classification adopted and the object obtained." *Romer*, 517 U.S. at 632, 116 S.Ct. 1620. The Court observed that the "search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature ...; and it marks the limits of our own authority." 517 U.S. at 632, 116 S.Ct. 1620. The Court continued: "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law.... 'If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect.' " 517 U.S. at 633, 116 S.Ct. 1620 (quoting *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 181, 101 S.Ct. 453, 66 L.Ed.2d 368 [1980] ) (Stevens, J., concurring).

*Romer* and other United States Supreme Court decisions instruct that we must examine the scope of the classification. Over-inclusiveness, where the legislation burdens a wider range of individuals than necessary given the State's interest, may be particularly invidious and unconstitutional. *Romer*, 517 U.S. at 632, 116 S.Ct. 1620. Likewise, a failure to create a classification which is sufficiently broad to effectively accommodate the State's interest, *i.e.*, the creation of an under-inclusive class, may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence an animus toward those burdened. _Cleburne, 473 U.S. at 450, 105 S.Ct. 3249._ Paradoxically, a class may be both under- and over-inclusive; Limon *31 argues the Romeo and Juliet statute creates such a class.

Justice O'Connor, in her concurring opinion in _Lawrence,_ cites and synthesizes four cases which illustrate these points:

"In _Department of Agriculture v. Moreno,_ [413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973),] for example, we held that a law preventing those households containing an individual unrelated to any other member of the household from receiving food stamps violated equal protection because the purpose of the law was to ' "discriminate against hippies." ' 413 U.S. at 534 [93 S.Ct. 2821]. The asserted governmental interest in preventing food stamp fraud was not deemed sufficient to satisfy rational basis review. [413 U.S. at 535-38, 93 S.Ct. 2821]. In _Eisenstadt v. Baird,_ 405 U.S. 438, 447-455, [31 L.Ed.2d 349], 92 S.Ct. 1029 (1972), we refused to sanction a law that discriminated between married and unmarried persons by prohibiting the distribution of contraceptives to single persons. Likewise, in _Cleburne v. Cleburne Living Center,_ we held that it was irrational for a State to require a home for the mentally disabled to obtain a special use permit when other residences--like fraternity houses and apartment buildings--did not have to obtain such a permit. And in _Romer v. Evans,_ we disallowed a state statute that 'impos[ed] a broad and undifferentiated disability on a single named group'--specifically, homosexuals. 517 U.S. at 632 [116 S.Ct. 1620]." _Lawrence,_ 539 U.S. at 580, 123 S.Ct. 2472 (O'Connor, J., concurring).

Of the four cases Justice O'Connor discusses, two are particularly analogous to this case. As Justice O'Connor indicated, in _Eisenstadt v. Baird,_ 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the Court invalidated on rational basis grounds a Massachusetts statute banning the distribution of contraceptives to unmarried persons. The state's highest court had found the legislative purpose to be "the State's interest in protecting the health of its citizens" by "preventing the distribution of articles designed to prevent conception which may have undesirable, if not dangerous, physical consequences" and "to protect morals" by discouraging premarital sexual intercourse. 405 U.S. at 442, 92 S.Ct. 1029. Addressing the purpose of preventing premarital sex, the Supreme Court concluded: " 'The rationality of this justification is dubious, particularly in light of the

admitted widespread availability to all persons ..., unmarried as well as married, of birth-control devices for the prevention of disease, as distinguished from the prevention of contraception.' " 405 U.S. at 448-49, 92 S.Ct. 1029 (quoting _Griswold v. Connecticut,_ 381 U.S. 479, 498, 85 S.Ct. 1678, 14 L.Ed.2d 510 [1965] [Goldberg, J., concurring] ). The Court concluded that "the Massachusetts statute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim." 405 U.S. at 449, 92 S.Ct. 1029.

The _Eisenstadt_ Court also explained, if the State genuinely considered contraceptives to pose a health risk, it would have banned their use by both married and unmarried persons. Protecting only single persons from the alleged dangers of contraceptives, and even then only when used to prevent pregnancy rather than the spread of disease, was "both discriminatory and overbroad" and "illogical to the point of irrationality." _Eisenstadt,_ 405 U.S. at 450-51, 92 S.Ct. 1029.

In the other case cited by Justice O'Connor which is particularly analogous, _Romer,_ the Court was reviewing the Colorado constitutional amendment which the State argued protected the associational rights of landlords and employers with moral objections to homosexuality and furthered the State's interest in "conserving resources to fight discrimination against other groups." _Romer,_ 517 U.S. at 635, 116 S.Ct. 1620. The Court found it "impossible to credit" these proffered purposes. 517 U.S. at 635, 116 S.Ct. 1620. Noting that rational basis inquiry was meant to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law," 517 U.S. at 633, 116 S.Ct. 1620 the Court held that

"[e]ven laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. Amendment *32 2, however, in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justification that may be claimed for it." 517 U.S. at 635, 116 S.Ct. 1620.

