UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12546-GAO

THOMAS COOK, MEGAN DRESCH, LAURA GALABURDA,
JACK GLOVER, DAVID HALL, MONICA HILL, JENNY LYNN
KOPFSTEIN, JENNIFER McGINN, JUSTIN PEACOCK, JAMES E.
PIETRANGELO II, DEREK SPARKS, STACY VASQUEZ,
Plaintiffs,

v.

DONALD H. RUMSFELD, Secretary of Defense,
MICHAEL CHERTOFF, Secretary of Homeland Security,
UNITED STATES OF AMERICA,
Defendants.

MEMORANDUM AND ORDER
April 24, 2006

O'TOOLE, D.J.

The plaintiffs are twelve former members of the armed forces of the United States who assert that they were forced to leave the military service involuntarily by reason of the defendants' enforcement of 10 U.S.C. § 654 and regulations adopted pursuant to it. Section 654 and its implementing regulations express what has become known as the "Don't Ask, Don't Tell" policy of the armed forces, mandating the exclusion from service of persons who either have engaged or attempted to engage in homosexual acts or have effectively identified themselves as homosexual. Claiming that the statute and regulations are unconstitutional, the plaintiffs seek a declaratory judgment to that effect and an injunction against the further enforcement of the policy. They also seek an order requiring their readmission into their respective former service branches, conditioned only

on a demonstration of continued eligibility under criteria exclusive of the "Don't Ask, Don't Tell" policy.

The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P 12(b)(6). Dismissal of a complaint under Rule 12(b)(6) should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" made in the complaint. Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 66 (1st Cir. 2004) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)). In making this determination, a court "assume[s] the truth of all well-pleaded facts and indulge[s] all reasonable inferences that fit the plaintiff's stated theory of liability." Redondo-Borges v. U.S. Dep't of Hous. and Urban Dev., 421 F.3d 1, 5 (1st Cir. 2005) (quoting In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003)). Those facts may be derived from the complaint, whatever documents are either annexed to it or fairly incorporated into it, and any relevant matters that are susceptible of judicial notice. Id. However, a court need not credit "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." Id. (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir.1996)). In short, dismissal of a complaint for failure to state a claim under Rule 12(b)(6) is appropriate where there are dispositive issues of law that bar the plaintiffs' claims even if they are able to prove the factual assertions made in the complaint.

I.      Section 654 and the Policy

Prior to January 1993, it had been the long-standing policy of the Department of Defense to discharge (or "separate," to use the term of art) members of the armed services who were homosexuals. See S. Rep. No. 103-112, at 265-67 (1993). Over time the policy had varied in its formulation and administration, but by 1982 it had been codified in Department of Defense Directives

1332.14 (applicable to enlisted personnel) and 1332.30 (applicable to officers). <u>See</u> S. Rep. No. 103-112, at 266-67 (1993). These Directives dealt broadly with the grounds and procedures for separating personnel from service; the 1982 iteration of the Directives explicitly included homosexual acts, or a "propensity" toward them, as a ground for separation.

Shortly after taking office in January 1993, President Clinton directed the Secretary of Defense to review the armed forces' policy regarding the service of homosexuals and to submit a report of his review by July 15, 1993. <u>See</u> Memorandum on Ending Discrimination in the Armed Forces, 1 Pub. Papers 23 (Jan. 29, 1993); <u>see also</u> S. Rep. No. 103-112, at 267-68 (1993). In the interim, the existing policy was to be enforced, with two qualifications. First, new recruits were not to be asked about homosexuality during the enlistment process (the "don't ask" feature). Second, instead of being fully separated, service members who were homosexual would simply be removed from active duty and placed in non-pay status in the standby reserve, so long as they had not engaged in homosexual acts. <u>See</u> S. Rep. No. 103-112, at 267-68 (1993). On July 19, 1993, after completing the review requested by the President, the Secretary of Defense issued a policy memorandum which effectively extended the interim policy for a few more months. <u>See</u> Remarks Announcing the New Policy on Homosexuals in the Military, 1 Pub. Papers 1109 (July 19, 1993); <u>see also</u> S. Rep. No. 103-112, at 289-92 (1993).

Congress also undertook a review of the existing policy in early 1993. The Armed Services Committees of both the Senate and the House of Representatives held hearings on the matter through the spring and summer of that year. <u>See</u> S. Rep. No 103-112, at 268-70 (1993); H.R. Rep. No. 103-200, at 286-90 (1993); <u>see also</u> <u>Thomasson v. Perry</u>, 80 F.3d 915, 921-23 (4th Cir. 1996) (recounting in detail the legislative process that led to the enactment of § 654). In particular, the

Senate Committee received testimony from present and former military commanders, including the

Chairman of the Joint Chiefs of Staff, the commanding officers of each of the several military

branches, and other present and former military officers, as well as from other interested persons,

including academics in the fields of law and the social sciences.  See S. Rep. No 103-112, at 268-70

(1993).

The result of these reviews was Congress' enactment of the policy now at issue.  See National

Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 571, 107 Stat. 1547, 1670-

73, *codified at* 10 U.S.C. § 654.  Subsection (b) of § 654 states the policy as adopted by Congress:

> A member of the armed forces shall be separated from the armed forces under
> regulations prescribed by the Secretary of Defense if one or more of the following
> findings is made and approved in accordance with procedures set forth in such
> regulations:
>
> > (1) that the member has engaged in, attempted to engage in, or solicited
> > another to engage in a homosexual act or acts unless there are further
> > findings, made and approved in accordance with procedures set forth in such
> > regulations, that the member has demonstrated that  –
> >
> > > (A) such conduct is a departure from the member's usual and
> > > customary behavior;
> > >
> > > (B) such conduct, under all the circumstances, is unlikely to recur;
> > >
> > > (C) such conduct was not accomplished by the use of force, coercion,
> > > or intimidation;
> > >
> > > (D) under the particular circumstances of the case the member's
> > > continued presence in the armed forces is consistent with the interests
> > > of the armed forces in proper discipline, good order, and morale; and
> > >
> > > (E) the member does not have a propensity or intent to engage in
> > > homosexual acts.
> >
> > (2) That the member has stated that he or she is a homosexual or bisexual, or
> > words to that effect, unless there is a further finding, made and approved in

4

accordance with the procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

(3) That the member has married or attempted to marry a person known to be of the same biological sex.

In due course, the Department of Defense issued a revised Department of Defense Directive 1332.14, which implements the policy for enlisted personnel, and Department of Defense Instruction 1332.40, which implements the policy for officers.[1]

In sum, the policy mandates the separation of a member of the armed services, subject to established administrative procedures, if the member has done one (or more) of three things: (i) engaged or attempted to engage in a homosexual act or acts (subject to some qualifications that address exceptional or aberrant behavior), (ii) stated that he or she is homosexual or bisexual (again, subject to some qualification), or (iii) married or attempted to marry a person of the same sex. See 10 U.S.C. § 654(b). Proponents of the policy have described these as "conduct-based" standards, rather than "status-based" ones.

Congress included several "findings" in the statutory enactment of the policy. 10 U.S.C. § 654(a). Although the word "findings" often connotes statements that resolve disputed questions of fact, it may be more appropriate to regard the congressional findings in § 654(a) as a mix of

---

[1] For the Coast Guard, which is within the Department of Homeland Security, the policy is implemented by regulations set forth in the Coast Guard Personnel Manual. See United States Coast Guard Personnel Manual, COMDTINST M1000.6A, Chapter 12.E.

propositions of constitutional law,[2] observations about the requirements of military service,[3] and

policy judgments.[4]

---

[2] For example: "Section 8 of article I of the Constitution of the United States commits exclusively to the Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for the government and regulation of the land and naval forces,"  § 654(a)(1); "There is no constitutional right to serve in the armed forces," § 654(a)(2); and "Pursuant to the powers conferred by section 8 of article I of the Constitution of the United States, it lies within the discretion of the Congress to establish qualifications for and conditions of service in the armed forces," § 654(a)(3).

[3] For example: "The primary purpose of the armed forces is to prepare for and to prevail in combat should the need arise," § 654(a)(4); "The conduct of military operations requires members of the armed forces to make extraordinary sacrifices, including the ultimate sacrifice, in order to provide for the common defense," § 654(a)(5); "Success in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion," § 654(a)(6); "Military life is fundamentally different from civilian life in that – (A) the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion, require that the military community, while subject to civilian control, exist as a specialized society[,] and the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society," § 654(a)(8); "The standards of conduct for members of the armed forces regulate a member's life for 24 hours each day beginning at the moment the member enters military status and not ending until that person is discharged or otherwise separated from the armed forces," § 654(a)(9); and "Those standards of conduct, including the Uniform Code of Military Justice, apply to a member of the armed forces at all times that the member has a military status, whether the member is on base or off base, and whether the member is on duty or off duty," § 654(a)(10).

