UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2006 MAY -4  A 11: 47

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| **THOMAS COOK**, *et al.* | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) |
| **DONALD H. RUMSFELD**, *et al.* | ) |
| **Secretary of Defense** | ) |
| | ) |
| *Defendants.* | ) |

**JUDGE GEORGE A. O'TOOLE, JR.**

**CASE NO. 04CV12546 GAO**

## MOTION FOR RECONSIDERATION

Plaintiff, James E. Pietrangelo, II, hereby respectfully moves this Court to reconsider its April 24, 2006 order dismissing Plaintiffs' Complaint, on the grounds that that order is inconsistent with the facts, the Constitution, and justice in this case, as explained in the accompanying memorandum. Plaintiff files this Motion on his own behalf only (since the other Plaintiffs are still represented by WilmerHale and SLDN), although this Motion applies to Plaintiffs' collective Complaint and case.

Respectfully submitted,

Dated: April 27, 2006 at Burlington, Vermont.

*James E. Pietrangelo II*
JAMES E. PIETRANGELO, II, Esq.
Vermont Bar License # 4265
P.O. Box 9231
South Burlington, VT 05407
(802) 338-0501

Plaintiff *Pro Se*

1

**MEMORANDUM**

The Court should reconsider its April 24, 2006 order dismissing Plaintiffs'
Complaint because that order is inconsistent with the facts, the Constitution, and justice,
as argued in Plaintiffs' Complaint and their pleadings[1] in response to the Motion to
Dismiss.

## I.    The Court's Decision Endorses Blatant Wrongful Discrimination

One of the problems with challenging wrongful societal discrimination in any
justice system is that you cannot rely on the normal tools or weapons of persuasion—
facts, logic, reason, and fairness—to make your case. That is because wrongful societal
discrimination is fundamentally driven by brute power, self-interest, ignorance, and fear,
not fact, logic, reason, or fairness. Indeed, at the heart of every system of discrimination
lies a single, almost unassailable, false assumption, falsehood, or myth. The judicial
challenge posed to a minority plaintiff is perfectly illustrated by the institutional
discrimination that existed against Blacks in America up until the nineteen-fifties and
nineteen-sixties. Whites perpetuated the myth that Blacks were inferior and/or not suited
to mix with Whites and that Blacks thus had to occupy an inferior or separate position in
society lest society be harmed. The highest levels of government and society endorsed
this myth, and accepted it as a perfect truism. Consequently, when Blacks went into
court, arguing that they were entitled to equality, courts invariably found their claims to
be "unmeritorious" and "weak." For example, when Homer Plessy complained in 1897
about discrimination in transportation, the Supreme Court, in a very cordial, Southern-
style opinion, could find no reason at all to entertain his complaint:

---

[1] Which are meritorious in their own right.

2

> In determining the question of reasonableness it is at liberty to act with reference to the established usages, customs and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order. Gauged by this standard, we cannot say that a law which authorizes or even requires the separation of the two races in public conveyances is unreasonable, or more obnoxious to the Fourteenth Amendment than the acts of Congress requiring separate schools for colored children in the District of Columbia, the constitutionality of which does not seem to have been questioned . . . .
> [Plessy v. Ferguson, 163 U.S. 537, 550 (1897).]

Thus, no matter how much Blacks argued that people are people, capable of the same greats and lows no matter what their color, and thus all people of all colors are entitled to equality—things we acknowledge as basic facts today—they could not convince the courts to grant them relief. And deny them relief the courts did—and not just in the area of transportation, but in all aspects of life in America. Blacks could not marry Whites. Blacks were denied equal opportunity in housing, employment, business. Blacks could not adopt White children. Blacks could not eat in the same restaurants or use the same public accommodations as Whites. Blacks were routinely mistreated and denied justice. Blacks were segregated in schools and in other institutions.

In fact, ultimately, it was not facts, logic, reason, or fairness that triggered relief in the courts for Blacks but another discriminatory myth—Adolf Hitler's myth of an Aryan race. After Hitler and his Nazis murdered and enslaved millions and brought terror and destruction to much of the world, all in the name of Aryan supremacy, America realized the truth: that Blacks were fundamentally no different than Whites, and that American society's many justifications for discrimination and segregation were as empty as Hitler's Final Solution and could not be justly maintained. So America's highest institutions—including the courts—began an enormous cultural shift towards equality. Once courts began proceeding on the basis of fact, logic, reason, and fairness, rather than myth, relief

3

for Blacks came in succession across all societal facets, since virtually no form of

discrimination could withstand the truth's liberating glare. To be sure, the shift did not

take place overnight, but over many decades. But, it happened. One of the many

institutions where it happened was the military.

