UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE
2006 JUN -1 P 12: 39
U.S. DISTRICT COURT
DISTRICT OF MASS.

THOMAS COOK, *et al.*              )
                                   )   JUDGE GEORGE A. O'TOOLE, JR.
              *Plaintiffs,*        )
                                   )   CASE NO. 04CV12546 GAO
v.                                 )
                                   )
DONALD H. RUMSFELD, *et al.*       )
Secretary of Defense               )
                                   )
              *Defendants.*        )

### PLAINTIFF PIETRANGELO'S CONSENTED MOTION FOR LEAVE TO FILE REPLY TO DEFENDANTS' *OPPOSITION*

Pursuant to Local Rule 7.1(b)(3), Plaintiff, James E. Pietrangelo, II, hereby respectfully moves this Court for leave to file the attached Reply to Defendants' *Opposition* to his Motion for Reconsideration, on the grounds that the Reply is necessary for a full explication of the complex and significant issues in this case and thus will be helpful to the Court in reaching its decision regarding Plaintiff's Motion for Reconsideration. Defendants, through their counsel, Mark T. Quinlivan, Esq., consented via telephone call on May 30, 2006, to Plaintiff's Motion for Leave.

Respectfully submitted,

Dated: May 30, 2006 at Burlington, Vermont.

*James E. Pietrangelo II*
JAMES E. PIETRANGELO, II, Esq.
Vermont Bar License # 4265
P.O. Box 9231
South Burlington, VT 05407
(802) 338-0501

1

Plaintiff *Pro Se*

### AFFIDAVIT OF SERVICE

I, JAMES E. PIETRANGELO, II, being duly sworn, state that on May 31, 2006, I served the foregoing *Motion for Leave to File Reply* on all parties by mailing a copy of same via first-class, postage prepaid, U.S. Mail to:

**Mark T. Quinlivan, Esq.**
**U.S. Attorney's Office**
Suite 9200
1 Courthouse Way
Boston, MA 02210
*Counsel for Defendants.*

**Stuart F. Delery, Esq.**
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, NW
Washington, D.C. 20037
*Lead Counsel for Plaintiffs.*

*James E. Pietrangelo, II*
JAMES E. PIETRANGELO, II

Sworn to and subscribed before me on May 31, 2006.

NOTARY PUBLIC

NOTARY PUBLIC
MY COMMISSION EXPIRES
02/07

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THOMAS COOK**, *et al.* ) | JUDGE GEORGE A. O'TOOLE, JR. |
| *Plaintiffs,* ) | |
| ) | CASE NO. 04CV12546 GAO |
| v. ) | |
| ) | |
| **DONALD H. RUMSFELD**, *et al.* ) | |
| **Secretary of Defense** ) | |
| ) | |
| *Defendants.* ) | |

### PLAINTIFF PIETRANGELO'S REPLY TO DEFENDANTS' *OPPOSITION* TO PLAINTIFF'S MOTION FOR RECONSIDERATION

Plaintiff, James E. Pietrangelo, II, hereby replies to Defendants' *Opposition* to his Motion for Reconsideration as follows.

A Rule 59(e) motion must be granted where there has been clear error or prevent manifest injustice. For the reasons stated in Plaintiff's Motion for Reconsideration, the Court's dismissal of Plaintiff's Complaint was clearly erroneous and worked a manifest injustice and therefore should be vacated. Defendants' Opposition does not *undermine* that conclusion, but *supports* it.

### I. The Government's Boot-Strapping

In an effort to bootstrap—no pun intended—the Military's exclusionary policy, Defendants point to General Colin Powell's rejection, at the inception of the policy, of the very discrimination comparison to racial segregation made by Plaintiff in his Motion. Defendants quote General Powell as saying to the effect that the exclusionary policy is a

