# United States Court of Appeals
## For the First Circuit

Nos. 06-2313, 06-2381

THOMAS COOK; MEGAN DRESCH; LAURA GALABURDA; JACK GLOVER;
DAVID HALL; MONICA HILL; JENNY LYNN KOPFSTEIN; JENNIFER MCGINN;
JUSTIN PEACOCK; DEREK SPARKS; STACY VASQUEZ,

Plaintiffs, Appellants,

JAMES E. PIETRANGELO, II,

Plaintiff,

v.

ROBERT M. GATES\*, Secretary of Defense; MICHAEL CHERTOFF,
Secretary of Homeland Security; UNITED STATES OF AMERICA,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Howard, Circuit Judge,

Campbell, Senior Circuit Judge

and Saris\*\*, District Judge.

---

\*Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate
Procedure, Robert M. Gates is automatically substituted for his
predecessor as Secretary of Defense, Donald H. Rumsfeld.

\*\*Of the District of Massachusetts, sitting by designation.

     Stuart F. Delery, with whom Benjamin C. Mizer, Wilmer Cutler
Pickering Hale and Dorr LLP, Sharra E. Greer, Kathi S. Westcott,
Sharon E. Debbage Alexander, Aaron D. Tax, and Servicemembers Legal
Defense Network were on brief, for appellants.
     James E. Pietrangelo, II, pro se.
     Gregory G. Katsas, Principal Deputy Associate Attorney General
with whom Michael J. Sullivan, United States Attorney, Peter D.
Keisler, Assistant Attorney General, Jonathan F. Cohn, Deputy
Assistant Attorney General, Anthony J. Steinmeyer, Assistant
Director Appellate Staff, Civil Division and Mark T. Quinlivan,
Assistant United States Attorney were on brief, for appellees.
     Tobias Barrington Wolff, on brief for amici curiae Akhil Reed
Amar, C. Edwin Baker, Erwin Chemerinsky, Owen M. Fiss, Pamela S.
Karlan, Andrew Koppelman, Kathleen M. Sullivan, and Laurence H.
Tribe, on brief for amici curiae Constitutional Law Professors.
     Virginia A. Seitz, Eamon P. Joyce, and Sidley Austin LLP,
     Leslie M. Hill, Robert Weiner, Christopher Anderson, and
Arnold & Porter LLP, on brief for amici curiae Law Professors.
     Rose A. Saxe, Matthew A. Coles, Kenneth Y. Choe, and Sarah
Wunsch, on brief for amicus curiae American Civil Liberties Union
and American Civil Liberties Union of Massachusetts.
     Patricia M. Logue and Bonnie Scott Jones, on brief for amicus
curiae Lambda Legal Defense and Education Fund, Inc.
     John E. Bies, D. Jean Veta, and Covington & Burling, on brief
for amicus curiae of American Sociological Association and Social
Science Professors.
     Steven W. Fitschen and Barry C. Hodge, on brief for amicus
curiae of the National Legal Foundation.
     Gary D. Buseck, Mary L. Bonauto, Gay & Lesbian Advocates &
Defenders, William M. Hohengarten, Luke C. Platzer, and Jenner &
Block LLP, on brief for amicus curiae Gay & Lesbian Advocates &
Defenders.

June 9, 2008

**HOWARD, Circuit Judge.** In 1993, Congress enacted a statute regulating the service of homosexual persons in the United States military. 10 U.S.C. § 654 (2007)(the Act). The Act, known as "Don't Ask, Don't Tell," provides for the separation of members of the military who engage, attempt to engage, intend to engage, or have a propensity to engage in a homosexual act. Id. § 654(b). In the aftermath of this congressional action, several members of the military brought constitutional challenges, claiming the Act violated the due process and equal protection components of the Fifth Amendment and the free speech clause of the First Amendment. These challenges were rejected in other circuits. See Able v. United States, 155 F.3d 628 (2d Cir. 1998); Holmes v. Cal. Army Nat'l Guard, 124 F.3d 1126 (9th Cir. 1997); Richenberg v. Perry, 97 F.3d 256 (8th Cir. 1996); Able v. United States, 88 F.3d 1280 (2d Cir. 1996); Thomasson v. Perry, 80 F.3d 915 (4th Cir. 1996) (en banc).

In 2003, the United States Supreme Court invalidated, on substantive due process grounds, two convictions under a Texas law criminalizing sodomy between consenting homosexual adults. Lawrence v. Texas, 539 U.S. 558 (2003). Lawrence has reinvigorated the debate over the Act's constitutionality. E.g., Pamela Glazner, Constitutional Doctrine Meets Reality: Don't Ask, Don't Tell in Light of Lawrence v. Texas, 46 Santa Clara L. Rev. 635 (2006); Note, The Military's Ban on Consensual Sodomy in a Post-Lawrence

World, 21 Wash. U. J. L. & Pol'y 379 (2006); Jeffrey S. Dietz, Getting Beyond Sodomy: Lawrence and Don't Ask, Don't Tell, 2 Stan. J. C. R. & C. L. 63 (2005). This case is the second post-Lawrence challenge to the Act to be decided by a federal court of appeals.[1]

## I. **Statutory and Regulatory Scheme**

We begin by summarizing the statutory framework and the accompanying Department of Defense (Department) directives. During the 1992 campaign, President Clinton, preceding his first election, promised to revisit the longstanding Department policy of separating homosexual individuals from military service. After taking office, President Clinton directed the Secretary of Defense to review Department policy, and Congress undertook its own review.

As part of the congressional review, then-Chairman of the Joint Chiefs of Staff, Colin Powell, in testimony explicitly adopted by the Senate Armed Services Committee, explained the

---

[1] The 9th Circuit recently decided Witt v. Dep't of the Air Force, 2008 U.S. App. LEXIS 10794, at *1 (9th Cir. May 21, 2008). In Witt, the plaintiff argued that the Act violated substantive and procedural due process and the Equal Protection Clause. See Id. at *1-2. The district court dismissed the suit under Fed. R. Civ. P. 12(b)(6). Id. at 2. The 9th Circuit reversed the district court's as applied due process rulings, remanding for further proceedings, and affirmed the court's dismissal of the plaintiff's Equal Protection claim. We agree with much of the reasoning set forth in that opinion but also part ways with the 9th Circuit's approach in some significant respects. Most importantly, for reasons that will become apparent, we resolve differently the as applied substantive due process claim brought in this case. We also note that the case before us includes facial challenges to the Act and a First Amendment claim.

- 4 -

rationale for the policy of separating certain homosexual members

of the military from continued service:

> It is very difficult in a military setting,
> where you don't get a choice of association,
> where you don't get a choice of where you live,
> to introduce a group of individuals who are
> proud, brave, loyal, good Americans, but who
> favor a homosexual lifestyle, and put them in
> with heterosexuals who would prefer not to have
> somebody of the same sex find them sexually
> attractive, put them in close proximity and ask
> them to share the most private facilities
> together, the bedroom, the barracks, latrines,
> and showers. I think that this is a very
> difficult problem to give the military. I
> think it would be prejudicial to good order and
> discipline to try to integrate that in the
> current military structure.

S. Rep. No. 103-112 at 283 (1993).

Congress' review culminated in the passage of the Act.
See National Defense Authorization Act for Fiscal Year 1994, Pub.
L. No. 103-160, 107 Stat. 1547 § 571, codified at 10 U.S.C. § 654.
The Act opens with a series of findings that echo General Powell's
concerns: "military life is fundamentally different from civilian
life;" "[s]uccess in combat requires military units that are
characterized by high morale, good order and discipline, and unit
cohesion;" and "the presence in the armed forces of persons who
demonstrate a propensity or intent to engage in homosexual acts
would create an unacceptable risk to the high standards of morale,
good order and discipline, and unit cohesion that are the essence
of military capability." See 10 U.S.C. § 654(a).

- 5 -

To avoid the risk to unit cohesion created by the continued service of those who are likely to engage in a homosexual act, the Act provides that members of the military are subject to separation from service where one of three findings is made: (1) the member has engaged or attempted to engage in a homosexual act;[2] (2) the member has "state[d] that he or she is a homosexual or words to that effect;" or (3) the member has married or attempted to marry a person known to be of the same biological sex. Id. § 654(b).

If a finding is made that a member of the military has engaged or attempted to engage in a homosexual act, the member may avoid separation by establishing that: (1) the conduct was a departure from the member's usual and customary behavior; (2) such conduct is unlikely to recur; (3) such conduct was not accomplished by use of force, coercion, or intimidation; (4) under the particular circumstances of the case, the member's continued presence in the military is consistent with the interests of the military in proper discipline, good order, and morale; and (5) the member does not have a propensity or intent to engage in a future homosexual act. Id. § 654(b)(1)(A)-(E). Similarly, a member found

---

[2]Homosexual act means "any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desire and any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in [the homosexual act previously described]." 10 U.S.C. § 654 (f)(3).

to have stated, in effect, that he or she is homosexual, may avoid separation by demonstrating "that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in a homosexual act." Id. § 654(b)(2).

Pursuant to authority granted by the Act, the Department issued directives for executing separation proceedings. The directives recite the three reasons under the Act for separation and provide that a member's statement that he or she is a homosexual "creates a rebuttable presumption that the [member] engages in, attempts to engage in, intends to engage in, or has a propensity to engage in a homosexual act." DOD Directive 1332.40 § E2.3 (1997). In considering whether a member has rebutted this presumption, the military considers: (1) whether the member has engaged in a homosexual act; (2) the member's credibility; (3) testimony from others about the member's past conduct; (4) the nature and circumstances of the member's statement; and (5) any other evidence relevant to whether the member is likely to engage in a homosexual act. Id.

## II. The Complaint and Motion to Dismiss

The plaintiffs are twelve former members of the United States military who were separated from service under the Act. The plaintiffs' complaint asserted the following claims: (1) the Act violates the plaintiffs' right to substantive due process on its face and as applied; (2) the Act denies the plaintiffs equal

protection of the law on the basis of sexual orientation; and (3) the portion of the Act that triggers separation proceedings based on a member's statement that he or she is homosexual violates the right to freedom of speech.

The government moved to dismiss the plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6). The government also contended that the plaintiffs' due process and equal protection claims failed because the Act was subject only to rational basis review, and Congress' "unit cohesion" justification sufficed to sustain the law under this standard as a matter of law. It also argued that the evidentiary use of a member's statement that he or she is homosexual to prove that the member has engaged, intends to engage, or has a propensity to engage in a homosexual act does not abridge First Amendment rights.