The Court faulted the Colorado constitutional amendment for imposing a "broad and undifferentiated disability on a single named group." 517 U.S. at 632, 116 S.Ct. 1620. The Court further condemned the statute because "its sheer breadth is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." 517 U.S. at 632, 116 S.Ct. 1620. Additionally, the amendment was "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." 517 U.S. at 635, 116 S.Ct. 1620. Because of these faults, the Court reached "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." 517 U.S. at 634, 116 S.Ct. 1620. " '[D]esire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.' " 517 U.S. at 634, 116 S.Ct. 1620 (quoting *U.S. Department of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 [1973] ). The result of these deficiencies was that, whatever else might be said of the amendment, it "offended" the "conventional and venerable" principle that "a law must bear a rational relationship to a legitimate governmental purpose." 517 U.S. at 635, 116 S.Ct. 1620.

With these holdings to direct us, we begin our search for a rational basis for the harshly disparate sentencing treatment of those 18 years old and younger who engage in voluntary sex with an underage teenager of the same sex.

*Legislative History*
Although the legislature need not have articulated the basis for the classification the State relies upon when the classification is challenged, we begin with an examination of the legislative record to determine if a purpose for the classification is suggested therein.

The Kansas unlawful voluntary sexual relations (Romeo and Juliet) statute was originally drafted as an amendment to K.S.A. 21-3520, rather than as a free-standing statute. See L.1999, ch. 164, sec. 38; 1999 S.B. 131. As it appeared in S.B. 131, the provision contained no requirement that the prohibited activity occur between members of the opposite sex. In other words, it would not have differentiated between a Romeo and Juliet relationship, a Romeo and Romeo relationship, or a Juliet and Juliet relationship.

The Kansas Sentencing Commission, which drafted the bill, offered the following testimony with regard to the provision:

"Numerous concerns have been raised by judges on the sentencing when the parties are in a mutual relationship and the parents or other parties initiate prosecution. This would allow for the sanctioning

of the activity as a person felony, but would designate a presumptive nonprison sentence. In addition, a conviction under this new section would not require the offender to register as a sex offender, which may result in long term consequences." Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999.

The Commission also noted that the provision was one of several recommendations that attempted to address proportionality issues. The Commission's recommendations were based on the guiding principles that incarceration should be reserved for the most violent and chronic offenders and that the length of sentences should increase in proportion to the severity of the offense, with loss of human life being the most severe threat to public safety. Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999.

There was significant opposition to the provision, although none of the recorded criticism faulted the statute for not containing language limiting the provision to heterosexual teen relations. The Kansas County & District Attorneys Association offered the following testimony opposing the provision:
*33 "[W]e are opposed to the provisions that distinguish sex crimes based on the offender's age on two grounds:
"1. POLICY. A crime is a crime, whether committed by a 19-year-old or a 22- year-old, and, historically, the offender's age has only determined whether the case is filed in juvenile or adult court. As the attached testimony submitted by the Reno County Attorney there is a strongly-held belief that there are predatory relationships out there, regardless of the proximity in age between predator and victim. Those cases truly involving Romeo and Juliet are better left to prosecutor discretion; or more correctly victim and police discretion, since the prosecutor rarely hears about true Romeo and Juliet situations. Likewise, the bundling of the various consensual sex acts between Romeo and Juliet into a single crime is indicative that the State makes no distinction between heavy petting, sodomy or intercourse. Those ... involved in the problem of teen pregnancy would beg to differ with that decision.
"2. LEGAL.... What is the state interest in making a distinction based on the difference in age? Is the victim less fondled or, in the extreme case, made less pregnant, simply because a defendant is near her own age? ..." Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Reno County Attorney testified that the law "will send a dangerous message to the young men and women of this State ... that fourteen and fifteen year old girls are entitled to less protection and it is somehow less of an offense if the perpetrator happens to be near them in age." He noted that not all sexual relations between teenagers involve romantic relationships. Testimony on S.B. 131 before the Senate Judiciary Committee, February 11, 1999. Representatives of the Kansas Peace Officers' Association and the Attorney General also opposed the provision, objecting on similar grounds. Kansas Peace Officers' Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999; Attorney General's Testimony on S.B. 131 before the Senate Judiciary Committee, February 11, 1999.