[4] For example: "One of the most critical elements in combat capability is unit cohesion, that is, the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members," § 654(a)(7); "The pervasive application of the standards of conduct is necessary because members of the armed forces must be ready at all times for worldwide deployment to a combat environment," § 654(a)(11); "The worldwide deployment of United States military forces, the international responsibilities of the United States, and the potential for involvement of the armed forces in actual combat routinely make it necessary for members of the armed forces involuntarily to accept living conditions and working conditions that are often spartan, primitive, and characterized by forced intimacy with little or no privacy," § 654(a)(12); "The prohibition against homosexual conduct is a long-standing element of military law that continues to be necessary in the unique circumstances of military service," § 654(a)(13); "The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability," § 654(a)(14); and "The presence in the armed forces of persons who demonstrate a propensity or intent to engage

II.    The Plaintiffs' Challenge to the Policy

The plaintiffs all allege that they were separated from military service by application of the policy embodied in § 654 and its implementing regulations, although the precise factual circumstances of separation are particular to each plaintiff. They further allege that their exclusion from military service violates their constitutional rights. They seek a declaration that the policy is unconstitutional and an injunction against its enforcement.

Although the complaint alleges that § 654 is unconstitutional both on its face – that is, it would be invalid in any conceivable application, see Reno v. Flores, 507 U.S. 292, 301 (1993); United States v. Salerno, 481 U.S. 739, 745 (1987) – and as it has been particularly applied to each of them, their legal reasoning as spelled out in their memoranda in opposition to the motion to dismiss as well as their counsel's statements at oral argument make it clear that the constitutional defects they perceive inhere in *any* application of the policy to a homosexual service member, rather than in the particular way the policy might be (or might have been) applied in any specific case. In other words, none of the plaintiffs claims that the policy, if valid in general, was misapplied in his or her particular case to result in separation when a proper application of the policy would have allowed him or her to remain a service member.[5]  Rather, their objections, as articulated in the legal arguments in

in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability," § 654(a)(15).

[5]  There are some stray allegations in the complaint that might be pertinent to an "as applied" challenge, but they are not addressed or developed in the arguments on the motion to dismiss. For example, paragraph 40 of the complaint alleges that the policy is applied "unevenly," with disproportionate effect on women and persons under age 25. While the plaintiffs do present an equal protection claim, the inequality argued is between homosexuals and heterosexuals, not between women and men or younger and older service members. Additionally, paragraph 158 alleges that § 654 and its implementing regulations "are enforced arbitrarily and capriciously." These allegations might support theories of denial of equal protection or of procedural due process, but no plaintiff

opposition to the motion to dismiss, are *that* the policy was applied, not *how* it was applied. This is classically a facial challenge to the statute, and their arguments will be evaluated with that understanding.

Some plaintiffs do argue that the policy was applied to separate them from the service even though their performance of their duties was at least acceptable and in some cases superior in leadership and achievement. The fact that they were ably performing service members means, they say, that Congress' factual premise that the presence of openly homosexual service members in the service is deleterious to "morale, good order and discipline, and unit cohesion" is disproved, and the policy cannot be permitted to stand when it rests on a false factual premise. This might seem at first to be an argument that the policy was applied to these plaintiffs unconstitutionally (as distinguished from being unconstitutional on its face), but on reflection it is not. The claim that the policy rests on an invalid premise is a challenge to the validity of the policy as a whole.[6] The policy itself does not contemplate weighing the perceived deleterious effects of the presence of openly homosexual service members on morale, good order and discipline, on the one hand, against the individual merit or value of the service of any particular openly homosexual service member, on the other. Rather, the latter factor is omitted entirely from the operation of the policy. Under the policy, it does not matter how exemplary a service member's performance has been; if the criteria of the policy are met, separation

---

articulates claims relevant to the cited allegations. The equal protection argument that the plaintiffs do advance is made with respect to any application of the policy itself to any openly homosexual service member, not its disparate application to some openly homosexual service members and not to others.

[6] The plaintiffs' argument in response to the motion to dismiss uses the so-called plaintiff-specific allegations to challenge the validity of the Congressional justifications for the policy. See, e.g., Pls.' Opp'n to Defs.' Mot. Dismiss at 15-19, 34 (Pls.' Opp'n); Pls.' Surreply in Opp'n to Defs.' Mot. Dismiss at 5, 11-12 (Pls.' Surreply).

is mandated.  This is not a question of the maladministration of the policy, but rather of its administration in accordance with its terms, which terms omit to provide for the possibility of any consideration of the actual service record or performance of an individual affected by the application of the policy.  Accordingly, to the extent the plaintiffs seek to avoid dismissal on the ground that factual development is necessary to the fair presentation of an as-applied challenge, the argument is beside the point, because they do not present a genuine as-applied challenge.

The complaint sets forth three separate constitutional theories in support of the relief the plaintiffs seek: "violation of due process," "violation of the First Amendment," and "denial of equal protection based on sexual orientation."  They are each addressed below.

III.    Judicial Review of Congress' Decision-making

In order to analyze the plaintiffs' due process and equal protection claims, it is first necessary to determine the proper constitutional standard to be used to evaluate Congress' enactment of § 654.

A.  Substantive Due Process

The Fifth Amendment to the United States Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "Due process of law" refers most obviously, but not exclusively, to the requirement that when the government acts to "deprive" a person of "life, liberty, or property" it must do so in conformity with regular and fair procedures.  See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125 (1992) ("The most familiar office of [the Due Process] Clause is to provide a guarantee of fair procedure in connection with any deprivation of life, liberty or property . . . ").  The Due Process Clause has also been considered, not entirely without controversy, to have a certain substantive, as well as procedural, puissance.  In particular, a person's "liberty" under that Clause encompasses some

9

"fundamental" interests to which the Due Process Clause grants special protection, and governmental deprivations or infringements of such liberty interests are subject to judicial review. <u>See</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997) ("The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests."); <u>see also</u> <u>Collins</u>, 503 U.S. at 125 (The Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.") (internal citations and quotations omitted).[7]  The plaintiffs' principal argument presented under this theory is that they have "a fundamental liberty interest in private adult consensual intimacy and relationships, including consensual intimacy and relationships between adults of the same sex," Compl. ¶ 156, and that § 654 and its implementing regulations infringe upon and deprive them of that liberty interest. There is, the plaintiffs allege, "no compelling interest, important interest, or even legitimate governmental interest motivating those deprivations." Compl. ¶ 160.  Indeed, it is alleged that § 654 is not even rationally related to any legitimate governmental interest.  <u>Id.</u>

The plaintiffs' preferred position is that the liberty interest they identify is a "fundamental" one in the sense necessary to require the defendants to demonstrate that § 654 is justified by a compelling

---

[7] <u>Collins</u> and <u>Glucksberg</u>, like the majority of Supreme Court cases discussing the "substantive" aspect of the Due Process Clause, were addressing the Clause that appears in the Fourteenth Amendment, applicable to the States.  The Fifth Amendment, applicable to the national government, is what is at issue in this case. The language of the Clause is identical in both the Fifth and Fourteenth Amendments, however, and there is no reason to think that the Court's explication of the concept of "substantive due process" under the Clause in cases arising under the Fourteenth Amendment would not apply fully to cases arising under the Fifth.  <u>See</u> <u>Flores</u>, 507 U.S. at 301-02 ("Respondents' 'substantive due process' claim relies upon our line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."); <u>see also</u> <u>Salerno</u>, 481 U.S. at 746-51.

governmental interest and narrowly tailored to serve that interest.  The defendants reply that the

identified interest has not been, and should not be, considered "fundamental" in the necessary sense,

so that the policy can be defended on the ground that it rationally serves the legitimate objective

Congress intended it to serve.[8]

Fundamental rights or interests are those "which are, objectively, 'deeply rooted in this

Nation's history and tradition' [Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 503 (1977)]

(plurality opinion); Snyder v. Massachusetts, 291 U.S. 97, 105 (1934) ("so rooted in the traditions

and conscience of our people as to be ranked as fundamental"), and 'implicit in the concept of

ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed,' Palko v.