Before World War II, and even during World War II, Blacks were segregated

from, subordinate to, and suffered discrimination at the hands of, Whites in the armed

forces. America's civilian and military leaders specifically justified segregation and

discrimination in the military on the grounds of "unit cohesion." However, after the

Supreme Court's post-War civil rights decisions in cases like Brown v. Board of

Education, 347 U.S. 483 (1954), the Army acknowledged the falseness of its unit

cohesion argument and the injustice of maintaining it, and integrated, as explained in the

following passages from a seminal U.S. Army history publication:

> [Civil rights leaders] flooded the services with appeals for a redress of
> black grievances and levied similar demands on the White House,
> Congress, and the courts.
>
> For its part, the Army resisted the demands, its spokesmen contending that
> the service's enormous size and power should not be used for social
> experiment, especially during a war. Further justifying their position,
> Army officials pointed out that their service had to avoid conflict with
> prevailing social attitudes, particularly when such attitudes were jealously
> guarded by Congress. In this period of continuous demand and response,
> the Army developed a racial policy that remained in effect throughout the
> war with only superficial modifications sporadically adopted to meet
> changing conditions.
>
> In the name of military efficiency the Army staff had, in effect, devised a
> social rather than a military policy for the employment of black troops.

> \*        \*        \*

> There would be no racial intermingling in regimental organizations
> because the practice of separating white and black troops had, the Army

4

staff said, proved satisfactory over a long period of time.[²]  To change
would destroy morale and impair preparations for national defense.
[Memo, TAG for CG's et al., 16 Oct 40, sub: War Department Policy in
Regard to Negroes, AG 291.21 (10-9-40) M-A-M.]

*  *  *

Judge Hastie [civilian aid to the Secretary of War] gained little support
from the Secretary of War, Henry L. Stimson, or the Chief of Staff,
General George C. Marshall, when he called for progressive integration.
Both considered the Army's segregated units to be in accord with
prevailing public sentiment against mixing the races in the intimate
association of military life.  More to the point, both Stimson and Marshall
were sensitive to military tradition, and segregated units had been a part of
the Army since 1863.  Stimson embraced segregation readily. ***
Stimson's attitude was not unusual for the times.  He professed to believe
in civil rights for every citizen, but he opposed social integration.***[H]e
inveighed against the "foolish leaders of the colored race" who were
seeking "at bottom social equality," which, he concluded was out of the
question "because of the impossibility of race mixture by marriage."

[General Marshall] consistently support[ed] measures to eliminate overt
discrimination in the wartime Army.  At the same time, he rejected the
idea that the Army should take the lead in altering the racial mores of the
nation.***The settlement of vexing racial problems cannot be permitted to
complicate the tremendous task of the War Department and thereby
jeopardize discipline and morale.

*  *  *

As Chief of Staff, Marshall faced the tremendous task of creating in haste
a large Army to deal with the Axis menace.  Since for several practical
reasons the bulk of that Army would be trained in the south where its
conscripts would be subject to southern laws, Marshall saw no alternative
but to postpone reform.  The War Department, he said, could not ignore
the social relationship between blacks and whites, established by custom
and habit.  Nor could it ignore the fact that the "level of intelligence and
occupational skill" of the black population was considerably below that of
whites.  Though he agreed that the Army would reach maximum strength
only if individuals were placed according to their abilities, he concluded
that experiments to solve social problems would be "fraught with danger
to efficiency, discipline, and morale."  In sum, Marshall saw no reason to
change the policy approved by the President less than a year before.

---

[²] Compare this language to that in § 654(a)(12): "The prohibition against homosexual
conduct is a long-standing element of military law . . . ."

. . .The Adjutant General . . .delivered what many considered the final word on integration during the war.

> The Army is made up of individual citizens of the United States who have pronounced views with respect to the Negro just as they have individual ideas with respect to other matters in their daily walk of life. Military orders, fiat, or dicta, will not change their viewpoints. The Army then cannot be made the means of engendering conflict among the mass of people because of a stand with respect to Negroes which is not compatible with the position attained by the Negro in civil life . . . . The Army is not a sociological laboratory; to be effective it must be organized and trained according to the principles which will insure success. Experiments to meet the wishes and demands of the champions of every race and creed for the solution of their problems are a danger to efficiency, discipline, and morale and would result in ultimate defeat. [Col Eugene R. Householder, TAGO, Speech Before Conference of Negro Editors and Publishers, 8 Dec 41, AG 291.21 (12-1-41) (1).]

*　　*　　*

> The integration of the armed forces was a momentous event in our military and national history; it represented a milestone in the development of the armed forces and the fulfillment of the democratic ideal. *** The experiences in World War II and the postwar pressures generated by the civil rights movement compelled all the services . . . to reexamine their traditional practices of segregation. While there were differences in the ways that the services moved toward integration, all were subject to the same demands, fears, and prejudices and had the same need to use their resources in a more rational and economical way. All of them reached the same conclusion: traditional attitudes toward minorities must give way to democratic concepts of civil rights.