1

benign policy designed merely to protect the privacy of Straights and that any comparison to discrimination against Blacks is inappropriate and offensive—an opinion, Defendants point out, also endorsed by the Senate Armed Services Committee, other members of Congress, and the federal courts. The reason, though, that quoting General Powell's opinion is bootstrapping, and without merit, is because General Powell, as well as all the Congressional members, the courts, and majority of Americans who endorsed his opinion, are *Straight*. As Plaintiff explained in his Motion for Reconsideration, *of course* the exclusionary policy makes sense to them and seems perfectly reasonable and not susceptible to a comparison with Jim Crow laws—they benefit exclusively from it; they do not generally suffer any of its harms. Segregation of Blacks during World War II, and specifically segregation of Blacks in the military, had its venerable, "fair-minded" White defenders as well, including the Congress, American Society, the courts, and General George C. Marshall who, as the Army itself states:

> consistently support[ed] measures to eliminate overt discrimination in the wartime Army. At the same time, he rejected the idea that the Army should take the lead in altering the racial mores of the nation.***The settlement of vexing racial problems cannot be permitted to complicate the tremendous task of the War Department and thereby jeopardize discipline and morale.[1]

Had a Black soldier challenged the Military's segregation policy in federal court during World War II, the Government undoubtedly would have quoted General Marshall for the proposition that racial segregation was "benign," based on the privacy of White soldiers, and not comparable to slavery. Yet, less than ten years later the Supreme Court overturned segregation, and more than thirty years later the Army was singing the praises of integration as the triumph of democracy over prejudice.

---

[1] See Plaintiff's Motion for Reconsideration for the citation.

The test for the constitutionality of the exclusionary policy is not whether the Straight majority, including General Powell, approve of it, but whether the policy offends equal protection, due process, and free speech, and, without a doubt, as demonstrated in Plaintiffs' combined pleadings, the policy offends all three. Even though heterosexual men and women are allowed to serve together in the military, despite their natural attraction and in many cases natural rejection of each other, Congress and the Military continue to exclude homosexual men and women from serving solely on the basis that heterosexual servicemembers do not want to be around them or possibly be the subject of their attraction—General Powell's so-called "privacy" concern (which is nothing more than the "privacy" concern White soldiers had against Blacks in the military during World War II). It is alright if a Straight female servicemember has to put up with an unwanted advance from a Straight male servicemember, and vice versa, but God forbid a Straight male or female servicemember should ever have to put up with the unwanted advance of a Gay servicemember. That is bigotry, pure and simple. Let's call it what it is. The policy is no more "benign" because the Straight majority calls it "benign" than Iran's policy of hanging Gays simply for being Gay is "just" because the Iranian mullahs call it "justice."

There is no rational basis or legitimate reason, much less a compelling interest, for excluding Gays from the military. There is only prejudice. If it walks like a duck, quacks like a duck, looks like a duck, and craps like a duck, it is a duck. If it egregiously harms one discreet innocent population like wrongful or unlawful discrimination, if it exists contemporaneously in an overall pattern of societal discrimination like wrongful

discrimination, if it lacks any reasonable[2] and consistent explanation like wrongful discrimination, it is wrongful discrimination. Period. Full-stop. End of story. Time for democracy to triumph over prejudice—not the other way around. It is just a question[3] of when—today, or ten years from now, or thirty years from now.

II.     **What's Hiding Behind the Closet Door**

You can usually tell wrongful or unlawful discrimination when the government in question simply refuses to discuss, in relation to its particular policy, *facts* or *allegations* of mistreatment or arbitrary treatment, as a result of the policy, of individuals or a population of individuals on a wholesale basis. The government must refuse because, as a factual matter, it cannot refute the allegations, and, of course, proof of such allegations demonstrates the policy for the discriminatory lie that it is. In other words, policies that are wrongfully discriminatory on their face usually result in mistreatment or arbitrary treatment in application or operation—by definition. The same is true in this case. Plaintiff Pietrangelo slapped Defendants in the face with a gauntlet of allegations regarding the serious and systemic mistreatment and arbitrary treatment, by the Military, and in the military, of Gay servicemembers and/or those servicemembers suspected of being Gay, under the policy for the last ten plus years—separate from the actual facial discharges themselves of servicemembers under the policy—and rather than bothering to

---

[2] The Court would be hard-pressed to find any Gay servicemember, or Gay who wants to be a servicemember, who believes the policy reasonable and not wrongfully discriminatory.