## III.  **The District Court Opinion**

The district court began its analysis by dispatching with the plaintiffs' as-applied due process challenges. Cook v. Rumsfeld, 429 F. Supp. 2d 385 (D. Mass. 2006). The court ruled that, while the complaint asserted that the plaintiffs were bringing as-applied challenges, in fact, they pleaded no such claims:

> Although the complaint alleges that [the Act] is unconstitutional . . . as it has been particularly applied to each of [the plaintiffs], their legal reasoning . . . make[s] it clear that the constitutional defects they perceive inhere in any application

> of the policy to homosexual service members,
> rather than in the particular way the policy
> might be (or might have been) applied in
> specific cases.  In other words, none of the
> plaintiffs claim that the policy, if valid in
> general, was <u>misapplied</u> in his or her
> particular case to result in separation when a
> proper application of the policy would have
> allowed him or her to remain in service.
> Rather, their objections . . . are <u>that</u> the
> policy was applied, not <u>how</u> it was applied.
> This is classically a facial challenge to the
> statute, and their arguments will be evaluated
> with that understanding.

<u>Id.</u> at 390 (emphases supplied).

The district court then turned to the plaintiffs' facial

challenges, beginning with the due process and equal protection

claims.  <u>Id.</u> at 391-407.  The court believed that the success of

these claims hinged primarily on the level of scrutiny that applies

after <u>Lawrence</u>.  <u>Id.</u> at 393.  The court closely analyzed <u>Lawrence</u>

and determined that the Supreme Court employed rational basis

review to invalidate the convictions under the Texas law against

homosexual sodomy.  The court, thus, concluded that <u>Lawrence</u> did

not alter the applicability of rational basis review, which had

been applied in pre-<u>Lawrence</u> challenges to the Act.  <u>Id.</u> at 395-96.

The court then determined, in accord with pre-<u>Lawrence</u> authority,

that Congress had set forth a rational reason for the statute -- to

promote unit cohesion and discipline -- and therefore the facial

due process and equal protection claims failed.  <u>Id.</u> at 397-406.

Finally, the district court rejected the plaintiffs'

First Amendment challenge.  <u>Id.</u> at 407-08.  The court noted that

the Act does not make a member's statement that he or she is a homosexual a basis for separation; rather separation is mandated only where there has been homosexual conduct or a demonstration of a propensity or intent to engage in such conduct. Id. at 407. Based on this understanding, the court concluded that the Act merely provides for the "evidentiary use" of a member's statement regarding sexual orientation and that such use does not violate the First Amendment. Id. at 408.

Having concluded that all of the plaintiffs' claims failed as a matter of law, the district court dismissed the complaint with prejudice and entered a final judgment. Id. at 410. The plaintiffs appealed.

## IV. **Standard of Review**

We review a district court's grant of a motion to dismiss de novo, accepting the complaint's well-pleaded facts as true and indulging all reasonable inferences in the plaintiff's favor. SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, 138-39 (1st Cir. 2005). To survive a motion to dismiss, a complaint must allege a "plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1967 (2007); Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007). In reviewing a Rule 12(b)(6) dismissal, "we are not wedded to the [district] court's rationale and may affirm an order of dismissal on any basis made apparent

from the record." McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006).

## V. Discussion

On appeal, the plaintiffs challenge all aspects of the district court's ruling. They contend that the district court incorrectly dismissed their substantive due process and equal protection claims because the court misunderstood Lawrence to mandate a rational basis standard of review, rather than some form of heightened judicial scrutiny.

In addition, the plaintiffs dispute the district court's ruling that they did not present as-applied due process and equal protection challenges. Finally, they posit that they sufficiently pleaded a First Amendment challenge to the portion of the Act that triggers separation proceeding based on a member's statement of sexual identity because such a statement is a form of protected speech that is punished by the Act.

### A. Due Process

We agree with the parties and the district court that interpreting Lawrence is the critical first step in evaluating the plaintiffs' substantive due process claim. Prior to Lawrence, the courts of appeals, relying on the Supreme Court's holding in Bowers v. Hardwick, 478 U.S. 186 (1986) that homosexuals did not possess a substantive due process interest in engaging in sodomy, considered due process challenges to the Act under rational basis

- 11 -

review.[3]  See, e.g., Richenberg, 97 F.3d at 260-61; Thomasson, 80 F.3d at 928.  But Lawrence overruled Bowers, so the post-Lawrence standard for reviewing a substantive due process challenge to the Act is unclear.  Before addressing the district court's conclusion that the rational basis standard continues to apply, we review basic substantive due process principles.

It has long been held that, despite their name, the due process clauses of the Fifth and Fourteenth Amendments "guarantee[] more than fair process."  Troxel v. Granville, 530 U.S. 57, 65 (2000).  The substantive component of due process "provides heightened protection against government interference with certain fundamental rights and liberty interests."  Washington v. Glucksberg, 521 U.S. 702, 720 (1997).

The Supreme Court acts with "caution and restraint" when classifying a particular liberty interest as triggering substantive due process protection, Moore v. City of E. Cleveland, 431 U.S. 494, 502 (1977), because classifying an interest as protected by due process to a "great extent, place[s a] matter outside the arena of public debate and legislative action."  Glucksberg, 521 U.S. at 720.  The Court has recognized that the "Nation's history, legal

---

[3]Where no protected liberty interest is implicated, substantive due process challenges are reviewed under the rational basis standard. See Medeiros v. Vincent, 431 F.3d 25, 33 (1st Cir. 2005).  Under this standard, a statute passes constitutional muster so long as the law is rationally related to a legitimate governmental interest.  Heller v. Doe, 509 U.S. 312, 320 (1993).

- 12 -

tradition, and practices provide the crucial guideposts for responsible decisionmaking" in this area. Id. at 721. But it has also recognized that while "history and tradition are the starting point," they are "not in all cases the ending point of the substantive due process inquiry." Lawrence, 539 U.S. at 572.

In Glucksberg, the Supreme Court catalogued the following "liberty interests" as "specially protected" by the due process clause: the right to marry; to have children; to direct the education of one's children; to enjoy marital privacy; to use contraception; to maintain bodily integrity; to choose to have an abortion; and to refuse unwanted medical treatment. Glucksberg, 521 U.S. at 720. The question here is whether Lawrence added to this list an adult's right "to engage in consensual sexual intimacy in the home." Lawrence, 539 U.S. at 567.

In Lawrence, the Court considered a substantive due process challenge to two criminal convictions under a Texas statute criminalizing homosexual sodomy. Id. at 564. The petitioners were two males who had been arrested for engaging in a sexual act in one of their apartments. Id. at 563. The statute at issue provided that a "person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex."[4] Id. The

_____

[4]The statute defined deviate sexual conduct as "any contact between any part of the genitals of one person and the mouth or anus of another person; or the penetration of the genitals or the anus of another person with an object." Tex. Penal Code Ann. § 21.01(1)(2007).

- 13 -

Lawrence Court characterized the constitutional question as "whether petitioners' criminal convictions for adult consensual sexual intimacy in the home violate their vital interests in liberty and privacy protected by the Due Process Clause." Id. at 564.

Lawrence addressed this question by considering a line of Supreme Court authority recognizing various due process rights that protect the formation and perpetuation of intimate relationships. Id. at 564. It identified Griswold v. Connecticut, 381 U.S. 479 (1965), as the "pertinent beginning point." Griswold invalidated a law banning the use of contraceptives by married couples because there is due process protection for the realm of privacy implicit in the marital relationship and bedroom. Lawrence, 539 U.S. at 564-65. From there, Lawrence discussed later cases that broadened the interest recognized in Griswold, including Eisenstadt v. Baird, 405 U.S. 438 (1972), which invalidated a ban on contraception use by unmarried people; Roe v. Wade, 410 U.S. 113 (1973), which invalidated a law restricting a woman's right to abort a pregnancy; and Carey v. Population Servs. Int'l, 431 U.S. 678 (1977), which struck down a prohibition on the sale of contraception to persons under sixteen years of age. Relying on these precedents, Lawrence concluded that Supreme Court substantive due process precedent establishes protection for "certain decisions regarding sexual

conduct [that] extend[] beyond the martial relationship."
Lawrence, 539 U.S. at 565.

Lawrence used these precedents as the launching point for
its critique of Bowers. In Bowers, the Court rejected a due
process challenge to a Georgia statute similar to the one
challenged in Lawrence. Lawrence, 539 U.S. at 566. Lawrence
criticized Bowers for focusing too narrowly on the "right of
homosexuals to engage in sodomy" rather than on the broader right
of adults to engage in private, consensual sexual intimacy:

> To say that the issue in Bowers was simply the
> right to engage in certain sexual conduct
> demeans the claim the individual [in Bowers]
> put forward, just as it would demean a married
> couple were it to be said that marriage is
> simply about the right to have sexual
> intercourse. The laws involved in Bowers and
> here are, to be sure, statutes that purport to
> do no more than prohibit a particular sexual
> act. Their penalties and purposes, though,
> have more far-reaching consequences, touching
> upon the most private human conduct, sexual
> behavior, and in the most private of places,
> the home. The statutes do seek to control a
> personal relationship that whether or not
> entitled to formal recognition in law, is
> within the liberty of persons to choose . . .

Id. at 566-67.

After identifying this analytical flaw in Bowers, the
Lawrence Court observed:

> [A]dults may choose to enter [into personal
> relationships] in the confines of their homes
> and their own private lives and still retain
> their dignity as free persons. When sexuality
> finds overt expression in intimate conduct with

- 15 -

> another person, the conduct can be but one
> element in a personal bond that is more
> enduring.   The liberty protected by the
> Constitution allows homosexual persons the
> right to make this choice.

Id. at 567.

Placing the final nail in Bowers' coffin, the Lawrence

Court quoted from Justice Stevens' Bowers dissent that "'individual

decisions by married persons, concerning the intimacies of their

physical relationship, even when not intended to produce offspring,

are a form of liberty protected by the Due Process Clause.

Moreover, this protection extends to intimate choices by unmarried

as well as married persons.'" Id. at 578 (quoting Bowers, 478 U.S.

at 216 (Stevens, J., dissenting)). In formally overruling Bowers,

the Court stated that "Justice Stevens' analysis . . . should have

been controlling in Bowers and should control here." Id.

Having dispatched with Bowers, the Court turned to

analyze the constitutionality of the convictions under the Texas

statute:

> The present case does not involve minors. It
> does not involve persons who might be injured
> or coerced or who are situated in relationships
> where consent might not easily be refused. It
> does not involve public conduct or
> prostitution. It does not involve whether the
> government must give formal recognition to any
> relationship that homosexual persons seek to
> enter. The case does involve two adults who,
> with full and mutual consent from each other,
> engaged in sexual practices common to a
> homosexual lifestyle. The petitioners are
> entitled to respect for their private lives.
> The State cannot demean their existence or

- 16 -

> control their destiny by making their private
> sexual conduct a crime. Their right to liberty
> under the Due Process Clause gives them the
> full right to engage in their conduct without
> intervention from government. "It is a promise
> of the Constitution that there is a realm of
> personal liberty which the government may not
> enter."   The  Texas  statute  furthers  no
> legitimate  state interest which can justify
> its intrusion into the personal and private
> life of the individual.

Id. (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505

U.S. 833, 847 (1992)).