After S.B. 131 received hearings in committee and was reported to the Senate, the Senate passed the bill on a vote of 35 "ayes" and 5 "nays." Sen. J., 1999, p. 242. Although S.B. 131 was heard by the House Judiciary Committee, the House did not take final action on the bill. Eventually, in conference committee, the provisions of S.B. 131 were amended into 1999 S.B. 149. At that point, the phrase limiting the statute to relations between members of the opposite sex, making it a true Romeo and Juliet statute, was added along with other revisions not relevant to the facts of this case. See House J., 1999, p. 1165. Although the version of the Romeo and Juliet law which appears in S.B. 149 is different from the one contained in S.B. 131, there are no minutes reflecting how or why it was changed to include the "opposite sex" language. S.B. 149, and previously S.B. 131, contained many other juvenile and crime provisions. When the Senate voted to accept the conference report, 30 "yea" votes and 9 "nay" votes were cast. Sen. J., 1999, p. 1003.

As this review of the legislative history reflects, there is nothing in the legislative record regarding the legislative purpose for adding the opposite sex requirement. The only legislative purposes recorded relate to the general goal of less harsh punishment for those 18 years old and younger who had voluntary sex with another teen who was at least 14 and the goal of adjusting sentence disparities. It was opponents to the legislation who raised public health and moral concerns and none of them related to the difference between heterosexual and homosexual conduct.

Although the legislative history does not suggest the State's interest in including the phrase "and are members of the opposite sex," the State argues

several possibilities. In addition, we must consider the rationales utilized by the Court of Appeals majority. These various possible State interests can be categorized as: (1) the protection and preservation of the traditional sexual mores of society; (2) preservation of the historical notions of appropriate sexual development of *34 children; (3) protection of teenagers against coercive relationships; (4) protection of teenagers from the increased health risks that accompany sexual activity; (5) promotion of parental responsibility and procreation; and (6) protection of those in group homes.

*Traditional Sexual Mores and Development*
Limon counters this theoretical justification by arguing that the State's moral disapproval of homosexuality is an illegitimate justification for discrimination.

The *Lawrence* decision rejected a morality-based rationale as a legitimate State interest. The Court recognized that many people condemn homosexuality as immoral:
   "[T]he Court in *Bowers* was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." 539 U.S. at 571, 123 S.Ct. 2472.

However, the Court continued by stating: "These considerations do not answer the question before us." 539 U.S. at 571, 123 S.Ct. 2472. The Court framed the issue as "whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. 'Our obligation is to define the liberty of all, not to mandate our own moral code.' *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 850 [112 S.Ct. 2791, 120 L.Ed.2d 674] (1992)." 539 U.S. at 571, 123 S.Ct. 2472.

Thus, when Texas argued that its anti-sodomy law furthered the promotion of morality (539 U.S. at 582, 123 S.Ct. 2472 [O'Connor, J., concurring] ), the Court in *Lawrence* rejected the argument and adopted the following reasoning from Justice Stevens' dissent in *Bowers:* " '[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
**(Cite as: 122 P.3d 22)**

Page 12

upholding a law prohibiting the practice.' " 539 U.S. at 577, 123 S.Ct. 2472 (quoting *Bowers,* 478 U.S. at 216, 106 S.Ct. 2841 [Stevens, J., dissenting] ).

This holding followed the precedent of *Casey, Eisenstadt, Romer,* and other cases. The Court in *Romer* explained that our laws are often morality-based which, in and of itself, is not objectionable if the laws are applied fairly to all. However, the right to equal protection of those laws is offended when legal classifications are drawn for the purpose of invoking moral disapproval with "the purpose of disadvantaging the group burdened by the law." *Romer,* 517 U.S. at 633, 116 S.Ct. 1620.

The Court of Appeals majority would dismiss this analysis in *Lawrence* because of the due process context in which the discussion was made. The *Lawrence* majority, however, signaled application of the principles to equal protection analysis: "Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests." 539 U.S. at 575, 123 S.Ct. 2472. In essence, the *Lawrence* decision recognized that the substantive due process analysis at issue in that case and the equal protection analysis necessary in this case are inevitably linked.

This court has described this link as follows:
"The difference between the constitutional concepts of due process and equal protection is that due process emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation are treated, while equal protection emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable. *The test in determining the constitutionality of a statute under due process or equal protection concepts weighs almost identical factors.*" (Emphasis added.) *Chiles v. State,* 254 Kan. 888, Syl. ¶ 10, 869 P.2d 707 (1994).

Thus, we are directed in our equal protection analysis by the United States Supreme *35 Court's holding in *Lawrence* that moral disapproval of a group cannot be a legitimate governmental interest.