Connecticut, 302 U.S. 319, 325 (1937)." Glucksberg, 521 U.S. at 720-21.  "Our Nation's history,

legal traditions, and practices thus provide the crucial 'guideposts for responsible decisionmaking,'

Collins [503 U.S.] at 125, that direct and restrain . . . exposition of the Due Process Clause."  Id.

Nonetheless, "history and tradition are the starting point but not in all cases the ending point of the

substantive due process inquiry."  Lawrence v. Texas, 539 U.S. 558, 572 (2003) (quoting County

of Sacramento v. Lewis, 523 U.S. 833, 857 (1998) (Kennedy, J., concurring)).  The Court in

Lawrence did not say what might be the "ending point" of the inquiry in cases where history and

tradition were not, but according to the concurring opinion it cited for the proposition, an

"objective assessment of the necessities" of the governmental function under scrutiny would be

an appropriate undertaking.  Lewis, 523 U.S. at 857 (Kennedy, J., concurring).  Translated to the

---

[8] The plaintiffs also allege, and have argued in opposing the motion to dismiss, that § 654 would
fail even under the level of review to be applied to substantive due process challenges not involving
"fundamental" rights.  That contention will be discussed further below.

present controversy, that presumably would authorize an "objective assessment of the necessities" of military service.

History and tradition may be said to be the starting point for the inquiry into whether there is a "fundamental" liberty interest at issue, but there is even a prior problem to be resolved, and that is how generally or specifically to characterize the proposed "liberty interest." Like navigating the strait between Scylla and Charybdis there is peril in both directions. Characterizing the liberty interest too specifically may result in a definition so narrowed by qualifying details that the claimed interest is thereby necessarily excluded from the stream of tradition. On the other hand, characterizing the interest too generally may leave it little more than a platitude and thus allow recognition of a non-traditional interest simply because it could plausibly be proposed as a species of a traditionally recognized genus.[9] This dilemma can be sidestepped in this case because, in ruling on the motion to dismiss, I accept the plaintiffs' proffered definition of the liberty interest they contend is implicated.

The plaintiffs have characterized the liberty interest they claim in rather general terms. They say it is the "fundamental liberty interest in private adult consensual intimacy and relationships, including consensual intimacy and relationships between adults of the same sex." Compl. ¶ 156. There is no doubt that under the broad canopy extended by the first part of the definition, there reside

---

[9] The problem is illustrated by the debate between Justices Brennan and Scalia in <u>Michael H. v. Gerald D.</u>, 491 U.S. 110 (1989) as to whether the right there at issue should be characterized by reference to traditionally recognized substantive parental rights of *natural parents* or those of *adulterous natural parents*. <u>See</u> <u>id</u>. at 127 & n.6, 138-40; <u>see also</u> <u>Glucksberg</u>, 521 U.S. at 769-70 (Souter, J., concurring in judgment) (in conducting substantive due process analysis, "When identifying and assessing the competing interests of liberty and authority . . . the breadth of expression that a litigant or judge selects in stating the competing principles will have much to do with the outcome and may be dispositive.").

interests that have been more particularly articulated and expressly recognized as fundamental ones

for substantive due process purposes, including, as the Supreme Court itself has catalogued them,

> the rights to marry, Loving v. Virginia, 388 U.S. 1 (1967); to have children,
> Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942); . . . to marital
> privacy, Griswold v. Connecticut, 381 U.S. 479 (1965); to use contraception,
> ibid.; Eisentstadt v. Baird, 405 U.S. 438 (1972); . . . and to abortion, [Planned
> Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833 (1992)].

Glucksberg, 521 U.S. at 720.

The second part of the plaintiffs' definition, signaled by the word "including" to be a subset

of the more general interest articulated in the first part, is more problematic for the plaintiffs'

argument here. Prior to Lawrence, it would not have been possible to say that "consensual intimacy

and relationships between adults of the same sex" constituted a fundamental liberty interest for

purposes of substantive due process, most obviously, though not exclusively, because of the holding

in Bowers v. Hardwick, 478 U.S. 186 (1986) that the Constitution did not guarantee a fundamental

right to engage in homosexual conduct, even in the privacy of one's home.

Lawrence expressly overruled Bowers, however, 539 U.S. at 578, removing that case as a

precedential impediment to the plaintiffs' claim here. The *result* in Lawrence was that the Texas

statute authorizing the criminal punishment of a person who engaged in "deviate sexual intercourse

with another individual of the same sex" was invalidated under the Due Process Clause of the

Fourteenth Amendment. Id. at 563. Exactly what the *holding* in Lawrence was, however, seems to

be a matter of some uncertainty. To the present point, the plaintiffs assert that Lawrence recognized

as fundamental the liberty interest they rely on, whereas the defendants assert that it did not. The

difference in interpretations is understandable, because the Lawrence opinion does not directly answer the question.[10]

At least this much is clear: the Lawrence majority did not expressly – that is, in so many words – recognize a fundamental liberty interest in "consensual intimacy and relationships between adults of the same sex." One might stop right there. After all, for a proposition to be considered a holding, one might reasonably expect it to have been stated. This is particularly so when the proposition would state a new – that is, not previously announced – principle of constitutional law. See Glucksberg, 521 U.S. at 721 (the Supreme Court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest"); see also Flores, 507 U.S. at 302; Collins 503 U.S. at 125.

It is true, as the plaintiffs argue, that there is much language in the Lawrence opinion that would be consistent with a possible holding that recognized a fundamental liberty interest in "consensual intimacy and relationships between adults of the same sex." But despite all the foreshadowing, the anticipated *denouement* is missing. The reason for the omission cannot be because such a holding is obvious from the rest of the opinion. In fact, the principal dissent argued pointedly

---

[10] This court and these parties are not the only ones recently to have faced this dilemma of determining whether Lawrence announced a new fundamental right, as the plaintiffs claim it does. Indeed, this is a question upon which various courts and commentators have diverged. Compare Muth v. Frank, 412 F.3d 808, 817-18 (7th Cir. 2005) (finding that Lawrence did not announce a fundamental right); Lofton v. Sec'y of the Dep't of Children & Family Servs., 358 F.3d 804, 815-17 (11th Cir. 2004) (same); United States v. Marcum, 60 M.J. 198, 204-05 (2004) (same); Loomis v. United States, 68 Fed. Cl. 503, 517-18 (2005) (same); State v. Limon, 122 P.3d 22, 29-30 (Kan. 2005) (same) with Fields v. Palmdale Sch. Dist., 271 F. Supp.2d 1217, 1221 (C.D. Cal. 2003) (including the "right to engage in private homosexual conduct" as recognized in Lawrence within a recounting of liberty interests recognized by the Supreme Court under the Due Process Clause); Laurence Tribe, Lawrence v. Texas: The Fundamental Right that Dare Not Speak Its Name, 117 Harv. L. Rev. 1893 (2004) (arguing that Lawrence implicitly recognized a new fundamental right).

that the majority opinion had not announced the recognition of such a fundamental liberty interest under the Due Process Clause, see Lawrence, 539 U.S. at 592-94 (Scalia, J., dissenting), and it might be expected that if that statement wrongly characterized a principal holding of the case, the majority would have answered and corrected it.  Contrary to the plaintiffs' argument, it more plausibly appears that the majority's silence on the point amounted to acquiescence in the dissent's statement that the case did not hold what the plaintiffs here say it did.

Moreover, beyond what the Lawrence majority said or did not say, there is the matter of what it actually did, which was, apparently, to review the challenged Texas statute under the standard of review appropriate when there is not a fundamental interest at stake.[11]  The Court stated, "The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." Lawrence, 539 U.S. at 578.  Asking whether there is any "legitimate state interest" that can justify a statute is a way of asking whether the statute has a "rational basis."  See Glucksberg, 521 U.S. at 728 (concluding that there was no fundamental liberty interest that included a right to assistance in committing suicide and then analyzing whether "Washington's assisted suicide ban [was] rationally related to legitimate government interests"); id. at 735 ("We need not weigh exactingly the relative strengths of these various interests.  They are unquestionably important and legitimate, and Washington's ban on assisted suicide is at least reasonably related to their promotion and protection."); see also Heller v. Doe, 509 U.S. 312, 320 (1993) (when legislative classification is subjected to rational-basis equal protection review, it "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate

---

[11] I say apparently because again the Court did not explicitly state what standard of review it was using.

governmental purpose"). The use of the appropriate adjective is telltale to constitutional lawyers. If the Lawrence court had been evaluating the constitutionality of the Texas statute under the more exacting standard applicable to cases where fundamental interests are at stake, it would instead have asked whether the state interest was "compelling," rather than whether it was "legitimate." See Glucksberg, 521 U.S. at 721 ("As we stated recently in Flores, the Fourteenth Amendment 'forbids the government to infringe . . . 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.' 507 U.S. at 302") (emphasis in original).[12] Thus, by the standard of review it applied, the Lawrence Court signaled that it did not consider that a fundamental liberty interest arising under the Due Process Clause was implicated.