Excerpts from Morris J. MacGregor, Jr., *Integration of the Armed Forces 1940-1965*,

Department of the Army Historical Advisory Committee (6 April 1979), part of the

Defense Study Series, U.S. Army Center of Military History (1985) (internet edition[3])

(page numbers omitted). Finally, in 1981, the Supreme Court, in Rostker v. Goldberg,

453 U.S. 57, 78 (1981), forever dispelled the military segregation or "unit cohesion"

---

[3] Available at http://www.army.mil/cmh-pg/books/integration/IAF-FM.htm.

myth: "This is not a case of Congress arbitrarily choosing to burden one of two similarly situated groups, such as would be the case with an all-black or all-white, or an all-Catholic or all-Lutheran, or an all-Republican or all-Democratic registration."

Like Blacks in American history before Brown v. Board of Education, Gays now face the same enormous challenge of overcoming myth in seeking justice in our judicial system. The modern fashionable myth of American society is the Straight myth that Gays are inferior, *i.e.*, defective, and/or harmful to society and therefore may properly and reasonably be excluded not only from the military but from all other aspects of life (such as marriage, adoption, employment, etc.). However, unfortunately for Gays, American society is closer to Plessy v. Ferguson than Brown v. Board of Education in the course of recognizing the enormous injustice of that myth and of discrimination against Gays. This case, with all due respect to this Court, is a perfect example. Despite the fact that the free world is again threatened by fascist, murdering fanatical thugs, in the form of terrorists and Muslim fundamentalists (who, by the way, consider homosexuality, and being Jewish, both a capital offense, just like the Nazis did), and despite the fact that thousands of Gays (if only closeted) have served with honor in the War on Terror and the Iraq War (just like Blacks did during World War II), this Court has blindly endorsed the military's and Congress' argument that Gays may be excluded from service on the basis of "unit cohesion"—the very exact same argument they used against Blacks sixty-years ago—even though that argument patently amounts to nothing more than a validation of the Straight majority's animus against Gays. It is no disrespect to point out to this Court that that endorsement, however far down American society is or is not in the course of equality for Gays, is plainly wrong, unfair, unjust, and unconstitutional—as plainly

7

wrong as we now know and acknowledge the ruling in Plessy v. Ferguson to have been.

Perhaps more importantly, this Court's endorsement is as personally devastating and

demeaning to all Gays who have served or wanted to serve in the military as was Plessy's

endorsement of racial discrimination to Blacks in the almost sixty years that followed that

decision.

## A.    Rational Review

As the Court stated in its Opinion, the crux of the rationality of §654 is whether it

"rationally conduces to achieve the end of maintaining effective military services."

Opinion, at 23. The same crux was present in Plessy v. Ferguson with respect to

maintaining law and order in the streets: "So far, then, as a conflict with the Fourteenth

Amendment is concerned, the case reduces itself to the question whether the statute of

Louisiana is a reasonable regulation, and with respect to this there must necessarily be a

large discretion on the part of the legislature." The problem in this case, as in Plessy, is

that the Court simply engaged in a syllogistic affirmation of myth or tautology rather than

doing an actual rationality test. The Court concluded that it was rational for the military

and Congress, based on the record before them, to conclude that the presence of Gays in

the military harms morale, good order and discipline, and unit cohesion.[4] However, the

---

[4]See Opinion, at 23-24:

> "In the hearings that led to the enactment of § 654, Congress was advised by the
> Nation's military leaders that the presence of open homosexuals in
> military service would interfere with the development of cohesive units
> and would harm discipline and morale.***After considering the
> information presented by those both in favor of and opposed to the
> proposed policy, Congress was persuaded to adopt it. As the findings set
> out in § 654(a) demonstrate, Congress was persuaded to the position
> articulated by the military leadership, who were presumably articulating
> the policy of the Executive Branch, that separation of open homosexuals

8

Court never explains or examines how that second conclusion is rational, just that it is

held by individuals' (like General Colin Powell) who believe that the presence of Gays in

the military harms morale, good order and discipline, and unit cohesion,[5] and whom the

overwhelmingly Straight military and Congress in turn believed. In other words, Gays

harm unit cohesion because Gays harm unit cohesion. Or, as <u>Plessy</u> held, Blacks can be

given separate but equal transportation because government can separate Blacks from

Whites. It is circular reasoning of the highest order. The Court never examined the

rationality of the underlying individuals' conclusion that Gays harm unit cohesion.