[3] It is not a competition over who suffered the worst discrimination, Blacks or Gays, just like it is not a competition over whether Blacks suffered more than Jews. Clearly, in some ways, Jews suffered more egregious harms than Blacks, such as the murder of six million Jews by the Nazis, and clearly, in some ways, Blacks suffered more egregious harms than Gays, such as being enslaved for centuries. However, each minority suffered some form of egregious institutional wrongful discrimination and oppression, sufficient to warrant judicial relief, and that is the real issue.

*deny* the allegations, Defendants simply sidestepped them, saying instead that Plaintiffs had to raise such "application" or "operation" (versus "facial") allegations under the Administrative Procedures Act (APA)—even though the APA is inapplicable when constitutional violations are involved. See Califano v. Sanders, 430 U.S. 99, 109 (1977). Defendants could not meet the substance of Pietrangelo's allegations because the allegations are *true* and show the exclusionary policy for the gross unconstitutional obscenity and injustice that it is.

However, with all due respect, this Court has a constitutional *duty* to review the wholesale mistreatment and arbitrary treatment of Gays in the military even if the Government wishes to keep that skeleton firmly in the closet—no pun intended.

### III. The Sleight of Hand

Plaintiff Pietrangelo referred in his Motion to suppression by Defendants of *two separate* types of protected free speech. The first is protected free speech directly proscribed or silence of protected free speech prescribed by the exclusionary policy, such as "I am Gay," "I want to marry someone of the same sex," etc. The second is other protected free speech caught up in the too-broad sweeping of the policy, that is, any and all protected free speech that might be construed by a Straight servicemember, particularly a Straight commander, as being stereotypically Gay, or "Gay," and thus supporting or leading to discharge. In his Motion, Plaintiff devoted the majority of his time to discussing suppression of the second form of protected free speech—restricting his argument regarding the first form to arguing that if the exclusionary policy is unconstitutional on equal protection/due process grounds, it must also necessarily fail on free speech grounds. Yet, Defendants failed in their Opposition to address at all this

5

second form of protected free speech, and, instead redirected their Opposition discussion to the first form in the hope that the Court would not notice the second form. But even a magician's sleight of hand cannot really make a rabbit disappear from a hat. The second form of protected speech is very real, and very really suppressed by the policy—a fact which not even Defendants can make go away.

Plaintiff Pietrangelo concedes, *arguendo*, and only *arguendo*, that if the Government can constitutionally exclude openly-Gay individuals from serving in the military, it does not violate the First Amendment to exclude individuals on the basis of statements expressly disclosing that they are Gay, such as "I am Gay," or "I want to marry someone of the same sex.," or to condition individuals' service on their not saying "I am Gay," or "I want to marry someone of the same sex." However, the exclusionary policy does not cover just express statements or admissions, or concealment of statements or admissions, of homosexuality. It covers a vast universe of other speech and expressive conduct, such as Plaintiff explained in his Motion, which is otherwise protected. In fact, it primarily covers this other speech and expressive conduct, and not express statements or admissions of homosexuality. To borrow a phrase from Romer v. Evans, 517 U.S. 620, 632 (1996), "its sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects." In other words, the exclusionary policy is not designed and does not operate merely to exclude open homosexuality from the military, but to punish homosexuality in its entirety and in all its perceived forms, and all those who support Gays and Gay rights. That is the classic definition of overbreadth, particularly because homosexuality, just like

6

heterosexuality, is not inherently harmful. See, *e.g.*, Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973); Lawrence v. Texas, 539 U.S. 558 (2003).

"The Government may not suppress lawful speech as the means to suppress unlawful speech." Ashcroft v. The Free Speech Coalition, 535 U.S. 234, 255 (2002). "Protected speech does not become unprotected merely because it resembles the latter." *Id.* Even if express statements or admissions of homosexuality may be legally suppressed in the Military, hypothetically speaking, the Government still may not suppress speech or expressive conduct that *could* be interpreted or may be interpreted as an express statement or admission of homosexuality, no matter how much the latter resembles the former. However, that is exactly what happens every day in the military under the exclusionary policy, because of the policy's real purpose and because of its arbitrary terms and application. *All* of the Plaintiffs, and hundreds of thousands, if not millions, of servicemembers and former servicemembers (whether Gay or Straight), can testify to this phenomenon. You simply do not read *The Advocate* in the barracks. You simply do not hang a rainbow flag in your barracks. You simply do not show platonic affection to other servicemembers of the same sex. You simply do not speak up in protest when other servicemembers make an anti-Gay comment or Gay joke. You simply do not listen to Liza Minnelli tapes. You simply do not make flamboyant gestures (such as crossing your leg over your other leg's knee rather than resting your leg's ankle on your other leg's knee while sitting down), even the isolated one. You simply do not associate with servicemembers known to be or suspected of being Gay. You simply do not protest, or report, instances of harassment against Gay servicemembers or those perceived to be Gay. You simply do not state or argue in any conversation with other servicemembers