Courts and commentators interpreting Lawrence diverge

over the doctrinal approach employed to invalidate the petitioners'

convictions.   Some have read Lawrence to apply a rational basis

approach.[5]   Others see the case as applying strict scrutiny.[6]   And

_____

[5]Sylvester v. Fogley, 465 F.3d 851, 858 (8th Cir. 2006); Muth v. Frank, 412 F.3d 808, 818 (7th Cir. 2005); Williams v. Att'y Gen. of Ala., 378 F.3d 1232, 1238 (11th Cir. 2004); Lofton v. Sec'y of Dept. of Children & Family Servs., 358 F.3d 804 (11th Cir. 2004); Witt v. U.S. Dept. of Air Force, 444 F. Supp. 2d 1138, 1143 (W.D. Wash. 2006); United States v. Extreme Assocs., Inc., 352 F. Supp. 2d 578, 591 (W.D. Pa. 2005); Conaway v. Deane, 401 Md. 219, 310 (Md. 2007); State v. Lowe, 861 N.E.2d 512, 517 (Ohio 2007); (Ex parte Morales, 212 S.W.3d 483, 493 (Tex. App. 2006); State v. Limon, 122 P.3d 22, 29 (Kan. 2005); Martin v. Ziherl, 607 S.E.2d 367, 370 (Va. 2005); State v. Clinkenbeard, 123 P.3d 872, 878 (Wash. App. 2005).

[6]Williams, 378 F.3d at 1252 (Barkett, J., dissenting); see Fields v. Palmdale Sch. Dist., 271 F. Supp. 2d 1217, 1221 (C.D. Cal. 2003) (including Lawrence within citations of precedent establishing fundamental rights); Doe v. Miller, 298 F. Supp. 2d 844, 871 (S.D. Iowa 2004), rev'd on other grounds, 405 F.3d 700 (8th Cir. 2005) (same); Hudson Valley Black Press v. IRS, 307 F. Supp. 2d 543, 548 (S.D.N.Y. 2004) (same); see also Donald H.J. Hermann, Pulling the Fig Leaf Off the Right of Privacy: Sex and the Constitution, 54 DePaul L. Rev. 909, 969 (2005); Laurence H. Tribe, Lawrence v. Texas: The Fundamental Right that Dare Not Speak Its Name, 117

a third group view the case as applying a balancing of state and
individual interests that cannot be characterized as strict
scrutiny or rational basis.[7]  Lawrence's doctrinal approach is
"difficult to pin down." Nan D. Hunter, Living with Lawrence, 88
Minn. L. Rev. 1103 (2004). But we are persuaded that Lawrence did
indeed recognize a protected liberty interest for adults to engage
in private, consensual sexual intimacy and applied a balancing of
constitutional interests that defies either the strict scrutiny or
rational basis label.

           There are at least four reasons for reading Lawrence as
recognizing a protected liberty interest. First, Lawrence relies
on the following due process cases for doctrinal support:
Griswold, Eisentstadt, Roe, Carey, and Casey. 539 U.S. at 565-66.
Each case resulted in the Supreme Court recognizing a due process
right to make personal decisions related to sexual conduct that
mandated the application of heightened judicial scrutiny. Id. It
would be strange indeed to interpret Lawrence as not recognizing a

---

Harv. L. Rev. 1893, 1917 (2004).

[7]United States v. Marcum, 60 M.J. 198 (U.S. Armed Forces 2004);
Nancy C. Marcus, Beyond Romer and Lawrence: The Right to Privacy
Comes out of the Closet, 15 Colum. J. Gender & L. 355 (2006); John
G. Culhane, Writing on, Around and Through Lawrence v. Texas, 38
Creighton L. Rev. 493 (2005); Jerald A. Sharum, Comment,
Controlling Conduct: The Emerging Protection of Sodomy in the
Military, 69 Alb. L. Rev. 1195, 1202 (2006); Donald L. Beschle,
Lawrence Beyond Gay Rights: Taking the Rationality Requirement for
Justifying Criminal Statutes Seriously, 53 Drake L. Rev. 231, 276
(2005).

protected liberty interest when virtually every case it relied upon
for support recognized such an interest.

Second, the language employed throughout Lawrence
supports the recognition of a protected liberty interest. Lawrence
associated the right at issue with the core constitutional rights
of "freedom of thought, belief, and expression," rights which
undoubtedly mandate special protection under the Constitution. Id.
at 563. It also stated that "liberty gives substantial protection
to adult persons in deciding how to conduct their private lives in
matters pertaining to sex." Id. at 572 (emphasis supplied). And
it concluded its analysis by stating that the "right to liberty
under the Due Process Clause" allowed the petitioners to engage in
"private sexual conduct" because "'[i]t is a promise of the
Constitution that there is a realm of personal liberty which the
government may not enter.'" Id. at 578 (quoting Casey, 505 U.S. at
847). Such language strongly suggests that Lawrence identified a
protected liberty interest.

Third, in overruling Bowers, Lawrence relied on Justice
Stevens' Bowers dissent as stating the controlling principles. Id.
at 578. The passage of Justice Stevens' dissent quoted in Lawrence
stated that "individual decisions by married persons, concerning
the intimacies of their physical relationship, even when not
intended to produce offspring, are a form of liberty protected by
the Due Process Clause . . . . Moreover, this protection extends to

intimate choices by unmarried as well as married persons." Id. In support of this proposition, Justice Stevens cited Griswold, Eisenstadt and Carey.   Bowers, 478 U.S. at 216 (Stevens, J., dissenting). As discussed above, these are due process cases that recognize protected liberty interests. Furthermore, in the very next passage of Justice Stevens' dissent, he described these cases as establishing rights that are "fundamental" and placed the right of adults to engage in private intimate conduct in the same category. Id. It is impossible to read Lawrence as declining to recognize a protected liberty interest without ignoring the Court's statement that Justice Stevens' Bowers dissent was controlling.

Finally, if Lawrence had applied traditional rational basis review (the appropriate standard if no protected liberty interest was at stake, see e.g., Medeiros, 431 F.3d at 33), the convictions under the Texas statute would have been sustained. The governmental interest in prohibiting immoral conduct was the only state interest that Texas offered to justify the statute. Lawrence, 539 U.S. at  582.   It is well established that a "legislature [can] legitimately act . . . to protect the societal interest in order and morality." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 569 (1991) (quoting Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61 (1973)). Thus, Lawrence's holding can only be squared with the Supreme Court's acknowledgment of morality as a rational basis by concluding that a protected liberty interest was at stake,

and therefore a rational basis for the law was not sufficient.

Taking into account the precedent relied on by Lawrence, the tenor of its language, its special reliance on Justice Stevens' Bowers dissent, and its rejection of morality as an adequate basis for the law in question, we are convinced that Lawrence recognized that adults maintain a protected liberty interest to engage in certain "consensual sexual intimacy in the home." The district court, relying on cases from other circuits, read Lawrence as applying rational basis review. We, however, do not find any of the four primary reasons supporting this view persuasive. See Muth v. Frank, 412 F.3d 808, 817-18 (7th Cir. 2005); Lofton v. Sec'y of the Dep't of Children & Family Servs., 358 F.3d 804, 815-17 (11th Cir. 2004).

First, the argument has been made that Lawrence nowhere explicitly stated that the right at issue was "fundamental" and therefore the opinion cannot be read as recognizing a fundamental right under the due process clause. See Cook, 429 F. Supp. 2d at 394. While it is true that Lawrence nowhere used the word "fundamental" to describe the interest at stake, there are several Supreme Court cases that have recognized protected liberty interests without using this word. For example, in Washington v. Harper, 494 U.S. 210, 223 (1990), the Supreme Court held that a state prisoner "retains a significant liberty interest" under the due process clause to avoid the unwanted administration of certain

drugs.  And in <u>Parham</u> v. <u>J.R.</u>, 442 U.S. 584, 600 (1979), the Court described a child's "substantial liberty interest" in not being confined unnecessarily for medical treatment.  <u>See also</u> <u>Casey</u>, 505 U.S. at 851 (describing the interest as a "protected liberty"); <u>Cruzan</u> v. <u>Director of Mo. Dept. of Health</u>, 497 U.S. 261, 278 (1990) (describing the interest as a "constitutionally protected liberty interest"); <u>Youngberg</u> v. <u>Romeo</u>, 457 U.S. 307, 315 (1982) (describing the interests as "liberty interests").  It is thus clear that the Supreme Court does not always use the word "fundamental" when it wishes to identify an interest protected by substantive due process.

Second, it has been maintained that <u>Lawrence</u> could not have identified a protected liberty interest because the Supreme Court did not engage in a thorough analysis of the "Nation's history and tradition" as required under <u>Glucksberg</u>.  <u>Muth</u>, 412 F.3d at 817; <u>Williams</u>, 378 F.3d at 1236; <u>Lofton</u>, 358 F.3d at 816-17.  This argument is based on the mistaken premise that the only history relevant to the substantive due process inquiry is a history demonstrating affirmative government action to protect the right in question.  But <u>Glucksberg</u> does not establish such a requirement.  <u>Lawrence</u> engaged in a thorough historical analysis identifying the lack of a long history of government action to punish the private consensual, intimate conduct of homosexuals.  This sort of historical analysis is not inconsistent with Supreme

Court precedent in this area.  Indeed, if affirmative government action protecting a right were required to trigger substantive due process protection, at least some of the due process cases recognizing a liberty interest would have come out differently because there was no established history of government protection for the right to have an abortion or to use contraception.  See Roe, 410 U.S. at 132-41 (reviewing history of abortion law to show that laws restricting abortion are of recent vintage but not showing any history of affirmative government action to protect the right to an abortion); see also Williams, 378 F.3d at 1258-59.

Moreover, to the extent that Lawrence did not adhere to the Glucksberg approach of locating the right to private, consensual adult intimacy in the Nation's history and tradition, it explicitly disavowed the exclusivity of this approach.  See Lawrence, 539 U.S. at 572 ("history and tradition are the starting but not in all cases the ending point of the substantive due process inquiry.").  In this regard, the Lawrence Court stated:

> [W]e think that our laws and traditions in the past half century are of most relevance here. These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex.

Id. at 571-72.  Thus, Lawrence recognized that, in at least some circumstances, the consideration of recent trends and practices is relevant to defining the scope of protected liberty.

Third, it has been suggested that the Lawrence majority's

- 23 -

refusal to respond to Justice Scalia's Lawrence dissent, in which he argued that the majority had not recognized a protected liberty interest, indicates that the majority agreed with the dissent's analysis. See Sylvester v. Fogley, 465 F.3d 851, 858 (8th Cir. 2006). The district court relied heavily on this point, observing that "it might be expected that if [Justice Scalia's dissent] wrongly characterized a principal holding of the case, the majority would have answered and corrected it." Cook, 429 F. Supp. 2d at 394.