### *Historical Notions of Appropriate Sexual Development of Children*
The Court of Appeals also determined the *Lawrence* holding did not apply to this case because *Lawrence*

involved adults and this case involved an adult in a relationship with a minor. Likewise, the State focuses its argument on the State's interest in the moral and sexual development of children.

Undoubtedly, the State has broad powers to protect minors. This point was noted by the United States Supreme Court in *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). *Carey* involved a constitutional challenge to a prohibition on distribution of contraceptives to persons under 16 years of age. The appellants argued that the free availability of contraceptives might encourage sexual activity among minors and the State had a legitimate interest in discouraging such behavior. In response, the appellees argued that minors as well as adults had a privacy right to engage in consensual sexual behavior. The *Carey* court noted that "in the area of sexual mores, as in other areas, the scope of permissible state regulation is broader as to minors than as to adults." 431 U.S. at 694 n. 17, 97 S.Ct. 2010.

However, *Carey* held that "the right to privacy in connection with decisions affecting procreation extends to minors as well as adults" and invalidated the prohibition in question. 431 U.S. at 693, 97 S.Ct. 2010. The Court noted that "State restrictions inhibiting privacy rights of minors are valid only if they serve 'any significant state interest ... that is not present in the case of an adult.' [Citation omitted.]" 431 U.S. at 693, 97 S.Ct. 2010.

Although this case does not involve the fundamental right to privacy in connection with decisions affecting procreation or legislation which inhibits the rights of minors, the *Carey* rationale suggests that even when the articulated interest is the protection of minors, there still must be a connection between the State's interest and the classification and, if the burden would not be allowed if placed upon an adult, the State's interest must be unique to children. So, unless the justifications for criminalizing homosexual activity between teenagers more severely than heterosexual activity between teenagers are somehow different than the justifications for criminalizing adult homosexual activity, those justifications must fail.

Neither the Court of Appeals nor the State cites any scientific research or other evidence justifying the position that homosexual sexual activity is more harmful to minors than adults.

After this court accepted review of the Court of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
(Cite as: 122 P.3d 22)

Appeals decision, the National Association of Social Workers and the Kansas Chapter of the National Association of Social Workers filed an *amici* brief which specifically questions the Court of Appeals' conclusion that the exclusion of gay teens from the application of the unlawful sexual relations statute protects the traditional sexual development of children. That brief cites a number of studies indicating that sexual orientation is already settled by the time a child turns 14, that sexual orientation is not affected by the sexual experiences teenagers have, and that efforts to pressure teens into changing their sexual orientation are not effective.

We conclude, as the United States Supreme Court stated in *Romer,* the "status-based enactment [is so] divorced from any factual context" we cannot "discern a relationship" to the espoused State interest (*Romer,* 517 U.S. at 635, 116 S.Ct. 1620) that the law preserves the sexual development of children consistent with traditional sexual mores. Additionally, we again recognize the *Lawrence* Court's conclusion that moral disapproval of a group cannot be a legitimate governmental interest.

### Coercive Effect Upon Minors

The State at various times refers to the coercive effect often existing in a relationship between an adult and a child. Certainly, the State has a significant interest in prohibiting sex between adults and minors, not only because of the potentially coercive effect of an adult's influence but also because of concern *36 regarding the minor's ability to arrive at an informed consent. These concerns are addressed by and form the fundamental policy rationale of statutory rape provisions. Limon's argument accepts and supports this State interest; he agrees he deserves punishment. He simply disputes that he should be punished more severely for having sex with a member of the same sex.

Additionally, the policy decision made by the legislature in enacting the Romeo and Juliet statute undercuts this argument. The legislature determined, at least as to those in a heterosexual relationship, that a mutual relationship between teenagers is less likely to involve the same coercion that a relationship between an older adult and a child might and is more likely to be one where the minor's participation is voluntary, although not legally consensual.

This, however, begs the question of whether there is a rational basis to distinguish between a class of those 18 years old and younger who engage in voluntary sex with minors aged 14 or 15 who are of the same

sex and a class of those 18 years old and younger who engage in voluntary sex with such minors of the opposite sex. We see no basis to determine that as a class one group or the other would have a higher tendency to be coercive. A distinction on this basis has no factual support.

The State makes the same argument in a narrower fashion as applied to the facts of this case, stating the activity between Limon and M.A.R. was "less than consensual and more likely coercive." Where the State stipulated below that the sexual activity between Limon and M.A.R. was consensual, it cannot be heard to argue on appeal that Limon's actions were "coercive and predatory." We agree the wording in the stipulation that the oral sex between Limon and M.A.R. was "consensual" was a legal misnomer and a better term would have been "voluntary," but that distinction does not permit the State to back away from its stipulation at this stage of the case.