For these reasons, though the matter is not free from doubt because of the ambiguity of the Lawrence opinion, I conclude that neither Lawrence nor any other relevant precedent requires treating the plaintiffs' articulated liberty interest as a "fundamental" interest calling for heightened scrutiny in judicial review of the legislative decision-making.[13] Rather, for purposes of the plaintiffs'

---

[12] The Court in Lawrence also did not engage in the type of analysis of the closeness of fit between the chosen legislative means and desired governmental ends that normally applies in cases involving fundamental rights. The requirement of narrow tailoring of legislation to serve the compelling governmental interest asserted is applied in cases involving fundamental liberty interests, but not in cases involving interests that are non-fundamental. See Flores, 507 U.S. at 305 ("But narrow tailoring is required only when fundamental rights are involved. The impairment of a lesser interest . . . demands no more than a 'reasonable fit' between governmental purpose and the means chosen to advance that purpose.").

[13] Some other courts have similarly concluded that Lawrence did not announce a new fundamental right along the lines argued for by the plaintiffs. See Marcum, 60 M.J. at 204-05 ("In Lawrence, the Court did not expressly identify the liberty interest as a fundamental right. Therefore, we will not presume the existence of such a fundamental right in the military environment when the Supreme Court declined in the civilian context to expressly identify such a fundamental right."); Loomis, 68 Fed. Cl. at 517-18 (same); cf. Muth, 412 F.3d at 817-18 (finding that Lawrence did not

16

substantive due process claim, Congress' enactment of § 654 and the armed forces' promulgation of implementing regulations are to be reviewed to determine whether they lack a rational basis.[14]

   B.  Equal Protection

   Under § 654 and its implementing regulations, openly homosexual service members are subject to separation from the armed forces for that reason alone, whereas other service members are not.  The plaintiffs allege that this distinction constitutes an inequality of treatment without a compelling, important, or even legitimate government interest to justify it, amounting therefore to a violation of the equal protection aspect of the Fifth Amendment's Due Process Clause.  See Compl. ¶¶ 176-180.[15]

   The constitutional principle that "no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons. . . .[Courts] have attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets

_____

announce a fundamental right of adults to engage in all forms of private consensual sexual conduct); Lofton, 358 F.3d at 815-17 (holding that Lawrence did not create a fundamental right to private sexual intimacy); Limon, 122 P.3d at 29-30 (holding that Lawrence does not create any fundamental right nor does it declare homosexuals a suspect class and thus equal protection challenge to law that classifies based on homosexual conduct must be evaluated under the rational-basis test).

[14]  This review collapses into consideration of the enactment of the statute, since the regulations appear to follow the congressional policy faithfully.  There is no claim that the regulations are invalid in ways that the statute is not.

[15] Although the Fifth Amendment does not explicitly contain a guarantee of "equal protection of the laws," it has been made clear that there is an equal protection mandate applicable to the federal government via the Fifth Amendment's Due Process guarantee, which generally is interpreted coextensively with the Fourteenth Amendment's Equal Protection guarantee.  See Bolling v. Sharpe, 347 U.S. 497 (1954); see also F.C.C. v. Beach Communications, 508 U.S. 307, 313-14 (1993) (describing the same standard for evaluation of equal protection challenges whether the idea of "equal protection" is "embodied in the Fourteenth Amendment or inferred from the Fifth").

a suspect class, [they] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996) (citing Heller, 509 U.S. at 319-20). See also Beach Communications, 508 U.S. at 313 ("Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). Accordingly, unless the plaintiffs can establish that the right they rely on is "fundamental" or that § 654 targets a "suspect class," equal protection calls for rational-basis review of the governmental action at issue.

The plaintiffs argue for a heightened level of scrutiny "[b]ecause section 654 discriminates against gay persons in the exercise of a fundamental right" and because "sexual orientation is a suspect classification." Pls.' Opp'n at 24. The plaintiffs cite no direct authority for either of these twin propositions. For the reasons set forth in the previous section, the plaintiffs have not shown that the interest or right they identify is "fundamental" in the necessary constitutional sense. Similarly, no controlling case has held that homosexuals generally, let alone the subset of that class that the plaintiffs comprise – openly homosexual service members as defined by § 654 – constitute a "suspect class" for equal protection purposes. Indeed, in two cases where it might have agreed to such a holding, Romer and Lawrence, the Supreme Court rather conspicuously avoided doing so.

Instead, in both cases, the Court employed a "rational-basis" standard of review, not a heightened standard such as "strict scrutiny" or "compelling governmental interest."[16]

I follow this state of the law, and conclude that the equal protection claim, like the substantive due process claim, calls for review of Congress' enactment of § 654 and the regulations implemented pursuant to it under the traditional equal protection standard, which is rational-basis review.[17]

IV.    Rational-Basis Review of § 654

The relevant inquiry under either substantive due process or equal protection analysis is, as a general matter, whether § 654 is rationally related to legitimate governmental interests. See Glucksberg, 521 U.S. at 728-35 (conducting rational-basis substantive due process review); Heller, 509 U.S. at 319-33 (conducting rational-basis equal protection review). In either event, the judicial role in conducting rational-basis review is deferential, representing the "paradigm of judicial restraint," and "[w]here there are plausible reasons for Congress' action, [the Court's] inquiry is at an end." Beach Communications, 508 U.S. at 313-14 (internal citations and quotations omitted).

In the equal protection setting, the Supreme Court has repeatedly emphasized the deferential nature of rational-basis review, including the admonition that it does not "authorize the judiciary [to]

---

[16] It is also worth noting that in neither Romer nor Lawrence did the Court engage in the type of "heightened" scrutiny short of the "strict" scrutiny which it has applied in cases involving the equal protection review of gender-based classifications, a test in which the Court evaluates whether the State, which has the burden of justifying its statute, has demonstrated there is an "exceedingly persuasive" justification for the statute or, at least, that the gender-based classification serves "important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." See United States v. Virginia, 518 U.S. 515, 532-33 (1996) (internal quotations and citations omitted).

[17] For the reasons previously stated, supra note 13, although the plaintiffs challenge both the statute and the implementing regulations, this review essentially collapses into a review of the legislative choice in enacting § 654.

sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." Heller, 509 U.S. at 319 (internal citations and quotations omitted). "For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity," id. and "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." Id. at 321. All that is required is that the statutory enactment bear "a rational relation to some legitimate end." Romer, 517 U.S. at 631.

Deference to Congressional judgment is of even greater importance in a case such as this one where the legislation challenged was enacted pursuant to Congress' authority over the national military forces. The Constitution grants to Congress the power "[t]o provide for the common Defence," "[t]o raise and support Armies," "[t]o provide and maintain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval Forces." U.S. Const., art. I, § 8, cl. 1, 12-14. "Congress' power in this area 'is broad and sweeping.'" Rumsfeld v. Forum for Academic & Instit. Rights, Inc., 126 S. Ct. 1297, 1306 (2006) ("FAIR") (quoting United States v. O'Brien, 391 U.S. 367, 377 (1968)). There are constitutional limitations on Congress' power to enact legislation, notably including the Due Process Clause of the Fifth Amendment. Nonetheless "'judicial deference . . . is at its apogee' when Congress legislates under its authority to raise and support armies." FAIR, 126 S.Ct. at 1306 (quoting Rostker v. Goldberg, 453 U.S. 57, 70 (1981)).

Rostker is highly instructive for the present controversy. In that case, the Supreme Court held that Congress had not violated the Due Process Clause by enacting a statute that required men, but

not women, to register with the Selective Service System.[18]  The Supreme Court noted two distinct reasons for judicial deference to the congressional judgment.  First, a court must show "due regard to the fact that [the court] is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government."  Rostker, 453 U.S. at 64 (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring).  "The customary deference accorded the judgments of Congress is certainly appropriate when . . . Congress specifically considered the question of the [statute's] constitutionality."  Rostker, 453 U.S. at 64.  Second, Congress had relied explicitly on its constitutional "authority over national defense and military affairs," and the Court observed that "perhaps in no other area has the Court accorded Congress greater deference."  Id. at 64-65.  The Court further took care to note that "a healthy deference" to Congress in these circumstances, id. at 66, was not an abdication of the Court's "ultimate responsibility to decide the constitutional question," but simply a recognition "that the Constitution itself requires such deference to congressional choice."  Id. at 68.  The Rostker Court also found it significant that the gender-based classification there at issue was not just the "accidental byproduct of a traditional way of thinking," id. at 74, but rather had been at the very center of the congressional debate.  "The issue was considered at great length, and Congress clearly expressed its purpose and intent."  Id.