Moreover, the Court completely ignored the context of the military's and

Congress' conclusion, and their own stated basis for that conclusion. A virtually all

Straight Congress, representing constituents the Straight majority of whom preach and

accept discrimination against Gays, concluded that unit cohesion would be harmed if

Gays were not excluded from the military because Straight servicemembers would have

to serve with individuals (Gays) to whom they object, thus causing friction. In other

words, the military's and Congress' conclusion embodies the Stimson-Marshall "the

Army is not a sociological experiment, we can't have Blacks and Whites in the same

from military service would help to maintain high effectiveness in the
armed forces."

See Opinion, at 23-24, quoting General Colin Powell: "[T]he presence of open
homosexuality would have an unacceptable detrimental and disruptive impact on the
cohesion, morale, and esprit of the armed forces."

[5] At no point did Congress ever find, that Gay individuals are inherently unsuited to serve
in the military. The only two arguments asserted by Congress and the military in
opposition to Gay military service have been the disorder that would purportedly result
from Straights objecting to Gays if Gays were allowed to serve and the disorder that
would purportedly result when either Gays are housed together and sexually attracted to
each other or Gays and Straights are housed together and Gays are sexually attracted to
Straights.

9

unit" argument, or, rather, in this case, the Powell/Schwarzkopf "the Army is not a
sociological experiment, we can't have Gays and Straights in the same military"
argument. The Powell/Schwarzkopf "animus is OK in the military context" argument is
one which the Court never addressed, but of which Plaintiffs complained. Instead, the
Court merely questions the "wisdom" of allowing pure animus to drive a military policy.
However, the Supreme Court *has* asked the pure animus question, and answered it
decisively in the negative. See Rostker, *supra*; Romer v. Evans, 517 U.S. 620, 635
(1996); Palmore v. Sidoti, 466 U.S. 429, 433 (1984). Therefore, this Court should also
have addressed and answered the animus question in the negative, and thus struck down
"Don't Ask, Don't Tell" as the egregious discrimination that it really is.

Moreover, had this Court asked the animus question, it would have seen why
Plaintiffs' attack upon the empirical reality of § 654—including upon the military's
second purported reason in support of § 654, that it cannot house Gays and Gays together
or Gays and Straights together, particularly on the battlefield, because of the sexual
tension among themselves—required factual examination by the Court and actually
precluded dismissal. A factual examination was and is necessary for the same reason it
would be necessary if the military and Congress had said it cannot house Blacks and
Whites together, because of the racial tension. That is, in light of the military's and
Congress' discriminatory history (towards Gays and Blacks), and in light of common
sense, such an illogical and obviously impossible excuse cannot be anything other than a
surrogate for discrimination. In fact, had this Court allowed a factual record—including
testimony from this Plaintiff who served in two wars—as to Plaintiffs' allegations in the
Complaint, it would have seen that the contention that the military cannot house Gays on

10

the battlefield because of privacy and sexual tension concerns is completely *fabricated* and nothing more than a pretext for discrimination—if only because the military *routinely* houses heterosexual men and women together, and homosexuals and heterosexuals together[6], even in combat zones, including Iraq. It was so from the beginning of the exclusionary policy, and has had nothing to do with an "imperfect fit." Section 654 is, and has always been, simply a classification of persons undertaken for its own sake—period. The military's and Congress' "sexual tension and lack of privacy" argument is nothing more than the equivalent of a polling tax on Gay servicemembers. It deserves no more deference, or debate as the Court suggests at page 35, fn 30 of its Opinion, than the polling tax did. It is so arbitrary—if one actually looks at the facts—as to not pass the stink test.

In short, this Court, in its Opinion, abdicated its Constitutional duty by doing nothing more than tell Plaintiffs that society discriminates against them (a fact of which they are painfully aware every day), and that, until *society* ends that discrimination, the *military* may continue to engage in that discrimination simply because society does. "Go tell it to your Congressman," the Court tells us. That is simply insufficient. That is simply unjust. That is simply wrong. Courts are supposed to combat wrongful discrimination wherever they find it, not endorse it or acquiesce in the face of it. The courts, not Congress, enforce the Constitution. This is a constitutional question, not a political one.

---

[6] In fact, "Don't Ask, Don't Tell" absurdly ensures that heterosexual and closeted/suspected homosexuals do live together.