7

that Gays have rights, or should be allowed to serve in the military, nor do you even discuss homosexuality. You simply do not mention to other servicemembers that you have Gay friends, or Gay relatives. You simply do not march in Gay parades. If you are Gay, you simply do not accord your significant other a public presence in your life, even to the point of foregoing benefits for them and yourself or public speech concerning them, or show them even platonic affection in public. Or, if you do any of these things, you do so with the utmost trepidation of physical harm, harassment, or loss of employment, and inconspicuously as possible. And the reason you don't is two-fold: 1) because, under the policy, your commander can and does as a matter of practice use these forms of speech and expressive conduct to *corroborate* a finding of homosexual conduct or initiation of an investigation into a suspicion of homosexual conduct for discharge, and 2) because, under the policy, Straight servicemembers, including Straight commanders, are encouraged to and do harass and abuse those suspected of being Gay based on these forms of speech and expressive conduct. No servicemember, Gay or Straight, wants to lose their livelihood or wants to be harassed and abused, based on the perception that they are "Gay," so they avoid any type of speech or expressive conduct that could even *remotely* be interpreted as being Gay or stereotypically Gay. That is classic overbreadth, particularly because the harms—including discharge and loss of benefits—suffered by individuals under the policy are significant and amount to criminal sanctions.

  Defendants cite Levy v. Parker in defense of the exclusionary policy's sheer discontinuous breadth, but Levy is clearly distinguishable. Levy dealt with an overbreadth challenge to a statute making certain speech by servicemembers criminally

sanctionable. An Army captain challenged the statute, arguing that, if a *civilian* engaged in the same speech as proscribed by the military statute, the speech would probably be protected. The Supreme Court held that what saved the statute was that it could be validly applied to servicemembers, because of the special need for obedience in the military and the affect of the particular proscribed speech on good order and discipline, even if it could not be constitutionally applied outside the military to civilians. See *id.*, at 760 ("This Court has, however, repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied."). In other words, the servicemember speech reached by the statutes in Levy was itself alleged by Congress, and accepted by the Supreme Court, to be inherently harmful to some degree, and therefore proscribable. In this case, the equivalent allegedly "harmful," and therefore proscribable, speech, under the exclusionary policy, would be servicemembers' express statements or admissions of homosexuality, such as "I am Gay," or "I want to marry someone of the same sex." And as already conceded, *arguendo*, such a proscription is constitutional under the First Amendment, if it constitutional under Equal Protection and Due Process. However, the exclusionary rule reaches beyond this first form of speech and substantially and primarily reaches to the second form of speech—the entire vast universe of speech and expressive conduct, as discussed above, that servicemembers are chilled into avoiding. This second form of speech is not inherently harmful in any way, nor has Congress or the Military said it is harmful. In fact, the Supreme Court would *never* find that such speech—the second form—is harmful, because to do so would be to completely vacate its entire First Amendment jurisprudence. Or, to put it another way, to do so would be to hold that

9

servicemembers have *no* First Amendment protections whatsoever. *Cf.* Levy, *supra*, at 758 ("While members of the military are not excluded from the protection granted by the First Amendment . . . ."). Thus, even under Levy, the exclusionary policy is indisputably overbroad.