This is a possible explanation for the majority's silence, but it is not the only explanation. It is equally possible that the Lawrence majority believed that the text of its opinion stood for itself and that there was little to be gained by debating Justice Scalia on this point. Cf. Cent. Bank of Denver N.A. v. First Interstate Bank of Denver N.A., 511 U.S. 164, 187 (1994) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction. . . ."). Given the equally possible, but conflicting, inferences that can be drawn from the majority's lack of response to Justice Scalia's dissent, we think that there is little to be gleaned about Lawrence's meaning from it.

Finally, it has been claimed that Lawrence's conclusion that "[t]he Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life

- 24 -

of the individual" indicates that Lawrence did not recognize a protected liberty interest. Sylvester, 465 F.3d at 857; Muth, 412 F.3d at 818; Lofton, 358 F.3d at 817 (emphasis supplied). This argument is premised on the notion that the words "legitimate state interest" indicate the application of rational basis review, which is not the proper standard where a protected liberty interest is implicated. As the district court stated, "[t]he use of the appropriate adjective is telltale to constitutional lawyers. If the Lawrence court had been evaluating the constitutionality of the Texas statute under the more exacting standard where fundamental interests are at stake, it would instead have asked whether the state interest was compelling, rather than whether it was legitimate." Cook, 429 F. Supp. 2d at 395.

We take a different view. A law survives rational basis review so long as the law is rationally related to a legitimate governmental interest. E.g., Nordlinger v. Hahn, 505 U.S. 1, 11-12 (1992). Rational basis review does not permit consideration of the strength of the individual's interest or the extent of the intrusion on that interest caused by the law; the focus is entirely on the rationality of the state's reason for enacting the law. See Heller v. Doe, 509 U.S. 312, 324 (1993) (a law "fails rational-basis review" only when it "rests on grounds wholly irrelevant to the achievement of the State's objectives" or the State's objectives are themselves invalid). Thus, the argument that

Lawrence did not recognize a protected liberty interest because it used the words "legitimate state interest" divorces these word from context -- a context which shows that Lawrence did not employ traditional rational basis review since the Lawrence Court's analysis focused on the individual's liberty interest. This view is supported by Supreme Court cases that have recognized protected liberty interests in the face of "legitimate state interests." Casey, 505 U.S. at 853 (recognizing that even though protected liberty interest was at stake, "the separate States could act in some degree to further their own legitimate interests in protecting prenatal life"); Addington v. Texas, 441 U.S. 418, 425-26 (1979) (balancing the "individual's interest in not being involuntarily confined indefinitely" against the state's "legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves").

To say, as we do, that Lawrence recognized a protected liberty interest for adults to engage in consensual sexual intimacy in the home does not mean that the Court applied strict scrutiny to invalidate the convictions. Several pre-Lawrence cases that have recognized protected liberty interests did not mandate that the challenged law be "narrowly tailored to serve a compelling state interest" -- the strict scrutiny standard. For example, in Sell v. United States, 539 U.S. 166, 179 (2003), the Court recognized a

"constitutionally protected liberty interest [for a criminal defendant] in avoiding the unwanted administration of antipsychotic drugs" and then applied a standard of review less demanding than strict scrutiny by asking whether administering the drugs was "necessary significantly to further important governmental trial-related interests." And similarly, in Casey, 505 U.S. at 877, the Supreme Court reaffirmed a woman's fundamental right to choose to have an abortion but applied the "undue burden" test which balanced the state's legitimate interest in potential human life against the extent of the imposition on the woman's liberty interest. See also Troxel, 530 U.S. at 67-75 (invalidating law burdening due process interest in parental autonomy without applying either rational basis or strict scrutiny); Riggins v. Nevada, 504 U.S. 127, 135-36 (1990) (balancing an individual's interest in refusing psychotropic drugs against the government's interest in trying a competent criminal defendant for a violent crime); Cruzan, 497 U.S. at 278-79 (balancing "protected liberty interest" in refusing unwanted medical treatment against the government interest in promoting life); Harper, 494 U.S. at 223 (weighing a prisoner's interest in refusing drugs against the government's interest in promoting a safe prison environment); Youngberg, 457 U.S. at 320-22 (balancing liberty interest of an individual to avoid bodily restraint against the State's asserted reason for the restraint).

Lawrence is, in our view, another in this line of Supreme

Court authority that identifies a protected liberty interest and then applies a standard of review that lies between strict scrutiny and rational basis. In invalidating the convictions, the Lawrence Court determined that there was no legitimate state interest that was adequate to "justify" the intrusion on liberty worked by the law. 539 U.S. at 578. In other words, Lawrence balanced the strength of the state's asserted interest in prohibiting immoral conduct against the degree of intrusion into the petitioners' private sexual life caused by the statute in order to determine whether the law was unconstitutionally applied. See Casey, 505 U.S. at 873 ("[N]ot every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right.").

Having defined the nature of the constitutional review mandated by Lawrence, we now consider whether the plaintiffs' facial due process challenge to the Act can survive a motion to dismiss.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [an Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid . . . ." United States v. Salerno, 481 U.S. 739, 745 (1987); see also Comfort v. Lynn Sch. Comm., 418 F.3d 1, 12 (1st Cir. 2005) (en banc). The Supreme Court

has recently emphasized the limits on facial challenges in the substantive due process context. See Gonzales v. Carhart, 127 S. Ct. 1610, 1639 (2007).

The plaintiffs' facial challenge fails. Lawrence did not identify a protected liberty interest in all forms and manner of sexual intimacy. Lawrence recognized only a narrowly defined liberty interest in adult consensual sexual intimacy in the confines of one's home and one's own private life. Lawrence, 539 U.S. at 567. The Court made it abundantly clear that there are many types of sexual activity that are beyond the reach of that opinion. Id., at 578. Here, the Act includes such other types of sexual activity. The Act provides for the separation of a service person who engages in a public homosexual act or who coerces another person to engage in a homosexual act. Both of these forms of conduct are expressly excluded from the liberty interest recognized by Lawrence. Id.

The plaintiffs' as-applied challenge, on the other hand, presents a more difficult question. The plaintiffs point out that the Act could apply to some conduct that falls within the zone of protected liberty identified by Lawrence. The Act, for example, could cover homosexual conduct occurring off base between two consenting adults in the privacy of their home.[8]

---

[8]The district court did not reach the merits of the plaintiffs' as-applied due process challenge to the Act. It concluded that, although the plaintiffs tried to plead as-applied challenges, the

Before addressing the significance of this observation, we pause to recognize the unique context in which the liberty interest at stake in this case arises. We are reviewing an exercise of Congressional judgment in the area of military affairs. The deferential approach courts take when doing so is well-established. Loving v. United States, 517 U.S. 748, 768 (1996) (noting that the Supreme Court gives Congress "the highest deference" in ordering military affairs) (citation omitted); Weiss v. United States, 510 U.S. 163, 177 (1994) (recognizing that the Supreme Court "[adheres] to [the] principle of deference in a variety of contexts [such as] where the constitutional rights of

_____

complaint failed to identify facts showing that the Act was "misapplied" in certain cases. We view differently the necessary factual predicate for an as-applied constitutional challenge to the Act. A claim that the Act was "misapplied" in a particular case is actionable, if at all, under the Administrative Procedures Act. See Richenberg v. Perry, 97 F.3d 256, 263 (8th Cir. 1996) (assuming that a review of separation decision under the Act is reviewable under the APA). But this is not the plaintiffs' claim. The plaintiffs allege that, even though the Act was properly administered according to its terms to separate each of them from service, the Act cannot be constitutionally applied in their particular cases because the application unconstitutionally infringes on their Lawrence interest. As-applied challenges "'are the basic building blocks of constitutional adjudication'" because they relieve the court of having "to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." Carhart, 127 S. Ct. at 1639. A plaintiff asserts an as-applied challenge by claiming that a statute is unconstitutional as-applied to his or her particular conduct, even though the statute may be valid as to other parties. See Daggett v. Comm'n of Gov. Ethics & Election Practices, 205 F.3d 445, 472 (1st Cir. 2000). The plaintiffs have pleaded classic as-applied challenges here because they claim that the Act is unconstitutional as applied to them, even though the Act may be constitutional as applied to others.

- 30 -

servicemen [are] implicated"); Rostker v. Goldberg, 453 U.S. 57, 70 (1981) ("[J]udicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged.").

The Supreme Court has articulated essentially two reasons for this deference. The first involves institutional competence. The Court has remarked:

> It is difficult to conceive of an area of governmental activity in which courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.

Gilligan v. Morgan, 413 U.S. 1, 10 (1973); see also N.D. v. United States, 495 U.S. 423, 443 (1990) (noting that where confronted with questions relating to military operations the Court "properly defer[s] to the judgment of those who must lead our Armed Forces in battle").

The second relates to the constitutional power of Congress to "raise and support armies and to make all laws necessary and proper to that end." United States v. O'Brien, 391 U.S. 367, 377 (1968). The Court has described this power as "broad and sweeping," id., and has further noted Congress' accompanying responsibility for "the delicate task of balancing the rights of servicemen against the needs of the military." Solorio v. United

States, 488 U.S. 435, 447 (1987).

It is unquestionable that judicial deference to congressional decision-making in the area of military affairs heavily influences the analysis and resolution of constitutional challenges that arise in this context. The Court's examination of the equal protection challenge leveled in Rostker provides an example. That case concerned a statute that required only males to register for selective service. The lower court had invalidated the statute as unlawful gender discrimination. 453 U.S. at 63. In reversing, the Court focused its analysis entirely on the legislative record that led to Congress' action. The Court discussed, in detail, the process Congress employed in considering the issue, its consultation with all interested parties, its serious consideration of the issues, including the constitutional implications, and its clear articulation of the basis for its decision. Id. at 72-80. The Court then declared the district court's analysis striking down the law "quite wrong" because the district court undertook "an independent evaluation of evidence rather than adopting an appropriately deferential examination of Congress' evaluation of the evidence." Id. at 82-83.

The Court's treatment of First Amendment and Due Process challenges brought in this area similarly manifests this deference to congressional judgment. In Parker v. Levy, 417 U.S. 733 (1974), a case involving vagueness and overbreadth challenges to provisions

of the Uniform Code of Military Justice, the Court stated that "Congress is permitted to legislate both with greater breadth and with greater flexibility when the statute governs military society." Id. at 755. In Weiss, the Court reemphasized that when dealing with due process challenges "the tests and limitations [associated with those challenges] may differ because of the military context." 510 U.S. at 177 (citing Rostker, 453 U.S. at 67).[9]

Fully apprised of the constraints on our constitutional inquiry when considering constitutional challenges in the military context, we now examine both the process by which Congress passed the Act and the rationale Congress advanced for it.

Congress' process for developing the Act was involved and it included sustained consideration of the Act's necessity and its impact on constitutional rights. After President Clinton was inaugurated, he directed the Secretary of Defense to submit a draft Executive Order "ending discrimination on the basis of sexual orientation in determining who may serve in the Armed Services." Memorandum on Ending Discrimination in the Armed Forces, 1 Pub.