### Public Health

As to the public health justification, Limon argues that excluding gay teenagers from the lesser penalties of the Romeo and Juliet law has no connection with the State's interest in reducing the spread of sexually transmitted diseases. Specifically, the State focuses upon the risks of HIV and in support of its argument cites briefs filed before the United States Supreme Court in the *Lawrence* case.

We first note that there is no basis to determine that public health risks for minors engaging in same-gender sexual relations is greater than the risk for adults. That *Lawrence* did not discuss the often-cited justifications of public health and morality tells us that those interests are either not legitimate interests at all, or more likely, that they are not sufficient to overcome an individual's right to liberty and privacy.

At a minimum, we cannot distinguish between the health risks for the adults involved in *Lawrence* and the minor involved in this case. Additionally, we find persuasive Limon's argument that for this justification to be rational, the prohibited sexual activities would have to be more likely to transmit disease when engaged in by homosexuals than by heterosexuals; however, this proposition is not grounded in fact.

Again, we have the benefit of additional arguments, including the *amici curiae* brief of a number of public health organizations which provided scientific and statistical information. These studies persuade us

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
(Cite as: 122 P.3d 22)

that the Romeo and Juliet statute presents one of those seemingly paradoxical situations where the classification is both over- and under-inclusive.

Using statistics from the United States Centers for Disease Control and Prevention (CDC) and other studies, the *amici* support the argument that the Court of Appeals majority and the State focus on the wrong population in citing the statistics regarding the incidence of HIV infection in adult homosexual males. Significantly, they point to the CDC's Basic Statistics which reflect that among the population of HIV-positive young people ages 13-19, which includes the age range covered by the Romeo and Juliet statute, 61 percent are female. Yet, the risk of transmission of the HIV infection through female to female contact is negligible. **\*37** Recognizing that HIV is transmitted through intravenous drug use of shared needles and other mechanisms besides sexual transmission, the gravest risk of sexual transmission for females is through heterosexual intercourse.

There is a near-zero chance of acquiring the HIV infection through the conduct which gave rise to this case, oral sex between males, or through cunnilingus. And, although the statute grants a lesser penalty for heterosexual anal sex, the risk of HIV transmission during anal sex with an infected partner is the same for heterosexuals and homosexuals.

The legislative history reveals that the concern of conferees was more focused upon teenage pregnancy. Obviously, this public health risk is not addressed through this legislation. According to the Kansas Department of Health and Environment's Teenage Pregnancy Report for 2003, there were 1,559 pregnancies in Kansas teens age 15 to 17. In contrast, the same agency reports that from 2000 to 2002 there were two cases of AIDS in Kansas among teenagers 13-19 years old.

Dissenting Judge Pierron cited several scenarios in which the statute did not protect against activities which raise a public health risk. In part, he stated:

"[U]nder the law a female infected with every venereal disease yet identified, and engaging in acts quite likely to infect or actually infecting a male minor, will receive a much lighter sentence. A disease-free male engaging in sex with another male in a manner not likely to spread disease if it was present will receive a much heavier sentence. Perversely, under the law, a male with a venereal disease who infects and impregnates an underage female will also receive a much lighter sentence." 32 Kan.App.2d at 397-98, 83 P.3d 229.

In essence, the Romeo and Juliet statute is over-inclusive because it increases penalties for sexual relations which are unlikely to transmit HIV and other sexually transmitted diseases. Thus, the statute burdens a wider range of individuals than necessary for public health purposes. Simultaneously, the provision is under-inclusive because it lowers the penalty for heterosexuals engaging in high-risk activities. In other words, the statute proscribes conduct unrelated to a public health purpose and does not proscribe conduct which is detrimental to public health.

Thus, the conclusions of the *Romer* Court are, again, particularly salient. The status-based distinction in the Kansas Romeo and Juliet statute is so broad and so divorced from supporting facts that we cannot discern a relationship to the facially legitimate interest of protecting public health and "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." 517 U.S. at 632, 116 S.Ct. 1620. The "statute's superficial earmarks as a health measure" (*Eisenstadt,* 405 U.S. at 452, 92 S.Ct. 1029) do not satisfy scrutiny under the rational basis test.

*Promoting Parental Responsibility and Procreation*
Limon also contends that there is no rational connection between the classification and the Court of Appeals' parental responsibility and procreation justifications. The Court of Appeals stated that the legislature might have determined that lengthy incarceration of a young adult offender who has become a parent as a result of a heterosexual relationship with a minor would be counterproductive to that young adult's duty to support his or her child. But, because same-sex relationships do not lead to unplanned pregnancies, the need to release a same-sex offender from incarceration is absent.