Here, as in Rostker, the challenged statute was the result of extended consideration in both the Executive and Legislative Branches.  In the Executive Branch, the Department of Defense conducted a detailed review and the Secretary of Defense shared the review and its conclusions with

---

[18]  The claim was that the classification – men must register, women may not – violated the Fifth Amendment's equal protection guarantee.

Congress.  In Congress, there were hearings by committees of both Houses at which the arguments

for and against the policy were aired and debated.  The resulting legislation was the end product of

a focused process of debate and deliberation.  See Thomasson v. Perry, 80 F.3d 915, 921-23 (4th Cir.

1996) (recounting the history of the enactment of § 654 and concluding that "[w]hat [the plaintiff]

challenges, therefore, is a statute that embodies the exhaustive efforts of the democratically

accountable branches of American government and an enactment that reflects month upon month of

political negotiation and deliberation").

        The reasons for Congress' approval of the statute are essentially stated in § 654(a).  See supra

notes 2-4.  Probably the most critical congressional finding articulated in the statute as a reason for

the exclusion of announced or actively practicing homosexuals from military service is the last one,

set forth in § 654(a)(15):

> The presence in the armed forces of persons who demonstrate a
> propensity or intent to engage in homosexual acts would create an
> unacceptable risk to the high standards of morale, good order and
> discipline, and unit cohesion that are the essence of military capability.

This proposition is a combination of a factual premise – that there is as a matter of fact some level

of risk to morale, good order and discipline, and unit cohesion from the presence in the armed forces

of persons who demonstrate a propensity or intent to engage in homosexual acts – and an evaluative

judgment – that the identified risk is unacceptable.

        The legitimacy of the end Congress sought to serve – maintaining effective military capability

by maintaining high standards of morale, good order and discipline, and unit cohesion – cannot be

doubted.  Thus, in this case, if there is a problem with the congressional enactment of the policy, it

lies in the relationship of the means selected to promote that concededly legitimate end.  In other

words, the question is whether the means chosen – the policy embodied in § 654 – rationally conduces to achieve the end of maintaining effective military services.[19]

In the hearings that led to the enactment of § 654, Congress was advised by the Nation's military leaders that the presence of open homosexuals in military service would interfere with the development of cohesive units and would harm discipline and morale.[20]   Contrary views and assessments from other qualified persons were also given.[21]   After considering the information

---

[19] It should be noted that the issue presented here is different from that faced in both <u>Lawrence</u> and <u>Romer</u>, decided under substantive due process review and equal protection review, respectively. In those cases, the Supreme Court found that the law in question furthered no legitimate purpose.

[20] An example is the testimony of General Colin Powell, Chairman of the Joint Chiefs of Staff, who testified before the Senate Armed Services Committee on July 20, 1993, saying in part:

> "To win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies.  We cannot allow anything to happen which would disrupt that feeling of cohesion within the force.
>
> *     *     *     *
>
> "[T]he presence of open homosexuality would have an unacceptable detrimental and disruptive impact on the cohesion, morale, and esprit of the armed forces."

S. Rep. No. 103-112, at 275, 278 (1993).

[21] The plaintiffs assert in their opposition to the motion to dismiss, <u>see</u> Pls.' Opp'n at 32, and in the complaint, <u>see</u> Compl. ¶ 45, that there were at least three reports before Congress at the time of enactment of § 654 which reached a conclusion contrary to the views of the military leadership.  The defendants acknowledge that these reports were considered by Congress in the debate leading up to § 654's enactment, pointing out that some Members relied on them to support their position against the legislation while others discounted those reports' persuasiveness.  <u>See, e.g.</u>, 139 Cong. Rec. S11172-74 (Sept. 9, 1993) (statement of Sen. Nunn); <u>id.</u> at S11197-98 (Sept. 9, 1993) (statement of Sen. Kennedy); <u>id.</u> at S11204 (Sept. 9, 1993) (statement of Sen. Feingold); <u>id.</u> at H7069 (Sept. 28, 1993) (statement of Rep. Kyl); <u>id.</u> at H7070 (Sept. 28, 1993) (statement of Rep. Morella); <u>id.</u> at

presented by those both in favor of and opposed to the proposed policy, Congress was persuaded to adopt it.  As the findings set out in § 654(a) demonstrate, Congress was persuaded to the position articulated by the military leadership, who were presumably articulating the policy of the Executive Branch, that separation of open homosexuals from military service would help to maintain high effectiveness in the armed forces.  That proposition had support in the record developed in the legislative process, and its acceptance was accordingly rational in the sense necessary to withstand constitutional challenge.  This is sufficient to conclude the substantive due process review and, for the most part, forecloses the plaintiffs' challenge on the grounds that the classification made by § 654 violates equal protection principles.  There are some arguments the plaintiffs make that apply uniquely to the equal protection claim, however.

In support of their equal protection challenge, the plaintiffs argue that the classification drawn by Congress is simultaneously too broad, because it excludes service members who individually pose no threat to military effectiveness, and too narrow, because it does not apply to other groups whose presence in the military may present a similar risk to morale, good order and discipline.  See Pls.' Opp'n at 25.  The argument is not one with any heft in cases where the legislation is reviewed under the traditional equal protection rational-basis standard.  This is illustrated by cases considering whether classifications based on generalizations about age, as a proxy for job suitability, violate the Equal Protection Clause. In that context, the Court has said that "the constitutionality of state classifications on the basis of age cannot be determined on a person-by-person basis. Our Constitution

---

H7077 (Sept. 28, 1993) (statement of Rep. Studds); id. at H7081-82 (Sept. 28, 1993) (statement of Rep. Schroeder).  There is no basis in the congressional record to conclude that the views of the opponents of the policy were ignored.  Rather, in the end, the proponents of the policy persuaded more Members to their view than the opponents did.

permits States to draw lines on the basis of age when they have a rational basis for doing so at a class-based level, even if it 'is probably not true' that those reasons are valid in the majority of cases." Kimel v. Florida Bd. of Regents, 528 U.S. 62, 85-86 (2000).

One of the cases cited by Kimel was Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307, 315 (1976). In Murgia, the Court upheld under rational-basis review the State's mandatory retirement age for uniformed state police officers, noting: "Since physical ability generally declines with age, mandatory retirement at 50 serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age. This clearly is rationally related to the State's objective. . . . That the State chooses not to determine fitness more precisely through individualized testing after age 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation. It is only to say that with regard to the interest of all concerned, the State perhaps has not chosen the best means to accomplish this purpose. But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' Dandridge v. Williams, 397 U.S. [471,] 485 [(1970)]." Murgia, 427 U.S. at 315-16 (footnotes omitted).

Similarly, in Vance v. Bradley, 440 U.S. 93 (1979), the Supreme Court upheld against an equal protection challenge of Congress' decision to establish a mandatory retirement age of 60 for employee participants in the Foreign Service retirement and disability system but not for other federal employees who were participants in the Civil Service retirement and disability system. The case is instructive for two reasons. First, the Court again applied the principle that classifications in legislation may be approximate. Id. at 109 ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is

25

nevertheless the rule that in a case like this 'perfection is by no means required.'"").  Second, the Court rejected an argument like one made by the plaintiffs here, that in order to sustain the challenged legislation, a court would have to have "current empirical proof" that the underlying factual premise relied on by Congress was true.  See id. at 110.  In Bradley, the argument was that the District Court should permit a trial to determine whether "health and energy tend to decline somewhat by age 60," with the suggestion that if the court did not find that to be true, the legislative classification based on that premise could not stand.  In the present case, the plaintiffs press a similar argument: that this suit should be permitted to continue so that the congressional premise that the service of open homosexuals in the armed forces threatens the effectiveness of the military can be tested in this court by "current empirical proof."  The Supreme Court rejected that argument in Bradley and so it must be rejected here as well.[22]

   The reason is that there is an important distinction, well recognized by lawyers, constitutional and otherwise, between the kinds of "facts" relied on by legislatures, on the one hand, and by courts, on the other.  Adversary litigation as conducted in the Judicial Branch typically involves the application of a principle of law to a concrete set of factual circumstances.[23]  For example, the legal principle might be: "A party to a binding contract who fails without excuse to perform his promise

---

   [22] The Supreme Court has also applied this same principle in conducting rational-basis review of government personnel policies which made classifications of employees based on factors other than age and were challenged on an equal protection basis because they were alleged to be based on generalized assumptions that did not necessarily hold true in the case of all employees so classified. See New York City Transit Auth. v. Beazer, 440 U.S. 568, 587-93 (1979) (applying rational-basis review and holding that Transit Authority rule excluding all methadone users from employment without requiring individual assessment of the qualifications of each worker did not deny equal protection).