11

## B.    **Equal Protection & Substantive Due Process**

During the Jim Crow era, segregation of Blacks in the military was directly related to their inability, under the law, to marry Whites (remember Secretary Stimson's position), which, in turn, was directly related to *de jure* Black inequality. Thus, although full integration and the fundamental right to (interracial) marriage (Loving v. Virginia, 388 U.S. 1 (1967)) did not come to Blacks until after their equality or status as a protected class was *acknowledged* beginning in 1954 with Brown v. Board of Education, there is no question, today, either that integration and intermarriage were inevitable as natural extensions of the basic principle that Blacks deserve equal access to and participation in all aspects of life, or that Blacks were entitled to equality as a matter of principle even before cases like Brown were on the books. Indeed, today Americans look back at things like "colored" drinking fountains and recoil in horror and disbelief. The same situation inhered in Plaintiff's legal position when they filed suit in this case. Although the primary crux of Plaintiffs' case is Lawrence[7], which is, as the Court noted, not unequivocal, this should not have deterred this Court from recognizing—as extensions of basic constitutional/democratic principles and justice, if not from Lawrence *qua* Brown v. Board of Education—both that Gays are a suspect/protected class and that Gays have a fundamental right to intimacy and marriage, and thus, in turn, that § 654 is unconstitutional because it excludes Gays from the military based purely on animus and it totally prohibits Gay servicemembers from intimate relationships and marriage.

In other words, this Court did not need express permission from the Supreme Court to conclude that it is fundamentally offensive to the Constitution and to Democracy

---

[7] It should be noted that Brown v. Board of Education was also a very tepid decision, whose general principle of equality had to be fleshed out in other cases.

12

to arbitrarily discriminate against individuals on the basis of irrelevant, immutable

characteristics, such as being Gay. Plaintiffs were not merely refused a second dessert by

the military after dinner in the mess hall, as one might think from the gentility of the

Court's opinion, but Plaintiffs were told in no uncertain terms by the military that, despite

excellent service[8], exceptional records, and great personal sacrifice, including in wartime

and combat service in defense of this Nation, they were nothing more than garbage—not

fit to wear the uniform, merely because of a random circumstance of their birth. With

their discharge, Plaintiffs lost their employment, their service, their friends, their

reputations if not their dignity, their peace of mind, and possibly their futures. Had

Plaintiffs been discharged for being Catholic, Jewish, or Muslim, for being White, Black,

Hispanic, Asian, or Indian, for being short or tall, for being Irish or Puerto Rican or

Italian, for being five-foot-nine or six-foot-three, for having brown hair or blond hair or

black hair, or even gray hair, for being married or single, for being rich or poor, or for

being educated or uneducated, for being fast or slow, for having straight teeth or crooked

teeth, even if they were not over-achievers, but under-achievers, this Court would have

granted Plaintiffs relief—immediately. Instead, this Court endorsed a policy under which

even the most unpatriotic, America-hating, undisciplined, unproductive citizens in this

Country who have never served a day in the military have more rights than Plaintiffs,

including the right to join the military and serve, the right to marry, etc. That is wrong.

Nor does this Court need the Supreme Court's express permission to conclude

that it is a fundamental right of every human being to have intimate (adult, consensual)

relationships and to marry—particularly if one is a servicemember who may be deployed

---

[8] Plaintiff had volunteered for his third combat tour when he was discharged for being Gay.

13

and killed in combat zones at any time. Neither this Court nor any reasonable person with a conscience could conclude anything but that it is *sadistic* to require an entire population of people (Gay servicemembers) to be completely celibate. Again, if the military and Congress had a policy forbidding Straight or heterosexual servicemembers from having relationships and marrying as a condition of their service, this Court would have laughed the military and Congress out of court. But, in this case, this Court, figuratively speaking, laughed Plaintiffs out of court, and told them to go see their Congressional representatives. That is wrong.

In short, there is no question that Gays in the military and in society are entitled to equality and the fundamental right to engage in relationships—it is merely a question of when will a court have the courage to say so—will Gays have to wait sixty plus years like Homer Plessy did, or will they not have to wait at all?

## II.      The Court Totally Missed Plaintiffs' Other Equal Protection Claim

This Court was so engrossed in the myth of harm to unit cohesion that it totally missed one of Plaintiffs' equal protection claims—that of arbitrary government action under the operation or application of § 654. See, *e.g.*, Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Romer v. Evans, 517 U.S. 620, 632 (1996). In fact, the Court's failure to appreciate this one claim in particular demonstrates that it has no understanding whatsoever—and made no attempt to understand—of the insidiousness of § 654. To the Straight observer, including this Court, § 654 and its implementing regulations is a benign regime that simply and discreetly operates to prevent openly Gay individuals or individuals concluded by commanders to be Gay from joining the military or staying in the military. In essence, under this theory, § 654 is nothing more than, say, a neutral

14

local property ordinance. A law may forbid a homeowner from building a certain kind of fence. If a homeowner openly applies for a building permit to build that kind of fence, the local municipality will deny the permit. If a homeowner builds that kind of fence without getting a permit, and the local municipality finds out about it after the fact, the municipality will require the homeowner to remove the fence. The total supposed incidence of the law upon the individual concerned consists only in the simple prohibition of something: in the case of the local ordinance, erection of the particular kind of fence, in the case of § 654, military service by Gays. Thus, in its Opinion, this Court found that Plaintiffs' claims about how § 654 was applied were really nothing more than complaints "*that* the policy was applied." See Opinion, at 8; see, also, at 9 ("This is not a question of the maladministration of the policy, but rather of its administration in accordance with its terms.") To be sure, Plaintiffs certainly objected that the policy was applied in the first place as a matter of equal protection (suspected class/protected class kind). However, as any Gay individual who has ever served in the military knows, § 654 and its implementing regulations is anything but a discreet, neutral regime, and has anything but a discreet, neutral incidence.