Finally, it should be noted that Defendants' argument, on pp. 6-7 of its Opposition, that the exclusionary policy is constitutional because it does not target pure speech or homosexual "status" is patently absurd. This is the Military's "admission *plus* failure to rebut the presumption," or "pure conduct" argument. It is patently absurd to say that the policy targets or punishes only "conduct," because the policy defines speech—an admission of homosexuality—*as* conduct, and also those servicemembers who are Gay *ipso facto* will have a propensity to engage in homosexual conduct and thus always be unable to rebut the presumption, just like those servicemembers who are Straight *ipso facto* will have a propensity to engage in heterosexual conduct. Sexuality is genetic, and expressive. Defendants' argument is as absurd as if it excluded Jews from the military and defended such exclusion policy by saying that it does not offend the First Amendment because, though servicemembers stating "I am Jewish" are discharged on that basis alone, admitted Jewish servicemembers could "rebut" the presumption by proving that they would not read the *Torah* or engage in other indicia and practices of the Jewish faith, or have the desire or propensity to do so. But to be Jewish is to have and practice one's Jewish faith, and to want to do so. The Military's "conduct, not status" and "rebut the presumption" arguments are simply not only intellectually dishonest, but deliberately deceitful, to justify what is otherwise an unjustifiable evil.

IV.   **The "Failure to Raise" Argument**

Finally, Defendants argue that the Court must reject the arguments Plaintiff Pietrangelo raised in his Motion for Reconsideration because neither he nor the other Plaintiffs raised them before in this case. Defendants' argument is without merit. *First*, Plaintiffs, including Plaintiff Pietrangelo before he made his *pro se* appearance, *did* raise these claims and arguments in their pleadings. A simple reading of the Complaint and subsequent pleadings and oral argument by Plaintiffs' counsel will indicate such arguments in sufficient form, particularly given the notice pleading standard of FRCP 8.[4] *Second*, parties are not limited on appeal to their exact arguments in the underlying case. See PGA Tour, Inc. v. Martin, 532 U.S. 661, 678 & n.27 (2001). Parties may "reframe" their earlier arguments, or frame their earlier arguments in different language, as long as the same basic issue from before is carried forward and the issue at stake is important. Indeed, reconsideration would be meaningless, were it otherwise, because the very purpose of a motion for reconsideration, at least with respect to clear error and manifest injustice, is to try to persuade the court that its decision was wrong by getting it to see the matter from a different angle. If a party were limited to its exact previous arguments, such a different angle would be impossible. In this case, the lives and livelihoods of millions of Americans are at stake, as are the democratic principles of this Nation. Additionally, Plaintiffs are up against a virtually unassailable false myth in trying to end discrimination and mistreatment against them. Given these circumstances, it is not only perfectly understandable, but perfectly permissible, for Plaintiff Pietrangelo to utilize a new perspective or frame upon already-raised constitutional issues like First Amendment,

---

[4] Pietrangelo notes that the other Plaintiffs can also specifically address this issue in their own Reply Brief.

11

Equal Protection, and Due Process. In fact, it is highly desirable in terms of judicial economy should the dismissal stand and this case goes up on appeal.

V. **Conclusion**

Plaintiff's Motion for Reconsideration should be granted and the Court's dismissal vacated.

Respectfully submitted,

Dated: May 30, 2006 at Burlington, Vermont.

*James E. Pietrangelo II*
JAMES E. PIETRANGELO, II, Esq.
Vermont Bar License # 4265
P.O. Box 9231
South Burlington, VT 05407
(802) 338-0501

Plaintiff *Pro Se*

### AFFIDAVIT OF SERVICE

I, JAMES E. PIETRANGELO, II, being duly sworn, state that on May 31, 2006, I served the foregoing *Reply* on all parties by mailing a copy of same via first-class, postage prepaid, U.S. Mail to:

**Mark T. Quinlivan, Esq.**
**U.S. Attorney's Office**
Suite 9200
1 Courthouse Way
Boston, MA 02210
*Counsel for Defendants.*

**Stuart F. Delery, Esq.**
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, NW
Washington, D.C. 20037
*Lead Counsel for Plaintiffs.*

*James E. Pietrangelo II*
JAMES E. PIETRANGELO, II

Sworn to and subscribed before me on May 31, 2006.

_____
NOTARY PUBLIC

NOTARY PUBLIC
MY COMMISSION EXPIRES
02/07

13