---

[9]Other examples of the deferential approach the Court has taken when analyzing constitutional challenges in the military context include: Goldman v. Weinberger, 475 U.S. 503, 508 (1986) (free exercise of religion); Chappell v. Wallace, 462 U.S. 296, 300-05 (1983) (racial discrimination); Brown v. Glines, 444 U.S. 348, 357-60 (1980) (free expression); Middendorf v. Henry, 425 U.S. 25, 43 (1976) (right to counsel in summary court-martial proceeding). Solorio, 483 U.S. at 448 (collecting cases).

Papers 23 (Jan. 29, 1993). The President instructed the Secretary to consult with the military's professional leadership and others concerned with the issue. Id. While this review was in progress, an interim policy was imposed that ended the practice of asking new recruits to confirm that they were heterosexual.

Congress quickly intervened. A few weeks after President Clinton was sworn in, Congress passed a provision calling for a review of the military's approach to homosexuals serving in the military by the Secretary of Defense and the Senate Armed Services Committee. See Pub. L. 103-3 § 601, 107 Stat. 6, 28-29 (1993).

Subsequently, the Department and congressional committees engaged in an exhaustive policy review. The Senate and House Armed Services Committees conducted fourteen days of hearings, heard more than fifty witnesses, and traveled to military facilities to investigate the issue. The Committees heard from witnesses with a wide range of views and various backgrounds, including the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, military and legal experts, enlisted personnel, officers, and public policy activists. See Assessment of the Plan to Lift the Ban on Homosexuals in the Military: Hearings Before the Military Forces and Personnel Subcomm. of the House Comm. on Armed Services, 103 Cong., 1st Sess. (1993); Policy Concerning Homosexuality in the Armed Forces: Hearings Before the Senate Comm. on Armed Services, 103 Cong., 1st Sess. (1993); Policy Implications of Lifting the Ban

on Homosexuals in the Military: Hearings Before the House Comm. on
Armed Servs., 103 Cong., 1st Sess. (1993).

While this congressional review was ongoing, the
Department conducted its own review.  The Department convened a
military working group comprised of senior officers, commissioned
a RAND Corporation study, studied the history of the military's
response to social change, and consulted legal experts.

In July 1993, President Clinton announced a new policy
for the service of homosexuals in the military.  Under the policy,
applicants for military service would not be asked their sexual
orientation but, once inducted into service, a member could be
separated for homosexual conduct.  1 Pub. Papers 1111 (July 19,
1993).

A few weeks after the President's announcement, the House
and Senate Armed Services Committees proposed to codify the
military's policy.  The Senate Report, in support of this effort,
stated that the Committee was acting only after it had considered
"a wide range of experiences, including those of current and former
servicemembers who have publicly identified themselves as gay or
lesbian" and after having "carefully considered all points of
view."  S. Rep. 103-112 at 270.  Similarly, the House Committee
reported that its recommendation was based on "an extensive hearing
record as well as full consideration of the extended public debate
on this issue . . ." H.R. Rep. 103-200 at 287 (1993) reprinted in

1993 U.S.C.C.A.N 2073 at 2074.    The Senate Report also focused
explicitly on the effect that the Act could have on constitutional
rights of homosexuals, concluding that "if the Supreme Court should
reverse its ruling in Bowers and hold that private consensual
homosexual acts between adults may not be prosecuted in civilian
society, this would not alter the committee's judgment as to the
effect of homosexual conduct in the armed forces." S. Rep. 103-112
at 287.

        Prior to the enactment of the Act, the full House and
Senate debated the measure and considered floor amendments.    In
particular, each house rejected amendments that would have
permitted the military to develop whatever policy it deemed
appropriate and would have allowed the Department to resume asking
applicants to state their sexual orientation. 139 Cong. Rec.
S11168-11228 (Sept. 9, 1993); 139 Cong. Rec. H7084-86 (Sept. 29,
1993).    The Act became law in November 1993, and, as stated
earlier, the Act expressly identified its purpose as preserving
"high standards of morale, good order and discipline, and unit
cohesion" in the military.  10 U.S.C. § 654(a)(15).

        The circumstances surrounding the Act's passage lead to
the firm conclusion that Congress and the Executive studied the
issues intensely and from many angles, including by considering the
constitutional rights of gay and lesbian service members.  S. Rep.
103-112 at 286-87.    Congress ultimately concluded that the

voluminous evidentiary record supported adopting a policy of separating certain homosexuals from military service to preserve the "high morale, good order and discipline, and unit cohesion" of the troops.

Acknowledging the government interest identified in this case, one that our deferential posture requires us to take at face value, as-applied challenges to the Act must fail as well.

Here, as in Rostker, there is a detailed legislative record concerning Congress' reasons for passing the Act. This record makes plain that Congress concluded, after considered deliberation, that the Act was necessary to preserve the military's effectiveness as a fighting force, 10 U.S.C. § 654(a)(15), and thus, to ensure national security. This is an exceedingly weighty interest and one that unquestionably surpasses the government interest that was at stake in Lawrence. See Lawrence, 539 U.S. at 585 (O'Connor, J., concurring).

Every as-applied challenge brought by a member of the armed forces against the Act, at its core, implicates this interest. Every member of the armed forces has one fact in common -- at a moment's notice he or she may be deployed to a combat area. 10 U.S.C. § 654(a)(11). The conditions of service in such an area bring into play the animating concerns behind the Act, namely, maintaining the morale and unit cohesion that the military deems essential to an effective fighting force. See 10 U.S.C §

- 37 -

654(a)(12), (15). Accordingly, we have no choice but to dismiss the plaintiffs' as-applied challenge.

To be sure, deference to Congressional judgment in this area does not mean abdication. Rostker, 453 U.S. at 67. But where Congress has articulated a substantial government interest for a law, and where the challenges in question implicate that interest, judicial intrusion is simply not warranted. See id. at 68 ("[W]e must be particularly careful not to substitute our judgment of what is desirable for that of Congress, or our own evaluation of evidence for a reasonable evaluation by the Legislative Branch.").[10]

## B.  Equal Protection

In addition to their due process claim, the plaintiffs assert that the Act is unconstitutional under equal protection principles.[11] Unlike the due process claim, which is premised on the constitutional protection afforded all citizens to engage in certain sexual conduct, the equal protection claim is based on the

---

[10]In Witt, the 9th Circuit resolved an as-applied, post-Lawrence substantive due process challenge to the Act differently then we do here. 2008 U.S. App. LEXIS 10794, at *36. The 9th Circuit relied on the Supreme Court's pre-Lawrence decision in Sell as a touchstone for its due process inquiry. Id. At 29-30. Although we find Sell instructive in the sense that it illustrates the Supreme Court's application of an intermediate level of scrutiny, we do not find Sell especially helpful in analyzing this statute regulating military affairs.

[11]The Fifth Amendment does not contain an equal protection clause but the due process clause has been interpreted to include an equal protection component. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

- 38 -

Act's differential treatment of homosexual military members versus heterosexual military members. See generally Erwin Chemerinsky, Constitutional Law: Principles and Policies § 10.1.1 (2d Ed. 2002) (explaining the difference between a due process and an equal protection challenge). The district court rejected this claim under rational basis review.

Under equal protection jurisprudence, a governmental classification aimed at a "suspect class" is subject to heightened judicial scrutiny. See Mills v. State of Me., 118 F.3d 37, 46 (1st Cir. 1997). Classifications that target non-suspect classes are subject only to rational basis review. Id. The plaintiffs contend that the district court erred by applying rational basis review because the Supreme Court's decisions in Romer v. Evans, 517 U.S. 620 (1996), and Lawrence mandate a more demanding standard.

In Romer, the Supreme Court invalidated, on equal protection grounds, a Colorado constitutional amendment which prohibited the enactment of any measure designed to protect individuals due to their sexual orientation. The Court analyzed the constitutionality of the amendment through the prism of rational basis, asking whether the classification bore "a rational relation to some legitimate end." Id. at 631. Applying this standard, the Court concluded that the amendment was unconstitutional because the only possible justification for the amendment was "animosity toward the class of persons affected,"

which does not constitute even "a legitimate governmental interest." Id. at 634-35.

Romer, by its own terms, applied rational basis review. The ground for decision was the notion that where "a law is challenged as a denial of equal protection, and all that the government can come up with in defense of the law is that the people who are hurt by it happen to be irrationally hated or irrationally feared, . . . it is difficult to argue that the law is rational if 'rational' in this setting is to mean anything more than democratic preference." Milner v. Apfel, 148 F.3d 812, 817 (7th Cir. 1998) (Posner, J.). Romer nowhere suggested that the Court recognized a new suspect class. Absent additional guidance from the Supreme Court, we join our sister circuits in declining to read Romer as recognizing homosexuals as a suspect class for equal protection purposes. Scarborough v. Morgan County Bd. of Ed., 470 F.3d 250, 261 (6th Cir. 2006); Citizens for Equal Prot. v. Bruning, 455 F.3d 859, 866 (8th Cir. 2006); Johnson v. Johnson, 385 F.3d 503, 532 (5th Cir. 2004); Lofton, 358 F.3d at 818; Veney v. Wyche, 293 F.3d 726, 731-32 (4th Cir. 2002); Holmes, 124 F.3d at 1132.

Lawrence does not alter this conclusion. As discussed earlier, Lawrence was a substantive due process decision that recognized a right in all adults, regardless of sexual orientation, to engage in certain intimate conduct. Indeed, the Lawrence Court explicitly declined to base its ruling on equal protection

- 40 -

principles, even though that issue was presented. See Lawrence, 539 U.S. at 574-75. Thus, there is no basis for arguing that Lawrence changed the standard of review applicable to a legislative classification based on sexual orientation.

As neither Romer nor Lawrence mandate heightened scrutiny of the Act because of its classification of homosexuals, the district court was correct to analyze the plaintiffs' equal protection claim under the rational basis standard. As stated earlier, an enactment survives this level of scrutiny so long as the "classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).

The plaintiffs maintain that, even under this standard, their claim survives because they will be able to demonstrate that the Act was based on irrational animus and therefore is invalid under Romer. We disagree. Congress has put forward a non-animus based explanation for its decision to pass the Act. Given the substantial deference owed Congress' assessment of the need for the legislation, the Act survives rational basis review.[12] Able, 155 F.3d at 635-37; Holmes, 124 F.3d at 1132-40; Richenberg, 97 F.3d at 262; Thomasson, 80 F.3d at 292.

In sum, the district court was correct to reject the

---

[12]The plaintiffs acknowledge that a conclusion that the Act survives rational basis review defeats their facial and as-applied equal protection challenges.

- 41 -

plaintiffs' equal protection claim because homosexuals are not a suspect class and the legitimate interests Congress put forward are rationally served by the Act.

## C.  First Amendment

The plaintiffs' final challenge attacks the portion of the Act that subjects a member to possible separation for making a statement identifying himself or herself as a homosexual.  The plaintiffs assert that they have adequately stated a claim that this aspect of the Act violates the First Amendment because it subjects a member to separation for stating his or her sexual identity.[13]  The plaintiffs maintain that this aspect of the Act is invalid because it restricts the content of the plaintiffs' speech and forces them to pretend that they are heterosexual.