Limon argues this justification and Judge Green's findings regarding the State's interest in relationships which lead to procreation make no sense since the State's interest is to discourage teen pregnancies, not encourage them. Further, the statute does not reduce penalties solely for conduct that results in pregnancy, but also for heterosexual intercourse which does not result in pregnancy, *i.e.,* sodomy and lewd contact. Again, the relationship between the objective and the classification is so strained that we cannot conclude it is rational.

**\*38** *Protection of Those in Group Homes*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The State also makes an argument that the State has an interest in gender segregation in group homes. The Romeo and Juliet statute has no limitation related to living arrangements or disability. If the statute punished similar behavior in segregated group homes for juveniles, the State's argument could conceivably justify a harsher penalty. However, the statute is not limited in this manner. If the legislative purpose is to protect those in group homes, the statute's overbreadth in covering situations both inside and outside residential living environments suggests animus toward teenagers who engage in homosexual sex. See *Romer*, 517 U.S. at 632, 116 S.Ct. 1620.

### No Rational Basis

We conclude that K.S.A.2004 Supp. 21-3522, the Kansas unlawful voluntary sexual relations statute, does not pass rational basis scrutiny under the United States Constitution Equal Protection Clause or, because we traditionally apply the same analysis to our state constitution, under the Kansas Constitution Equal Protection Clause. The Romeo and Juliet statute suffers the same faults as found by the United States Supreme Court in *Romer* and *Eisenstadt;* adding the phrase "and are members of the opposite sex" created a broad, overreaching, and undifferentiated status-based classification which bears no rational relationship to legitimate State interests. Paraphrasing the United States Supreme Court's decision in *Romer,* the statute inflicts immediate, continuing, and real injuries that outrun and belie any legitimate justification that may be claimed for it. Furthermore, the State's interests fail under the holding in *Lawrence* that moral disapproval of a group cannot be a legitimate governmental interest. As Justice Scalia stated: "If, as the [United States Supreme] Court asserts, the promotion of majoritarian sexual morality is not even a *legitimate* state interest," the statute cannot "survive rational-basis review." 539 U.S. at 599, 123 S.Ct. 2472 (Scalia, J., dissenting).

Because we determine the statute violates constitutional equal protection guarantees based upon a rational basis analysis, we need not reach Limon's other arguments that strict scrutiny should be applied, including his argument that the statute discriminates based on sex.

### Appropriate Remedy

[7] Given our holding, we must determine the appropriate remedy. Limon asks this court to: (1) strike the language from the Romeo and Juliet statute that limits its application to members of the opposite

sex and (2) reverse and remand this case with instructions that the State initiate any further proceedings under the Romeo and Juliet law within 30 days. The State argues that this court cannot judicially rewrite the statute and contends that, if the court were to declare the challenged classification unconstitutional, it must nullify the statute.

On several occasions, this court has considered severing an unconstitutional provision from a statute and leaving the remainder in force. Each time, we have reiterated that the determination of whether the provision may be severed "depends on the intent of the legislature." *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City,* 264 Kan. 293, Syl. ¶ 16, 955 P.2d 1136 (1998). See, *e.g., State v. Carpenter,* 231 Kan. 235, 240-41, 642 P.2d 998 (1982) (striking phrase from statute as unconstitutionally vague); *Gumbhir v. Kansas State Board of Pharmacy,* 228 Kan. 579, 588, 618 P.2d 837 (1980) (striking phrase from statute which unlawfully delegated legislative power). We have applied the same test when reading judicial requirements into statutes which otherwise were overbroad, if doing so reflects the "manifest intention of the legislature." *State v. Motion Picture Entitled "The Bet,"* 219 Kan. 64, 71, 547 P.2d 760 (1976) (imposing constitutional standard upon statutory definition of "obscene").

[8] When an alteration of a statute--either through striking language or adding judicial requirements to the statute--would be contrary to legislative intent, courts must nullify the statute. This point was emphasized in *State v. Marsh,* 278 Kan. 520, 102 P.3d 445 (2004), *cert. granted* --- U.S. ----, 125 S.Ct. 2517, 161 L.Ed.2d 1109 (2005), in **39** which this court nullified the Kansas death penalty statute after finding it unconstitutional. Marsh raised the constitutionality of the statute because the jury had been instructed, consistent with the statute, that the death penalty must be imposed if aggravating and mitigating circumstances weighed equal, in other words were in equipoise. Marsh argued his death sentence must be reversed because this equipoise provision had been found to violate the Eighth Amendment in *State v. Kleypas,* 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834, 123 S.Ct. 144, 154 L.Ed.2d 53 (2002). Marsh also argued that this constitutional infirmity required nullification of the death penalty statute, a result which would require reversing portions of the *Kleypas* decision. Specifically, Marsh argued the *Kleypas* court had erroneously applied precedent and improperly rewritten an unambiguous statute in a manner clearly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
**(Cite as: 122 P.3d 22)**

contrary to legislative intent.