   [23] There is the constitutional requirement, for instance, that there be an *actual* "case" or "controversy," and not merely a hypothetical one.  See U.S. Const. art. III, § 2; Flast v. Cohen, 392 U.S. 83, 94-97 (1968).

26

to the other party is liable in damages for loss caused by his breach." The factual inquiry will be whether the facts of the particular case are such as to support the application of the principle. Was the defendant in fact a party to a binding contract? Did the defendant in fact fail to perform his promise? Were there in fact circumstances which excuse his nonperformance? What harm in fact was caused to the other side, and to what extent? And so on. Generally the factual inquiry is an historical one: what in fact happened between these parties?

Factual inquiries by Congress are different. Their focus is not so much on particulars, but on generalities, and their purpose is not to settle concrete disputes, but to prescribe broadly applicable policies. To be sure, factual data and empirical evidence may properly be, and usually are, considered in the legislative process. For instance, in deciding whether to adopt a policy of mandatory retirement for Foreign Service workers at age 60, Congress might consult epidemiological data concerning the effects of natural aging on health and energy. But Congress does not resolve factual disagreements the way a court does, by finding that one side to a controversy has sustained a burden of proof and then making a concrete resolution of the facts of a particular case. Rather, Congress draws on the evidence presented with respect to proposed legislation in deciding what general facts are true and what policy judgments might rationally be supported by those generally true facts.[24] Thus, for Congress' purposes, it does not matter that any particular Foreign Service officer can run marathons at age 60 if the evidence rationally supports the conclusion that vigorous performance of duties

---

[24] There is more than just a difference in mission between Congress and the courts. There is a difference in institutional competence as well. "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable. . . . As an institution, moreover, Congress is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon an issue . . . ." Turner Broadcasting Sys., Inc. v. F.C.C., 512 U.S. 622, 665 (1994) (opinion of Kennedy, J.) (citations omitted).

generally diminishes with age and that an early retirement age thus serves the interest of maintaining an effective Foreign Service.

Consequently, in an equal protection case in which review is to be conducted according to the rational-basis standard, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Bradley, 440 U.S. at 111.  What that means in this case is that the plaintiffs would have to show that Congress could not reasonably conceive that the service of open homosexuals in the military would have the deleterious effect on "morale, good order and discipline, and unit cohesion" that was described by some military leaders and is contained in the legislative record.  The plaintiffs cannot meet that standard.  As to historical facts, the record before Congress included testimony from officers that the presence of homosexual service members had in their experience negatively affected a unit's morale, discipline, and cohesiveness.[25]  Congress was not required to accept and rely on such testimony, but it plainly was entitled to do so.  And, as explained above, if it was possible  for Congress rationally to accept the

---

[25]  For example, General H. Norman Schwarzkopf, U.S. Army (Ret.), testified before the Senate Armed Services Committee as follows:

> "[I]n my years of military service, I have experienced the fact that the introduction of an open homosexual into a small unit immediately polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war . . . .
>
> "[I]n every case I am familiar with, and there are many, whenever it became known in a unit that someone was openly homosexual, polarization occurred, violence sometimes followed, morale broke down, and unit effectiveness suffered."

S. Rep. No. 103-112, at 280 (1993).

factual premise – that there is some level of risk in permitting the service of openly homosexuals in military units – then it was also possible rationally to conclude that a means for reducing or eliminating the acknowledged risk would be to exclude open homosexuals from service in military units.  Similarly, in conducting what could be described as its "legislative factfinding" role, Congress was free not to rely on evidence, including some which the plaintiffs rely heavily upon, see supra note 20, which tended to prove contrary propositions.  It is not for this court on rational-basis review to conduct a re-weighing of the evidence that was before the legislative decision-makers.  See Rostker, 453 U.S. at 82-83 ("The District Court was quite wrong in undertaking an independent evaluation of this evidence, rather than adopting an appropriately deferential examination of Congress' evaluation of that evidence.").

The plaintiffs' contention that § 654 fails to pass constitutional muster under even rational-basis review is predicated on the proposition that a special kind of "active" rational-basis review is called for.  They claim that there should be a "more searching form of  review" that would involve skeptically inquiring into whether the proffered justifications for the policy are "substantiated."  When that is done, they say, § 654 does not survive review because the interest in "unit cohesion" emphasized by the defendants is little more than a pretext for animus against homosexual service members.  See Pls.' Opp'n at 13-19;  Pls.' Surreply at 3-6.  At the very least, the plaintiffs urge that the case should be permitted to go forward, with an opportunity for discovery, so that there might be an inquiry into the legitimacy of Congress' motivation.  See Pls.' Surreply at 3-6.  The authorities they rely on in support of this line of argument include principally Romer, City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985); Dep't of Agric. v. Moreno, 413 U.S. 528 (1973), and

Justice O'Connor's concurring opinion in <u>Lawrence</u>, which itself relies principally on the other three cases mentioned.[26]

   As an initial matter, the plaintiffs argue that this proposed "active" rational-basis test should be applied in support of both their equal protection and substantive due process claims.  If such a distinct test does exist, it has only been employed by the Supreme Court in a limited number of cases, all of which invalidated challenged legislative acts under an equal protection theory.  <u>See</u> <u>Romer</u>, 517 U.S. at 634-36; <u>Cleburne</u>, 437 U.S. at 446-50; <u>Moreno</u>, 413 U.S. at 533-38.  Similarly, Justice O'Connor's statements about an elevated level of review were made relative to her consideration of the issue in <u>Lawrence</u> under an equal protection theory only, <u>see</u> <u>Lawrence</u>, 539 U.S. at 574-75, rather than the majority's substantive due process theory.  Therefore, to the extent that an "active" rational-basis review should be applied here, it should only be applied to the plaintiffs' equal protection claim.

   I do not agree that a more "active" or "searching" review is appropriate to decide whether the plaintiffs can establish that the enactment of § 654 was not rationally related to the achievement of a legitimate governmental interest.  To begin with, it is far from clear that the cases relied on by

---

[26] The plaintiffs argue that the traditional form of rational-basis review is reserved for legislative classifications pertinent to economic and social welfare regulation.  Some cases have stated that the rational-basis test is to be applied in reviewing such legislation, <u>see</u> <u>e.g.</u>, <u>Beach Communications</u>, 508 U.S. at 313; <u>Dandridge</u>, 397 U.S. at 485, but the purpose of the statement in those cases seems to have been to distinguish such cases from those involving fundamental rights or suspect classifications. <u>See</u> <u>Murgia</u>, 427 U.S. at 312 (stating that "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class.") (footnotes omitted). It is not necessary to determine that a case involves regulation of "economics and social welfare," <u>Dandridge</u>, 397 U.S. at 485, in order to apply the rational-basis test.  Rather, it is necessary to determine if the case involves a fundamental right or a suspect class.  If so, strict scrutiny is the standard; if not, rational-basis is.  <u>See</u> <u>Romer</u>, 517 U.S. at 631.

the plaintiffs in making this argument applied anything other than the traditional rational-basis test, as described earlier in this opinion. Indeed, the Court itself has indicated that the traditional standard of review was used in some of those cases. In <u>Heller</u>, the Court said in discussing <u>Cleburne</u>,"We have applied rational-basis review in previous cases involving the mentally retarded and mentally ill. <u>See</u> [<u>Cleburne</u>, 473 U.S. at 432; <u>Shweiker v. Wilson</u>,450 U.S. 221 (1981)]. In neither case did we purport to apply a different standard of rational-basis review from that just described." <u>Heller</u>, 509 U.S. at 321. The Court had "just described" the rational-basis standard of review, emphasizing the deferential nature of that test. <u>See id.</u> at 320-21. The Court then went on to conduct the traditional, deferential rational-basis review of legislation that was alleged to have disadvantaged the mentally retarded, the same group that was alleged to have been harmed in <u>Cleburne</u>. <u>See id.</u> at 322-29. Likewise, the Court in <u>Moreno</u> did not in the end use any rational-basis standard other that the traditional one. <u>See</u> 413 U.S. at 538 (holding that the law challenged in that case's classification is invalid because it is "wholly without any rational basis").