In fact, as would be expected with a law that is motivated by animus against one particular group, § 654 is designed to, and results in, separate real and substantial harm to Gays, even before they are discharged—just like segregation resulted in extensive abuse of Blacks servicemembers, and just as "separate but equal" was not really equal ("colored" accommodations were usually inferior). It would be, with respect to the fence analogy, as if the local ordinance allowed the building code inspector not merely to remove the fence, but to beat the homeowner up, harass him, and peek in his bathroom

15

windows. Section 654's regime, in short, allows the military to routinely harass and

abuse and conduct witch hunts against Gay servicemembers or those perceived to be Gay

servicemembers. That is not hyperbole for purposes of this Motion. That is pure, hard,

demonstrable fact. Commanders and servicemembers regularly act out their personal

(but societal) prejudices against Gay servicemembers, humiliating them, assaulting them,

harassing them, and acting arbitrarily towards them in administrative actions and in the

discharge process on a daily basis. According to a study done by the Department of

Defense itself in 2000—ten years after "Don't Ask, Don't Tell" was instituted—more

than 80% of 71,000 randomly-surveyed service members said that they had heard

offensive speech, derogatory names, jokes, or other remarks regarding Gays in the last

year; 85% of them believed leaders and other servicemembers tolerated such comments;

and 37% of them said that they had witnessed or experienced an event of harassment

toward a servicemember because of the servicemember's perceived sexual orientation.

See Linda D. Kozaryn, "DoD Seels Public Views on Homosexual Harassment,"

American Forces Press Service, April 20, 2000. Many, if not all of Plaintiffs suffered

such harassment, mistreatment, or abuse, including as alleged in the Complaint. This

Plaintiff's command, for example, intentionally released his personal Privacy Act

information to other servicemembers and a non-DoD civilian who had no need to know,

in order to humiliate Plaintiff before he was discharged. Such "tarring and feathering" of

Gay servicemembers before they are discharged is common in the military. And Gay

servicemembers have no real remedy against such harassment and abuse, under § 654,

because § 654 itself says that Gays are harmful to unit cohesion, and because Gays are

punished, *i.e.*, discharged, for reporting⁹ illegal or wrongful actions against them, which makes them avoid reporting incidents in the first place.¹⁰

In fact, § 654 expressly provides for arbitrary action against Gay servicemembers. Commanders have virtually unfettered discretion as to if, how, and when they discharge a servicemember, regardless of the real and substantial harm to the servicemember such as loss of future employment, harm to reputation, invasion of privacy, and anguishing uncertainty. For example, under § 654, commanders have unfettered discretion to determine when a person found to be Gay is actually discharged; they can wait a year, they can wait four months, they can wait four weeks. One Plaintiff was retained for more than a year after being known as Gay by her command, as stated in the Complaint. Plaintiff was retained for approximately four months, just long enough for his command to use his special expertise, even though Plaintiff was in a special administrative status (like many if not all Gay servicemembers facing discharge) in which he legally could not receive any favorable actions, such as awards or leave, during that four months. For another example, under § 654, commanders have virtually unfettered discretion to characterize a Gay servicemember's service at discharge, and commanders' prejudice

---

⁹ Reporting under the military's Anti-Harassment Policy is useless, because most servicemembers, including commanders, are afraid to stand up for Gay servicemembers lest they be targeted themselves under the Policy. Plaintiff reported an instance where a civilian contractor bragged to soldiers about beating up Gays for fun, and the Army did nothing substantive about it and the contractor continued to work on post just as if nothing had happened. If that contractor had bragged about beating up Blacks for fun, there would have been hell to pay, and rightly so.

¹⁰One would think that reporting harassment or a crime against an individual, even on the basis of sexual orientation, would not be a problem, but, with § 654 it is, because commanders have almost unfettered discretion under the policy to determine what constitutes "evidence" of homosexuality, and the mere act of reporting harassment against Gays can and does lead to the belief by commanders that a servicemember is Gay.

against Gays usually negatively informs that characterization—whatever the excellence of the discharged servicemember's service was factually or as a matter of record. As an officer and a judge advocate, this Plaintiff often heard commanders expressly state that first-tour individuals being discharged under the policy were entitled to nothing more than a General Discharge.[11] A General Discharge can adversely affect a servicemember's later civilian employment opportunities, government benefits, and reputation.