There is no question that members of the military are

---

[13]For the first time on appeal, the plaintiffs contend that a wide variety of expressive activities could trigger discharge proceedings.  They argue, "A service member might wave a rainbow flag or wear a pink triangle, or he might state that he opposes 'Don't Ask, Don't Tell.'  Under § 654 . . . these possibilities and more could force the service member -- whether straight or gay -- into discharge proceedings where he must prove that he has no propensity to engage in homosexual conduct."  None of the plaintiffs contend that they were separated from service because they participated in expressive activities. Moreover, the explicit terms of the Act do not indicate that such activities could trigger separation proceedings and the government has stipulated they do not. DOD Directive 1332.414 § E3.A4; DOD Instruction 1332.40 § E8. In any event, we decline to reach this newly raised overbreadth argument on appeal. See Brown v. Hot, Sexy & Safer Products, Inc., 68 F.3d 525, 530 (1st Cir. 1995) (stating that an appeal from a motion to dismiss "is not an opportunity to conjure new arguments not raised before the district court.").

engaging in speech when they state their sexual orientation. See Hurley v. Irish-American Gay & Lesbian & Bisexual Group of Boston, Inc., 515 U.S. 557, 574-75 (1995). There is also no question that First Amendment protections apply to some degree in the military context. See Goldman, 475 U.S. at 503. But "our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." Id. This limitation is rooted in the recognition that free expression can sometimes conflict with the military's compelling need to "foster instinctive obedience, unity, commitment, and espirit de corps" and that "the essence of military service is the subordination of the desires and interests of the individual to the needs of service." Id.

The Act does affect the right of military members to express their sexual orientation by establishing the possibility of adverse consequences from announcing their sexual orientation. But the Act's purpose is not to restrict this kind of speech. Its purpose is to identify those who have engaged or are likely to engage in a homosexual act as defined by the statute. The law is thus aimed at eliminating certain conduct or the possibility of certain conduct from occurring in the military environment, not at restricting speech. See, e.g., Phillips v. Perry, 106 F.3d 1420, 1430 (9th Cir. 1997); Thomasson, 80 F.3d at 931. The Act relies on a member's speech only because a member's statement that he or she

is homosexual will often correlate with a member who has a propensity to engage in a homosexual act.

The Supreme Court has held that the First Amendment "does not prohibit the evidentiary use of speech to establish" a claim "or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993); see also Wayte v. United States, 470 U.S. 598, 612 (1985). As the Fourth Circuit explained in rejecting a challenge identical to the one presented here:

> There is no constitutional impediment, . . . to the use of speech as relevant evidence of facts that may furnish a permissible basis for separation from military service. No First Amendment concern would arise, for instance, from the discharge of service members for declaring that they would refuse to follow orders, or that they were addicted to controlled substances. Such remarks provide evidence of activity that the military may validly proscribe.

Thomasson, 80 F.3d at 931.

We think that the Fourth Circuit has correctly analyzed this claim. To the extent that the Act may be constitutionally applied to circumscribe sexual conduct, the First Amendment does not bar the military from using a member's declaration of homosexuality as evidence of a violation of the Act. We therefore join the other courts that have rejected First Amendment challenges to the Act on this basis. See Holmes, 124 F.3d at 1136; Able, 88 F.3d at 1300; Thomasson, 80 F.3d at 931.

The plaintiffs argue that, after Lawrence, this analysis

- 44 -

is "outmoded." We disagree. The Act does not punish a member for making a statement regarding sexual orientation; separation from service is mandated only because a member has engaged, intends to engage or has a propensity to engage in a homosexual act. This is still a question concerning conduct (or likely conduct); the member's speech continues to have only evidentiary significance in making this conduct-focused determination.

Citing Dawson v. Delaware, 503 U.S. 159 (1992), the plaintiffs also argue that the First Amendment nevertheless limits the kinds of statements that may be used by the government as evidence in an adversary proceeding. In Dawson, the Supreme Court held that the defendant's membership in a white supremacist group could not be introduced against him in a capital sentencing hearing because it violated the defendant's First Amendment right to associate. Id. at 166-68. In reaching this conclusion, the Court emphasized that the admission violated the First Amendment because it had "no bearing on the issue being tried." Id. No similar claim can be made here. A statement by a member that he or she is homosexual is undoubtedly relevant to the kind of conduct a member intends to engage in or has a propensity to engage in. See United States v. Simkanin, 420 F.3d 397, 417-18 (5th Cir. 2005) (concluding that Dawson did not apply where the defendant's statement was relevant to the issues at sentencing). Therefore, Dawson is inapposite.

Finally, plaintiffs argue that the Act's rebuttable presumption violates their First Amendment rights. The Act's rebuttable presumption works as follows. A military member may be separated from the armed forces if,

> the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

10 U.S.C. § 654(b)(2) (emphasis added).

The plaintiffs' attack on the rebuttable presumption is twofold. First, they claim that for homosexual military members, the rebuttable presumption is functionally impossible to rebut. Because they are homosexual within the meaning of section 654(f)(1), they cannot prove that they are not homosexual as section 654(b)(2) effectively requires. Second, the plaintiffs argue that even if section 654(b)(2) did offer a presumption capable of being rebutted by homosexual members, the existence of such a presumption "would still force [them] and other gay and lesbian service members to live in an environment that severely restricts and chills constitutionally protected speech." We deal with each contention in turn.

Each plaintiff has agreed that he or she is a person who "engages in, attempts to engage in, has a propensity to engage in,

- 46 -

or intends to engage in homosexual acts." 10 U.S.C. § 654 (f)(1). Because they admit they fall within section 654(f)(1)'s definition of homosexual, none of them could have proved at a separation proceeding that she or he was not a person who "engages in, attempts to engage in, has a propensity to engage in, or intends to engage in" prohibited conduct because, by definition, they are such a person. See id. In that sense, for a military member who is homosexual as defined by 654(f)(1), the rebuttable presumption would be functionally impossible to rebut.

But that does not mean the Act violates the plaintiffs' First Amendment rights. As noted earlier, the government may use a member's statement that he or she is a homosexual as evidence that he or she "engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." If a person cannot show otherwise, because in fact he or she does engage in or have such a propensity to engage in homosexual conduct, then the military is entitled to separate that person from the service. The military, in that scenario, is not punishing speech but conduct or propensity to engage in conduct.

Moreover, the contention that it is functionally impossible for a gay member to say "I am homosexual" and then rebut the presumption according to the terms of section 654(b)(2) is inaccurate on its face. A member's personal definition of "homosexuality" may not be coextensive with the Act's. For

example, a person may say he or she is homosexual even though the person does not engage in, attempt to engage in, have a propensity to engage in, or intend to engage in homosexual acts. In that scenario, there is a meaningful opportunity to rebut the presumption. The Ninth Circuit's opinion in Holmes provides examples.

> One female Naval officer admitted to her homosexuality but submitted a statement, in which she stated, *inter alia*, that she understands the rules against homosexual conduct and intended to obey those rules. Another female Naval officer stated that she was a lesbian but that the statement 'in no way, was meant to imply [] any propensity or intent or desire to engage in prohibited conduct.'

124 F.3d at 1136.

Of course, a situation may arise where a gay member triggers the rebuttable presumption by stating he is gay, proves he is not a person who "engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts," and yet is still separated from service. This member would have an administrative challenge available to him. See 5 U.S.C. § 701. No facts have been plead suggesting such a scenario arose in this case.

We now turn to the plaintiffs' alternative argument that the rebuttable presumption, even if capable of being rebutted by homosexual military members, chills their First Amendment rights.

The plaintiffs suggest that the presumption is content based and thus unconstitutional.    The Fourth Circuit rejected a similar argument in Thomasson.  It observed:

> Whenever a provision prohibits certain acts, it necessarily chills speech that constitutes evidence of the acts.  A regulation directed at acts thus inevitably restricts a certain type of speech; this policy is no exception. But effects of this variety do not establish a content-based restriction of speech.

Thomasson, 80 F.3d at 932.

As we explained, the Act's purpose is not to restrict military members from expressing their sexual orientation.  Its purpose is to identify those who have engaged in or are likely to engage in a homosexual act.  The fact that the Act may, in operation, have the effect of chilling speech does not change the analysis.  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (noting that regulation is . . . content-neutral so long as it is "'justified without reference to the content of the regulated speech'" even if it has an "effect on some speakers or messages but not others.") (citation omitted); City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986).  Ultimately, the Act is justified on a content-neutral, nonspeech basis; specifically, maintaining the military's effectiveness as a fighting force. "That the policy may hinge the commencement of administrative proceedings on a particular type of statement does not convert it into a content based enactment."  Thomasson, 80 F.3d at 933.

- 49 -

## VI. Conclusion

The constitutional challenges presented in this case are all aimed at a federal statute regulating military affairs. Although the wisdom behind the statute at issue here may be questioned by some, in light of the special deference we grant Congressional decision-making in this area we conclude that the challenges must be dismissed.

We **affirm** the judgment of the district court. No costs are awarded.

**So ordered.**

- **Dissenting Opinion Follows -**

**SARIS, United States District Judge, concurring and dissenting.** I concur with the majority opinion regarding the application of Lawrence to the "Don't Ask, Don't Tell" statute, 10 U.S.C. § 654 (the "Act"). I also concur with the majority's discussion of the plaintiffs' equal protection challenge. However, I respectfully dissent from the discussion of the plaintiffs' claim that 10 U.S.C. § 654(b)(2)[14] violates the First Amendment.

The military calls the evidentiary presumption created by 10 U.S.C. § 654(b)(2) a "rebuttable" presumption. See Department of Defense ("DoD") Directive No. 1332.14 ¶ E3.A1.1.8.1.2.2 (amended 1994) ("A statement by a Service member that he or she is a homosexual or bisexual, or words to that effect, creates a rebuttable presumption that the Service member engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.") (emphasis added). Because the plaintiffs dispute that the presumption is rebuttable, I adopt the phrasing

---

[14] 10 U.S.C. § 654(b)(2) provides, in relevant part, that:

> (b) A member of the armed forces shall be separated from the armed forces . . . if one or more of the following findings is made and approved . . .:
>
> (2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

- 51 -

used by the Second Circuit, and call the presumption the "statement

presumption." See Able v. United States, 88 F.3d 1280, 1283 (2d

Cir. 1996).

## 1.    The Claims

Plaintiffs argue that the statement presumption violates

the First Amendment in two ways. First, they contend that the

presumption is a dead letter in practice because, as applied, "it

is functionally impossible for a gay service member to say 'I am

gay' and then prove that he has no 'propensity' to engage in

homosexual activity, even if the service member could show a track

record of celibacy and an honest intent to refrain from prohibited

conduct." In the plaintiffs' view, the only way to avoid discharge

is to recant their sexual orientation. As such, the statement

presumption is allegedly used to punish plaintiffs' speech

concerning their own status as homosexuals.