The majority in *Marsh* agreed with this argument. First, the *Marsh* court noted, "the avoidance doctrine [under which courts seek to construe statutes as constitutional] is applied appropriately *only* when a statute is ambiguous, vague, or overbroad." 278 Kan. at 539, 102 P.3d 445. The provision of the death penalty statute was not ambiguous, vague, or overbroad. The express language adopted by the legislature made it clear that the legislature intended to mandate the imposition of a death sentence where the existence of aggravating circumstances is not outweighed by any mitigating circumstances found to exist. In other words, there was no ambiguity and, therefore, no basis to apply rules of statutory construction. Second, the *Marsh* court, citing decisions of this court and of the United States Supreme Court, reiterated the long-standing and well-established rule that a court can only " 'construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute.' " 278 Kan. at 539, 102 P.3d 445. The majority concluded that the statutory construction adopted in *Kleypas* was not within the apparent intent of the legislature. The legislative history of the death penalty statute showed that the attorney general had presented the legislature the precise question of whether the equipoise provision was constitutional. The attorney general recommended that the statute provide that the aggravating circumstances must outweigh the mitigating circumstances before a death sentence may be imposed and advised that without this change the constitutionality of the statute was in question. Despite this specific recommendation and advice, the legislature did not act on the attorney general's advice. 278 Kan. at 540, 102 P.3d 445. Thus, to read the statute in the manner suggested in *Kleypas* was contrary to legislative intent. The *Marsh* court concluded it was a violation of the separation of powers doctrine for the court to rewrite a statute in a manner so clearly contrary to the legislative intent. The only option in such a situation is to nullify the statute.

In this case, it is the State suggesting that the statute must be nullified if found unconstitutional. Limon, noting that the statute is overbroad, thus making it appropriate for the court to consider the remedy of striking language, suggests there is evidence of a legislative intent to have the offending language struck rather than to nullify the entire provision. He points to the severance provision within the sex crimes statutes.

We have noted that, although our decision to strike language is not dependent upon the presence of a severance provision, "[t]he enactment of a severability clause in a statute or series of statutes evidences the intent of the legislature that if some portion or phrase in the statute is unconstitutional, the balance shall be deemed valid." *State v. Next Door Cinema Corp.*, 225 Kan. 112, Syl. ¶ 8, 587 P.2d 326 (1978). In this case there is an applicable severability provision which applies to all sex crimes and provides: "If any provision of this act is held to be invalid or unconstitutional, it shall be conclusively presumed that the legislature would have enacted the remainder of this act without such invalid or unconstitutional provision." K.S.A.2004 Supp. 21-3521. The severability clause was already in place (it was enacted in 1998) at the time the Romeo and Juliet law was enacted in 1999. Thus, it is conclusively presumed the legislature would have enacted the statute even if it did not include the *40 phrase "and are members of the opposite sex."

There are other considerations which also lead us to conclude that the legislative intent would be to strike the offending language rather than nullify the entire statute. These considerations were discussed in *State v. Denney*, 278 Kan. 643, 101 P.3d 1257 (2004). At issue in *Denney* was whether there was an equal protection violation because K.S.A. 21-3502 allowed postconviction DNA testing in a rape case but not in an aggravated criminal sodomy case. After concluding there was no rational basis for allowing DNA testing for rapists but not allowing testing for Denney who had penetrated a female's anus with his penis, we concluded the statute was under-inclusive.

In considering a remedy, we extensively discussed applicable general rules and specifically examined use of those rules in two cases: *Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979), and *People v. Liberta*, 64 N.Y.2d 152, 485 N.Y.S.2d 207, 474 N.E.2d 567 (1984). We need not repeat the full discussion here. Summarizing that discussion, we stated:

"[T]he question before us is whether the Kansas Legislature would prefer to have statutes which cover DNA testing for those convicted of aggravated criminal sodomy like Denney, or instead to have no statutes providing for postconviction DNA testing. To answer this question, we first consider the legislative purpose.... We next consider the public's needs.... "As an additional consideration, we also examine the overall statutory scheme." *Denney*, 278 Kan. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

659-60, 101 P.3d 1257.