Be all that as it may, even assuming that the mode of analysis based on <u>Romer</u>, <u>Cleburne</u>, and <u>Moreno</u> that Justice O'Connor suggested in <u>Lawrence</u> accurately captures the teaching of the prior cases, that principle would still not apply here. Those cases that arguably applied a "more searching" form of review would have done on the basis that the challenged law exhibited a "bare . . . desire to harm a politically unpopular group," something the Court has consistently held is not a legitimate governmental interest (and thus not a rational basis for legislation). <u>See Lawrence</u>, 539 U.S. at 580 (O'Connor, J. concurring in judgment) ("When a law exhibits [a bare] desire to harm a politically unpopular group, [the Court has] applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause."); <u>Romer</u>, 517 U.S. at 635 (the challenged

amendment to the Colorado constitution violated equal protection because it "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else"); Cleburne, 473 U.S. at 450 ("The short of it is that requiring the permit [for the mentally retarded group home] in this case appears . . . to rest on an irrational prejudice against the mentally retarded."); Moreno, 413 U.S. at 534-35 ("The challenged classification clearly cannot be sustained by reference to this congressional purpose [to prevent 'hippies' from participating in the food stamp program]. For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). Here, however, there can be no question that Congress' stated reasons for enacting § 654, even if misconceived or unconvincing, represented more than just a "bare congressional desire to harm a politically unpopular group." Rather, Congress' expressed purpose was to assure the effectiveness of the armed forces. Once that is acknowledged, the inquiry turns to whether the means chosen to advance that end – eliminating what is judged to be an impediment to a desired level of "morale, good order and discipline, and unit cohesion" – is a rational one. Neither Romer, Cleburne, Moreno, nor Justice O'Connor's Lawrence concurrence teaches otherwise.[27]

---

[27]  Justice O'Connor, proposing to employ a "more searching" approach in evaluating the Texas criminal sodomy statute at issue in Lawrence, said that her reason for invalidating the law was that the sole state interest asserted in that case, moral disapproval of same-sex relations, was not a legitimate one. She observed, however, that there were other state interests that could be recognized as legitimate beyond mere disapproval of an unpopular group, such as "*national security* or preserving the traditional institution of marriage." See 539 U.S. at 585 (O'Connor, J. concurring in judgment) (emphasis added). To the extent it is either practical or desirable to draw guiding principles from *obiter* theorizing by the Justices, it appears that Justice O'Connor would not consider this case one for the application of the sort of "elevated" of rational-basis review she would advocate in some other cases.

Furthermore, especially in light of the principle that some overinclusiveness or underinclusiveness in a legislative classification does not necessarily condemn it under equal protection analysis, the plaintiffs' factual allegations regarding the operation of § 654 in practice are not adequate to support a conclusion in their favor that the link between the legitimate goal of § 654 and the classification drawn to serve that goal is so attenuated as to demonstrate that the law is grounded in nothing more than "animus." In short, it is not possible, taking the factual allegations of the complaint as true, to say that "the breadth of [§ 654] is so far removed from [Congress'] justifications that . . . it [is] impossible to credit them," that § 654 is not directed to "any identifiable legitimate purpose or discrete objective," that it is "a status-based enactment divorced from any factual context from which [one] could discern a relationship to legitimate state interests," or that § 654 is simply "a classification of persons undertaken for its own sake." Romer, 517 U.S. at 635; see also Cleburne, 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."); Moreno, 413 U.S. at 538 ("Traditional equal protection analysis does not require that every classification be drawn with precise 'mathematical nicety' . . . . But the classification here in issue is not only 'imprecise,' it is wholly without any rational basis.").[28]

This is an issue about which thoughtful persons have disagreed. However, the plaintiffs' position here is (as it must be) that no legitimate disagreement is possible, that there is only one

---

[28] This conclusion is underscored by the difference in context between this case and the prior cases cited by the plaintiffs. As the Second Circuit has noted, "Those cases did not arise in the military setting. In the civilian context, the Court was willing to examine the benign reasons advanced by the government to consider whether they masked an impermissible underlying purpose. In the military setting, however, constitutionally-mandated deference to military assessments and judgments gives the judiciary far less scope to scrutinize the reasons, legitimate on their face, that the military has advanced to justify its action." See Able v. United States, 155 F.3d 628, 634 (2d Cir. 1998).

legitimate position to take on the issue, and that position is that Congress was wrong, both as to its assessment of the factual premise – that there is some level of risk to an effective military from the active service of open homosexuals – and as to its evaluation of the level of risk – that the risk is "unacceptable."  See Heller, 509 U.S. at 320-21; see also id. at 326 ("States are not required to convince the courts of the correctness of their legislative judgments.  Thus, since the question is at least debatable, rational-basis review permits a legislature to use just this sort of generalization") (citations and internal quotations omitted);  Beach Communications, 508 U.S. at 320 ("The assumptions underlying these [plausible] rationales may be erroneous, but the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immuniz[e]' the congressional choice from constitutional challenge.  Vance v. Bradley, 440 U.S. 93, 112 (1979).").

It would be impossible to agree with the plaintiffs' position without ignoring the obligation to defer to Congress' judgment, both as a matter of rational-basis review of legislative decision-making, see Glucksberg, 521 U.S. passim; Heller, 509 U.S. passim, and as a matter of deference to Congress' judgment in regulation of the military.  See Rostker, 453 U.S. passim.  The plaintiffs themselves recognize this, because they argue that deference to Congress' judgment is not required.  Their argument in this respect, however, depends on the characterization of the liberty interest at stake as "fundamental" or a finding that the classification is constitutionally "suspect," the necessary predicates to invoke a heightened form of judicial review.  They are correct that the calculus of deference to congressional decision-making is different when a fundamental interest is at stake or suspect class implicated.  But, for the reasons stated above, I have concluded that is not the case here. Under the rubric of rational-basis review, deference to congressional judgments is required.

It should not have to be said, though given the nature of the issue it is worth saying so for emphasis, that deciding that Congress has made a rational choice is not the same as deciding it has made a wise choice.[29]  Wisdom, or its lack, is not a constitutional category.  Acting within their proper constitutional authority, Congress and the Executive Branch are free to act both wisely and unwisely, and the remedy for bad decision-making by the Political Branches is to be found in the working of the political process.  The office of the judiciary is to enforce the constitutional limitations on executive and legislative action that do exist, as those limitations are elaborated in the Constitution and applicable precedents.  If a court determines that Congress has acted within the limits on its authority imposed by the Constitution, the court's inquiry and interest in the matter are at an end.[30]

I conclude as a matter of law that § 654 and its implementing regulations do not deprive the plaintiffs of substantive due process, and their claim to that effect must be dismissed for failure to

---

[29]  See Heller, 509 U.S. at 319 (rational basis review "'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'  Beach Communications, Inc., 508 U.S. at 313.")

[30]  The plaintiffs also have alleged and argue that the experience of the armed forces since the enactment of § 654 undercuts the asserted justifications for the statute.  See Compl. ¶ 46; Pls.' Opp'n at 33-3; Pls.' Surreply at 13.  If that is so, it counsels at least as much in favor of allowing Congress' reconsideration of the policy as it does foreclosing any debate by judicial decision.  See Schlesinger v. Ballard, 419 U.S. 498, 510 n.13 (1975) ("These developments no more than reinforce the view that it is for Congress, not for the courts, to decide when the policy goals sought to be served by [10 U.S.C.] § 6401 are no longer necessary to the Navy's officer promotion and attrition programs"); Thomasson v. Perry, 80 F.3d 915, 934 (4th Cir. 1996) ("In the end, the best service courts can render is to return [the debate over § 654] to where it all began–to the halls of democratic governance, where the many Americans affected by decisions such as these can participate directly in their resolution."); cf. Glucksberg, 521 U.S. at 735 ("Throughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide.  Our holding permits this debate to continue, as it should in a democratic society.").  I note that a bill has been introduced in the House of Representatives that would repeal § 654, establish a policy of non-discrimination based on sexual orientation, and require re-accession of otherwise qualified former service members who were separated in accordance with § 654 and its implementing regulations.  See Military Readiness Enhancement Act of 2005, H.R. 1059, 109th Cong. (introduced March 17, 2005).

state a claim upon which relief can be granted.  I also conclude, as a matter of law, that the plaintiffs

have failed to state a claim under their equal protection theory upon which relief can be granted, and

that claim must be dismissed.