In fact, as far as officers are concerned, the military still explicitly categorizes homosexual conduct, even the mere admission of homosexuality, as "misconduct," see Army Regulation 600-8-24, para. 4-22$b$(6); AR 135-175, thus allowing commanders to list the reason for an officer's discharge as "misconduct" on his or her DD 214 (the public record of his or her service)—even if the officer had a stellar career, and even if the military ultimately awards the officer an Honorable Discharge. This unfortunately happened to Plaintiff, or almost happened to him. Although Plaintiff figuratively performed miracles for the command from which he was discharged, and he had a spotless record, his command, at the direction of Headquarters Department of the Army ("HQDA") in Washington, initially indicated on Plaintiff's DD 214 that he was being discharged for "substandard performance," and then, after Plaintiff complained about that, indicated he was being discharged for actual "misconduct," simply because of his homosexual admission. It was not until SLDN intervened and contacted HQDA, that the reason for Plaintiff's discharge was changed to the Army's real reason for his discharge, "homosexual admission," but not before numerous individuals, including DoD civilians

---

[11] See Complaint regarding Plaintiff Cook, whose commander tried to give him a General Discharge.

18

and enlisted clerks, had seen the prior defamatory entries. Only God knows what would have happened to Plaintiff's life had SLDN not successfully intervened.

In fact, § 654 allows the military to arbitrarily actually deny a Gay servicemember an Honorable Discharge, and give him or her a devastating Under Other Than Honorable (OTH) Conditions Discharge, merely for *publicly* engaging in affection with someone of the same sex, off-duty, and off-post, even though the same act of public affection would not otherwise be punishable for Straight servicemembers. See AR 600-8-24, para. 4-22*h*(4); AR 635-200, para. 15-4(*a*). For example, a Gay servicemember could be given an OTH merely for kissing his or her sweetheart on the mouth while in the street, off-duty and off-base—even if the servicemember is already known in his or her unit as Gay and is pending discharge. Such punishing of "Gay" behavior *per se* is completely unrelated to any legitimate government interest and unconstitutional. See, *e.g.*, Lawrence v. Texas, 539 U.S. 558 (2003). Nor is that some archaic provision. This Plaintiff witnessed a superior give a soldier pending discharge an instruction thus not to engage in public affection.

Thus, day in, and day out, § 654's arbitrary regime physically, financially, and personally harms Gay servicemembers even before they are discharged, and it is allowed to continue to do so because no court bothers to take complaints against it by Gay servicemembers seriously. Straight judges cannot even imagine that Gays are complaining about anything other than the fact of application of the law, since they cannot imagine that such egregious arbitrariness in operation could occur. How could they. As Straights, they never experience it, and could never be victimized by it. To them, it is perfectly neutral. And there are no channels through which they could hear

19

complaints from Gays about such applied or operating harm and arbitrariness. There are

certainly no channels to hear them through the military, which wants nothing to do with

Gays and discharges them, nor through Congress who enacted § 654, nor through society

which also generally ostracizes Gays. But hear these complaints courts must, since such

arbitrary oppression is antithetical to the Constitution and our Democracy.

## III.     The Court Completely Missed Plaintiffs' Other First Amendment Claim

In the same fashion that it missed the equal protection claim, this Court also

identified only part of Plaintiffs' First Amendment claim—that § 654 violates the First

Amendment by proscribing statements by Gay servicemembers, or prescribing silence for

Gay servicemembers, about their sexuality.[12]  However, there is another First

Amendment claim encompassed by the Complaint, which is that the § 654 regime is

really and substantially overbroad and chills a whole range of protected speech that is

unrelated to even the military's stated objective of maintaining unit cohesion. See, *e.g.*,

Parker v. Levy, 417 U.S. 733, 760 (1971).  Again, it is § 654's arbitrariness that causes

the constitutional problem.  Under § 654, a servicemember may be discharged not only

for sexual contact or marriage/attempted marriage with someone of the same sex, or for

an admission of homosexuality, but also for "any bodily contact that a reasonable person

would understand to demonstrate a propensity or intent to engage in such [sexual] bodily

contact," and also for any "language or behavior that a reasonable person would believe

intends to convey the statement that a person engages in, attempts to engage in, has a

propensity to engage in, or intends to engage in [such sexual bodily contact]. See AR

---

[12]Of course, once § 654 is recognized as unconstitutional under equal protection and due process, this proscription/prescription is automatically unconstitutional under the First Amendment.