Second, the plaintiffs argue that the statement

presumption is an unconstitutional allocation of the burden of

proof, which chills their own speech as well as a whole range of

protected expression by both gay and straight service members. The

plaintiffs argue that:

> The provision's burden falls on any speaker
> whose "[l]anguage or behavior" suggests to "a
> reasonable person" that the person "intended
> to convey" that he or she is gay. This broad
> definition could chill a whole range of
> protected expression: A service member might
> wave a rainbow flag or wear a pink triangle,
> or he might state that he opposes "Don't Ask,

> Don't Tell."   Under § 654's burden-shifting
> mechanism, these possibilities and more could
> force the service member -- whether straight
> or gay -- into discharge proceedings where he
> must prove that he has no propensity to engage
> in homosexual conduct.

(internal citations omitted).

## 2.   Content Neutrality

The starting point for the analysis is the difficult question of whether the statement presumption restricts speech based on its content or viewpoint. I ultimately agree with the majority's position that the statement presumption is content-neutral, but I believe that the issue is a much closer call.

"The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992) (citations omitted). A content-based restriction "can stand only if it satisfies strict scrutiny," and thus is only constitutional if it is "narrowly tailored to promote a compelling Government interest." United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000).

However, "[a] restriction that on its face appears to be content-based, yet serves another purpose that by itself is not speech restrictive, may be constitutionally permitted." Able, 88 F.3d at 1294. Where a restriction does not "fit neatly into either the 'content-based' or 'content-neutral' category," the Supreme

- 53 -

Court has held that the speech restriction is content-neutral so long as it is "justified without reference to the content of the regulated speech." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48 (1986) (finding zoning ordinance that limits placement of adult theaters content-neutral because it was "aimed not at the content of the films shown . . . but rather at the secondary effects of such theaters on the surrounding community") (emphasis in original).

Even a content-neutral statute, though, must pass First Amendment muster. A content-neutral regulation is permissible:

> [1] if it is within the constitutional power of the Government;
> [2] if it furthers an important or substantial governmental interest;
> [3] if the governmental interest is unrelated to the suppression of free expression; and
> [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

Wayte v. United States, 470 U.S. 598, 611 (1985) (quoting United States v. O'Brien, 391 U.S. 367, 377 (1968)).

The four circuits that addressed the constitutionality of the Act soon after its passage (and before Lawrence)[15] rejected First Amendment challenges to the statement presumption, but they did not fully agree on the appropriate categorization of the First Amendment restriction.  In Thomasson v. Perry, 80 F.3d 915 (4th

_____

[15] A recent post-Lawrence challenge to the statute did not include a First Amendment claim.  See Witt v. Dep't of the Air Force, No. 06-35644, 2008 WL 2120501 (9th Cir. May 21, 2008).

Cir. 1996) (en banc), involving a First Amendment challenge to the
Act both on its face and as-applied, the Fourth Circuit rejected an
argument that the statement presumption suppressed speech on the
basis of its content and viewpoint, holding:

> The statute does not target speech declaring
> homosexuality; rather it targets homosexual
> acts and the propensity or intent to engage in
> homosexual acts, and permissibly uses the
> speech as evidence.  The use of speech as
> evidence in this manner does not raise a
> constitutional issue -- "the First Amendment .
> . . does not prohibit the evidentiary use of
> speech to establish the elements of a crime,"
> or, as is the case here, "to prove motive or
> intent."

Id. at 931 (quoting Wisconsin v. Mitchell, 508 U.S. 476, 489
(1993)).   The Fourth Circuit pointed out that service members
subject to proceedings under the statement presumption have, in the
past, "successfully demonstrated that they lack a propensity or
intent to engage in homosexual acts."   Id. at 932.   The Fourth
Circuit relied on opinions from two district courts to demonstrate
that some service members had successfully rebutted the presumption
of propensity.  See Richenberg v. Perry, 909 F. Supp. 1303, 1313
(D. Neb. 1995) (noting that seven service members have successfully
rebutted  the  presumption  but  not  describing  the  evidence
presented), aff'd, 97 F.3d 256 (8th Cir. 1996); Able v. United
States, 880 F. Supp. 968, 976 (E.D.N.Y. 1995) (identifying three
instances where Navy members had been able to escape discharge, but
concluding that these instances were "obviously aberrations that

cannot be taken to show that the Act holds out any realistic
opportunity to rebut the presumption"), vacated, 88 F.3d 1280, 1298
(2d Cir. 1996) (rejecting the district court's characterization of
these cases as "aberrations" and stating instead that "they
demonstrate that the admission of homosexual status does not
inevitably equate with a finding of propensity to engage in
homosexual acts").

Two circuits similarly held that the Act and its
implementing DoD Directives do not target mere status or speech,
but seek to identify and exclude those who are likely to engage in
homosexual acts. See Richenberg v. Perry, 97 F.3d 256, 263 (8th
Cir. 1996) (agreeing with Thomasson); Holmes v. Cal. Army Nat'l
Guard, 124 F.3d 1126, 1136 (9th Cir. 1997) (holding brevis that the
statement presumption does not violate the First Amendment because
the service members were discharged for their conduct and not for
their speech).

In a thoughtful opinion, the Second Circuit in Able v.
United States, 88 F.3d 1280 (2d Cir. 1996), addressed a facial
challenge to the statement presumption claiming that it violated
the First Amendment. Assuming, without deciding, that separation
of a service member based on status alone would be
unconstitutional, id. at 1297 n.10, the Second Circuit discussed
whether the statement presumption was content-neutral or content-
based. Id. at 1294-96. The court never opted for one label or the

other, holding instead that the statement presumption passed constitutional muster under both standards. Id. at 1295-96. The court emphasized that, under United States v. Salerno, 481 U.S. 739, 745 (1987), the plaintiffs failed to show that "no matter how the Act [was] read, it punish[ed] status not conduct." Able, 88 F.3d at 1297. It reasoned:

> Contrary to the district court, we do not believe that, in the context of a facial challenge, we may conclude that the Act equates status with propensity. To be sure, in most cases a member who admits to a homosexual orientation will eventually be separated from the armed forces. But that is because the evidentiary value of the admission is strongly linked to what it is used to prove: a likelihood of engaging in homosexual acts. The plaintiffs cannot prove and the district court cannot credibly maintain that there are no instances in which a person will be retained, despite admitting to a homosexual status, because there is no likelihood that he will engage in such acts. The Directives promulgated by the DoD in accordance with the Act specifically contemplate that such an event may occur. See DoD Directive No. 1332.14, encl. 3, pt. 1, at H.1.b(2).

Id. at 1298.

As the Supreme Court has held, when it is not clear whether a restriction is content-based or content-neutral, the controlling consideration is the governmental purpose in enacting the legislation. Renton, 475 U.S. at 48; see also Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Here, the government insists that the purpose of the Act is to target conduct, not status, and points to DoD Directives that limit the Act to only

those who engage in or are likely to engage in homosexual conduct. See DoD Directive No. 1332.14 ¶ E2.1.10 (defining "propensity to engage in homosexual acts" to mean "more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts") (emphasis added); see also id. at ¶ E3.A1.1.8.1.2.2 (same). In response, the plaintiffs point to the plain terms of the statute, and also to a regulation that states that the statement presumption encompasses "[l]anguage or behavior that a reasonable person would believe was intended to convey the statement that a person engages in, attempts to engage in, or has a propensity to engage in homosexual acts." Id. at ¶ E2.1.16. According to plaintiffs, given the vagueness of the term "propensity," the statement presumption can be interpreted to reach expressions of mere homosexual status.

While the question is close, I conclude that the statement presumption is better viewed as content-neutral because its primary purpose, as set forth by the government, is to target conduct, not speech. But see Thomasson, 80 F.3d at 934 (Luttig, J., concurring) (agreeing with plaintiff that the purpose of Congress in passing the Act was to mandate exclusion of all known homosexuals based on their orientation or status "regardless of whether they have actually engaged in homosexual conduct or are likely to engage in any such conduct").

Thus, under the standard that applies to content-neutral restrictions on speech, the critical remaining inquiries are "(1) whether the statement[] presumption furthers a substantial governmental interest, and (2) whether the statement[] presumption restricts the plaintiffs' speech no more than is essential." Able, 88 F.3d at 1295 (emphasis added). For the reasons stated by the majority opinion with respect to the plaintiffs' other constitutional claims, the answer to the first of these inquiries is "yes." Accordingly, I now turn to the question of whether the statement presumption, as applied, is overly restrictive of the plaintiffs' speech.

### 3.    Dead Letter

Undaunted by pre-Lawrence case law, the plaintiffs, who all admit they are homosexual within the meaning of Section 654(f)(1),[16] argue that the statement presumption burdens speech more than is essential because, as applied, it is "functionally impossible" to rebut the presumption short of recanting one's

---

[16] As the majority correctly points out, "[e]ach plaintiff has agreed that he or she is a person who 'engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts,'" as defined under the Act. Yet this concession by the plaintiffs does not end the matter because the plaintiffs also argue that the Act's definition of propensity improperly includes homosexual status. Thus, I do not understand the plaintiffs to be conceding that they could not have rebutted the statement presumption under § 654(b)(2) if, as the government maintains in defending the Act, "propensity" was limited to a likelihood of engaging in prohibited homosexual acts while a service member.

status. As such, plaintiffs allege that the statement presumption punishes service members who speak about their constitutionally protected homosexual status by requiring their discharge.

The government disagrees with plaintiffs' dead letter theory that the statement presumption is impossible to rebut in practice. The government points out that, although the Act broadly defines homosexual conduct to include a "propensity to engage in" homosexual conduct, 10 U.S.C. § 654(f)(1), the implementing DoD Directives narrowly interpret "propensity to engage in" homosexual conduct to mean "more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts." DoD Directive No. 1332.14 ¶ E2.1.10 (defining "propensity") (emphasis added); see also id. at ¶ E3.A1.1.8.1.2.2 (same). Accordingly, in the government's view, because a service member's personal definition of "homosexuality" may not coincide with the Act's definition, a service member may be able to successfully rebut the statement presumption if he can show that his statement "I am gay" is not indicative of a likelihood that the he will engage in proscribed homosexual conduct.

As several courts have pointed out, the line between "propensity" and "orientation" is razor-thin at best. See, e.g., Able, 880 F. Supp. at 975 (characterizing the distinction between "orientation" and "propensity" as "Orwellian"); Thomasson, 80 F.3d

at 941-42 n.8 (Luttig, J., concurring) ("I do not know what homosexual orientation is, if it is not the propensity to commit homosexual acts; indeed, I do not understand how one even knows that he has a homosexual orientation except by realizing that he has a propensity toward the commission of homosexual acts."). Emphasizing that "propensity" sweeps in everyone who is gay, plaintiffs allege that, in practice, gay and lesbian service members are routinely discharged despite evidence that there is no likelihood that they will engage in proscribed homosexual conduct while they are in military service.   Accordingly, plaintiffs contend that any honest admission of a gay or lesbian service member's sexual orientation results in discharge.