In this case, the first two inquiries mentioned-- legislative purpose and public need--are closely related. As previously discussed, the principal legislative purposes of the Romeo and Juliet statutes were to accommodate the situation where a teen relationship reduces the level of coercion potentially involved in a sexual relationship between an adult and a minor and to adjust the proportionality of sentences. These purposes are not harmed by striking the language and, some would argue, are actually furthered through the revision.

The next consideration under *Denney* is the overall statutory scheme. We have stated: "Where parts of a statute or a section of a statute can be readily separated, then the part which is constitutional may stand while the unconstitutional part is rejected." *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City,* 264 Kan. at 316, 955 P.2d 1136. In this case, the phrase "and are members of the opposite sex" can readily be struck without creating an ambiguous statute.

In *State ex rel. Tomasic* we also noted that, if from the legislative scheme "it can be said that the act would have been passed without the objectionable portion and if the statute would operate effectively to carry out the intent of the legislature with such portion stricken, the remainder of the law will stand as valid." 264 Kan. 293, Syl. ¶ 16, 955 P.2d 1136.

In this case, we are assisted in this inquiry by the legislative history, specifically, the Senate vote on S.B. 131, which did not include the language that makes the provision unconstitutional. The Senate approved that proposal on a vote of 35 "ayes" to 5 "nays." Sen. J., 1999, p. 242. Hence, although a vote was not taken in both chambers of the legislature on S.B. 131, we know that the Senate, at least, supported the legislation without the offending language-- indeed, with more yea votes than the measure drew once the offending language had been added.

From this examination, we conclude that several factors--the severability clause, the legislative purposes, the public need, the legislative scheme, and the legislative history--reveal that striking the offending language rather than nullifying the statute would be consistent with legislative intent.

*Conclusion of Equal Protection Analysis*
We hold K.S.A.2004 Supp. 21-3522 unconstitutional as violating the equal protection provisions of the United States and Kansas Constitutions and strike from the statute the words "and are members of the opposite sex." We further hold that Limon's conviction and sentence for criminal sodomy pursuant*41 to K.S.A. 21-3505(a)(2) violate his right to equal protection of the laws.

We further grant Limon's requested remedy of imposing a time limit upon further proceedings in this case and order that the State will have 30 days in which to: (1) charge Limon under the provisions of K.S.A.2004 Supp. 21-3522 without the words "members of the opposite sex" or (2) take other action.

Because we reach these holdings, we need not decide Limon's argument that his sentence was cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

*Apprendi Argument*
[9] We must, however, consider one additional issue raised by Limon. He contends that increasing his sentence based on his prior juvenile adjudications violates the principles of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *State v. Gould,* 271 Kan. 394, 23 P.3d 801 (2001). Limon recognizes that this argument was rejected in *State v. Hitt,* 273 Kan. 224, 235-36, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104, 123 S.Ct. 962, 154 L.Ed.2d 772 (2003), but raises the issue to preserve it for future review in the federal courts and to give this court a chance to reconsider *Hitt.*

*Hitt* held that juvenile adjudications "enjoy ample procedural safeguards" and are encompassed in the *Apprendi* exception for prior crimes. 273 Kan. at 236, 42 P.3d 732. This court has declined to overrule *Hitt* as recently as June 2004. See *State v. Carter,* 278 Kan. 74, 91 P.3d 1162 (2004).

More importantly, Limon did not raise this issue before the Court of Appeals; thus the issue is not properly before this court. See *State v. Layton,* 276 Kan. 777, 784, 80 P.3d 65 (2003) (where issue raised in petition for review was neither presented to nor decided by Court of Appeals, issue was not properly before this court).

Reversed and remanded with directions.

DAVIS, J., and GERNON, J., not participating.

LARSON, S.J., assigned. [FN1]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 P.3d 22
122 P.3d 22
(Cite as: 122 P.3d 22)

FN1. **REPORTER'S NOTE:** Senior Judge
Edward Larson was appointed to hear case
No. 85,898 vice Justice Davis pursuant to
the authority vested in the Supreme Court by
K.S.A. 20-2616.

122 P.3d 22

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 1958979 (Appellate Brief) Brief of
Amici Curiae (Aug. 09, 2004)

• 2004 WL 1958980 (Appellate Brief) Brief Amici
Curiae of the National Association of Social Workers
and the Kansas Chapter of the National Association
of Social Workers in Support of Defendant/Appellant
Matthew Limon (Aug. 09, 2004)

• 2004 WL 1646973 (Appellate Brief) Defendant-
Appellant's Supplemental Brief on Review (Jun. 24,
2004)

• 2004 WL 1646974 (Appellate Brief) Supplemental
Brief of Appellee (Jun. 18, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.