V.     Infringement of First Amendment Rights

Section 654(b) provides in part:

> A member of the armed forces shall be separated from the armed
> forces under regulations prescribed by the Secretary of Defense if one
> or more of the following findings is made and approved in accordance
> with procedures set forth in such regulations:
>
> *     *     *     *
>
> (2) That the member has stated that he or she is a homosexual or
> bisexual, or words to that effect, unless there is a further finding, made
> and approved in accordance with procedures set forth in the
> regulations, that the member has demonstrated that he or she is not a
> person who engages in, attempts to engage in, has a propensity to
> engage in, or intends to engage in homosexual acts.

10 U.S.C. § 654(b)(2).

The plaintiffs assert that this provision restricts their speech in violation of the First

Amendment.  Specifically, they say, it penalizes statements by them about their sexual orientation,

because statements will be used by the armed forces as a basis for separating service member from

36

his or her particular branch.[31]   The plaintiffs also contend that § 654, in practice, forces them to remain silent about their sexual identity and thus violates the First Amendment by compelling them to affirm an identity other than their own.

The claim is not viable.  The policy embodied in § 654 is, by its terms, directed at homosexual conduct or the propensity or intention to engage in such conduct.  The fact that one might speak about one's conduct, or one's propensity or intention to engage in certain conduct, does not mean that a governmental regulation pertaining to the conduct is also an impermissible restriction on speaking about it. When certain conduct combines both "speech" and "nonspeech" elements, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  United States v. O'Brien, 391 U.S. 367, 376 (1968).

The governmental interest served by § 654(b)(2) is the effective enforcement of the policy. Facilitating the enforcement of a valid policy is a legitimate, and one may even say important, governmental interest.  See Wayte v. United States, 470 U.S. 598, 611-13 (1985).

For purposes of the administration of the policy, the significance of a statement of the kind described in § 654(b)(2) lies in its evidentiary value.  In effect, § 654(b)(2) creates a presumption that a person who states that he or she is a homosexual (or bisexual) may on the basis of the statement be considered to have an intention or propensity to engage in homosexual conduct.  It is as if the statute said, "We'll take you at your word.  If you say you are a homosexual, we will infer that you have the intention or propensity to act accordingly."  The presumption is rebuttable, and a service member may demonstrate that the statement is not a basis for inferring propensity or intention to engage in homosexual conduct and thus avoid separation pursuant to § 654.

---

[31]   An exception exists for statements made "for the purpose of avoiding or terminating military service." 10 U.S.C. § 654(e).

The evidentiary use of statements by a person to prove that person's intent is common in the adjudication of cases and is not prohibited by the First Amendment. See Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993) (stating that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). The fact that a person may experience a disadvantageous consequence from having made a statement that is later used for its value as evidence of a fact is not the kind of "burdening" of the right to free speech that raises serious First Amendment concerns. Id. at 488-89. Indeed, under the Federal Rules of Evidence, a party's prior extrajudicial statement is admissible as non-hearsay *only* when it is offered *against* the party by a litigation opponent – that is, only when disadvantage flows from the person's having made the statement. See Fed. R. Evid. 801(d)(2)(A). The admission of such statements in evidence occurs routinely.

An argument not dissimilar to the plaintiffs' here was rejected by the Supreme Court in Wayte, 470 U.S. 598. Wayte had been prosecuted for failing to register with the Selective Service System as he was required by law to do. Not only had Wayte not registered; he also had written letters to the President and to the Selective Service System stating that he did not intend to register. At the time, the Selective Service System had a policy of "passive enforcement" according to which only those violators who came to the attention of the Service without active investigation would be prosecuted. When Wayte was prosecuted under this policy (having brought himself to the attention of the authorities), he objected that the passive enforcement policy punished speech protected by the First Amendment, *viz.* his protest letters to government officials in which he declared his refusal to register. The Supreme Court rejected the First Amendment claim, concluding that the passive enforcement policy served an important governmental interest in facilitating prompt and effective enforcement of the Selective Service registration requirement (which the Court noted was

imposed pursuant to Congress' powers to "provide for the common Defence" and "to raise and support armies"), and that the enforcement policy imposed only an incidental burden on First Amendment freedoms. Id. at 611-13.

So here. As discussed in prior parts of this opinion, the policy rationally serves the important governmental interest of maintaining an effective national military. In authorizing the use of a person's statement as evidence that the person has engaged or has the propensity or intention to engage in homosexual conduct, Congress imposed only a minimal burden on the right to free speech guaranteed by the First Amendment. See Mitchell, 508 U.S. at 488-90; Wayte, 470 U.S. at 612-13. The burden is further minimized by dint of the fact that the authorized presumption is a rebuttable one, permitting the service member affected, in cases where it is possible, to reduce the evidentiary value of the speech, and thus any "burden," to nil.

Other courts have rejected First Amendment claims similar to that presented by the plaintiffs here. See Holmes v. Cal. Army Nat'l Guard, 124 F.3d 1126, 1136 (9th Cir. 1997); Able v. United States, 88 F.3d 1280, 1300 (2d Cir. 1996); Thomasson, 80 F.3d at 931. As the Fourth Circuit has succinctly put it:

> There is no constitutional impediment, therefore, to the use of speech as evidence of facts that may furnish a permissible basis for separation from military service. No First Amendment concern would arise, for instance, from the discharge of service members for declaring that they would refuse to follow orders, or that they were addicted to controlled substances. Such remarks provide evidence of activity that the military may validly proscribe.

Thomasson, 80 F.3d at 931. Thus, the plaintiffs are incorrect that § 654 constitutes a presumptively invalid burden on speech. The policy is properly justified, on a content-neutral, nonspeech basis,

as a means of preventing the disruption to military readiness from homosexual activity by service members that Congress could legitimately (for the reasons previously set forth) take action to forestall.  See id. at 932-33.

For these reasons, the plaintiffs' First Amendment claim is without merit and must also be dismissed for failure to state a claim upon which relief can be granted.

VI.     Summary

Following the codification of the "Don't Ask, Don't Tell" policy by Congress as 10 U.S.C. § 654, a number of courts considered and rejected challenges to the policy substantially similar to the challenges presented by the plaintiffs here.  See Able v. United States, 155 F.3d 628 (2d Cir. 1998); Holmes v. Cal. Army Nat'l Guard, 124 F.3d 1126 (9th Cir. 1997), cert. denied, 525 U.S. 1067 (1999); Philips v. Perry, 106 F.3d 1420 (9th Cir. 1997); Richenberg v. Perry, 97 F.3d 256 (8th Cir. 1996), cert. denied, 522 U.S. 807 (1997); Able v. United States, 88 F.3d 1280 (2d Cir. 1996); Thomasson v. Perry, 80 F.3d 915 (4th Cir.) (en banc), cert. denied, 519 U.S. 948 (1996); see also Hoffman v. United States, 1997 WL 136418 (E.D. Pa. March 24, 1997) (upholding constitutionality of § 654 against constitutional challenge), aff'd, 124 F.3d 187 (3d Cir. 1997) (Mem.).  After the Supreme Court decided Lawrence (and overruled Bowers), the question occurred whether a renewed challenge might succeed, premised, as the plaintiffs have principally done here, on the proposition that Lawrence had recognized as "fundamental" the liberty interest the plaintiffs propose and rely on, or if not that, had treated homosexuals (or openly homosexual service members) as a "suspect class" for purposes of constitutional analysis.

For the reasons set forth in this opinion, I have concluded that <u>Lawrence</u> did not work the changes in the law the plaintiffs argue for, and that settled constitutional doctrine calls for evaluating the substantive due process and equal protection challenges to the statute according to the rational-basis standard.  Under this standard, I conclude, as all the pre-<u>Lawrence</u> cases did, that § 654 does not violate the Due Process Clause of the Fifth Amendment.

The First Amendment claim is a weak one, not even potentially affected by <u>Lawrence</u> or the demise of <u>Bowers</u>, and I have found it unmeritorious as a matter of law, again in line with the decisions of all the other courts that have considered the issue.

As a matter of law, the plaintiffs' complaint fails to state a claim upon which relief can be granted.  Therefore, the defendants' motion to dismiss the complaint is ALLOWED and the complaint is DISMISSED.  A judgment of dismissal with prejudice shall enter accordingly.

It is SO ORDERED.


April 24, 2006                              \s\ George A. O'Toole, Jr.
DATE                                        DISTRICT JUDGE

41