600-20, para. 4-19. In other words, a servicemember may be discharged for anything that society stereotypes as "Gay." In light of the fact that individual commanders have virtually unfettered discretion to find that a servicemember is homosexual or has engaged in homosexual conduct (unless the servicemember has a certain number of years in, in which case a board makes that finding based on the commander's recommendation and "evidence"), the last two categories of qualification for discharge are open-ended and unreasonably cover an entire universe of language and behavior that might be stereotyped as "Gay,"[13] even if neutral and constitutionally protected. For example, commanders may use non-sexual, innocent hugging or touching between servicemembers of the same sex, flamboyancy, liking the "softer" things in life, supporting Gay rights, having a friend who is Gay, going to a bar frequented by Gays, possessing or reading Gay publications like *The Advocate*, or watching Gay-themed movies like *Brokeback Mountain* as *corroborating* (but not sole) evidence of homosexual conduct requiring or allowing discharge. See AR 600-20, para. 4-19$d$(2)($a$); AR 600-8-24, para. 4-22$b$(2)($e$); 635-200, para. 15-3$b$(2)($c$).

Consequently, since, under § 654, *servicemembers* bear the burden of proving that they are not homosexual or have not engaged in homosexual conduct if they are ever so accused, suspected, or found by the command, both Gay and Straight servicemembers avoid any innocent or neutral conduct that might even remotely invite suspicion as being "Gay" and trigger an investigation[14] into their sexuality or ultimately be used to support a finding of homosexuality. On its face, such avoidance behavior sounds almost silly or

---

[13] In the military, as in society, one often hears Straights use, among themselves, the put-down, "That's so Gay."

[14]Commanders have virtually unlimited discretion as to how they pursue such investigations, which become modern-day witch-hunts.

incredible, yet this Plaintiff can assure the Court that it is very real and occurs every day in the military. Gay servicemembers, or those servicemembers perceived to be Gay, are so mistreated in the military, and so vulnerable to the arbitrary loss of their employment and service, under § 654, that most servicemembers (Gay and Straight) do whatever is necessary to avoid becoming a victim of the policy—even if that means avoiding a whole range of normal, reasonable, beneficial, and neutral language and behavior that has nothing to do with *per se* homosexual expressive conduct (like saying "I am Gay," or saying "I love you" to someone of the same sex). And their fears are well-founded because, as Plaintiff said before, commanders and other servicemembers may and *do* evaluate an individual servicemember's sexuality based on Gay-stereotyped language and behavior. The only other situation to which this avoidance behavior could be compared, although certainly not even close to the same horrible degree, is how people in Nazi Germany and other Nazi-occupied countries often had to avoid language, behavior, appearances, or situations—however innocent—which might get them branded as Jewish (or another marked group, such as "Gypsies") by the Nazis and sent to concentration camps. The analogy is completely appropriate, though, in the sense that the military's and Congress', and indeed, society's discrimination against Gays is as unacceptable as anti-Semitism and proceeds from the same methodology and myth, and should be as equally rejected by the courts, including this Court.

## IV.    Conclusion

What, it should be asked, caused the Supreme Court in Brown v. Board of Education to reject systematic wrongful racial discrimination and all of its accompanying mythology, whereas sixty years earlier the Supreme Court in Plessy v. Ferguson endorsed

it? Was it luck of the Plaintiffs? Was it timing? Was it courage? Was it society's

epiphany? Whatever it was, either Plaintiffs or this Court, or both, need it now. We are

the greatest country in this world because we believe in the almighty power of justice and

doing what is right. This Court's opinion and dismissal in this case were not just or right,

and this Court should expeditiously reconsider and vacate them.

Respectfully submitted,

Dated: April 27, 2006 at Burlington, Vermont.

*James E. Pietrangelo, I*

JAMES E. PIETRANGELO, II, Esq.
Vermont Bar License # 4265
P.O. Box 9231
South Burlington, VT 05407
(802) 338-0501

Plaintiff *Pro Se*

### AFFIDAVIT OF SERVICE

I, JAMES E. PIETRANGELO, II, being duly sworn, state that on May 2, 2006, I

served the foregoing *Motion for Reconsideration* on all parties by mailing a copy of same

via first-class, postage prepaid, U.S. Mail to:

**Mark T. Quinlivan, Esq.**
**U.S. Attorney's Office**
Suite 9200
1 Courthouse Way
Boston, MA 02210
*Counsel for Defendants.*

**Stuart F. Delery, Esq.**
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, NW
Washington, D.C. 20037
*A Counsel for Plaintiffs.*

*James E. Pietrangelo, II*

JAMES E. PIETRANGELO, II

Sworn to and subscribed before me on May 2, 2006.

NOTARY PUBLIC

NOTARY PUBLIC
MY COMMISSION EXPIRES

02/07

23