In my view, if the Act were applied to punish statements about one's status as a homosexual, it would constitute a content-based speech restriction subject to strict scrutiny. See Meinhold v. U.S. Dep't of Def., 34 F.3d 1469, 1476-80 (9th Cir. 1994) (in an equal protection challenge to the military's pre-"Don't Ask, Don't Tell" homosexuality policy, construing the policy as only applying to conduct in order to avoid constitutional concerns that would arise if the policy punished service members for "mere propensity" or status alone) (quoting Powell v. Texas, 392 U.S. 514, 543-44 (1968) (Black, J., concurring)).   Indeed, as Lawrence articulates, "Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."

Lawrence v. Texas, 539 U.S. 558, 562 (2003); see also Whitney v. California, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring) (stating that the founders "believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth").

It is telling that the government does not contend it has a substantial interest, let alone a compelling one, in separating a service member because of his or her status as a homosexual. Rather, the government protests that it is not punishing homosexual status, and insists that it has an interest only in identifying and proscribing homosexual conduct to further its substantial interest in morale, good order and discipline, and unit cohesion.

As proof that the statement presumption is in fact rebuttable, the government highlights opinions, in particular Able and Holmes, that have found that the statement presumption has been successfully rebutted in the past. See Able, 88 F.3d at 1298 ("[A]s the government represented at oral argument without contradiction, in seven cases (out of forty-three attempts), service members have been able to rebut the presumption created by their admission and have been retained."); Holmes, 124 F.3d at 1136 (pointing to several cases, including one where a "female Naval officer admitted to her homosexuality but submitted a statement, in which she stated, inter alia, that she understands the rules against homosexual conduct and intended to obey those rules.").

However, in Able, the fact that some service members were
successful was held to be sufficient to defeat a facial assault on
the statute under the Salerno standard. See Able, 88 F.3d at 1297-
98 ("Because plaintiffs have mounted a facial challenge to the Act,
they must show that, no matter how the Act is read, it punishes
status and not conduct.") (citing Salerno, 481 U.S. at 745). Here,
in contrast to Able, plaintiffs mount an as-applied challenge by
alleging the presumption is now functionally impossible to rebut
short of recanting. Although the government points to cases of the
statement presumption being successfully rebutted, the cherry-
picked examples are all well over twelve years old: In fact, some
11,000 service members have been discharged under the Act since
1993. On a motion to dismiss, a court "must accept as true all the
factual allegations in the complaint," Leatherman v. Tarrant
County Narcotics Intelligence & Coordination Unit, 507 U.S. 163,
164 (1993); accord Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955,
1965 (a court must assume "that all the allegations in the
complaint are true (even if doubtful in fact)"), and a court must
make all reasonable inferences in the plaintiffs' favor. Clark v.
Boscher, 514 F.3d 107, 112 (1st Cir. 2008).

Finally, the government argues that even if the statement
presumption is a dead letter in practice, any misapplication of the
presumption can be cured by the availability of administrative
review. It may be true that an individual service member may

- 63 -

prevail in rebutting the presumption on administrative review short of recanting his status, by stating, for example, that he will refrain from engaging in prohibited homosexual conduct. However, the availability of an administrative remedy does not defeat a First Amendment claim that the government is systematically applying the Act in such a way that it unconstitutionally burdens protected speech. See Califano v. Sanders, 430 U.S. 99, 109 (1977) ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures."); see also Able, 88 F.3d at 1289 ("[B]ecause none of the administrative boards before which the plaintiffs would appear has the power to declare the Act unconstitutional, there is no realistic possibility that such proceedings would result in anything other than the plaintiffs' discharge.").

Accordingly, when all reasonable inferences are drawn in their favor, the plaintiffs have alleged a viable cause of action that the burden placed by the government on gay and lesbian service members' speech is "greater than is essential" to the government's interest in preventing the occurrence of homosexual acts in the military.

## 4.   Chill

Plaintiffs also argue that the statement presumption is an unconstitutional allocation of the burden of proof, which chills

a whole range of protected expression.[17]  The majority treats the
plaintiffs' chill claim as an "overbreadth" claim, although only
Appellant Pietrangelo describes the claim in those terms.   This
designation by the majority is understandable because plaintiffs
are unclear as to whether this is a facial challenge, an as-applied
challenge, or both.

Because the plaintiffs have not expressly raised a facial
challenge to the statement presumption, I will treat the claim as
an as-applied challenge.  The majority is correct to state that
"[n]one of the plaintiffs contend that they were separated from
service because they participated in expressive activities."  Op.
at 41-42 n.13.  However, the core of the plaintiffs' as-applied
challenge is that they were chilled from engaging in protected
speech, not that they were punished for engaging in such speech.

As a preliminary matter, the government has argued that
this allocation-of-proof challenge to the statement presumption was

[17] A group of constitutional law professors submitted an amicus
brief in support of this argument.  The professors on the brief are
Akhil Reed Amar, Southmayd Professor of Law at Yale Law School; C.
Edwin Baker, Nicholas F. Gallicchio Professor of Law at the
University of Pennsylvania Law School; Erwin Chemerinsky, Alston &
Bird Professor of Law and Professor of Political Science at Duke
Law School; Owen M. Fiss, Sterling Professor of Law at Yale Law
School; Pamela S. Karlan, Kenneth and Harle Montgomery Professor of
Public Interest Law at Stanford Law School; Andrew Koppelman, John
Paul Stevens Professor of Law at Northwestern Law School; Kathleen
M. Sullivan, Stanley Morrison Professor of Law and Former Dean of
Stanford Law School; Laurence H. Tribe, Carl M. Loeb University
Professor at Harvard Law School; and Tobias Barrington Wolff,
Professor of Law at the University of Pennsylvania Law School.

not raised before the district court, and is therefore waived. While the plaintiffs raised a chilling argument before the district court, they did not raise this precise argument. However, in a First Amendment case, "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." See Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 379 (1995) (internal quotation marks omitted). Accordingly, in my view, in this case involving a First Amendment challenge, plaintiffs' argument that the statement presumption violates the First Amendment because it requires service members to rebut the presumption should not be deemed waived.

The government contends that the DoD Directives and Issuances specifically carve out protected speech, quoting Directives and Issuances that show that the presumption is not triggered by rumors, suspicions, or capricious claims of others, see DoD Directive No. 1332.14 ¶ E3.A4.1.3.3, or by going to a gay or lesbian bar, possessing or reading homosexual publications, associating with gays and lesbians, or marching in a gay rights parade in civilian clothes. See id. ¶ E3.A4.1.3.3.4; see also S. Rep. No. 103-112, at 292 (1993) ("What the policy recognizes is that heterosexuals, as well as homosexuals, might march in gay rights parades, frequent a gay bar, [and] read gay literature.").

Citing Parker v. Levy, 417 U.S. 733 (1974), the

government argues that the military's need for obedience and necessity "may render permissible within the military that which would be constitutionally impermissible outside it." 417 U.S. at 758 (affording deference to regulations applied to an Army doctor who protested Vietnam War and refused to obey orders on base). As the Supreme Court has held, its "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." Goldman v. Weinberger, 475 U.S. 503, 507 (1986). Moreover, Congress is given the "highest deference" when legislating in the realm of military affairs. Loving v. United States, 517 U.S. 748, 768 (1996); see also Solorio v. United States, 483 U.S. 435, 447 (1987) (noting that Congress has "primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military").

        While judicial deference is "at its apogee" when legislative action regarding military affairs is challenged, "deference does not mean abdication." Rostker v. Goldberg, 453 U.S. 57, 70 (1981) ("None of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs."). The Supreme Court has struck down restrictions on speech imposed by Congress on First Amendment grounds, even when military matters were involved. See Schacht v. United States, 398 U.S. 58, 60, 62-63 (1970) (striking down a statutory restriction

that allowed the wearing of military uniforms by actors in civilian theatrical productions only when such productions would not "tend to discredit" the military).

The Supreme Court has afforded its strongest deference to the military for speech in military settings. See, e.g., Goldman, 475 U.S. at 507-10 (affording deference to regulation that prevented soldiers from wearing yarmulkes while on duty and in uniform); Brown v. Glines, 444 U.S. 348, 354-55 (1980) (affording deference to regulation that prevented soldiers from circulating petitions on air force bases). Even then, the deference is not absolute. In Brown v. Glines, for example, the Court held that the limitations on on-base petitions "restrict speech no more than is reasonably necessary" because it allowed for alternative channels of protest, such as through the United States mail, and the regulations "specifically prevent commanders from halting the distribution of materials that merely criticize the Government or its policies." 444 U.S. at 355.

The most troubling aspect of the Act's statement presumption is that it covers purely private speech, and public speech made off base and off duty. By its own terms, the Act is "pervasive" in scope, applies "24 hours [a] day," and applies even to speech made "off base" and/or "off duty." See 10 U.S.C. §§ 654(a)(9)-(11). Thus, as alleged in the complaint, the Act required the discharge of some of the plaintiffs based upon

strictly private speech, such as confiding in a friend or words within a letter from a friend or family member. In addition, the amicus brief submitted by the constitutional law professors cites the example of an Arizona state representative who spoke about his homosexuality on the floor of the legislature. After the military discovered the speech through an anonymous complaint and initiated discharge proceedings against the representative, he negotiated a voluntary separation from the Army. See generally Tobias Barrington Wolff, Political Representation and Accountability Under Don't Ask, Don't Tell, 89 Iowa L. Rev. 1633, 1644-50 (2004) (providing examples of the Act's statement presumption being applied to conversations with family members, sessions with chaplains and psychotherapists, and certain public statements).

Plaintiffs argue that the statement presumption, as applied, chills speech because a service member will fear triggering a discharge proceeding, regardless of whether he or she could successfully rebut the presumption. As the Supreme Court explained when striking down a statement presumption in another context, "[t]he man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens." Speiser v. Randall, 357 U.S. 513, 526 (1958) (in a due process challenge, invalidating a statute that conditioned a veteran's tax exemption on the signing of an oath disavowing the

violent overthrow of the government and that established a rebuttable presumption against eligibility for the exemption if one failed to sign the oath); see also Smith v. California, 361 U.S. 147, 150-51 (1939) (explaining that "the allocation of the burden of proof," like many other legal devices that ordinarily pass constitutional muster, "cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to use it."). As alleged, the Act's statement presumption chills individual service members from discussing homosexuality both privately and publicly even when they have no intent to engage in prohibited homosexual conduct.

In conclusion, the plaintiffs' burden is a tough one in light of the strong deference owed to Congress and the military seeking to protect unit cohesion. Yet, when all reasonable inferences are drawn in their favor, plaintiffs have made sufficient allegations that the burden that the statement presumption places on speech is greater than is essential, particularly in nonmilitary settings off base and off duty. Thus, I believe that the motion to dismiss should be denied. Because the majority holds otherwise, I respectfully dissent in this very difficult case.